UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | | |
|---|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY., LTD., ET AL., | ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | Consol. Court No. 20-3885 |
| DALIAN PENGHONG FLOOR PRODUCTS CO., LTD., ET AL., | ) ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) ) | |
| UNITED STATES, | ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| AMERICAN MANUFAACTURERS OF MULTILAYRED WOOD FLOORING, | ) ) ) | |
| Defendant-Intervenor. | ) | |

**PLAINTIFF-INTERVENORS' RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff-Intervenors*

Dated: May 14, 2021

1

# TABLE OF CONTENTS

I.      **RULE 56.2 STATEMENT** ...................................................................... 1

     A.    Administrative Determination Subject to Appeal ......................... 1

     B.    Issues Presented ............................................................................. 1

II.     **STANDARDS OF REVIEW** .................................................................. 2

III.    **ARGUMENT** ......................................................................................

     A.    **The Department Erred in Finding Respondents Used and Benefitted From the EBCP because The Record Only Contains Evidence of Non-Use, Which Can Be Verified** .................................................................... 3

          1.   **Record Evidence Establishes That Respondents Did Not Use or Benefit from the EBC Program** ............................................... 3

          2.   **The Department Can Verify Baroque Timber and Jiangsu Guyu's Customers' Non-Use Declarations** ......................................... 12

     B.    **The Department's Selection of Jiangsu Guyu as a Mandatory Respondent is Not Supported by Substantial Evidence** ................................... 13

     C.    **The Department's AFA Finding that Jiangsu Guyu's Suppliers of Poplar Cores are Authorities Within the Meaning of the Statute is Not Supported by Substantial Evidence** ............................................... 14

     D.    **The Department's Inclusion of Jiangsu Guyu's Poplar Cores in the LTAR Program for Plywood is Not Supported by Substantial Evidence** ............. 15

     E.    **The Department's inclusion of HTS 4412.99 as a Benchmark for Plywood at LTAR is Not Supported by Substantial Evidence** ................................... 16

IV.    Conclusion and Prayer for Relief ................................................................ 18

# TABLE OF AUTHORITIES

## CASES

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)............................................2

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019)..............................7

*Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ........................................................................................................................................7

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .............................................................................................................. 7, 9-10

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137 (Nov. 8, 2019).....................................................................................7, 9

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 144; SLIP OP. 2019-143 (Nov. 18, 2019)..........................................................................................7

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)............................................

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938) ........................................2

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983)........................................2

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ......................7

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ...............................3

*Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018).........................6

*Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346 (Ct. Int'l Trade  2019).......................6

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019).........................7

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019)..................... 7-9

*Guizhou Tyre Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 86; Slip Op. 2020-81 (June 5, 2020) ...............................................................................................................................7

*Husteel Co. v. United States*, 98 F. Supp. 3d 1315 (Ct. Int'l Trade2015)....................................14

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019)........................................................................................................................7, 10

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 (Mar. 24, 2020).........................................................................................7, 10

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) ........................3

*Nippon Steel Corp. & United States*, 337 F.3d 1373 (Fed. Cir. 2003) ............................................3

*Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) ............................................................................................................................................. 2-3

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................................................2

**STATUTES & REGULATIONS**

19 U.S.C. § 1516a(b)(1)(B)(i).......................................................................................................... 2

19 U.S.C. § 1677e .......................................................................................................................... 3-

**ADMINISTRATIVE DECISIONS**

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9274 (Mar. 5, 2017)................................17

## I.       RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff-Intervenors Dalian Penghong Floor Products Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., and Dalian Qianqiu Wooden Product Co., Ltd. (collectively "Plaintiff-Intervenors") hereby state the administrative decision subject to appeal and the issues of law presented below.  Plaintiff-Intervenors each received the all-others rate in the underlying review, as cooperating companies that were not selected as a mandatory respondent.  Plaintiff-Intervenors' all-others rate is derivative of the mandatory respondents' rates, accordingly each of the issues specific to the mandatory respondents' directly impacts Plaintiff-Intervenors' rate.  Plaintiff-Intervenors incorporate by reference each of the arguments made by the other Plaintiffs and Plaintiff-Intervenors in their R56.2 briefs filed concurrently on May 14, 2021.

