## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et al*., <br><br> Plaintiffs, <br><br> and <br><br> BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, *et al*., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, and <br><br> AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, <br><br> Defendant-Intervenor. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Consol. Court No. 20-03885 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Andrew T. Schutz
Kavita Mohan
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: May 14, 2021

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

A.  Administrative Decision Under Appeal ................................................................. 1

B.  Reasons For Contesting The Administrative Decision ........................................... 1

C.  Issues Presented And Summary Of Argument ...................................................... 1

  1.  Was Commerce's inclusion of HTS 4412.99 in calculating the benchmark for plywood unlawful and unsupported by substantial evidence? .............................................. 1

  2.  Whether Commerce's application of adverse facts available to Baroque's use of the Export Buyer's Credit was unlawful and unsupported by substantial evidence? ................... 2

STATEMENT OF FACTS ............................................................................................. 2

STANDARD OF REVIEW ........................................................................................... 5

ARGUMENT ................................................................................................................ 6

I.  COMMERCE'S INCLUSION OF HTS 4412.99 IN CALCULATING THE BENCHMARK FOR PLYWOOD WAS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE .............................................................................. 6

A.  Legal Standard For The Calculation Of Benchmarks ........................................... 6

B.  Record Evidence Demonstrates That The Products Encompassed By 4412.99 Were Not Reflective Of Baroque's Plywood Inputs ............................................................. 9

II.  THE APPLICATION OF AFA TO THE EXPORT BUYER'S CREDIT PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW ......................................................................................... 13

A.  Legal Framework For Applying AFA In CVD Proceedings ................................ 13

B.  Commerce's Application Of AFA In Cases Involving The EBCP Have Been Consistently Rejected Under Almost Identical Factual Circumstances ..................................... 17

C.  None Of The Information Commerce Deems As "Missing" Actually Creates A Gap In The Record Concerning Usage And Information Concerning Usage Is Verifiable ........ 30

  1.  The 2013 Administrative Measures Are Not Needed To Determine Usage .......... 30

  2.  The Names Of Possible Third Party Banks Are Not Needed To Determine Usage ... 33

  3.  Commerce's Claims Regarding Verification Are Wrong And Insufficient To Warrant AFA ................................................................................................................. 35

CONCLUSION ........................................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ...... 36

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................ 34

*Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ....................................................................................................................................................... 25

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ........................................................................................................................................... 16, 22, 25

*Changzhou Trina Solar Energy Co. v. United States,* Ct. No. 17-146, Slip Op. 18-167, 2018 WL 6271653 (Ct. Int'l Trade Nov. 30, 2018) ............................................................................... 23, 25

*Changzhou Trina Solar Energy Co., et al. v. United States*, No. 17-00198, Slip Op. 19-137, 2019 WL 5856438 (Ct. Int'l Trade Nov. 8, 2019) ...................................................................... 22, 25

*Changzhou Trina Solar Energy Co. et al. v. United States*, No. 17-00246, Slip Op. 19-143, 2019 WL 6124908 (Ct. Int'l Trade Nov. 18, 2019) ................................................ 24, 25, 35, 36, 37

*Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ....................................................................................................................................................... 23

*Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, Slip. Op. 20-109, 2020 WL 4464251 (Ct. Int'l Trade Aug. 4, 2020) ...................................................................................... 24

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ..................... passim

*Clearon Corp. v. United States*, 474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ...................... 18, 19

*Clearon Corp. v. United States*, Case No. 17-00171, 2021 WL 1821448 (Ct. Int'l Trade May 6, 2021) ......................................................................................................................................... 18, 19

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ....................................................................... 5

*F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ................................................................................................................................................ 16

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ............................................ 5

*Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ................ passim

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) ....................... 25

*Guizhou Tyre Co. et al. v. United States*, 399 F.Supp.3d 1346 (Ct. Int'l Trade 2019) ..... 25, 27, 34

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019)...... 24, 27, 36, 37

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019)....................... 28

*Guizhou Tyre Co. v. United States*, No. 18-00100, 2020 WL 3033244 (Ct. Int'l Trade June 5, 2020).............................................................................................................................. 27

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F.Supp.3d 1317 (Ct. Int'l Trade 2019).............................................................................................................................. 25

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015).................... 13

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)................................ 5

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997)........................................... 38

*Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247 (Fed. Cir. 2009)....................... 15

*Nippon Steel Corp. v. United States,* 337 F.3d 1373 (Fed. Cir. 2003).................................. 14, 16

*NSK Ltd. v. United States*, 358 F. Supp. 2d 1276 (Ct. Int'l Trade 2005).................................... 15

*NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257 (Ct. Int'l Trade 2002) ........ 38

*NTN Bearing Corp. of America v. United States*, 368 F.3d 1369 (Fed. Cir. 2004)..................... 15

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ................................... 5

*Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ... 14

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................... 5

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)................................................... 5

*SolarWorld Ams., Inc. v. United States*, 229 F. Supp. 3d 1362 (Ct. Int'l Trade 2017)................ 25

*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012).................... 6

*Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019)......... 28

*Yama Ribbons & Bows Co. v. United States*, No. 19-00047, 2021 WL 1716644 (Ct. Int'l Trade Apr. 30, 2021) ............................................................................................... 20, 21, 34, 35

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011)................ 15

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................................ 5

19 U.S.C. § 1677(5) ................................................................................................ 16, 17

19 U.S.C. § 1677(5)(E)(iv) ............................................................................................. 6

19 U.S.C. § 1677(5A) .................................................................................................... 16

19 U.S.C. § 1677e(a) ................................................................................................ 14, 15

19 U.S.C. § 1677e(b) ............................................................................................... 14, 16

**Other Authorities**

Statement of Administrative Action for the implementation of the Uruguay Round Agreements Act H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.& A.N. at 4198-99 .......................... 15

**Regulations**

19 C.F.R. § 351.511(a)(2) ............................................................................................... 6

**Administrative Decisions**

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010)................................................................................................................ 7

*Certain Pasta from Italy: Final Results of the Fourth Countervailing Duty Administrative Review*, 66 Fed. Reg. 64,214 (Dec. 12, 2001)................................................................. 39

*Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016) .......................................... 7

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (March 12, 2021) .................................................................... 39, 40

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017) .......................... 8

*Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products from the People's Republic of China: Final Affirmative Determination and Final Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 3,282 (Jan. 11, 2017) ...................................... 31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018) .............................................................. 7

*Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005) ................................................ 8

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Mar. 14, 2019)................................................................................................................ 2

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008) ............................................................................ 8

*Magnesia Carbon Bricks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 45,472 (Aug. 2, 2010)........................................... 8

*Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,692 (Dec. 8, 2011) ............................................................................... 2

*Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2017* (Feb. 6, 2020) .......................................................................................................... 3, 4

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,* 85 Fed. Reg. 76,011 (Nov. 27, 2020)................................................................................................................ 1, 3, 9

*Stainless Steel Sheet and Strip in Coils from France: Final Results of Countervailing, Duty Administrative Review*, 67 Fed. Reg. 62,098 (Oct. 3, 2002)....................................... 17

Consolidated Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation (collectively "Baroque") submit this Memorandum of Law to support their Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSANT TO RULE 56.2

### A.   ADMINISTRATIVE DECISION UNDER APPEAL

Baroque seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") results published in *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,* 85 Fed. Reg. 76,011 (Nov. 27, 2020) (**PR 369**), and the accompanying Issues and Decision Memorandum ("IDM") (**PR 361**) (collectively, "Final Results").

### B.   REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Baroque's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.   ISSUES PRESENTED AND SUMMARY OF ARGUMENT

**1.   Was Commerce's inclusion of HTS 4412.99 in calculating the benchmark for plywood unlawful and unsupported by substantial evidence?**

Yes. The Department has an obligation to calculate CVD rates as accurately as possible. Calculating a subsidy benefit based on HTS provisions that wholly consist of products that Baroque does not purchase, cannot and does not achieve this objective and subverts the Department's statutory and regulatory obligations. Record evidence demonstrates that HTS 4412.99 consists of laminate wood, not plywood, and therefore is not appropriate for use in the benchmark for plywood.

1

**2.**   **Whether Commerce's application of adverse facts available to Baroque's use of the Export Buyer's Credit was unlawful and unsupported by substantial evidence?**

Yes. As the Court has now found on numerous occasions, Commerce cannot apply adverse facts available ("AFA") to the use of the Export Buyer's Credit Program ("EBCP") as there is no gap in the record regarding the usage of this program and, instead, (1) there is substantial evidence on the record establishing that the respondents' U.S. customers did not use this program; and (2) there is no evidence on the record that non-use cannot be verified at either the China Export Import Bank ("Ex-Im Bank") or at the U.S. customers.

## STATEMENT OF FACTS

The Department published the countervailing duty order at issue on December 8, 2011. *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,692 (Dec. 8, 2011) ("Order"). On March 14, 2019, the Department initiated the administrative review of the countervailing duty order on MLWF from China, covering the period January 1 through December 31, 2017 ("POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Mar. 14, 2019) **(PR 21)**. Subsequent to the initiation of the proceeding, by memorandum dated May 21, 2019, the Department selected Baroque and one other Chinese manufacturer/exporter as mandatory respondents in the review. *See* Memorandum from Suzanne Lam to Kathleen Marksberry Re: Respondent Selection (May 21, 2019) **(CR 6, PR 57)**.