### A.       Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published the contested final results in the Federal Register on November 27, 2020.  *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Nov. 27, 2020), **PR369**, *incorporating* Issues and Decision Memorandum ("IDM")*, **PR361**.

### B.       Issues Presented

1.      <u>Issue One</u>:  Whether the Department's AFA finding that the respondents' benefitted from the Export Buyer's program is supported by substantial evidence or otherwise contrary to law?

1

2.      <u>Issue Two</u>: Whether the Department's selection of Guyu as a mandatory respondent was supported by substantial evidence?

3.      <u>Issue Three</u>: Whether the Department's AFA determination that Guyu's suppliers of poplar cores were authorities is supported by substantial evidence?

4.      <u>Issue Four</u>: Whether the inclusion of Guyu's purchases of poplar core sheets in the program for veneers at LTAR was supported by substantial evidence?

5.      <u>Issue Five</u>:  Whether the Department's inclusion of exports under HTS 4412.99 in its benchmark was supported by substantial evidence?

## II.      STANDARD OF REVIEW

The Court will only sustain the Department's factual determination if it is based on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).   Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161, 572 F. Supp. 883, 888 (1983) (quoting *Universal Camera*, 340 U.S. at 488).  Moreover, "Commerce's determination cannot be based on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Imp. & Exp. Co. v. United*

*States,* 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (internal citation omitted). The

substantial evidence standard "requires more than mere assertion of 'evidence which in and of

itself justified {the determination}, without taking into account contradictory evidence or

evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United

States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera*, 340 U.S. at 487).

## III.   ARGUMENT

### A.   The Department Erred in Finding Respondents Used and Benefitted From the EBCP because The Record Only Contains Evidence of Non-Use, Which Can Be Verified.

#### 1.   Record Evidence Establishes That Respondents Did Not Use or Benefit from the EBC Program.

The Department's use of adverse facts available ("AFA") to find that Baroque Timber

and Jiangsu Guyu benefitted from the EBC program when record evidence only contains

evidence of non-use is unreasonable and unlawful. The Federal Circuit has described the

application of AFA as a two-part inquiry. First, the Department must identify why it needs to

rely on facts otherwise available, and second, the Department must show how a party failed to

cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting

from the facts otherwise available." *See* 19 U.S.C. § 1677e(b); *Nippon Steel Corp. v. United

States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003)  ("{T}he legislative history mirrors the language in

the statute by recognizing that: (1) the Department must use facts otherwise available when

requested information is missing and (2) the Department may impose an adverse inference after

determining that a respondent has not been fully cooperative or has failed to act to the best of its

ability in gathering information."); *Mueller Commercial de Mex., S. de R.L. de C.V. v. United

States*, 753 F.3d 1227, 1231-32 (Fed. Cir. 2014) (quoting *Nippon Steel*, 337 F.3d at 1381). The

Department is allowed to use facts available only when "necessary information is not available

on the record," or an interested party has withheld requested information, significantly impeded the investigation, or provided unverifiable information.  19 U.S.C. § 1677e(a).  As such, the Department must first establish its authority to act under Section 1677e(a) before it can properly invoke Section 1677e(b) and apply AFA.

In its Final Determination, the Department cited 19 U.S.C. §§ 1677e(a)(1), (a)(2)(A), and (a)(2)(C), claiming that because the GOC failed to provide the 2013 Revisions and a list of all the partner banks involved in the disbursement of funds under the EBC program, necessary information is missing from the record and that the Department was unable to verify Baroque Timber and Jiangsu Guyu's non-use of the EBC program.  Final IDM at 65 ("Commerce must rely on the facts otherwise available, pursuant to Sections 776(a)(1), (a)(2)(A), and (a)(2)(C) of the Act.  Specifically, necessary information is not on the record because the GOC withheld information that we requested that was reasonably available to it, which significantly impeded the proceeding.").[1]  Although the Department did not expressly invoke 19 U.S.C. § 1677e(a)(2)(D) by rejecting Baroque Timber and Jiangsu Guyu's and their customers' statements