On July 16, 2019, Baroque submitted its initial CVD questionnaire response. **(CR 99-126, PR 132-140)**. Baroque submitted additional information and responses on September 16, November 8, 2019, and January 8, 2020, in response to the Department's supplemental and new subsidy allegation questionnaires. **(CR 144-146, 188-190, 197-201, PR 187, 219, 246)**. Baroque

also submitted timely factual information on August 12, November 13, and November 25, 2019, for the Department's use in the valuation of the benchmarks with respect to the provision of plywood for less than adequate remuneration ("LTAR") program alleged in the review. **(CR 192-194, PR 148-150, 222-225, 232-234)**.

The Department published its Preliminary Results of the administrative review on February 6, 2020. *Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2017* (Feb. 6, 2020) ("Preliminary Results"). In its Preliminary Results, the Department preliminarily found that Baroque had received countervailable benefits during the POR, calculating a preliminary CVD rate of 18.18 percent for the companies.

On March 13, 2020, Baroque filed its administrative case brief challenging certain decisions and findings in the Department's Preliminary Results, including: (1) the Department's decision to average prices from certain Harmonized Tariff Schedule ("HTS") codes to determine the LTAR benchmark for plywood which covered products that were not similar to the plywood Baroque purchased; and (2) the finding that Baroque had used the EBCP as a result of the application of AFA to the Government of China ("GOC"). **(PR 312)**. Baroque also incorporated by reference the arguments made in the other respondent's and the GOC's briefs, and on March 24, 2020, timely filed a rebuttal brief addressing issues raised in Petitioner's administrative case brief. **(PR 333).**

On November 27, 2020, the Department published its Final Results assigning Baroque a final CVD rate of 14.09 percent. 85 Fed. Reg. 76,011 (Nov. 27, 2020). In its unpublished IDM, the Department rejected Baroque's arguments with regard to: (1) whether to include HTS 4412.99 in its benchmark for plywood; and (2) Baroque's non-use of the EBCP. *See* IDM at

Cmts. 6 and 9 **(PR 361)**.

With regard to the benchmark for plywood, in the Preliminary Results, Commerce had used world export data from the UN Comtrade for HTS categories 4412.33, 4412.39, 4412.34, 4412.10 (in part), 4412.14, 4412.31, 4412.32, 4412.29, 4412.94, and 4412.99 to value the benchmark for plywood in its Preliminary Results. However, after considering arguments made in case briefs submitted by Baroque and another interested party, Fine Furniture (Shanghai) Limited and Double F Limited (collectively, "Fine Furniture") **(CR 218, PR 314)**, Commerce agreed in the Final Results that the HTS categories 4412.94 and 4412.31 did not reflect Baroque's plywood inputs for the production of wood flooring, and therefore it did not include these HTS provisions in the plywood benchmark calculation for Baroque. IDM at 37-39 **(PR 361)**. However, with regard to HTS 4412.99, Commerce stated that it disagreed with Baroque's and Fine Furniture's arguments that this HTS related to products that were not used in production. Thus, in the Final Results, Commerce continued to use 4412.99 in its benchmark for plywood. *Id*.

With regard to the EBCP, in the Preliminary Results, Commerce determined that the use of AFA was warranted in determining the countervailability of the program, because the GOC did not provide the requested information needed to allow Commerce to fully analyze this program. PDM at 23-25 **(PR 263)**. Commerce noted that Baroque and the other mandatory respondent provided certifications of non-use, but found that the GOC was the only party that can answer questions about the internal administration of the program and thus, absent the requested information, the GOC's and respondent company's claims of non-use of this program are not verifiable. Thus, as AFA, it found that both mandatory respondents subject to the review used and benefited from the program. *Id*. at 25-26.

In the Final Results, Commerce disregarded arguments submitted by the GOC and Baroque against Commerce's practice of applying AFA to the EBCP, and it continued to apply AFA to the EBCP in this administrative review. *See* IDM at 56-66.

Other relevant facts are discussed in the context of the arguments below.

## <u>STANDARD OF REVIEW</u>

This Court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

"Despite Commerce's statutory discretion, . . . if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quotation omitted). "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice."

*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (Ct. Int'l Trade 2012).

## ARGUMENT

**I.    COMMERCE'S INCLUSION OF HTS 4412.99 IN CALCULATING THE BENCHMARK FOR PLYWOOD WAS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

In the Final Results, Commerce rejected arguments made by Baroque in its

administrative case brief that HTS 4412.99 should not be included in the benchmark for plywood

because it is laminated wood not used by companies in their production of subject merchandise.

Commerce's decision is unsupported by substantial evidence and not in accordance with the law

as discussed below.

### A.  LEGAL STANDARD FOR THE CALCULATION OF BENCHMARKS

The selection of benchmarks for use in less than adequate remuneration ("LTAR")

calculations is governed by 19 U.S.C. § 1677(5)(E)(iv), which states:

> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

Under 19 C.F.R. § 351.511(a)(2), the Department sets forth the basis for identifying

appropriate market-determined benchmarks for measuring the adequacy of remuneration for

government-provided goods or services. These potential benchmarks are listed in hierarchical

order by preference: (1) "a market-determined price for the good or service resulting from actual

transactions in the country in question" (tier one); (2) "world market price where it is reasonable

to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, ***making due allowance for factors affecting comparability***" (tier two) (emphasis added); or (3) "assessing whether the government price is consistent with market principles." (tier three). At issue in this case is the benchmark for plywood inputs under tier two of Commerce's analytical framework.

It is Commerce's practice to select the most product-specific benchmark possible for use in LTAR calculations. *See, e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,828 (July 23, 2018), and accompanying IDM at Cmt. 3 ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product, which, in this case, would be the annual IHS Markit data (which reflects prices for aluminum frames, while the Comtrade data encompasses a broader range of aluminum products)."); *see also Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Jan. 2, 2016), and accompanying IDM at "3. Provision of Caustic Soda for LTAR" ("As noted above, our approach in this regard is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade-specific basis."); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) (finding a species-specific benchmark for timber to be more appropriate than a generic timber value); *Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from*

*Canada*, 70 Fed. Reg. 56,640 (Sept. 28, 2005), and accompanying IDM at Cmt. 1 (selecting a region-specific benchmark in order to "conduct the most accurate 'apples-to-apples' comparison between U.S. PNW and B.C. Coast log prices").

The Department has followed this logic in rejecting non-product specific HTS categories in favor of more product-specific benchmarks in the past. In the countervailing duty investigation on aluminum foil from China, Commerce initially used the HTS provision for alloyed aluminum ingot and the separate HTS for unalloyed aluminum ingot in the benchmark for primary aluminum. However, in the final determination, Commerce changed its benchmark because the respondent only purchased unalloyed ingot:

> The benchmark for primary aluminum currently includes unalloyed aluminum ingot, HTS 7601.10, and alloyed ingot, HTS 7601.20. Because the respondent purchased unalloyed aluminum ingots, consistent with our practice, we have revised the benchmark to include only unalloyed aluminum ingot, HTS 7601.10, for this final determination.

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Mar. 5, 2017), and accompanying IDM at Cmt. 16. *See also Magnesia Carbon Bricks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 45,472 (Aug. 2, 2010), and accompanying IDM at Cmt. 7; *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (June 24, 2008), and accompanying IDM at Cmt. 15 ("the relevant section of India's Harmonized Tariff Schedule which shows that that this is a basket category for all PP films that are 'flexible, plain.' Therefore, we have excluded these Indian export statistics from your benchmark calculation").

Even in the instant case, Commerce acknowledged its policy of selecting the most

product-specific HTS categories. In explaining why it accepted Baroque's arguments that 4412.94 and 4412.31 did not reflect Baroque's plywood inputs for the production of wood flooring, Commerce explained: "Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product." IDM at 37 **(PR 361)**. And while it agreed with Petitioner that "perfection is not required when selecting benchmark information," it further stated:

> Record information *related to wood types and species* stands in favor of selecting benchmarks which, in accordance with Commerce practice, are the narrowest category of products encompassing the input product used by the respondents.

*Id.* (emphasis added).

As discussed below, since HTS 4412.99 relates to products not used by Baroque in its production of subject merchandise, Commerce's decision in the Final Results to nonetheless include this HTS provision in establishing the benchmark for plywood was unlawful and unsupported by substantial evidence.

### B.   RECORD EVIDENCE DEMONSTRATES THAT THE PRODUCTS ENCOMPASSED BY 4412.99 WERE NOT REFLECTIVE OF BAROQUE'S PLYWOOD INPUTS

In its Final Results, Commerce stated that it disagreed with Baroque's arguments that HTS 4412.99 should not be included in plywood benchmark because it is a laminated wood not used in production. IDM at 39 **(PR 361)**. Commerce's reasons for continuing to include HTS 4412.99 in the plywood benchmark were unsupported by substantial evidence and not in accordance with the law.

First, Commerce states that "all plywood is a laminate structure which uses thin layers of wood to form plywood." Commerce cites as support for this statement a definition for plywood found in Baroque's Rebuttal Benchmark Exhibit 4c, at 11-5 (Nov. 25, 2019) **(CR 192-194, PR 232-234)**, which states that plywood is constructed with layers consisting of "single ply or of two

or more plies laminated with their grain direction parallel." However, the inclusion of the word

"laminated" in this description refers to the process of construction and does not mean that

"laminated wood" as encompassed under HTS 4412.99 is the same as the plywood used by

Baroque in production. The full paragraph from which that excerpt was taken states:

> Plywood is a panel product built up wholly or primarily of sheets of
> veneer called plies. It is constructed with an odd number of layers with the
> grain direction of adjacent layers oriented perpendicular to one another. A
> layer can consist of a single ply ***or of*** two or more plies laminated with
> their grain direction parallel.