---

[1] 19 U.S.C. § 1677e(a) reads:
    (a) **In general** if –
        (1)  necessary information is not available on the record, or
        (2)  an interested party or any other person –
            (A) withhelds information that has been request by the administering authority or the Commission under this subtitle,

            (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

            (C) significantly impedes a proceeding under this subtitle, or

            (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

of non-use as unverifiable, the Department expends a considerable amount of its analysis on how it could not verify that respondents or their customers did not use the EBC program. Final IDM at 55-58 & 63-65. Therefore, the Department is in fact, for the most part of its analysis, relying on Section 1677e(a)(2)(D) of the statute although it failed to expressly state so.

Specifically, the Department found that EBC loans can potentially be distributed to the importer's account from a partner bank of the China Ex-Im Bank, and then from there be sent to the exporter's bank account. *See* Final IDM at 58-59. The Department argued that "performing the verification steps to make a determination of whether the 'manufacture, production, or export' of the company respondents' merchandise has been subsidized would therefore require knowing the names of the intermediary banks; it would be their names, not the name 'China Ex-Im Bank,' that would appear in the subledgers of the U.S. customers if they received the credits." Final IDM at 60. Therefore, the Department continued to find that the GOC withheld necessary information, and, as AFA, that Baroque Timber and Jiangsu Guyu used and benefited from the EBC program. *See id.* at 65-66.

The decision to apply an adverse inference to the GOC and further to Baroque Timber and Jiangsu Guyu because of GOC's failure to submit the 2013 revisions and a list of partner banks is unsupported by substantial evidence. Baroque Timber and Jiangsu Guyu responded that they have never applied for any EBC loans for itself or assisted its customers to apply for such loans. In addition, both Baroque Timber and Jiangsu Guyu provided customer declarations of non-use from every single U.S. customer to whom they exported during the POI. *See* Baroque Timbers Section III Response at 20-21 & Exhibit 15c (July 16, 2019), **PR132, CR99** and Jiangsu Guyu Section III Response at 11-12 & Exhibit IV-C-5 (July 15, 2019), **PR95, CR23**. Additionally, the GOC corroborated Baroque Timber and Jiangsu Guyu's and their customers'

5

non-use by searching the customers' names in China Ex-Im Bank's loan database.  *See* GOC's

Initial Questionnaire Response at 35-40 (July 16, 2019), **PR99, CR36**.

Record evidence thus establishes that Baroque Timber, Jiangsu Guyu, and their

customers did not use or benefit from the EBC program.  Indeed, the Department does not point

to any evidence to the contrary; instead, the Department claims that it needs a complete

understanding of how the program is run in order to verify the non-use of the program.  Final

IDM at Cmt. 10. The Department's bare-bone assertion cannot be sustained.  *See Clearon Corp.*

*v. United States*, 359 F. Supp. 3d 1344, 1359 (Ct. Int'l Trade 2019) ("It is important to keep in

mind that a determination concerning the presence or absence of a subsidy revolves around

whether 'the manufacture, production, or export' of particular 'merchandise' has been

subsidized. Thus, a determination as to whether the use of facts available or adverse facts

available is lawful depends on whether the information missing from the record relates to the

'manufacture, production, or export' of that 'merchandise.' If it does not, the information is not

'necessary' and so the application of neither facts available nor adverse facts available is

lawful.") (internal citation omitted).