*Id*. at Exhibit 4c. Thus, "all plywood" is not a laminate structure as a layer can also consist of a

"single ply." Moreover, this sentence is taken out of context of the report as a whole, which

demonstrates that plywood is a categorically distinct product from laminated wood. *See id*. For

example, the referenced report provides the following explanation for how the report is

organized, stating:

> This chapter is organized into three sections. The first section covers
> conventional wood-based composite panels. Materials, adhesives, and
> additives common to conventional wood-based composites are
> summarized. Specific products addressed include panel products such as
> plywood, oriented strandboard, particleboard, and fiberboard. Specialty
> composites are also discussed. The second section covers structural
> composite lumber, including glued-laminated timber, laminated veneer
> lumber, parallel strand lumber, laminated strand lumber, and oriented strand
> lumber. Wood–nonwood composites are discussed in the third section,
> including inorganic-bonded composites and wood–thermoplastic
> composites.

*Id.* at Exhibit 4c, 11-2. Plywood is covered under "conventional wood-based composite panels"

while laminated woods are in a distinct category. *See also id.* at Tables 11-1 and 11-2

(distinguishing between plywoods and laminated woods). This report further demonstrates that

plywood and laminated wood are comprised of different materials, undergo different

manufacturing processes, and have different applicable standards. Figure 11-4 of the same

report, for example, provides images demonstrating the differences between plywood and laminated products.

Second, Commerce states that Baroque did not "provide evidence" that "that imports into China under HS 4412.99 are categorized as laminated wood of the type not used as an input into the production of wood flooring." IDM at 39 **(PR 361)**. However, this ignores uncontroverted record evidence in this case that Baroque used plywood made only of eucalyptus or beech wood, not "laminated wood." *See* Baroque Rebuttal Benchmark at 1 **(CR 192-194, PR 232-234)** ("neither Baroque Timber nor Riverside Plywood use plywood made of bamboo; it is mostly made of eucalyptus or beech wood"); Baroque NSA Response at 2 (Nov. 8, 2019) **(CR 188-190, PR 219-220)** ("A majority of the plywood purchased and used by both companies is made from of beech wood or eucalyptus. None of the plywood purchased has tropical wood layers."). Baroque also provided record evidence demonstrating that imports into China under HTS 4412.99 are not plywood but instead are only "laminated wood." Specifically, the products below are all the products entering under 4412.99:

| HTS | Description |
| --- | --- |
| 4412.9910 | --With at least one outer ply of non-coniferous wood |
| 4412.9910 10 | Laminated wood with at least one outer ply of Acajou d'afrique |
| 4412.9910 20 | Laminated wood with at least one outer ply of Ramin wood |
| 4412.9910 30 | Laminated wood with at least one outer ply of endangered tropical wood |
| 4412.9910 40 | Laminated wood with at least one outer ply endangered nonconiferous wood |
| 4412.9910 90 | Laminated wood with at least one outer ply of non-coniferous Wood |
| 4412.9991 | -- With at least one outer ply of tropical wood |
| 4412.9991 10 | Other laminated wood, with at least one outer ply of tropical coniferous wood |
| 4412.9991 90 | Other laminated wood, with at least one outer ply of tropical coniferous wood |
| 4412.9992 | -- Other, containing at least one layer of particle board |

11

| 4412.9992 10 | Other, containing at least one layer of particle board, surface layer of endangered coniferous wood |
| 4412.9992 90 | Other laminated wood, containing at least one layer of particle board, surface lawyer of coniferous wood |
| 4412.9999 | -- Other |
| 4412.9999 10 | The endangered coniferous board veneer particle board |
| 4412.9999 90 | The coniferous board veneer particle board |

*See* GOC NSA Questionnaire Response at Exhibit NSA-5 (Nov. 8, 2019) **(CR -173-181, PR 216-217)**. Nothing under HTS 4412.99 references plywood of any kind, let alone made of beech wood and eucalyptus. Thus, there is no basis to believe that HTS 4412.99 is an appropriate benchmark for plywood.

Third, Commerce argues that the Chinese description for the four digit HTS 4412 – i.e., "{p}lywood, veneered panels and similar laminated wood" –also suggests that plywood is, or can be, laminated. IDM at 39 **(PR 361)**. However, this is mere conjecture and not based on record evidence. In fact, the same exhibit in the GOC's NSA Questionnaire Response demonstrates that while 4412.99 references only different types of laminated wood, other HTS categories at the six digit level under 4412 are specific to plywood, thus demonstrating this inherent difference. *See* GOC NSA Questionnaire Response at Exhibit NSA-5 **(CR -173-181, PR 216-217)**.

Lastly, Commerce argues that the UN Comtrade description of HS 4412.99 "explicitly excludes particle board, differentiating it from other potential wood flooring inputs." IDM at 39. However, this is irrelevant and does not address the fact that there is an inherent difference between plywood and laminated wood. These differences are made clear in the explanatory notes to 4412.99, which provides the following definitions for the products covered by heading 4412 ("Plywood, veneered panels, and similar laminated wood"). *See* Baroque Benchmark Rebuttal at Exhibit 2b **(CR 192-194, PR 232-234)**.

This heading covers:

(1) Plywood consisting of three or more sheets of wood glued and pressed one on the other and generally disposed so that the grains of successive layers are at an angle; this gives the panels greater strength and, by compensating shrinkage, reduces warping. Each component sheet is known as a "ply" and plywood is usually formed of an odd number of plies, the middle ply being called the "core".

(2) Veneered panels, which are panels consisting of a thin veneer of wood affixed to a base, usually of inferior wood, by glueing under pressure. Wood veneered on to a base other than wood (e.g., panels of plastics) is also classified here provided it is the veneer which gives the panel its essential character.

(3) Similar laminated wood. This group can be divided into two categories :- Blockboard, laminboard and battenboard, in which the core is thick and composed of blocks, laths or battens of wood glued together and surfaced with the outer plies. Panels of this kind are very rigid and strong and can be used without framing or backing.

Panels in which the wooden core is replaced by other materials such as a layer or layers of particle board, fibreboard, wood waste glued together, asbestos or cork.

However, the heading does not cover massive products such as laminated beams and arches (so-called "glulam" products) (generally heading 44.18).

Thus, plywood is inherently distinct from "veneered panels and similar laminated wood."

The Department has an obligation to calculate CVD rates as accurately as possible.

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2015). By calculating a subsidy rate based on a HTS provision that consists wholly of products that Baroque did not purchase, Commerce has failed to meet this objective.

## II. THE APPLICATION OF AFA TO THE EXPORT BUYER'S CREDIT PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW

### A. LEGAL FRAMEWORK FOR APPLYING AFA IN CVD PROCEEDINGS

To be consistent with the law, Commerce's AFA finding must satisfy three criteria: (1) it must identify a gap in the record; (2) it must identify how the offending party failed to cooperate

to the best of its ability; and (3) the overall AFA decision must be supported by substantial

evidence. Commerce failed to satisfy these criteria in the instant case.

The use of facts otherwise available is governed by 19 U.S.C. § 1677e(a):

(a) In general

If-
(1) necessary information is not available on the record, or
(2) an interested party or any other person-
(A) withholds information that has been requested by the administering
authority or the Commission under this subtitle,
(B) fails to provide such information by the deadlines for submission of
the information or in the form and manner requested, subject to
subsections (c)(1) and (e) of section 1677m of this title,
(C) significantly impedes a proceeding under this subtitle, or
(D) provides such information but the information cannot be verified as
provided in section 1677m(i) of this title,
the administering authority and the Commission shall, subject to section
1677m(d) of this title, use the facts otherwise available in reaching the
applicable determination under this subtitle.

The use of "adverse inferences" (*i.e.*, AFA), is governed by 19 U.S.C. § 1677e(b):

If the administering authority or the Commission (as the case may be) finds
that an interested party has failed to cooperate by not acting to the best of
its ability to comply with a request for information from the administering
authority or the Commission, the administering authority or the
Commission (as the case may be), in reaching the applicable determination
under this title, may use an inference that is adverse to the interests of that
party in selecting from among the facts otherwise available.

These two provisions require separate findings, *i.e.*, an adverse inference cannot be applied

unless it is appropriate to use facts otherwise available. *See, e.g.*, *Shandong Huarong Mach. Co.

v. United States*, 435 F. Supp. 2d 1261, 1289 (Ct. Int'l Trade 2006) ("Absent a valid decision to

use facts otherwise available, Commerce may not use an adverse inference"). Moreover, reliance

on facts otherwise available is only appropriate to "fill gaps" in the record necessary for

Commerce to complete its calculation. *See Nippon Steel Corp. v. United States,* 337 F.3d 1373,

1381 (Fed. Cir. 2003) (stating that the use of facts otherwise available is to "fill in the gaps"

14

when "Commerce has received less than the full and complete facts needed to make a

determination"); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1255 (Fed. Cir.

2009) (noting that "{t}he legislative history of the URAA thus reveals that Congress intended §

1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the

antidumping laws"); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348

(Fed. Cir. 2011) ("Commerce can only use facts otherwise available to fill a gap in the record").

The intended purpose of section 1677e(a) is further confirmed from explicit language in

the legislative history. The Statement of Administrative Action for the implementation of the

Uruguay Round Agreements Act ("SAA") includes the following discussion about the use of

facts otherwise available:

> New section 776(a) requires Commerce and the Commission to make
> determinations on the basis of facts available where requested information
> is missing from the record or cannot be used because, for example, it has
> not been provided, it was provided late, or Commerce could not verify the
> information. … The agencies will be required, consistent with new section
> 782(e), to consider information requested from interested parties that: (1) is
> on the record; (2) was filed within the applicable deadlines; and (3) can be
> verified. … Section 776(a) generally will require Commerce to reach a
> determination by filling gaps in the record due to deficient submissions or
> other causes.