The Court of International Trade has in many instances held that the China Ex-Im Bank's

2013 revision and a list of the third-party banks involved in disbursing the EBC funds do not

create a "gap" on the record that warrants the application of AFA.  *See Guizhou Tyre Co. v.*

*United States*, 348 F. Supp. 3d 1261, 1270 – 71 (Ct. Int'l Trade 2018) ("Although GOC failed to

fully respond to the Department's request for information, this failure did not create the requisite

gap needed to make an adverse inference.") (*OTR Tires from China* POR 2014 first opinion); *see*

*e.g., Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346 (Ct. Int'l Trade  2019) (*OTR Tires*

*from China* POR 2014 remand opinion); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d

1402 (Ct. Int'l Trade  2019) (*OTR Tires from China* POR 2014 second remand opinion);

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) (*OTR Tires from*

*China* POR 2015 first opinion); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct.

Int'l Trade 2019) (*OTR Tires from China* POR 2015 remand opinion); *Guizhou Tyre Co. v.*

*United States*, 2020 Ct. Intl. Trade LEXIS 86; Slip Op. 2020-81 (June 5, 2020) (*OTR Tires from*

*China* POR 2015 second remand opinion); *Changzhou Trina Solar Energy Co. v. United States*,

255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ("*Changzhou I*"); *Changzhou Trina Solar Energy*

*Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) (*Solar Cells from China* POR

2014 first opinion; "*Changzhou Trina II*"); *Changzhou Trina Solar Energy Co. v. United States*,

2018 Ct. Intl. Trade LEXIS 179; SLIP OP. 2018-167 (Nov. 30, 2018) (*Solar Products from*

*China* POR 2014-15 first opinion; "*Changzhou Trina III*"); *Changzhou Trina Solar Energy Co.*

*v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137 (Nov. 8, 2019) (*Solar*

*Cells from China* POR 2014 remand opinion; "*Changzhou Trina IV*"); *Changzhou Trina Solar*

*Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 144; SLIP OP. 2019-143 (Nov. 18,

2019) (*Solar Products from China* POR 2014-15 remand opinion; "*Changzhou Trina V*");

*Canadian Solar, Inc. v. United States*, 2020 Ct. Intl. Trade LEXIS 24; SLIP OP. 2020-23 (Feb.

25, 2020) (*Solar Cells from China* POR 2015, granting the Department's request for voluntary

remand to reevaluate the AFA application on the EBC program); *Clearon Corp. v. United States*,

359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) (*Chlorinated Isos from China* POR 2014 first

opinion); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade

2019) (*Narrow Woven Ribbons from China* POR 2015 first opinion); *Jiangsu Zhongji*

*Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019)

(*Aluminum Foil CVD Investigation* first opinion); *Jiangsu Zhongji Lamination Materials Co. v.*

*United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 at 5 (Mar. 24, 2020)

(*Aluminum Foil CVD Investigation* remand opinion).

The *Guizhou Tyre* litigation arose from the *OTR Tires from China* 2014 administrative

review.  The Department's second remand redetermination filed with the Court in that case is

substantially the same reasoning used in the Final IDM in the instant case, which was scrutinized

and criticized by the Court.  *See Guizhou Tyre*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019).  In

pertinent part, the Court held:

> The Department has provided a myriad of reasons why verification might be
> onerous without additional information pertaining to the EBCP revisions. But until
> these reasons are grounded in facts supported by the record—that is, until the
> Department actually attempts verification and adequately confronts these
> (purportedly) insurmountable challenges, there is little for the Department to hang
> its hat on when it "continues to find a 'gap' in the record." The court is sympathetic
> to the Department's struggles surrounding this Program, but an adverse inference is
> not one that can be applied just because the Department is unsatisfied with the
> respondent's answers about the EBCP's operations—a program that Plaintiffs do
> not even use, according to the only evidence available on the record. The court
> remains convinced that the Department has not adequately addressed what the gap
> in the record is (as required under the AFA statute), or, that the missing information
> is required to effectively verify respondent's non-use of the Program.

*Id.* at 1405.

Indeed, the record in the instant review contains no evidence that Baroque Timber,

Jiangsu Guyu, or their customers used or benefitted from the EBC program.  Instead of

confronting the record evidence and conducting a verification of non-use as the Department

normally does for all other programs that Respondents asserted not to have used, for EBCP, the

Department completely disregarded the record evidence and applied AFA based on a vague

claim that, due to GOC's failure to submit the 2013 Revisions and a list of partner banks, the

Department lacked a complete and reliable understanding of the program.  *See* Final IDM at 64.