H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 U.S.C.C.& A.N. at 4198-99. Thus, the

prerequisite for the use of facts otherwise available pursuant to section 1677e(a) is a "gap" in the

record resulting from missing information. *Id.; see also NTN Bearing Corp. of America v. United*

*States*, 368 F.3d 1369, 1377 (Fed. Cir. 2004) (noting that the "post-1994 version of the statute

permits the use of facts available when necessary information is not available on the record");

*NSK Ltd. v. United States*, 358 F. Supp. 2d 1276, 1290 (Ct. Int'l Trade 2005) (noting that "{b}y

its nature, a 'facts available' analysis necessarily implies that Commerce used facts where the

actual facts are an insufficient basis for a complete analysis").

In addition to showing that the information is missing from the record, Commerce is also required to show that the interested party "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). In determining whether a party cooperated to the best of its ability, the Court has instructed that Commerce cannot apply AFA for a "failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at 1383; *see Changzhou Trina Solar Energy Co. v. United States,* 352 F. Supp. 3d 1316, 1326-27 (Ct. Int'l Trade 2018) ("*Changzhou Trina I*") ("The use of facts available allows Commerce to render determinations when information is missing and it may use an adverse inference if respondents fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA."); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (Ct. Int'l Trade 2018) ("*Guizhou Tyre I*") ("Compliance with the 'best of its ability' standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation"). As the Federal Circuit stated "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.Lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

In applying these AFA strictures to a CVD proceeding, it is necessary to first identify the critical components of Commerce's CVD analysis. In a CVD proceeding, the existence of a countervailable subsidy is governed by 19 U.S.C. §§ 1677(5) and (5A). These provisions generally lay out the elements of a countervailable subsidy, which require that the alleged program (a) be "specific" and (b) provide a financial contribution from (c) a government

authority that results in (d) a benefit conferred. Put another way, Commerce's investigation of the countervailability of any alleged subsidy program essentially has two separate prongs: (1) to determine how the program operates so as to determine countervailability; and (2) to determine whether the respondent received a benefit from the program so as to establish usage. *See* 19 U.S.C. § 1677(5). These inquiries are independent of and distinct from one another; the failure to obtain information relating to prong one (is the program a subsidy and countervailable?) cannot be used to bootstrap an affirmative determination with respect to prong two (did the respondent use this program and receive a benefit?). *See, e.g.*, *Stainless Steel Sheet and Strip in Coils from France: Final Results of Countervailing, Duty Administrative Review*, 67 Fed. Reg. 62,098 (Oct. 3, 2002) and accompanying IDM at Cmt. 1 (finding that because no financial contribution was made, *i.e.*, no revenue forgone, "there is nothing to countervail," even if a benefit could be calculated). Thus, the GOC's inability to respond to Commerce's questions regarding certain aspects of the subsidy analysis (i.e., countervailability) does not render responses to other portions of the program unusable or irrelevant (i.e., usage).

### B. COMMERCE'S APPLICATION OF AFA IN CASES INVOLVING THE EBCP HAVE BEEN CONSISTENTLY REJECTED UNDER ALMOST IDENTICAL FACTUAL CIRCUMSTANCES

The Court has addressed Commerce's application of AFA to the usage of the EBCP in numerous cases now, under almost identical facts. In these cases, when cooperative respondents have provided evidence of non-use of the EBCP, the Court has unequivocally rejected Commerce's attempts to apply AFA due to the GOC's perceived failure to provide requested information on the EBCP. [1] The Court should follow the same reasoning here.

---

[1] Indeed, the Court has rejected the application of AFA to the EBCP in every case since *Guizhou Tyre I*. In many of these cases, Commerce holds its ground through several remands only to ultimately find non-usage under protest. But despite this protest, Commerce has not appealed any of these decisions to the Federal Circuit and instead continues to apply AFA to the EBCP in

Most recently, in a May 6, 2021, decision arising out of lengthy litigation challenging the results of Commerce's first administrative review of the countervailing duty order on chlorinated isocyanurates from China, the Court again confirmed its rejection of Commerce's attempts to apply AFA to the EBCP. *See Clearon Corp. v. United States*, Case No. 17-00171, 2021 WL 1821448 (Ct. Int'l Trade May 6, 2021) ("*Clearon III*"). In this decision, the Court sustained Commerce's second remand results, issued under protest, in which Commerce found that neither respondent nor its customers used or received a benefit under the EBCP. Commerce's decision was made pursuant to the Court's prior ruling in *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ("*Clearon II*"), which was summarized as follows in *Clearon III*:

> In *Clearon II* . . .the court ruled that Commerce's finding, based on adverse facts available, that Consolidated Plaintiff and Defendant-Intervenor Heze Huayi Chemical Co., Ltd. ("Heze"), a cooperative mandatory respondent, used and benefitted from China's Export Buyer's Credit Program, lacked the support of substantial evidence. Importantly, the record contained evidence in the form of uncontroverted declarations that supported Heze's claims of non-use. The record contained nothing to support a finding that there was information, necessary to Commerce's statutory "benefit" determination, that was missing (i.e., a gap in the factual record) that justified using "facts otherwise available," under 19 U.S.C. § 1677e(a). Commerce claimed that it would be unduly burdensome to verify non-use without information regarding the operation of the Export Buyer's Credit Program that China refused to provide—a claim that Heze disputed. The court directed the parties to "confer and agree upon a verification procedure to apply in this case," and further that Commerce was either to "verify Heze's claims of non-use and, based on the results of verification, determine whether Heze received a benefit under the program; or in the alternative, ... find, based on the existing record evidence, that neither Heze nor its customers used or received a benefit under the program." Clearon II, 44 CIT at __, 474 F. Supp. 3d at 1354.

*Clearon III*, 2021 WL 1821448 at *1.

---

**every** CVD investigation and review against China. Commerce's steadfast and unlawful refusal to follow CIT precedent regarding this program is egregious and discriminatory, and Commerce's unlawful actions regarding this program must stop.

In *Clearon II*, the Court had also explained:

> Although Commerce, in the Remand Results, takes the court through why it wanted this information, as has been found in other cases in this Court, ***it is not clear that any of the missing information was "necessary" to Commerce's central statutory inquiry, i.e., to determine whether the Export Buyer's Credit Program provided a benefit to Heze.*** Thus, it appears that, as in Guizhou Tyre, "the Department has assumed the conclusion—that a gap in the record exists as a result of {China's} failure to cooperate—without addressing what 'constitutes a "gap" in the record,' and by pointedly closing its eyes on the evidence provided by {Heze} that would 'fairly detract{}' from its ultimate conclusion." Guizhou Tyre, 43 CIT at ——, 415 F. Supp. 3d at 1342 (internal citations omitted). "***The law does not permit Commerce to circumvent the statutory requirements of the {countervailable duty} statute just because a respondent fails to cooperate; nor is Commerce 'relieve{d} {} from relying on some facts to make the requisite determinations to satisfy the elements of 19 U.S.C. § 1677(5).***' " Id. (citation omitted).

*Clearon II*, 474 F. Supp. 3d at 1353–54 (emphases added).

Following *Clearon II*, Commerce did not confer with parties on a verification procedure or verify respondent's claims of non-use. Instead, in its second remand results, it found "under respectful protest" that neither Heze nor its customers used or received benefits. The Court sustained these results in *Clearon III*, holding:

> The court finds that Commerce has sufficiently complied with the court's instructions in Clearon II. Though the Department did not "confer and agree upon a verification procedure," as stated in the court's instructions, Commerce ultimately chose the alternative decisional path provided by the court that did not require verification, i.e., ***to rely on the uncontroverted record evidence supporting Heze's claims of non-use of the Export Buyer's Credit Program.*** Based on this evidence, Commerce determined on remand that substantial evidence did not support a finding that the Export Buyer's Credit Program—a government loan program—conferred a benefit on Heze. See 19 U.S.C. § 1677(5)(B) (defining subsidy as a "financial contribution," provided by an "authority" to a person, by which a "benefit is ... conferred"). Accordingly, Commerce removed the subsidy rate determined for that program (0.87 percent) from the calculation of Heze's final countervailing duty rate, which reduced Heze's rate from 1.91 percent to 1.04 percent. See Second Remand Results at 9.

*Clearon III*, 2021 WL 1821448, at *2 (emphasis added).

On April 30, 2021, the Court issued a decision in *Yama Ribbons & Bows Co. v. United States*, No. 19-00047, 2021 WL 1716644 (Ct. Int'l Trade Apr. 30, 2021) ("*Yama Ribbons*"), also rejecting Commerce's practice of applying AFA to the EBCP. In this case, involving Commerce's final results in the sixth administrative review of narrow woven ribbons with woven selvedge from China, the Court held:

> Based on its review of the administrative record for the Final Results, the court holds that the Department's use of facts otherwise available and an adverse inference did not suffice to support a subsidy rate related to the EBCP. ***Most significantly, Commerce disregarded record evidence that Yama did not benefit from the EBCP and overlooked the lack of record evidence from which Commerce could conclude that it had.*** Commerce deemed Yama to have benefitted from the EBCP by resorting to facts otherwise available, and an adverse inference, reasoning that the government of the PRC failed to provide certain requested information. As the court explains below, the record evidence does not support a finding that the information Commerce lacked as a result of non-cooperation by the Chinese government prevented Commerce from relying upon or verifying the information Yama provided to show the absence of a benefit from the EBCP.