Furthermore, Baroque Timber and Jiangsu Guyu cooperated in this review regarding this

program to the utmost of their abilities.  Regarding the impact of AFA on fully cooperating

parties when applied to a non-cooperating party, the Federal Circuit found in *Fine Furniture* that

in a countervailing duty investigation, a collateral impact on a cooperating party does not render

the AFA application against the foreign government improper.  *Fine Furniture (Shanghai) Ltd. v.

United States*, 748 F.3d 1365, 1372 (Fed. Cir. 2014).  Central to the Federal Circuit's decision,

however, was the fact that the adverse inferences were used to substitute for information the

GOC failed to provide and were <u>not</u> used against Fine Furniture.

> The Government points out that **the Department used respondents' actual
> reported data to measure the benefit received in order to ensure that the
> adverse inference was applied only with regard to the missing information and
> not the information supplied by Fine Furniture.**  Therefore, the Government
> argues, by not substituting any adverse inferences for the facts provided by Fine
> Furniture, the Department did not apply adverse inferences against Fine Furniture.

*Fine Furniture*, 748 F.3d 1365, 1371 {emphasis added}.  The Federal Circuit therefore found

that "the Department did not apply adverse inferences to substitute for any information that was

actually submitted by the cooperating respondents, such as the actual rate Fine Furniture reported

paying for electricity."   *Id.* at 1372.  However, in the instant case, the Department did precisely

the opposite – it applied adverse inferences against the GOC and substituted facts available for

the record evidence supporting a finding of non-use of the EBC program that was provided by

the cooperating respondent and its customers.

In *Changzhou Trina II,* for instance, the Court acknowledged that if a foreign government

fails to cooperate in a countervailing duty case, the Department may apply AFA even if the

collateral effect is to adversely impact a cooperating party."  *See Changzhou Trina II*, 352 F.

Supp. 3d 1316, 1325.  But in the very next sentence, the Court states that "the Department,

however, should seek to avoid such impact if relevant information exists elsewhere on the

record."  *Changzhou Trina II*, 352 F. Supp. 3d at 1325.  *Changzhou Trina II* is the Court's first

opinion remanding several aspects of the Department's final results in the *Solar Cells from China* POR 2014 CVD review.  *See id.* at 1323.  In that opinion, the Court overturned the Department's AFA finding on the EBC program and directed the Department to explain what information is actually missing from the record, and reasonably show that such information is, in fact, unverifiable.  *Id.*, at 1327.

However, following the Court's opinion in *Changzhou II,* upon remand, the Department used the same exact reasoning as it used in this review and insisted that it could not verify non-use of the EBC program because it does not have a list of partner banks involved in the disbursement of the EBC loan, which was remanded by the Court in *Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137, dated November 2019 - three months before the Department released the Final IDM in the instant case ("*Changzhou Trina IV*").  The Court stated, yet again, that "it cannot sustain the Department's determination that verification would be impossible or unduly onerous," and "it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program."  *Changzhou Trina*, SLIP OP. 2019-137 at 11.  Little room remains for the Department to distinguish the instant case from *Changzhou Trina II* and its subsequent remand opinion.

In the *Aluminium Foil from China CVD Investigation* litigation, the Court of International Trade held:

> the Department again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program. … In its brief to the court, for example, the government provides one such explanation: that the identities of third-party banks allegedly involved are unknown to the Department, and those names, not "China Ex-Im Bank," would appear in the records of U.S. customers that received EBCP credits. Thus, if the Department were to verify the ledgers of U.S. customers, it could check for credits from those third-party banks…. But that argument still fails to explain how the 2013 rule change

> "affected the way {the Department} conducts verification" of non-use claims. Critically, the Department does not explain why it could not identify the intermediate banks and the corresponding bank disbursement information by soliciting information from respondents. Instead, the Department summarily declares that, as the "primary entity" involved, the Ex-Im Bank is the only entity that possesses records sufficient to verify claims of non-use.