*Id.* at *3 (emphasis added). In reviewing the record, the Court found that "Commerce had a basis in record evidence on which to conclude that the Chinese government failed to cooperate by not providing information, but only regarding information on the 2013 revisions to the EBCP." It further held

> But record evidence does not establish a relationship between this missing information and the question of whether Commerce could rely upon or verify Yama's and the Chinese government's submitted information constituting record evidence that Yama did not benefit from this program. The only explanation Commerce provided as to why it sought the 2013 revisions was its desire to ascertain whether a two-million-dollar threshold applies to loans under the program. . . . The record shows no relationship between the existence of, or lack of, that loan threshold and the issue of whether Yama's customers used the EBCP to Yama's benefit.

*Id.* at *7. The Court continued:

The record refutes any contention that Commerce considered the record evidence Yama and the Chinese government presented relating to the question of a benefit to Yama from the EBCP. The only reason Commerce offered as to why Yama's evidence was incomplete was a non-sequitur: "we are unable to rely on the information provided by Yama because Commerce lacks a complete and reliable understanding of the program."6 Id. There was no evidence on the record of the review to support a finding that any U.S. customer of Yama used the EBCP, and the record contained evidence refuting any such finding. On remand, Commerce must consider the record evidence fairly and impartially and reach a new determination on whether Yama benefitted from the EBCP.

*Id*.

In litigation arising from an appeal of Commerce's decision in the third administrative review of photovoltaic cells from China, the Court considered whether Commerce could apply AFA to the EBCP despite the fact that respondents provided certifications applicable to the period of review stating that U.S.-based customers had not benefited from the EBCP. As in the instant case, the GOC also had not provided information to Commerce on potential third-party involvement in the EBCP, noting that this information was irrelevant to Commerce's determination regarding whether the program had been used by the relevant parties. The Court held that:

> Under 19 U.S.C. § 1677e(b) Commerce may use AFA to choose among facts of record, ***but the choice must fill in the information that is actually missing***. Further, although it is true that Commerce need not consider information submitted by respondents that cannot be verified, Commerce must first reasonably show that such information is, in fact, unverifiable. See 19 U.S.C. § 1677m(e); see also Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1382–83 (Fed. Cir. 2016) (holding that if the requirements of § 1677m(e) are not met, Commerce need not consider information submitted by an interested party). What type of information requested from the GOC would have made these claims verifiable? And what information, such as loan agreements and other relevant documents ostensibly held by Respondents, might have sufficed to provide Commerce the assurance it needed? Commerce does not explain.
>
> Accordingly, the court remands this matter and instructs Commerce to explain ***what information specifically the GOC failed to provide that led it to resort to facts available and the facts as to which it drew an adverse***

> ***inference in arriving at the conclusion that Respondents benefited from the EBCP. Commerce should further explain if and how certifications of non-use are unverifiable in the absence of the GOC's cooperation.*** If Commerce determines that it is able to verify non-use by not unreasonably onerous means, the court instructs it to do so.

*Changzhou Trina I*, 352 F. Supp. at 1327 (emphases added). On remand, Commerce continued to find the certifications of non-use unverifiable and imputed usage of the EBCP as AFA. The Court then again remanded the case, rejecting Commerce's reasoning that it could not conduct verification due to uncertainties about the EBCP's potential use of third-party banks to distribute EBCP funds and in order to avoid unnecessarily impacting cooperating parties. It explained:

> The court cannot sustain Commerce's determination that verification would be impossible or unduly onerous. Although Commerce has shown that the GOC failed to answer certain questions regarding the EBCP's operation, it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program. In order to avoid unnecessarily impacting cooperating parties because of the GOC's failure to cooperate, ***Commerce needs to at least attempt to verify the certifications of non-use in this case.*** See Archer Daniels Midland Co. v. United States, 917 F. Supp. 2d 1331, 1342 (CIT 2013) (noting that Commerce should "seek to avoid" adversely impacting a cooperating party). There appears to be enough information on the record for Commerce to identify potential suspect financial entries. As respondents indicate, this may require Commerce to deviate from its standard verification procedures. The court suggests ways in which Commerce might attempt verification, but respondents have suggested others that may be preferable. On remand, the parties should discuss potential ways forward and Commerce should request records that may answer the question of EBCP use from respondents, and, if necessary, their importers. Commerce should detail its process in its remand redetermination.

*Changzhou Trina Solar Energy Co. v. United* States, No. 17-00198, Slip Op. 19-137, 2019 WL 5856438, at *4 (Ct. Int'l Trade Nov. 8, 2019) (emphasis added).

In its second remand, Commerce accepted respondents' claims of non-use and removed the AFA rate from the calculation under protest, but continued to maintain that it would not be able to conduct a full verification of the EBCP without full cooperation from the GOC. The

Court sustained Commerce's second remand results, noting that since Commerce did not

maintain the AFA rate, there was no need to remand the case again. However, the Court

remained skeptical of Commerce's claims that verification was not possible, stating:

> Although the court acknowledges that Commerce's verification concerns
> in view of the 2013 revisions to the EBCP are not completely unfounded,
> the court cannot conclude that verification is impossible, particularly in
> view of Commerce's failure to pose even the most basic questions
> regarding the borrowing practices of the relevant parties.

*Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (Ct. Int'l Trade

2020). The Court also noted that Commerce's decision on remand was in accordance with its

actions in the second administrative review, in which it had accepted similar certifications of as

sufficient evidence of non-use:

> Commerce's reversion to its prior practice is not an impermissible course
> of action here. Commerce typically has discretion in deciding whether to
> verify factual information, and no party contends verification was required
> in this instance. See generally, 19 C.F.R. § 351.307 (regulation discussing
> Commerce's verification of information). As in Jiangsu, "the court did not
> direct this result; Commerce chose it." Jiangsu, at *3. ***Commerce did not
> confer with the parties as the court said that it should, but the court does
> not find that Commerce's decision to accept the certifications of non-use
> amounts to noncompliance with the remand.*** The court sees no purpose in
> continuing to remand for further development of the facts.

*Id*. at 1293 (emphasis added).

The appeal of the first administrative review of crystalline silicon photovoltaic products

from China followed an almost identical trajectory, with the Court's rejection of Commerce's

determination that verification of EBCP was impossible. *See Changzhou Trina Solar Energy Co.

v. United States,* Ct. No. 17-146, Slip Op. 18-167, 2018 WL 6271653 at *3 (Ct. Int'l Trade Nov.

30, 2018) ("Prior to applying AFA, Commerce must first demonstrate that the GOC's failure to

provide information left a gap in the record and subsequently explain how using facts available

with an adverse inference reasonably leads to a given conclusion."); *Changzhou Trina Solar*

*Energy Co. v. United States*, No. 17-00246, Slip Op. 19-143, 2019 WL 6124908 at *3 (Ct. Int'l

Trade Nov. 18, 2019) ("The court cannot sustain Commerce's determination that verification

would be impossible or unduly onerous. Although Commerce has shown that the GOC failed to

answer certain questions regarding the EBCP's operation, it is still not entirely clear to the court

that the missing information is required to effectively verify respondent's non-use of the

program."). After the second remand, Commerce continued to argue that verification was

impossible or unduly onerous, but under protest removed the AFA rate from its calculation. *See*

*Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, Slip. Op. 20-109, 2020 WL

4464251 at *2 (Ct. Int'l Trade Aug. 4, 2020). The Court sustained the results, but noted that

> Commerce has not persuaded the court that verification is impossible, in
> particular given Commerce's refusal to ask 'even the most basic questions
> regarding the borrowing practices,' of respondent . . . . Commerce has
> previously accepted similar certifications of non-use, and the Court has
> upheld that decision.

*Id.* at *3 (citations omitted).

In an appeal of the 2015 administrative review on off-the-road tires from China, the

Court similarly rejected attempts by Commerce to apply AFA when the record contained

evidence of non-usage of the EBCP by the respondents, and ordered Commerce to verify

respondents' affidavits of non-usage:

> The Department's (flawed) reasoning has remained unwavering—despite
> now eleven decisions from this Court urging Commerce to correct the
> repeated blatant deficiencies in its AFA analyses of the EBCP. . . . In
> response to Commerce's dereliction, then, the Court's opinion today will
> also remain unwavering. The Department is ordered on remand to pursue
> verification of the non-use affidavits on record from Plaintiffs; otherwise,
> as it stands, the Department's use of adverse facts available to impute use
> of the EBCP is unlawful on the record of this case.