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1333-34 (Ct. Int'l Trade 2019) ("*Jiangsu Zhongji I*") (internal citation omitted).  The Court instructed the Department to "consider what information could be verified that would show non-use" and emphasized that "effort should be made to avoid the collateral consequences to cooperating parties of another's non-cooperation."  *Id.*, at 1334 (*citing Archer Daniels Midland Co. v. United States*, 917, F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013)).  On remand, the Department opted to remove the EBC rate from Jiangsu Zhongji' rate but did so only "under respectful protest."  *Jiangsu Zhongji Lamination Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 at 5 (Mar. 24, 2020) ("*Jiangsu Zhongji II*").  The Department still insisted that it does not know how to verify non-use of the program and refused to even issue the proposed questions to Zhongji's customers.  *See id.* at 6 - 7.  Indeed, as the Court in *Jiangsu Zhongji II* observed, "the Department's true position is that it wishes to rely solely on GOC's failures" and after the position being rejected by the Court in many cases, it now has "interposed non-verifiability or incompleteness as reasons to maintain the EBCP as contributing to the CVD rates, without much to back up such stances."  *Id.* at 7-8.

In sum, the Department's finding that Baroque Timber and Jiangsu Guyu used and benefitted from the EBC program is unsupported by record evidence.  The administrative record provides the Department with no basis upon which to find that Baroque Timber and Jiangsu Guyu used or benefitted from the EBC program.  As the Department itself chose not to attempt verification of their customers' assertion of non-use, their statements of non-use must be deemed

accurate.

### 2. The Department Can Verify Baroque Timber and Jiangsu Guyu's Customers' Non-Use Declarations.

The Department's argument that it cannot verify the importer's non-use of the EBC program without knowing a list of partner banks to the China Ex-Im Bank is not based on any record evidence but is, rather, pure speculation. In fact, the Department itself described the verification process in the Final Issue and Decision Memorandum, as that:

> {Commerce's} first step would be to examine the company's balance sheets to derive the exact amount of lending outstanding during the period of examination. Second, once that figure was confirmed, Commerce would examine subledgers or bank statements containing the details of all individual loans. Because Commerce could tie or trace the subledgers or bank statements to the total amount of outstanding lending derived from the balance sheets, it could be assured that the subledgers were complete and that it therefore had the entire universe of loan information available for further scrutiny. …Commerce's third step would be to select specific entries from the subledger and request to see underlying documentation, such as applications and loan agreements, in order to confirm the accuracy of the subledger details.

Final IDM at 53. The Department certainly could have taken steps to verify the respondents' customers' statements of non-use based on the same methodology described above, as it does in every CVD proceeding in verifying a number of programs respondents claim to have not used.

Department could have taken any number of steps to test the U.S. Customers' statements of non-use but chose not to do so for its own internal reasons. For instance, a sampling method is applied in every verification, and there is no reason why the Department cannot do the same if the respondents' customers had a large amount of outstanding financing during the POR. The Department could have adopted such procedures during the almost two-year long review to confirm that the U.S. customers did not take EBC loans. It is simply untenable for the Department to insist on the non-use being unverifiable while making no attempts to verify at all

during the lengthy investigation.

In sum, the Department's assertion that it cannot conduct a verification of Respondents' customers' books and records and other financial documents without knowing the identity of the China Ex-Im Bank's partner banks is unreasonable and unsupported by *any* record evidence. The Court should not sustain the Department's action to punish cooperating respondents when the Department itself declined to verify the EBC program during the investigation.