*See Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1341–42 (Ct. Int'l Trade 2019),

*citing Changzhou Trina Solar Energy Co. et al. v. United States*, Slip Op. 19-143, 2019 WL

6124908 (Ct. Int'l Trade Nov. 18, 2019); *Changzhou Trina Solar Energy Co. et al. v. United States*, Slip Op. 19-137, 2019 WL 5856438 (Ct. Int'l Trade Nov. 8, 2019); *Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F.Supp.3d 1317 (Ct. Int'l Trade 2019); *Guizhou Tyre Co. et al. v. United States*, 399 F.Supp.3d 1346 (Ct. Int'l Trade 2019); *Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019); *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019); *Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 18-167, 2018 WL 6271653 (Ct. Int'l Trade Nov. 30, 2018); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018); *Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017); *SolarWorld Ams., Inc. v. United States*, 229 F. Supp. 3d 1362 (Ct. Int'l Trade 2017). The Court further explained:

> Just because Commerce resorted to adverse facts available "does not obviate the need for Commerce to affirmatively find that the elements of the statute have been satisfied." Changzhou Trina Solar Energy Co., 43 CIT ——, ——, 359 F. Supp. 3d at 1338**. *But as it currently stands, the Department has assumed the conclusion—that a gap in the record exists as a result of the GOC's failure to cooperate—without addressing what "constitutes a 'gap' in the record,"* Zhejiang DunAn Hetian Metal, 652 F.3d 1333, 1347, and by pointedly closing its eyes on the evidence provided by Guizhou that would "fairly detract{}" from its ultimate conclusion, CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016). . . . Stripped away of its misconceptions surrounding the AFA statute, the Department is left with the most compelling facts placed on the record: that Plaintiffs did not use the Program, and therefore, no specific benefit was conferred. Despite the court's instruction, there are still integral flaws in the Department's reasoning on remand. The court again concludes that Commerce erred in invoking its "adverse inference" authority with respect to the information (purportedly) missing from the record. *Both the law and the record are clear, and there is more than enough reason to support the Plaintiffs' position.* . . .
>
> As before, the Department has failed to explain why information about the 2013 rule changes is relevant to verifying demonstrative claims of non-use; and, importantly, why the omission of this information constitutes a gap necessary to "complete the factual record," Nippon Steel Corp. v. United

States, 337 F.3d 1373, 1381 (Fed. Cir. 2003). The Department alleges that the GOC failed to cooperate to the best of its ability and therefore, the record lacks information concerning the use of the Program. ***According to the Department, this permits Commerce to use adverse facts available to fill in this "missing" information. But Commerce has the relationship backwards.*** See Guizhou III, 399 F.Supp.3d 1346, 1351 ("Commerce does not know what the 2013 rule change was, and consequently, the court finds no record support for the Department's determination that the rule change is tied to verification."). There is evidence in the record that squarely detracts from Commerce's inference that Plaintiffs used and benefited from the EBCP. ***Commerce may not simply declare that the evidence cannot be verified and therefore, a gap exists. That is not how it works. Commerce must attempt verification in order to conclude that a gap exists related to that inquiry; and then only after Commerce finds that the "interested party has failed to cooperate by not acting to the best of its ability" can Commerce use an adverse inference to fill that gap.*** 19 U.S.C. § 1677e(b)(1). . . .

The court recognizes the Department's quandary when it claims that verification might be particularly onerous if EX-IM credits were disbursed through (unnamed) intermediary banks. . . .   But . . . ***Commerce has not explained why it cannot verify claims of non-use using a different method at its disposal***. . . . Commerce has more verification tools at its disposal than the Government would have this court believe, including "spot checks and viewing underlying documentation," as suggested by Plaintiffs. See Pls.' Br. 4. The Department must use these tools to attempt to verify the non-use declarations before concluding that the evidence is unverifiable, and a gap exists in the record.

Finally, ***Commerce has an "obligation when drawing an adverse inference based on a lack of cooperation by a foreign government to avoid collaterally impacting respondents to the extent practicable by examining the record for replacement information."*** Guizhou I, 348 F. Supp. 3d at 1271. . . . After countless investigations of the EBCP (particularly those initiated after Commerce's knowledge of the 2013 revisions to the Program), Commerce should be able to seek information that would aid in its verification process, which includes asking "necessary questions to determine whether a review of EX-IM Bank's user database could sufficiently demonstrate non-use," Pls.' Br. 5. Instead, ***Commerce has focused its inquiry on the operation of the program rather than Guizhou's alleged use of it.*** Commerce had an opportunity to "clearly and adequately" request additional information that would help the Department to verify the submitted non-use declarations (or ascertain Plaintiffs' alleged use of the Program); it failed to do so, and the court will not fault Plaintiffs for the Department's own shortcomings. Therefore, based on the record and the demonstrative evidence available, Commerce has failed to "compl{y} with

the court's remand order," . . . as it relates to Commerce's application of the AFA statute to the EBCP.

*Guizhou Tyre Co*, 415 F. Supp. 3d at 1342–44 (emphases added). Following remand, Commerce

removed the subsidy rate for the EBCP under protest, a decision which was affirmed by the

Court. The Court noted:

> Commerce cannot state that it needed information regarding the 2013 rule change to verify certifications of non-use without showing why the missing information was relevant to verification. . . . Here, evidence on this record supported the conclusion that Guizhou and its U.S. customers did not use, and therefore did not benefit from, the EBCP.

*Guizhou Tyre Co. v. United States*, No. 18-00100, 2020 WL 3033244, at *1-2 (Ct. Int'l Trade

June 5, 2020).

In *Guizhou Tyre Co.*, 399 F. Supp. 3d 1346, involving another appeal of an

administrative review of off-the-road tires from China, the Court held that:

> Commerce has failed to demonstrate why the 2013 EBCP rule change is relevant to verifying claims of non-use, and how that constitutes a "gap" in the record. ***Additionally, Commerce's anemic conclusion that verification of the non-use declarations would be unreasonably onerous is based on speculation that stems from the Department's own failure to "clearly and adequately" request information to aid in its verification.*** The court is hopeful that Commerce will see the light (and the law) and apply it accordingly.

*Id*. at 1353 (emphasis added). Following remand, Commerce issued a finding of non-use of the

EBCP under protest. The Court sustained the decision and held:

> The Department has provided a myriad of reasons why verification *might* be onerous without additional information pertaining to the EBCP revisions. But until these reasons are grounded in facts supported by the record—that is, until the Department actually *attempts* verification and adequately confronts these (purportedly) insurmountable challenges, there is little for the Department to hang its hat on when it "continues to find a 'gap' in the record," Second Remand Results at 8.   The court is sympathetic to the Department's struggles surrounding this Program, ***but an adverse inference is not one that can be applied just because Commerce is unsatisfied with the respondent's answers about the EBCP's***

27

> ***operations—a program that Plaintiffs do not even use, according to the
> only evidence available on the record.*** The court remains convinced that
> the Department has not adequately addressed what the gap in the record is
> (as required under the AFA statute), or, that the missing information is
> required to effectively verify respondent's non-use of the Program.

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402, 1405 (Ct. Int'l Trade 2019) (italics

indicating emphasis in original, bold indicating emphasis added).

In *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade

2019), involving the fifth administrative review on narrow woven ribbons with woven selvedge

from China, the Court also rejected Commerce's reliance on AFA for EBCP benefits which

record evidence established had not been received:

> Commerce erred in promising, and then failing, to allow Yama a meaningful
> opportunity to demonstrate that it did not benefit from the EBCP. It erred,
> specifically, ***when it ignored the considerable evidence Yama and the
> government of China provided indicating that Yama had not in fact
> benefitted from the program and when it overlooked that there was a
> complete lack of evidence that Yama had obtained a benefit.*** Commerce
> also erred in finding that, due to the failure of the Chinese government to
> respond to three identified categories of information requests, the record
> information did not allow Commerce to determine whether Yama benefitted
> from the program. That finding lacked the support of substantial evidence
> on the record of the review. Accordingly, the record did not contain
> evidence sufficient to support the Department's determination to impute to
> Yama a benefit from the EBCP using facts otherwise available or an adverse
> interference. ***On remand, Commerce now must make the "benefit"
> determination the statute required it to make as to the EBCP, it must do
> so without resort to facts otherwise available or an adverse inference, and
> it must redetermine*** Yama's overall subsidy rate in accordance with that
> finding.

*Id*. at 1356 (emphases added).

Following the mountain of precedence above, the Court should again reject Commerce's

attempts to apply AFA to Baroque's customers' EBCP usage. This case is indistinguishable, both

factually and legally, from the previous cases before this Court as summarized above. First, as in

the cited cases, there is no question that Baroque was a cooperative respondent in this review. As

the Court has warned, Commerce has an "obligation when drawing an adverse inference based on a lack of cooperation by a foreign government to avoid collaterally impacting respondents to the extent practicable by examining the record for replacement information." *Guizhou*, 348 F. Supp. 3d at 1271. When Commerce concluded that the GOC had failed to cooperate with Commerce's inquiries in this review, it applied AFA to determine that Baroque – a cooperative respondent – used and benefited from the program.

Second, as in the cases above, the record of this case contains overwhelming and consistent evidence demonstrating that Baroque's customers did not use the EBCP. This includes:

- U.S. customer declarations that Baroque submitted as part of its questionnaire response, each of which stated that the customers did not use the EBCP to finance the purchases of subject merchandise or receive any support from the China Ex-Im Bank related to the purchases of subject merchandise during the POR. *See* Baroque's Initial Questionnaire Response at Exhibit 15c (July 16, 2019) (**CR 99-126, PR 132-140**).

- Baroque's own certification that it did not submit, or assist its customers in submitting, any EBCP applications to the China Ex-Im Bank. *Id*. at 21.

- The GOC's corroboration that "none of the U.S. customers of the mandatory respondents or their cross-owned companies applied for, used, benefited from or accrued assistance from Export Buyers Credits from the Ex-Im Bank." GOC Initial Questionnaire Response at 37-38 (July 15, 2019) (**CR 36-98, PR 96-131**).

There is no evidence on the record of this proceeding that Baroque or its U.S. customers used the EBCP. Finally, as discussed in greater detail below and just as in these other cases, Commerce's Final Results continue to focus on the operation of the EBCP but fail to effectively identify what

gap exists warranting application of AFA against Baroque. Commerce has provided a lengthy

discussion summarizing the history of how it has treated this program, but made no attempt to

address the extensive precedence rejecting its practice of applying AFA to the EBCP in the Final

Results. The Final Results are therefore unsupported by substantial evidence and not in

accordance with the law.