**B.      The Department's Selection of Jiangsu Guyu as a Mandatory Respondent is Not Supported by Substantial Evidence.**

Plaintiff-Intervenors support and incorporate by reference the briefs filed by the other Plaintiffs on this issue.  On March 14, 2019, the Department released import data from U.S. Customs and Border Protection ("CBP") for purposes of mandatory respondent selection and solicited comments from interested parties.  Dep't CBP Memo (March 14, 2019) **PR23, CR1-2**. Several parties, including petitioner, Jiangsu Senmao, and Jiangsu Guyu filed comments indicating the CBP data had serious flaws and requested that the Department issue quantity and value questionnaires to obtain accurate information to determine the largest exporters for respondent selection.  Most critically, the CBP data regarding Jiangsu Guyu appeared obviously flawed.  The CBP data presented commercially impossible import quantities for Jiangsu Guyu. As these comments conveyed, the degree of error in the CBP data was so large that the only reasonable determination was to disregard the CBP data for Guyu or to seek accurate data directly from the parties—i.e. issue Q&V questionnaires.  However, the Department refused the parties' requests and claims and relied upon the flawed CBP data for respondent selection, selecting Jiangsu Guyu as a mandatory respondent.  Accordingly, the Department's determination to rely upon the CBP data and select Jiangsu Guyu is not supported by the record. No reasonable mind could determine that the CBP data was accurate with respect to Jiangsu

Guyu.  This Court has also found in the past that the Department cannot ignore facial evidence of

BP data errors. *See Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1327n.8 (Ct. Int'l Trade

2015) (finding that where "Commerce wishes to rely on CBP data for respondent selection, it is

unreasonable for Commerce to ignore evidence on the face of that data suggesting that the actual

number of potential respondents is likely less than the number of companies separately listed").

The Court should find that the Department's reliance on this data and selection of Jiangsu Guyu

is not supported by substantial evidence.

C.      **The Department's AFA Finding that Jiangsu Guyu's Suppliers of Poplar**
        **Cores are Authorities Within the Meaning of the Statute is Not Supported by**
        **Substantial Evidence.**

Plaintiff-Intervenors support and incorporate by reference the briefs filed by the other

Plaintiffs on this issue.  The Department determined that suppliers which supplied Jiangsu Guyu

with poplar core sheets are "authorities" within the meaning of 19 U.S.C. § 1677.  The

Department reached this conclusion on the basis of adverse facts available ("AFA") and claimed

that the Government of China ("GOC") withheld information regarding Guyu's input suppliers.

This determination is not supported by the record.

The record establishes that Guyu purchased poplar core sheets from **private individual**

**farmers**.  *See* Guyu NSA Qre Response (November 8, 2019) at Exhibit NSA-3, **PR216, CR182**;

Guyu Second Supp Qre Response (January 7, 2020) at Exhibit Supp. 2-4, **PR247, CR202**.

Despite this information, the Department treated these individual private farmers as "enterprises"

that may be authorities of the GOC.  IDM at Comment 4.  The Department's determination is

based on its Public Bodies Analysis Memorandum, however, this memorandum is limited to the

discussion of enterprises and companies, not private individual farmers.  For example, some of

the names of the documents contained within this memorandum are "Update of the *Public*

*Bodies Analysis* of State-Invested Enterprises in China for Countervailing Duty Purposes" and

"The Relevance of the Chinese Communist Party for the Limited Purpose of Determining

Whether Particular *Enterprises* Should be Considered to be 'Public Bodies' Within the Context

of a Countervailing Duty Investigation." *See* Dep't Public Bodies Analysis Memoranda

(February 3, 2020), **PR286.**

The memorandum cover entities which the Department believes are controlled by the

CCP. These include: Central Entities; Local Entities: Congresses and Committees; Villagers'

Committees; and Ministries. *Id.* There is no mention whatsoever of individuals or natural

persons. This flows from the obvious fact that individuals (like the poplar farmers in this

instance) are not public bodies or entities. Nothing in this documentation, or the documentation

and responses provided by the GOC, provides any situation where private persons could be

considered enterprises or authorities. Accordingly, even if finding the GOC failed to provide

certain information was reasonable, the Department's finding that Jiangsu Guyu's private farmer

suppliers are authorities is not supported by substantial evidence.