### C. NONE OF THE INFORMATION COMMERCE DEEMS AS "MISSING" ACTUALLY CREATES A GAP IN THE RECORD CONCERNING USAGE AND INFORMATION CONCERNING USAGE IS VERIFIABLE

Commerce explained in its Final Results that it found the GOC's responses deficient due

to two missing pieces of information relating to the operation of the EBCP: (1) the 2013

Administrative Measures; and (2) the identity of all partner/correspondent banks involved in

disbursement of funds under the EBCP. IDM at 56-58 (**PR 361**). Commerce's finding that this

missing information creates a gap in the record regarding the usage of the EBCP is unsupported

by substantial evidence. None of the information that Commerce has deemed as "missing"

actually creates a gap in the record concerning usage. Even if this information was critical to

Commerce's "understanding," the information was only critical to **understanding** the operation

of the program and not establishing **usage** of this program. *Guizhou Tyre Co. Ltd.*, 348 F. Supp.

3d at 1271; *Clearon Corp.*, 359 F. Supp. 3d at 1360. If there is no evidence on the record

regarding usage, then there is no evidence on which the Department can base either the financial

contribution or benefit elements of the subsidy analysis.

### 1.   The 2013 Administrative Measures Are Not Needed To Determine Usage

With regard to the first piece of missing information, the 2013 revisions to the

Administrative Measures, Commerce first noted that its previous understanding of the Export

Buyer's Program was that there was a USD 2 million contract value threshold for usage of the

program and now, with the 2013 revisions, this threshold may have been eliminated. IDM at 57

(**PR 361**). Commerce argued that this elimination increases the difficulty of verifying loans as the prior parameters did not exist. *Id.* However, even if this were true, Commerce has not used this USD 2 million threshold as the basis for finding non-use in the past and has never explored this threshold in the countless on-site verifications it has conducted at the Ex-Im Bank as a means to determine non-use.[2] Rather, at verification Commerce has always reviewed the Ex-Im Bank database, which – by listing all loan recipients of Ex-Im Bank loans of any kind – would identify the users of this program. The USD 2 million criterion is, therefore, irrelevant to whether the Department could determine usage. *See Clearon Corp.*, 359 F. Supp. 3d at 1358 (rejecting references to this threshold as relevant stating "Commerce failed to adequately answer the question why—why was the requested information necessary for Commerce to make its determination under these facts?").

Next, Commerce noted that it requested the 2013 Administrative Measures Revisions, which were not provided by the GOC. IDM at 58 (**PR 361**). It argues that even in the instant review, the GOC provided information related to other programs, even though it considered this information inapplicable, and that the GOC's failure to provide requested information was therefore deficient and unresponsive. However, this mischaracterizes the GOC's response. The GOC explained to Commerce that it was unable to obtain the 2013 Administrative Measures Revisions (and the list of all partner and correspondent banks) because it was confidential and the GOC had no authority to require the China Ex-Im Bank to provide it. *See* GOC Supplemental

---

[2] We note that while Commerce has discussed this issue with Ex-Im Bank officials at verification, it has never been a basis for finding non-use. Instead, this threshold went to the operation of the program. *See Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products from the People's Republic of China: Final Affirmative Determination and Final Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 3,282 (Jan. 11, 2017), and accompanying I&D Memo at Cmt. 1.

Questionnaire Response at 5 (Oct. 28, 2019) **(CR 161-172, PR 207-212)**. Thus, this was not like the other instances of the GOC providing information it believed not to be relevant, but rather a situation in which the GOC was unable to provide information despite its best efforts.

In any case, the GOC's inability to provide the 2013 Administrative Measures Revisions is irrelevant as to whether Commerce could have established usage in the course of an Ex-Im Bank verification. The GOC explained very clearly in its questionnaire responses how Ex-Im Bank determined usage in this case – specifically, "The GOC determined that none of the customers of the respondents or their crossowned affiliates by obtaining their customer lists. The EX-IM Bank then searched its records to confirm whether the U.S. customers included in such lists used or benefited from such export buyers credit." GOC Initial Questionnaire Response at 109 **(CR 36-98, PR 96-131)**. The GOC even provided Commerce with screen shots of each individual search conducted by the Ex-Im Bank for each of the U.S. customers of the mandatory respondents, showing that for all searches "{n}o qualified records were found." GOC Supplemental Questionnaire Response at 7 **(CR 161-172, PR 207-212)**. These methods were no different than the methods Ex-Im Bank has used to determine usage prior to the effective date of the 2013 Administrative Measures Revisions.

Moreover, Commerce never inquired whether the 2013 Administrative Measures Revisions impacted how the Ex-Im Bank can determine usage. In fact, as in previous cases, "{t}he questions Commerce asked do not seem designed to elicit information that would tend to prove or disprove the record evidence establishing that {respondents'} purchasers did not use the program." *Clearon Corp.*, 359 F. Supp. 3d at 1360. Thus, the Department failed to investigate whether the absence of the 2013 Administrative Measures Revisions on the record had any real impact on the usage determination and whether it in fact created a gap in the record that required

the application of AFA.

**2.    The Names Of Possible Third Party Banks Are Not Needed To Determine Usage**

With regard to the second piece of missing information, Commerce stated in the Final Results that it requested a list of "all partner banks/ correspondent banks" involved in the "disbursement/ settlement" of export buyer's credits. IDM at 58 (**PR 361**). In response to these requests in the questionnaire, the GOC explained that this information was not necessary because the respondents' customers did not use this program and also explained that it did not have the authority to force the Ex-Im Bank to reveal such details because the information is confidential commercial information to the Ex-Im Bank. GOC Supplemental Questionnaire Response at 5 **(CR 161-172, PR 207-212)**.

As an initial matter, the Court's recent decision in *Yama Ribbons*, the Court found that Commerce erred in concluding this information was missing from the record. The Court explained:

> {a}ccording to record evidence, Commerce erred, in two respects, in concluding that it lacked requested information comprised of "a list of all third-party banks involved in the disbursement/settlement of export buyer's credits, and a list of all partner/correspondent banks involved in disbursement of funds under this program," Final Decision Mem. 22. First, Commerce was on notice from record evidence that only the Ex-Im Bank disbursed EBCP funds and that private banks did not. Second, the questions Commerce placed before the Chinese government pertained only to the disbursement of funds. Commerce did not ask for a list of banks involved in the settlement of funds. See GOC First Supplemental Questionnaire Response 65 ("6. Provide a list of all partner/correspondent banks involved in disbursement of funds under the Export Buyer's Credit Program)" . . . . Commerce may not resort to its authority under 19 U.S.C. § 1677e based on an alleged failure to provide information it never requested. Commerce, therefore, was unjustified, and unsupported by record evidence, in concluding that the information it requested, and did not receive, from the PRC government regarding "disbursement" and "settlement" of EBCP funds prevented it from relying upon or verifying the information Yama provided.

2021 WL 1716644, at *6. As in *Yama Ribbons*, in the instant proceeding, Commerce asked the GOC only about "disbursements of funds." *See* GOC Supplemental Questionnaire Response at 5 **(CR 161-172, PR 207-212)**.

However, regardless of whether, for example, the program could be disbursed through Bank of America in the United States, usage could still be determined through Ex-Im Bank's system in China, as the GOC explained and demonstrated by providing screen shots of the database, which proved that there were no records for the customers of the mandatory respondents.[3] Because of this, Commerce failed to make a rational connection between the information requested (a list of third party banks) and the conclusion made (that without this information, the Department cannot determine or verify use). *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (explaining that agencies must "articulate a{} rational connection between the facts found and the choice made").[4]

The information that was not provided goes to the countervailability of the program pure and simple; it does not impact the evaluation or the determination of usage. Based on a substantially similar record regarding this program, the Court's analysis in *Guizhou Tyre* is particularly poignant here: "the only gap of information on the record are facts regarding certain aspects of the *operation* of the Program. In turn, the only factual issues potentially appropriate for facts otherwise available, § 1677e(a), and adverse inferences, § 1677e(b), are those that

---

[3] Asking that Ex-Im Bank identify *every* partner or correspondent bank/third party in the entire world is not necessary. The banks Ex-Im Bank uses in Africa, for example, are not relevant here. At most, Commerce should be asking the exporter's U.S. customers to indicate the entities through which they received loans and *then* ask Ex-Im Bank if any EBCP loans have ever been issued through these entities. *See, e.g., Guizhou Tyre Co.,* 399 F. Supp. 3d at 1353.

[4] Furthermore, there is no basis to Commerce's contention that "the GOC is the only party which could provide the identities of the correspondent banks that the China Ex-Im Bank utilizes to disburse funds under the EBC program." IDM at 58, n.344. Certainly those entities allegedly using the programs would know the identities of the correspondent banks used to disburse funds.

concern the operation of the Program, factors entirely irrelevant to Guizhou's apparent non-use."

348 F. Supp. 3d at 1271; *see also Clearon Corp.*, 359 F. Supp. 3d at 1360 ("While Commerce is,

no doubt, curious as to all of the inner workings of many Chinese programs, mere curiosity is not

enough. Commerce must either provide an adequate answer as to why the information it seeks

"to fully understand the operation of the program" is necessary to fill a gap as to Heze's products

and their sale, or rely on the information it has on the record."). With record evidence

specifically demonstrating non-use, there is no evidence on the record, and no gap, in which to

find a "benefit." *Yama Ribbons*, 2021 WL 1716644, at *7 ("The record refutes any contention

that Commerce considered the record evidence Yama and the Chinese government presented

relating to the question of a benefit to Yama from the EBCP.").