      **D.**    **The Department's Inclusion of Jiangsu Guyu's Poplar Cores in the LTAR Program for Plywood is Not Supported by Substantial Evidence.**

Plaintiff-Intervenors support and incorporate by reference the briefs filed by the other

Plaintiffs on this issue. The Department initiated upon and determined that the provision of

veneers for less than adequate remuneration constitutes a subsidy. However, the Department

then included poplar core sheets purchased by Shunyang, Jiangsu Guyu's affiliate, in its subsidy

benefit calculation. The Department improperly included poplar core sheets as veneers.

Looking to the scope of the Order that "defines a veneer as, '…a *thin slice of wood, rotary cut*

{emphasis added}, sliced or sawed from a log, bolt or flitch," the Department found the poplar

core sheets are veneers because they are "rotary cut thin slices of wood." IDM at 23. The

15

Department's reliance on the "veneer" definition from the Scope of the Order is misplaced given the contrary evidence on the record.  The fact that poplar core sheets are "thin slices of wood" does not make them veneers in the multilayered wood flooring industry. If the Department actually intended to include all "thin slice { s} of wood" under the veneers LTAR program, then even plywood would be included under this program.  But instead, there is a separate plywood LTAR program with a separate questionnaire questions and inquiries.  By including poplar core sheets, the Department has expanded the program beyond the obvious scope of the language.

Further, Jiangsu Guyu explained in length numerous differences between veneers and poplar core sheets.  Guyu 2nd Supp Qre (January 7, 2020) at 2-4 and Exhibit Supp 2-3.  The poplar core sheets are much lower density and quality than a veneer and are used in a different aspect of the manufacturing.  The poplar core sheets are different, distinct input from a face veneer.  The Department was obligated to consider the full record of information, including that which detracts from its determination, and should have concluded that the poplar core sheets are a distinct, different product from the veneers covered by the LTAR veneer program.

### E.    The Department's inclusion of HTS 4412.99 as a Benchmark for Plywood at LTAR is Not Supported by Substantial Evidence.

Plaintiff-Intervenors support and incorporate by reference the briefs filed by the other Plaintiffs on this issue.  As a benchmark to measure the adequacy of remuneration for plywood sold at LTAR, the Department relied upon world export data for several different HTS, including HTS 4412.99.  IDM at 37.  These HTS were specific to various types of plywood, but the Department also included HTS 4412.99 which captures all "Other" types of plywood, veneered panels, and similar laminated wood.  HTS 4412.99 covers "plywood, veneered panels, and similar laminated wood" "with at least one outer ply of non-coniferous wood, not containing particle board."  *Id*.; *see also* Baroque Timbers Rebuttal Benchmarks (November 25, 2019) at

21; **PR232**.  Accordingly, HTS 4412.99 includes a variety of different types of veneers and laminated woods other than plywood.

By including this HTS, the Department is not relying on the most specific information as a benchmark.  19 U.S.C. § 1677(5)(E) directs the Department to measure "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  By relying on an HTS including numerous dissimilar products to the good being provided, i.e., plywood, the Department failed to follow the statute's guide to rely on prevailing market conditions for the good being provided at LTAR.

Further, in past cases, the Department has properly excluded those HTSUS codes that encompass products that do not represent the specific input subject to a subsidy rate. *See*, e.g., *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9274 (Mar. 5, 2017), and accompanying l&D Memo at Cmt. 16 (Commerce excluded HTSUS 7601.20 from the benchmark calculation of unalloyed ingot as HTSUS 7601.20 includes alloyed ingots).  The Court should find that the Department's inclusion of HTS 4412.99 in a benchmark for plywood is unsupported by substantial evidence, and order the Department to exclude this HTS from the benchmark.

**IV.     Conclusion and Prayer for Relief**

In light of the foregoing, the Department's *Final Results* were not supported by

substantial evidence or in accordance with the law.  Plaintiff-Intervenors respectfully request that

the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com

Date: May 14, 2021                          *Counsel to Plaintiff-Intervenors*

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar
members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **5,489** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff-Intervenors*