### 3. <u>Commerce's Claims Regarding Verification Are Wrong And Insufficient To Warrant AFA</u>

Commerce concluded that without the missing information it requested, it would be not

be able to complete its verification process and that it would be "onerous for Commerce to comb

through the business activities of the company respondents' customers without any guidance as

to how to simplify the process or any guidance as to which loans or banks should be subject to

scrutiny as part of a verification of each company." IDM at 61 (**PR 361**). Commerce further

argued that it could not "accurately and effectively" verify usage of the company respondents'

customers because it would "amount to looking for a needle in a haystack with the added

uncertainty that Commerce might not even be able to identify the needle when it was found." *Id*.

at 62. As discussed above, these claims are without merit and have been firmly, **and repeatedly,**

refuted by the Court.

In *Changzhou Trina*, 2019 WL 6124908 at *3, the Court held that it "cannot sustain

Commerce's determination that verification would be impossible or unduly onerous." The Court

further held that "{i}n order to avoid unnecessarily impacting cooperating parties because of the

GOC's failure to cooperate, Commerce needs **to at least attempt to verify the certifications** of

non-use in this case." *Id.* (emphasis added)*,* citing *Archer Daniels Midland Co. v. United States*,

917 F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013) (noting that Commerce should "seek to avoid"

adversely impacting a cooperating party). In *Guizhou Tyre Co*, 415 F. Supp. 3d at 1342–44, the

Court noted that it "recognizes the Department's quandary when it claims that verification might

be particularly onerous if Ex-Im credits were disbursed through (unnamed) intermediary banks. .

. . But even with this supposed explanation (and indeed, the Department is only assuming

verification here would be onerous based on those circumstances), Commerce has not explained

why it cannot verify claims of non-use using a different method at its disposal." Similarly in the

instant case, Commerce has not explained why it could not verify claims using another one of

these tools.

Commerce incorrectly argues that "The GOC's response indicated that exporters would

know whether there was an interaction between the China Ex-Im Bank and the borrowers . . . but

neither the GOC, nor the respondent companies, provided enough information for Commerce to

understand this interaction or how this information would be reflected in the respondent

companies' (or their U.S. customers') books and records." IDM at 62 (**PR 361**). In fact, the

GOC's questionnaire response explained this interaction in a great deal of detail, providing

unrefuted proof that – aside from the Ex-Im Bank – respondent companies and their customers

would certainly be aware of usage. Specifically, the GOC explained that "if there is a loan under

the Export Buyer's credit program of the EX-IM Bank, in practice, the Chinese exporter should

be involved in the loan evaluation proceeding and/or in the after-loan management." GOC Initial

Questionnaire Response at 111 (**CR 36-98, PR 96-131**).

36

Instead of following arguments made by the GOC and Baroque that Commerce had a clear path to find non-use by accepting its customer declarations or verifying those declarations, Commerce argues that its verification procedures require examining books and records that can be tied to audited financial statements, tax returns, etc. to provide a complete picture of the company's activities, which is not possible given the deficiencies in the GOC's explanation of the operation of the program. IDM at 63 **(PR 361)**. However, as discussed above, the CIT has also rejected this position in multiple cases. *See, e.g., Changzhou Trina Solar Energy Co.,* 2019 WL 6124908 at *3 ("There appears to be enough information on the record for Commerce to identify potential suspect financial entries. As respondent indicates, this may require Commerce to deviate from its standard verification procedures."); *see also Guizhou Tyre Co*, 415 F. Supp. 3d at 1343–44 ("Commerce may not simply declare that the evidence cannot be verified and therefore, a gap exists. That is not how it works. Commerce must attempt verification in order to conclude that a gap exists related to that inquiry; and then only after Commerce finds that the 'interested party has failed to cooperate by not acting to the best of its ability' can Commerce use an adverse inference to fill that gap.").

Commerce's description of how verification would take place regarding this program is disingenuous and plain wrong. First, all that is required to verify usage of this program is for Commerce to visit Ex-Im Bank and review the usage database and confirm that none of the U.S customers are listed. There is no evidence on the record that this cannot be completed despite the missing information on the record. Indeed, Commerce never asked the Ex-Im Bank whether its database of users would identify a user if the loan was distributed through another bank. Since the Ex-Im Bank operates the program, determines the applicant's creditworthiness, and is the source of the funds, identifying partner or correspondent banks is irrelevant to the usage analysis.

Also irrelevant to the usage verification is the missing revised administrative rules, which have nothing to do with usage. Therefore, the non-use evidence on the record remains unrebutted and could be verified at Ex-Im Bank.

Second, to verify the declarations and nonusage of this program at the customers, Commerce would simply need to visit several of the U.S. customers and review the underlying loan documentation. The verification would not require reviewing tax returns or other information that Commerce lists since all that matters is whether the customer had loans and the source and purpose of those loans. Thus, Commerce need only to identify the loans that the company received, if any, and then identify the purpose of the loan by looking at the loan documentation. The amounts and other financial details of the loan are irrelevant since the customers reported receiving no EBCP loans (*i.e.,* and therefore any EBCP loan found would result in AFA).

Such a verification is not an onerous or difficult process, nor is the sheer number of customers to verify. Commerce is well versed in verifying difficult-to-verify information and numerous entities. The primary manner by which Commerce conducts such verifications is via a spot check.[5] Commerce uses this methodology in virtually every verification it conducts, particularly with regard to issues that can only be confirmed through underlying documentation. For example, in the AD context Commerce can only verify whether product characteristics of a particular product are correctly reported by selecting several examples and reviewing the

---

[5] *See Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (Commerce need not "trace through every number of the response- a representative sample is sufficient") (citations and internal omitted); *NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (Ct. Int'l Trade 2002) ("A verification is a spot check and is not intended to be an exhaustive examination of the respondent's business.") (internal quotation omitted).

underlying documentation. Respondents often report hundreds (or even thousands) of different products, rendering it impossible to review each and every one. Thus, Commerce verifies data through spot checks, normally selecting five line items for extensive examination. If Commerce finds that the spot check is accurate, it will conclude that the entire database is accurate.

Commerce is also often faced with many actors in a case and typically selects no more than a handful to verify. For example, a respondent may purchase subject merchandise from numerous unaffiliated producers or export through numerous unaffiliated trading companies. *See, e.g.*, *Certain Pasta from Italy: Final Results of the Fourth Countervailing Duty Administrative Review*, 66 Fed. Reg. 64,214 (Dec. 12, 2001), and accompanying Issues and Decision Memorandum at "Attribution" (limiting its analysis of an exporter's subsidies to only its major unaffiliated producers). Often, because it is too time consuming to review all of these companies, Commerce only verifies a limited number. Thus, the number of entities involved, the fact that reviewing underlying records is the only method to verify a negative fact such as non-use, or the necessity of using a spot check verification methodology simply do not constitute "unreasonably onerous" activities, even cumulatively. Commerce is faced with similar circumstances all the time and often must determine how to verify complex issues, including the absence of use of a particular program.

Commerce's ability to rely on information provided by a respondent's U.S. Customers, such underlying loan documents, to demonstrate non-use has now been clearly demonstrated by Commerce's decision in *Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (March 12, 2021), and accompanying IDM ("*VSEs*"). In *VSEs*, the Department actually accepted a respondent's submission of a U.S. customer's

underlying loan documents and loan reconciliation as sufficient evidence of non-use. Commerce noted that a loan "reconciliation" demonstrated the purpose of each financing instrument and "lending agreements . . .  show the purpose of each of {the} debt instruments and the parties involved in the financing' of loans." *Id*. at Cmt. 2. The finding in *VSEs* shows that Commerce can indeed review information at the U.S. Customers to establish non-use and, thus, the declarations of non-use are in fact verifiable. Thus, there is no basis to Commerce's claims that the "missing" information requested regarding the operation of the program is necessary to usage. Commerce's failure to even attempt to verify non-usage in the instant case, and apply adverse inferences on cooperative respondents, is unsupported by record evidence and not in accordance with the law.

Ultimately, the evidence on the record of this case proves that the China Ex-Im Bank, Baroque, and Baroque's customers are all competent to certify to whether the program was used and that *each* would have to be an active participant in the EBCP application process in order to use that program. *See* GOC Initial Questionnaire Response at 110-111 **(CR 36-98, PR 96-131)**. Because EBCP money is always transferred to or from an Ex-Im Bank, Ex-Im Bank could attest the identity of the entries taking care of the program and this could be verified in the bank's database. Baroque and its customers could corroborate the Ex-Im Bank's assertions since customers themselves apply directly to the China Ex-Im Bank and exporters' participation is required. *See id.* Thus, information placed on the record by Baroque regarding its customers and the declarations of non-use are sufficient for Commerce to verify whether the program was used by Baroque or its customers.

\*\*\*

In sum, in this case, Commerce continues espousing the same reasons for applying AFA

to the EBCP that have been repeatedly and consistently rejected by the Court in many, many

cases. The Court should continue to follow that precedent here and find Commerce's application

of AFA to the EBCP unsupported by substantial evidence and contrary to law.

### **<u>CONCLUSION</u>**

For the reasons discussed above, Baroque requests that this Court hold that Commerce's

Final Results are unsupported by substantial evidence and otherwise not in accordance with law,

and remand the Final Results with instructions to issue a new determination that is consistent

with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Kavita Mohan

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated:  May 14, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 13,725 words, less than the 14,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Consolidated Plaintiffs, Baroque Timber
Industries (Zhongshan) Co., Ltd. and
Riverside Plywood Corporation*

Dated: May 14, 2021

11114554_1