## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., ET AL., | ) ) ) ) |
| Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenors, | ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) Consol. Court No. 20-03885 ) Nonconfidential Version |
| Defendant, and | ) ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING | ) ) ) ) |
| Defendant-Intervenors. | ) ) ) ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF CONSOLIDATED PLAINTIFFS AND PLAINTIFF- INTERVENORS FINE FURNITURE (SHANGHAI) LIMITED AND DOUBLE F LIMITED**

Kristin H. Mowry
Sarah M. Wyss
Wenhui "Flora" Ji
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

May 14, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ................................. 1

ISSUES PRESENTED ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

SUMMARY OF ARGUMENT ................................................................................. 6

STANDARD OF REVIEW ....................................................................................... 7

ARGUMENT ............................................................................................................. 8

    I.      COMMERCE'S SELECTION OF GUYU AS A MANDATORY RESPONDENT BASED ON FLAWED CBP DATA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW ...................... 8

    II.     COMMERCE'S VENEERS FOR LTAR SUBSIDY RATE CALCULATION FOR GUYU WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW .................................................................. 15

        A.     Commerce's Inclusion of Poplar Core Sheets in the Veneers for LTAR Subsidy Calculation was Unsupported by Substantial Evidence and Otherwise not in Accordance with Law ............................................................................................. 16

        B.     Commerce's Veneers for LTAR Subsidy Rate Calculation Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ............................... 20

    III.    COMMERCE'S BENCHMARK PRICE CALCULATION FOR THE PLYWOOD FOR LTAR PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ................................................................... 23

    IV.    COMMERCE'S USE OF AFA TO IMPUTE A BENEFIT UNDER THE EBCP WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND UNLAWFUL .............. 25

    V.     COMMERCE'S SPECIFICITY DETERMINATION AND BENCHMARK CHOICE FOR THE ELECTRICITY FOR LTAR PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND UNLAWFUL ........................................................ 29

        A.     Commerce's Specificity Finding Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ........................................................................ 29

        B.     Commerce's Electricity Benchmark Determination Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ............................... 31

CONCLUSION ....................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

Archer Daniels Midland Co. v. United States, __ CIT __, 917 F. Supp. 2d 1331 (2013) ............ 26

Borusan Mannesmann Boru Sanavi ve Ticaret A.S. v. United States, __ CIT __, 61 F. Supp. 3d 1306 (2015) ......................................................................................................................... 20

Canadian Solar Inc. v. United States, Consol. Ct. No. 18-00184, slip op. 20-23 (Feb. 25, 2020) ..................................................................................................................................... ..28

Changzhou Trina Solar Energy Co. v. United States, __ CIT __, 352 F. Supp. 3d 1316(2018) . 28, 30

Changzhou Trina Solar Energy Co. v. United States, Consol. Ct. No. 17-00198, 2020 Ct. Intl. Trade LEXIS 114, at *11 (Aug. 4, 2020) ................................................................... 28

Changzhou Trina Solar Energy Co. v. United States, Consol. Ct. No. 17-00198, slip op. 19-137 (Nov. 8, 2019) .................................................................................................................... 28

Changzhou Trina Solar Energy Co. v. United States, No. 16-00157, 2018 Ct. Int'l Trade LEXIS 31 (Mar. 27, 2018) (upholding results of remand redetermination), Final Results of Redetermination Pursuant to Remand (Dec. 1, 2017), ECF No. 50 ........................................ 21

Changzhou Trina Solar Energy Co. v. United States, No. 17-00198, 2019 Ct. Intl. Trade LEXIS 138, at *11-12 (Nov. 8, 2019) ...................................................................................... 27, 30

Chia Far Indus. Factory Co. v. United States, 28 CIT 1336, 343 F. Supp. 2d 1344 (2004) ......... 24

China Steel Corp. v. United States, _CIT_, 393 F. Supp. 3d 1322 (2019) ................................... 22

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938) ........................................................................ 7

Consol. Fibers, Inc. v. United States, 32 CIT 24, 535 F. Supp. 2d 1345 (2008) ........................... 8

Essar Steel Ltd. v. United States, 34 CIT 1057, 721 F. Supp. 2d 1285 (2010) ........................... 26

Fine Furniture (Shanghai) Ltd. v. United States, Consol. Ct. No. 16-000145, 2021 Ct. Intl. Trade LEXIS 27 (Mar. 3, 2021) ............................................................................................... 15

Guizhou Tyre Co. v. United States, __ CIT __, 348 F. Supp. 3d 1261 (2018) ............................. 26

Guizhou Tyre, Co. Ltd. v. United States, __ CIT __, 398 F. Supp. 3d 1315 (2019) .................... 27

Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369 (Fed. Cir. 2003) ........................... 7

Husteel Co. v. United States, _CIT_, 98 F. Supp. 3d 1315 (2015) ....................................... 12, 13

In re Gartside, 203 F.3d 1305 (Fed. Cir. 2000) ............................................................................. 8

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) . 8

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) .......................................... 7

NMB Singapore Ltd. v. United States, 557 F.3d 1316 (Fed. Cir. 2009) ........................................ 8

Nucor Fastener Div. v. United States, Ct. No. 09-00531, 2013 Ct. Intl. Trade LEXIS 76 (May 24, 2013) .......................................................................................................................... 24

Pakfood Pub. Co. v. United States, 35 CIT 60, 753 F. Supp. 2d 1334 (2011) ............................ 13

Rhone Poulenc v. United States, 899 F.2d 1185 (Fed. Cir. 1990) ............................................... 20

Swiff-Train Co. v. United States, 793 F.3d 1355 (Fed. Cir. 2015) ................................................ 7

Thai Plastic Bags Indus. Co., Ltd. v. United States, _CIT_, 949 F. Supp. 2d 1298 (2013) ......... 28

Transactive Corp. v. United States, 91 F.3d 232 (D.C. Cir. 1996) .............................................. 28

U.S. Steel Corp. v. United States, __ CIT __, 953 F. Supp. 2d 1332 (2013) ............................... 8

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ............................................................... 7

**Statutes**

19 U.S.C. § 1677e(b)(1) ................................................................................. 25

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................ 7

19 U.S.C. § 1677a(e)(2) ..................................................................................... 8

19 U.S.C. § 1677f-1(c)(2) .................................................................................. 8

19 U.S.C. § l677(5)(E)(iv) ............................................................................... 20

**Other Authorities**

Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 9274 (Dep't of Commerce Mar. 5, 2018)...... 23

Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005) ................................ 23

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019)........................................................................... 3

Multilayered Wood Flooring from China, 75 Fed. Reg. 70,719 (Int'l Trade Comm'n Oct. 27, 2010) ..................................................................................................................... 3

Multilayered Wood Flooring From the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011) ..................................................... 3, 16

Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020).......................................................................................... 1

Multilayered Wood Flooring From the People's Republic of China: Initiation of Countervailing Duty Investigation, 75 Fed. Reg. 70,719 (Dep't of Commerce Nov. 18, 2010) ...................... 3

Multilayered Wood Flooring From the People's Republic of China: Prelim. Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2017, 85 Fed. Reg. 6,908 (Dep't of Commerce Feb. 6, 2020)................................................................ 3

**Regulations**

19 C.F.R. § 351.204(c)(2) (2020) ....................................................................... 8

19 C.F.R. § 351.511(a)(2)(i) ............................................................................. 20

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Consolidated Plaintiffs and Plaintiff-Intervenors Fine Furniture (Shanghai) Limited and Double F Limited, foreign producers and exporters of the subject merchandise (collectively, "Fine Furniture"), hereby move for judgment upon the agency record.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Fine Furniture challenges certain aspects of the final results of the seventh administrative review of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF") from the People's Republic of China conducted by the U.S. Department of Commerce ("Commerce"). See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) ("Final Results") (P.R. 369), and accompanying Issues and Dec. Mem. ("Final I&D Mem.") (P.R.361).  The review in question covers entries of MLWF during the January 1, 2017 through December 31, 2017 period of review ("POR").

## ISSUES PRESENTED

I. **Whether Commerce's selection of Jiangsu Guyu International Trading Co., Ltd. ("Guyu") as a mandatory respondent was supported by substantial evidence and otherwise in accordance with law.**

Commerce's selection of Guyu as a mandatory respondent in the current review was not based on substantial evidence and otherwise not in accordance with law because Commerce relied on inaccurate Customs and Border Protection ("CBP") data and failed to adequately consider evidence that established flaws in the CBP data.

II. **Whether Commerce's classification of Guyu's poplar core sheets as veneer and the inclusion of poplar core sheets in the veneers for less than adequate remuneration ("LTAR") subsidy rate calculation was supported by substantial evidence and otherwise in accordance with law.**

Commerce' determination to classify poplar core sheets as veneers in determining Guyu's subsidy rate for the veneers for LTAR program, and to use veneer benchmarks to measure Guyu's prices of poplar core sheet purchases, is unsupported by substantial evidence and not in accordance with law because veneer sheets and core sheets are distinct products.

III. **Whether Commerce's calculation of the benchmark price for the plywood for LTAR program was supported by substantial evidence and in accordance with law.**

Commerce's benchmark price calculation for the plywood for LTAR program was unsupported by substantial evidence and unlawful because Commerce included Harmonized Tariff Schedule ("HTS") code 4412.99 import data in the calculation despite record evidence establishing that Baroque Timber Industries ("Baroque Timber") did not use materials under that HTS classification in their production of subject merchandise.

IV. **Whether Commerce's finding that mandatory respondents benefited from the Export Buyer's Credit Program ("EBCP") was supported by substantial evidence and otherwise in accordance with law.**

Commerce's finding that mandatory respondents benefitted from the EBCP was unsupported by substantial evidence and unlawful because Commerce failed to consider evidence submitted by the parties demonstrating non-use and, instead, imputed a benefit to the mandatory respondents based on the application of adverse facts available ("AFA") to the Government of China ("GOC").

V. **Whether Commerce's use of AFA to make its specificity determination concerning the electricity for LTAR program and benchmark selection were supported by substantial evidence and otherwise in accordance with law.**

Commerce's reliance of AFA for its specificity determination and its benchmark selection for the electricity for LTAR program were unsupported by substantial evidence and unlawful because it did not make any of its statutorily required factual findings on specificity for the electricity program even after the GOC delegated its price setting authority to the provinces.

## STATEMENT OF FACTS

On November 18, 2010, Commerce initiated a CVD investigation on MLWF from China. See Multilayered Wood Flooring from the People's Republic of China: Initiation of Countervailing Duty Investigation, 75 Fed. Reg. 70,719 (Dep't of Commerce Nov. 18, 2010).  The International Trade Commission ("Commission") simultaneously conducted its investigation.  See Multilayered Wood Flooring from China, 75 Fed. Reg. 70,719 (Int'l Trade Comm'n Oct. 27, 2010).   On December 8, 2011, Commerce issued a final determination and CVD order on MLWF from China following an affirmative CVD determination and an affirmative injury determination by the Commission.   See Multilayered Wood Flooring From the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011) ("CVD Order").

Following requests from interested parties, Commerce initiated the seventh administrative review of the CVD order on MLWF from China covering the January 1, 2017 through December 31, 2017 POR.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019) (P.R. 21).  On March 14, 2019, Commerce placed on the record CBP data concerning entries of MLWF during the POR for the purpose of respondent selection.  See Multilayered Wood Flooring From the People's Republic of China: Prelim. Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2017, 85 Fed. Reg. 6,908 (Dep't of Commerce Feb. 6, 2020) (P.R. 380), and accompanying

Issues and Dec. Mem. at 2 ("Prelim I&D Mem.") (P.R. 263).  Commerce invited comments from interested parties on the CBP data and respondent selection.  See Prelim I&D Mem. at 2 (P.R. 263).  During the CBP data comment period, various parties raised concerns to Commerce about inaccuracies in the CBP data.  See id.  Commerce, nevertheless, refused to issue quantity and value ("Q&V") questionnaires to confirm the accuracy of the CBP data.

On May 21, 2019, Commerce relied on CBP data to select two mandatory respondents for the seventh administrative review: Baroque Timber and Guyu (collectively, "mandatory respondents").  See id.

On October 17, 2019, Commerce initiated an investigation of four new subsidy programs alleged by the American Manufacturers of Multilayered Wood Flooring ("AMMWF"), namely (1) the provision of plywood for LTAR, (2) the provision of sawn wood and continuously shaped wood for LTAR, (3) the provision of particleboard for LTAR and (4) the provision of fiberboard for LTAR.  See id. at 3.  On November 8, 2019, Guyu responded to Commerce's New Subsidies Allegation ("NSA") questionnaire and disclosed the poplar core sheet purchases of its affiliate Siyang County Shunyang Wood Co., Ltd ("Shunyang").  See Final I&D Mem. at Cmt. 3 (P.R. 361).  On November 21, 2019, and after Guyu submitted its NSA questionnaire response, AMMWF argued for the inclusion of poplar core sheets in the veneers for LTAR subsidy program. See id.  Aside from AMMWF's comments, there was no information on the record establishing that the veneers for LTAR program covers poplar core sheets.

On December 18, 2019, Commerce issued a supplemental questionnaire to Guyu requesting more information regarding its purchases of poplar core sheets.  See id.  On February 2, 2020, Commerce published the Preliminary Results and characterized poplar core sheets as veneer, thereby including Guyu's purchases of poplar core sheets in its calculation of the benefit

received by Guyu under the veneers for LTAR program.  See Prelim I&D Mem. at 22-26 (P.R. 263).

On March 13, 2020, Fine Furniture submitted its case brief arguing that 1) Commerce erred in its selection of mandatory respondents, 2) Commerce improperly concluded that Guyu benefitted from the veneers for LTAR program through its purchases of poplar core sheets, 3) Commerce erred in its plywood benchmark calculation to measure Baroque Timber's benefit from the plywood for LTAR program, 4) Commerce improperly used AFA to determine that the electricity for LTAR program is specific and in determining the benchmark for this program, and 5) Commerce improperly included a benefit for the EBCP in the subsidy rate for both mandatory respondents.  See Letter on Behalf of Fine Furniture to Dep't of Commerce re: Case Brief at 3-5 (Mar. 13, 2020) (Public Version) ("Fine Furniture Case Brief") (P.R. 314).  On March 24, 2020, Fine Furniture submitted a rebuttal brief incorporating all rebuttal arguments made by the mandatory respondents.  See Letter on Behalf of Fine Furniture to Dep't of Commerce re: Letter in Lieu of Rebuttal Brief (Mar. 24, 2020) (Public Document) (P.R. 334).

On November 27, 2020, Commerce published the Final Results.  Final Results, 85 Fed. Reg. at 76,011 (P.R. 369).  Commerce determined that Fine Furniture was entitled to the non-reviewed companies' rate.  Id. at 76,013.  Commerce determined that the non-reviewed companies' rate assigned to Fine Furniture was 20.75 percent based on the weight-average of the calculated subsidy rate for Baroque Timber, i.e., 14.09 percent, and Guyu, i.e., 122.92 percent.  Id. at 76,012. In the Final Results, Commerce continued to characterize Guyu's purchases of poplar core sheets as veneer and calculated a subsidy rate for Guyu's purchases of poplar core sheets based on the veneer benchmark.  See Final I&D Mem. at Cmt.3 (P.R. 361).  In the Final Results, Commerce continued to treat Guyu as a mandatory respondent based on CBP data despite interested parties'

comments regarding the inaccuracies in the CBP data.  See id. at Cmt. 1.  In addition, Commerce

countervailed the EBCP by finding that the mandatory respondents did not establish non-use of

the EBCP even though the record in the instant review contains certified evidence of non-use of

the EBCP related to the mandatory respondents' U.S. customers.  See id. at Cmt. 9.  Moreover,

Commerce calculated the benchmark for the plywood for LTAR program using import data under

an HTS code for products that were not used in the production of subject merchandise by Baroque

Timber.  See id. at Cmt. 6.  Lastly, Commerce continued to find that the provision of electricity

for LTAR was "specific" within section 771(A) of the Act and calculated the electricity benchmark

based on the highest electricity rate on the record.  See id. at Cmt. 8.

## SUMMARY OF ARGUMENT

Commerce's decision in the Final Results to select Guyu as a mandatory respondent based

on demonstrably flawed CBP data, is unsupported by substantial evidence and unlawful because

abundant evidence on the record established clear inaccuracies in the CBP data, which Commerce

chose to ignore.

Notwithstanding Commerce's erroneous mandatory respondent selection, the

countervailing duty rate calculated for the mandatory respondents and the resultant non-reviewed

companies' rate assigned to Fine Furniture is also unsupported by substantial evidence and

unlawful because of the following errors.  First, Commerce improperly classified poplar core

sheets as veneer and included poplar core sheets in the veneers for LTAR subsidy calculation.

Second, Commerce erroneously calculated the benchmark price for the plywood for LTAR

program because Commerce's data included laminated wood not purchased or used in Baroque

Timber's production.  Third, Commerce's determination that the mandatory respondents benefited

from the EBCP is erroneous because both respondents submitted signed certifications from their

customers proving non-use of the program.  Further, Commerce's decision to disregard record

evidence proving non-use of the EBCP is also arbitrary and capricious.  In addition, Commerce's finding that the alleged electricity for LTAR program is specific, based on AFA, was unlawful because it failed to make any factual finding as to how the program is specific and failed to connect the information that it deemed missing on the record with its specificity determination.  Commerce also erred in calculating the electricity benchmark by selecting the highest electricity rates in all of China without substantial evidence on the record.  Finally, Fine Furniture concurs with and incorporates by reference all of Guyu's and Baroque Timber's arguments presented in their Rule 56.2 motions and briefs.

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . .  to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal citation omitted).  Substantial evidence requires "more than a mere scintilla,"  see, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin, 322 F.3d at 1374 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from its weight."  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)).  Disregarding record information with no explanation defies

this requirement.  Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable."  NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Further, "{t}o be in accordance with law, a decision must not be arbitrary and capricious . . . and must be supported by substantial evidence and reasoned explanations."  U.S. Steel Corp. v. United States, __ CIT __, __, 953 F. Supp. 2d 1332, 1336 (2013) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41-43 (1983)).  In reviewing an agency decision for arbitrariness, the Court "(1) must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between the agency's fact findings and its ultimate action."  Consol. Fibers, Inc. v. United States, 32 CIT 24, 35-36, 535 F. Supp. 2d 1345, 1354 (2008) (citing In re Gartside, 203 F.3d 1305, 1312-13 (Fed. Cir. 2000)).

## ARGUMENT

**I.      COMMERCE'S SELECTION OF GUYU AS A MANDATORY RESPONDENT BASED ON FLAWED CBP DATA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Section 777A(e)(1) of the Tariff Act of 1930, as amended (the "Act"), directs Commerce to determine an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise.  Commerce may limit its examination to a reasonable number of exporters or producers if it determines that it is not practicable to determine individual countervailable subsidy rates because of the large number of exporters or producers involved in the administrative review.  See 19 U.S.C. § 1677a(e)(2); 19 C.F.R. § 351.204(c)(2) (2020). These  mandatory respondents are selected based on the following.

> (1) a sample of exporters or producers that it determines is statistically valid based on the information available to it at the time of selection, or

(2) the exporters or producers accounting for the largest volume of the subject merchandise from the exporting country that Commerce determines can be reasonably examined.

19 U.S.C. § 1677f-1(c)(2).

In the administrative review at issue, Commerce purported to select mandatory respondents accounting "for the largest volume of subject merchandise that can be reasonably examined" in accordance with 19 U.S.C. § 1677f-1(2) and based that determination "primarily on entry data obtained from CBP."  See Mem. from Suzanne Lam to Irene Darzenta Tzafolias re: Respondent Selection at 4-5 (May 21, 2019) (Public Version) ("Respondent Selection Mem.") (P.R. 57). Relying on CBP data, Commerce selected Baroque Timber and Guyu as mandatory respondents. Id. at 6.  The entry data from CBP, however, was [███████████████████████ ██████ ], as fully explained below.  As many parties pointed out in comments to Commerce, the CBP dataset was simply unreliable, making Commerce's respondent selection decision based on this flawed dataset inherently inaccurate.  Commerce's selection of Guyu as a mandatory respondent was, therefore, unsupported by substantial evidence because it was based on inaccurate CBP data and because Commerce ignored abundant evidence provided by the parties that established flaws in the data.

Various parties reported serious concerns regarding the reliability of the CBP data with respect to [████████████████ ] of the subject merchandize.  In particular, the AMMWF explained that the exports to United States as reported in the CBP data are not accurate because "[

████████████████████████████████████████████████████████

████████████████ ] of flooring, {which is} [███████████████████████

████████████████████████████ ]."  Letter on Behalf of AMMWF to Dep't of Commerce re: Comments on CBP Data and Respondent Selection at 3-4 (Mar. 21, 2019) (Business Proprietary

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

Document) (C.R. 5).   Additionally, Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

("Senmao") pointed out that



Letter on Behalf of Senmao to Dep't of Commerce re: Comments on CBP Data and Request for

Issuance Q&V Questionnaires at 2 (Mar. 21, 2019) (Business Proprietary Document) ("Senmao

CBP Data Comments") (C.R. 3).   As these comments conveyed, the degree of error in the CBP

data was so large that the only reasonable determination was for Commerce to disregard or clarify

the CBP data as to [ ▉ ].   Despite comments from a broad array of parties, representing both

domestic producers and foreign exporters, explaining to Commerce that the [ ▉

▉ ] and cannot accurately form the basis for respondent selection,

Commerce selected respondents based on this flawed CBP data.   See Respondent Selection Mem.

(P.R. 57).

        Moreover, Commerce had ample notice of the flawed CBP data and time to revise its

respondent selection decision early in the proceeding, yet still Commerce disregarded the parties'

comments on the flaws in the CBP data and maintained its mandatory respondent selection

decision in the Preliminary Results.   See Prelim I&D Mem. at 2-3 (P.R. 264).   At the case brief

stage, parties again reiterated the unreliability of the CBP data and resulting inaccuracy of

Commerce's respondent selection decision.   In the Final Results, however, Commerce continued

to ignore the substantial flaws in the CBP data and, instead, maintained its position from the

Preliminary Results, stating that "Fine Furniture and Jiangsu Guyu have not provided any

compelling arguments that have not already been addressed that would cause Commerce to

abandon its preferred practice of relying on CBP data in respondent selection in favor of issuing

Q&V questionnaires." Final I&D Mem. at Cmt. 1 (P. R. 361). To the contrary, Commerce never

responded to the points raised in Fine Furniture and Guyu's case briefs. See Fine Furniture Case

Brief at 3-5 (Business Proprietary Document) (C. R. 218); Letter on Behalf of Guyu to Dep't of

Commerce re: Case Brief at 16 (Mar. 19, 2020) (Public Version) ("Guyu Case Brief") (P.R. 326-

327). In addition, Commerce failed to properly consider interested parties' comments that were

submitted during the CBP data commenting period - the earliest possible stage for parties to raise

such issues - and explained, in detail, how the CBP data were inaccurate. See generally Letter on

Behalf of AMMWF to Dep't of Commerce re: Comments on CBP Data and Respondent Selection

(Mar. 21, 2019) (Business Proprietary Document) ("AMMWF CBP Data Comments") (C.R. 5);

Senmao CBP Data Comments (Business Proprietary Document) (C.R. 3); Letter on Behalf of

Hengtong to Dep't of Commerce re: Comments on CBP Data and Respondent Selection (Mar. 21,

2019) (Business Proprietary Version) ("Hengtong CBP Data Comments") (C.R. 4). Specifically,

in CBP data comments and again in their case briefs, various parties established, with evidence

and examples, that the [ ███████████████ ] in the CBP data are inaccurate and, as a

result, unreliable to determine the largest exporters of the subject merchandise into the United

States. See AMMWF CBP Data Comments at 3-4 (Business Proprietary Document) (C.R. 5);

Senmao CBP Data Comments at 2-3 (Business Proprietary Document) (C.R. 3); Hengtong CBP

Data Comments at 2-3 (Business Proprietary Version) (C.R. 4); Fine Furniture Case Brief at 3-5

(Business Proprietary Document) (C.R. 218). Commerce's decision to ignore this highly relevant

and determinative evidence and proceed to conduct an administrative review of Guyu as a

mandatory respondent was, thus, unsupported by substantial evidence and unlawful. In short,

Commerce's error at the respondent selection phase represents a fatal flaw that tarnished the entirety of its administrative review proceeding.

This Court has found that it is unreasonable for Commerce to ignore facial evidence of CBP data errors.  See Husteel Co. v. United States, _CIT_, _, 98 F. Supp. 3d 1315, 1327 n.8 (2015) (finding that where "Commerce wishes to rely on CBP data for respondent selection, it is unreasonable for Commerce to ignore evidence on the face of that data suggesting that the actual number of potential respondents is likely less than the number of companies separately listed").[1] In the Final Results, Commerce wrongly claimed that Husteel is inapplicable to the current facts because "Husteel addressed whether Commerce erred in selecting the number of respondents to examine, not whether the CBP data were unreliable for use in respondent selection." Final I&D Mem. at Cmt. 1 (P.R. 361).  Although the facts in Husteel are not identical to the present case, the Court's discussion of Commerce's obligation in reviewing the accuracy of CBP data for respondent selection is highly relevant.  There, the Court explained its position as follows:

> The government argues that Commerce is not required to conduct a pre-investigation into the accuracy of the CBP data for purposes of respondent selection, as such an investigation is not contemplated by the statute and would hinder the timely completion of the proceedings.  Although this argument may have some weight in certain situations, to the extent that Commerce wishes to rely on CBP data for respondent selection, it is unreasonable for Commerce to ignore evidence on the face of that data suggesting that the actual number of potential respondents is likely less than the number of companies separately listed.  The court agrees with Husteel that it is unreasonable "to suggest that it requires a 'pre-investigation' to determine that an exporter appearing in the CBP data with a quantity of {TEXT REDACTED BY THE COURT} is not a potential respondent" and that "{l}ikewise, where the same exporter appears multiple times in the same dataset, it is hardly unreasonable to expect Commerce to recognize that exporter will constitute only a single respondent."

---

[1] Although not binding on this Court in the present appeal, we offer this and other past opinions of the Court of International Trade as persuasive authority.

Husteel, _CIT at _, 98 F. Supp. 3d at 1327 n.8 (internal citations omitted).  The Husteel Court acknowledged that Commerce has an obligation to review CBP data for accuracy and should not ignore obvious errors based on information available, even if it need not conduct a "pre-investigation."  Id.  That is all the parties were asking for in this case.  After explaining to Commerce clearly and repeatedly that [ ████████████████████████████████████████

████████████████████████████████████████████████████ ], Commerce should address these errors raised and provide explanation for its decision.  The Husteel court specifically ruled that it was unlawful for Commerce to ignore evidence suggesting errors or flaws in CBP data for respondent selection.  Husteel, _CIT at _, 98 F. Supp. 3d at 1327.  Here, Commerce did just that – Commerce ignored that the CBP data [ █████████████████████████████████

████████████████████████████ ].  See Senmao CBP Data Comments at 3 (Business Proprietary Document) (C.R. 3).

Moreover, the Court has long held that the accuracy CBP data is a rebuttable presumption, and its reliability should only be upheld in "absence of evidence to the contrary."  Pakfood Pub. Co. v. United States, 35 CIT 60, 74 753 F. Supp. 2d 1334, 1376 (2011).  In Pakfood, the Court sustained Commerce's use of CBP data to select mandatory respondents and the reliability of the data because "Customs officers have a duty to assure the accuracy of information submitted to that agency . . . {and} the presumption of regularity entails the reasonable conclusion that, in the absence of evidence to the contrary, the data obtained by Customs officials in their regular course of business is accurate."  Pakfood Pub. Co. v. United States, 35 CIT at 74, 753 F. Supp. 2d at 1346 (emphasis added).  The Court in Pakfood then concluded that because there was no evidence in the record to show that "the CBP data – for merchandise entered during the relevant POR and subject to the AD duty order at issue – are in some way inaccurate or distortive," the reliability of

13

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

the CBP data was sustained   Id. at 73, at 1345.  The facts here are exactly the opposite. In the instant administrative review, parties placed abundant evidence on the record showing that the [ ███████████ ] in the CBP dataset were strikingly inaccurate and implausible, and, therefore, Commerce had no grounds to continue to presume that the CBP  data were reliable.

Further, Commerce could have confirmed the inaccuracy of the CBP data by issuing Q&V questionnaires as requested by parties in their comments, but Commerce refused to do so.  See Final I&D Mem. at Cmt. 1 (P.R. 361).  There was sufficient time between when Commerce received CBP data comments, March 21, 2019, and the day when Commerce issued the Respondent Selection Memorandum, May 21, 2019, to at least issue a Q&V to the exporters who were identified as the largest exporters per the CBP data.  Commerce could have remedied this error early in this proceeding in response to parties' comments but, instead, the agency proceeded with the unlawful review of an erroneously selected mandatory respondent.

Moreover, because Commerce's calculation of the countervailing duty rate for the non-examined companies, including Fine Furniture, was based in part on Guyu's rate, Commerce's calculation of Fine Furniture's CVD rate was similarly unsupported by substantial evidence and unlawful.   On remand, the Court should specifically instruct Commerce to recalculate the countervailing duty rate for Fine Furniture, a non-examined company, based solely on the CVD rate of Baroque Timber, the other individually examined mandatory respondent.  Using the rate of a single mandatory respondent for the all others rate, after another respondent is removed from consideration after litigation, is consistent with this Court's past opinions.  For example, in the analogous re-calculation of the separate rate in an appeal covering the antidumping duty order on MLWF from China, Commerce calculated a separate rate of 0.00 percent for the non-individually investigated companies "based solely on {Dalian Penghong Floor Products Co., Ltd./ Dalian

Shumaike Floor Manufacturing Co., Ltd.'s} weighted-average dumping margin," the only remaining mandatory respondent after the antidumping order was revoked with regards to the other individually examined mandatory respondent, Fine Furniture.  <u>Fine Furniture (Shanghai) Ltd. v. United States</u>, Consol. Ct. No. 16-000145, 2021 Ct. Intl. Trade LEXIS 27, *1 (Mar. 3, 2021).

In sum, Commerce's selection of Guyu as a mandatory respondent was unsupported by substantial evidence and unlawful because it was based on inaccurate CBP data.  Moreover, parties raised the issue with Commerce in a timely manner, and Commerce should have reconsidered its selection of Guyu.  The Court, therefore, must remand this issue back to Commerce with instructions to remove Guyu as a mandatory respondent and recalculate non-examined company rate for Fine Furniture based on Baroque Timber's rate alone.

## II.   COMMERCE'S VENEERS FOR LTAR SUBSIDY RATE CALCULATION FOR GUYU WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

In the event that the Court does not instruct Commerce to remove Guyu as a mandatory respondent per our arguments above, it must instruct Commerce to remedy certain errors in Guyu's CVD rate calculation.  In particular, Commerce wrongfully classified poplar core sheets as veneer in calculating Guyu's benefits from the veneers for LTAR program and also erroneously measured the value of poplar core sheets purchases using a benchmark for face-grade veneers because core sheets and poplar sheets are two different products, and any related subsidies should be measured separately.  In the Final Results, Commerce equated poplar core sheets with veneer based on one line in the scope of the CVD order covering this case – "a 'veneer' is a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch. Veneer is referred to as a ply when assembled." Final I&D Mem. Cmt. 3 n.115 (P.R. 361).  Contrary to this one line in the scope language, substantial record evidence establishes that core sheets and veneer sheets are two distinct products that are used differently in the production of subject merchandise.  <u>See</u> Letter on Behalf of Guyu

15

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

to Dep't of Commerce re: Response to New Subsidy Allegations at 2 (Nov. 8, 2019) (Public Version) ("Guyu NSA Response") (P.R. 218); Guyu Case Brief at 8-13 (Public Version) (P.R. 326-327).   Commerce failed to adequately consider this record evidence and, instead, unreasonably determined that Guyu received a benefit from the veneers for LTAR program by purchasing poplar core sheets.   As fully explained below, the Court must find this determination unsupported by substantial evidence and remand to Commerce for reconsideration.   If the Court sustains Commerce's decision to include poplar core sheet purchases in the veneers for LTAR program rate calculation, the Court must, at minimum, overturn Commerce's benchmark choice and instruct Commerce to use only those HTS subheadings that cover poplar core sheets for the poplar core sheets benchmark.

### A. Commerce's Inclusion of Poplar Core Sheets in the Veneers for LTAR Subsidy Calculation was Unsupported by Substantial Evidence and Otherwise not in Accordance with Law

In the underlying review, the petitioner AMMWF never alleged a new subsidy program pertaining to core sheets or core.   Guyu reported purchases of [ ████████████ ] that are used solely to produce plywood.   See Letter on Behalf of Guyu to Dep't of Commerce re: Response to New Subsidy Allegations at 1 (Nov. 8, 2019) (Business Proprietary Document) (C.R. 182-187) ("Guyu NSA Response").   Commerce, however, determined that because Guyu describes the poplar core sheets as thin slices of wood "rotary cut" from poplar wood, these poplar core sheets fit in the definition of veneer in the CVD order.   See Final I&D Mem. at Cmt. 3 (P.R. 361).   The CVD Order describes veneer very generally as a "thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch.   Veneer is referred to as a ply when assembled." Id.   Based solely on its determination that poplar core sheets meet veneer definition in the scope, Commerce included

Guyu's poplar core sheet purchases in the subsidy rate calculation of the provision of veneers for LTAR program.

Commerce's reliance on the "veneer" definition from the scope of the CVD order is misplaced given the contrary evidence on the record. Primarily, Commerce ignores the rest of the scope, namely the mention of "core." <u>CVD Order</u>, 76 Fed. Reg. at 76,694. The scope provides that "multilayered wood flooring is composed of an assembly of two or more layers or plies of wood veneer(s) in combination with a <u>core</u>." <u>Id.</u> (emphasis added). The language clearly distinguishes veneers from core; if core were the same as veneers, as Commerce determined in the Final Results, then there would be no need for this final clause: "in combination with a core." As Guyu reported to Commerce, [ ███████████████████████████████████████ ███████████████████████████████████████ ]. <u>See</u> Letter on Behalf of Guyu to Dep't of Commerce re: Response to Second Supplemental Questionnaire at 2 (Jan. 8, 2020) (Business Proprietary Document) ("Guyu Second Supplemental Questionnaire Response") (C.R. 202-210). Guyu further explained that [ ████████████████████████████ ███████████████████████████████████████ ███████████████████████████████ ]. <u>Id.</u>

Moreover, the record is flush with evidence establishing that core sheets and face veneer sheets are distinct products. For example, Guyu explained in its Second Supplemental Questionnaire Response that there are various differences between veneers and poplar core sheets such as type of wood, application, density and pricing, as summarized in the char below.

17

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

|  | | Poplar Core Sheets | Face Veneers | |
|---|---|---|---|---|
| Type of wood | [ | ██████ | ██████ | ] |
| Density | [ | ████ ████ █<br>█████ | ████████████<br>████████ | ] |
| Application | [ | ███ █ ██ █<br>██ █ ██ █ ██<br>███ ██ ███<br>████████<br>██████ ██<br>████ █ ███<br>████ | ██████████<br>███ ██ ███ ███ █<br>█████████ | ] |

See Guyu Second Supplemental Questionnaire Response at 2  (Business Proprietary Document) (C.R. 202-210).

Further, if poplar core sheets can be lumped into the veneers for LTAR program simply because they are "thin slice{s} of wood" in a literal sense, why then did Commerce not include all plywood purchases in the veneers for LTAR program?  Under an overly broad reading of the quoted definition, plywood could also be construed as a "thin slice of wood."  Practically, that would have been absurd because it is obvious at least in the MLWF industry that plywood and veneer are separate products.  Moreover, there is a separate program specifically covering plywood for LTAR.  Core sheets are just like plywood in that they are a distinct product from veneers.  Just because there is no core sheet for LTAR program does not mean that Commerce can squeeze Guyu's core sheet purchases into the veneers for LTAR program.  If the petitioner, AMMWF, had grounds to allege a core sheet for LTAR program, it should have done so, and only then could Commerce investigate such a program and possibly include Guyu's core sheet purchases under a core sheet for LTAR program.  AMMWF never made a new subsidy allegation related to core sheet purchases for LTAR.

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

In fact, contrary to Commerce's decision to countervail poplar core sheet purchases in the Final Results, AMMWF's actions in this review indicate that it did not believe "poplar core sheet" was covered by the veneers LTAR program.  For example:

1. AMMWF did not allege a subsidy program on poplar core sheets for LTAR or any species of core sheets.  See Letter on Behalf of AMMWF to Dep't of Commerce re: Comments on Jiangsu Guyu's New Subsidy Allegations Questionnaire Response (Nov. 22, 2019) (Public Version) ("Comments on NSA Questionnaire Response") (P.R. 230). It was only after Guyu's response to the NSA Questionnaire that AMMWF argued for the inclusion of poplar core sheets under the definition of veneers.

2. The benchmark data submitted by AMMWF on September 3, 2019 "contained 2018 monthly export data of wood veneers" and specified HTS subheadings "4408, 4408.10, 4408.39, and 4408.90."  See Letter on Behalf of AMMWF to Dep't of Commerce re: Other Factual Information and Benchmark Pricing Information at 3 (Sept. 3, 2019) (Public Document) (P.R. 172-181).  These HTS subheadings do not cover poplar core sheets, showing that AMMWF did not foresee that Commerce would include poplar core sheets in the benchmark calculation for veneers.

3. The only instance where "poplar" appears in AMMWF's benchmark submission is with respect to the plywood benchmark.  See Letter on Behalf of AMMWF to Dep't of Commerce re: Other Factual Information and Benchmark Pricing Information Regarding New Subsidy Allegations at Ex. 1 (Nov. 13, 2019) (Public Document) (P.R. 226-228).  AMMWF reported commodities under HTS 4412.33 covering "{p}lywood; with sheets of wood only; not bamboo; each ply 6mm or less, with at least one outer ply of alder, ash, beech, birch, cherry, chestnut, elm, eucalyptus, hickory, horse chestnut, lime, maple, oak, plane, poplar, aspen, robinia, tulipwood or walnut".  Id. Even this HTS subheading, however, does not cover "poplar core sheet" and instead covers only that wooden flooring with an outer ply made of poplar, which is different from core made of poplar.

AMMWF's failure to include poplar core sheets in any of its submissions prior to Guyu's NSA Questionnaire Response, coupled with the fact that the HTS data submitted by AMMWF for the calculation of veneers did not include poplar core sheets, indicates that even AMMWF understood that poplar core sheets were not covered by any subsidy program in this review.

Moreover, Commerce's misclassification of poplar core sheets as veneers is also highlighted by the veneer benchmark price, which is [ ███████████████████████████████████ ███████████████████████ ] and, thus, drives up the CVD margin exponentially.  See Mem. from

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

Robert Palmer to the File re: Final Results Calculations for Jiangsu Guyu International Trading Co., Ltd. (Guyu) at Attach. 2, Veneer Bench Tab, Shuyang Veneer Tab (Nov. 23, 2020) (Business Proprietary Document) ("Guyu Final Cal.") (C.R. 229-230) [ █████████████████████████

███████████████████████████████████████████████████████████████████

███████ ].  Commerce's unreasonable action here thus runs contrary to its obligation to calculate margins as accurately as possible.  See Borusan Mannesmann Boru Sanavi ve Ticaret A.S. v. United States, __ CIT __, __, 61 F. Supp. 3d 1306, 1337 (2015) (citing Rhone Poulenc v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).   Based on the physical differences between core sheets and veneers, the absence of poplar core sheets from any new subsidy allegation, and the disparate pricing of veneers and core sheets, Commerce's decision to include poplar core sheets in the veneers for LTAR subsidy calculation is contrary to record evidence and not in accordance with the law.  To remedy this error, the Court should remand the Final Results to Commerce with instructions to recalculate the veneers for LTAR subsidy rate by excluding Guyu's poplar core sheet purchases.

### B. Commerce's Veneers for LTAR Subsidy Rate Calculation Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

Commerce's determination to use the same benchmark data to calculate the benefit for Guyu's purchases of poplar core sheets and veneers is also unlawful.  Even assuming *arguendo* that Commerce reasonably countervailed core sheet purchases under the veneers for LTAR program, at minimum, Commerce's benchmark calculation for poplar core sheets was unsupported by substantial evidence and unlawful because it used data for HTS subheadings that cover veneers.

Pursuant to Section 771 of the Act, in measuring the benefit from any LTAR countervailable subsidy program, Commerce determines the adequacy of remuneration by assessing respondents' purchases "in relation to prevailing market conditions," or benchmarks.

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

See 19 U.S.C. § l677(5)(E)(iv).  In selecting benchmark prices pursuant to this statutory authority,

Commerce is limited in that it is "required to 'select benchmarks that are comparable' to the good

at issue, and normally relies on data reflecting the narrowest category of products encompassing

the input product wherever possible."  Changzhou Trina Solar Energy Co. v. United States, No.

16-00157, 2018 Ct. Int'l Trade LEXIS 31 (Mar. 27, 2018) (upholding results of remand

redetermination), Final Results of Redetermination Pursuant to Remand (Dec. 1, 2017), ECF No.

50 at 7-8.  Moreover, Commerce's requirement to select input-specific benchmark data  is firmly

rooted in its requirement to select LTAR benchmark data that represent "the good or service being

provided." 19 U.S.C. § l677(5)(E)(iv); see also 19 C.F.R. § 351.511(a)(2)(i)  (providing that

benchmark should match "the good or service" consumed).

      Here, the record is clear that Guyu reported purchases of [ ████ ].  See Guyu

NSA Response at 1 (Business Proprietary Document) (C.R. 182-187).  Guyu made it clear that

Shuyang "purchased [ ███ ] which falls outside the range of the four inputs"

mentioned in the New Subsidy Questionnaire.  Id.  Also, the thickness of [ ███ ]

ranges "from 1.4mm to 2.8mm is substantially differentiated from [ ██ ]."  Id.  Most

importantly, Guyu has pointed out that "[ ███ ] and [ ██ ] are subject to

different benchmark prices and, therefore, any comparison between the two is inappropriate." Id.

at 2.  Despite Guyu's clear statement to differentiate [ ██ ] from [ ███ ],

Commerce used import data under veneer HTS subheadings [ ███ ] to

calculate the benchmark for Guyu's poplar core sheet purchases, which cover the following

products:

- [ ████████████
████████████
████████████
███████

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED



]

See Guyu Final Cal. At Attach. 2 Veneer Bench Tab (Business Proprietary Document) (C.R. 229-230) (the Veneer benchmark tab shows that Commerce used the above three codes to calculate benchmark price for veneer); Letter on Behalf of Baroque Timber to Dep't of Commerce re: Second Benchmark Data Submission at Ex. 2 (Nov. 13, 2019) (Public Document) (P.R. 222-225) (HTS headings descriptions listed above are provided in Baroque Timber's Second Benchmark submission). As these HTS subheadings cover veneer sheets and not poplar core sheets, they are not comparable to Guyu's actual inputs of poplar core sheets.

Further, parties requested the chance to submit additional and more accurate benchmark data, but Commerce refused to accept. See Final I&D Mem. at Cmt. 3 (P.R. 361). Commerce's refusal of more accurate benchmark data and its decision to conduct an unreasonable comparison with a flawed benchmark is not supported by the evidence on the record and unlawful. See China Steel Corp. v. United States, _CIT_, _, 393 F. Supp. 3d 1322, 1342 (2019) ("Commerce must accept new information between the preliminary and final determination stages if it is reasonable to do so."). Here, given the understanding in the industry that core and veneer are separate products and because the subsidy program under review only covered "veneers" for LTAR, once Commerce decided to include Guyu's poplar core sheet purchases in its veneers for LTAR subsidy rate calculation, the only reasonable determination was for Commerce to allow parties to submit poplar core sheet benchmark data.

In sum, this Court must remand this issue back to Commerce with instruction to 1) remove poplar core sheets from the veneers for LTAR program calculation or, alternatively, 2) reopen the record so that parties can submit benchmark data for poplar core sheets and 3) recalculate the countervailing duty rates for the mandatory respondents and the non-examined companies.

## III.  COMMERCE'S BENCHMARK PRICE CALCULATION FOR THE PLYWOOD FOR LTAR PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce's plywood benchmark calculation for Baroque Timber is not supported by substantial evidence and is unlawful because it failed to adequately account for "factors affecting comparability." 19 C.F.R. § 351.511(a)(2)(i).  In the Final Results, when calculating the plywood benchmark, Commerce improperly included data under HTS subheading 4412.99, which covers products not used by Baroque Timber in its production of the subject merchandise.  See Final I&D Mem. at Cmt. 6 (P.R. 361).  HTS 4412.99 covers the following products: "Plywood, veneered panels and similar laminated wood – Other."  Letter on Behalf of Baroque Timber to Dep't of Commerce re: Benchmark Rebuttal at 3 (Nov. 25, 2019) (Public Version) ("Baroque Timber Benchmark Rebuttal") (P.R. 232-234).

In the Final Results, Commerce recognized that it is obligated to determine the benchmark by relying on data that reflects the narrowest category of products encompassing the input product. See Final I&D Mem. at Cmt. 3 n. 206 (citing to past proceedings where Commerce determines benchmarks using the narrowest category of input product).  The preference for data representing the narrowest category of product is consistent with Commerce's own past practice of excluding HTS codes from its benchmark calculation that do not represent the specific input subject to a subsidy rate.  See, e.g., Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 9274 (Dep't of Commerce Mar. 5, 2018), and accompanying Issues and Dec. Mem. at Cmt. 16 (Commerce

excluded HTS 7601.20 from the benchmark calculation of unalloyed ingot as HTS 7601.20 includes alloyed ignots); Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005), and accompanying Issues and Dec. Mem. at Cmt. 1.  Commerce, thus, has a duty to ensure that its selected benchmark is specific to plywood and does not include other generic wood products.  Acting contrary to its acknowledged obligation and established past practice, however, Commerce selected a benchmark is that is not "specific" to the plywood used by Baroque Timber.

Baroque Timber reported that 4412.99 covers laminated wood that Baroque Timber does not use in its production of the subject merchandise.  See Letter on Behalf of Baroque Timber to Dep't of Commerce re: Administrative Case Brief at 6-7 (Mar. 13, 2020) (Public Document ) (P.R. 312).  Baroque Timber further explained that including 4412.99 imports in the plywood benchmark calculation leads to excessive inclusion of different types of veneers and laminated wood that are not plywood.  See id. at 6.  Commerce, however, ignored this factual information and calculated the plywood benchmark inclusive of 4412.99 data, which is contrary to its obligation to select the narrowest category of input product.  See Final I&D Mem. at Cmt. 6 (P.R. 361).

Commerce's refusal to remove 4412.99 data from Baroque Timber's plywood benchmark calculation also runs contrary to Commerce' long established practice to rely on a company's certified statements about its operation.  See, eg., Nucor Fastener Div. v. United States, Ct. No. 09-00531, 2013 Ct. Intl. Trade LEXIS 76, at *24 (May 24, 2013) (upholding an agency's reliance on "a firm's certified statements about its own internal operations and to weigh evidence and resolve conflicts in the data"); see also Chia Far Indus. Factory Co. v. United States, 28 CIT 1336, 1356, 343 F. Supp. 2d 1344, 1364 (2004) (upholding Commerce's reliance on "a certified statement" as  the company "is in the best position to know its own business" ).  Baroque Timber

has stated in certified submission that subheading 4412.99 does not cover its production input, and without evidence questioning the truthfulness of its submission, Commerce's benchmark calculation should not be formulated to the contrary. Commerce's benchmark price for plywood in the Final Results is, therefore, flawed because the HTS data are overly broad and do not accurately represent the price of plywood.

By including data under HTS 4412.99, Commerce rendered its plywood benchmark calculation unsupported by substantial evidence and unlawful. Instead, Commerce should have selected only the most product-specific information for the plywood benchmark. This Court, therefore, must remand this issue back to Commerce with instructions to exclude data from HTS subheading 4412.99 from the plywood benchmark calculation, recalculate the countervailing duty rates for Baroque Timber and revise the rate for non-examined company Fine Furntiure accordingly.

## IV.   COMMERCE'S USE OF AFA TO IMPUTE A BENEFIT UNDER THE EBCP WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND UNLAWFUL

Commerce's use of AFA to impute a benefit under the EBCP to the mandatory respondents was unsupported by substantial evidence and unlawful. Before applying an adverse inference in selecting from facts available, Commerce must find that information is missing on the record as the result a party's noncooperation. See 19 U.S.C. § 1677e(a); § 1677e(b)(1). The adverse inference must then be limited to the noncooperating party. See id. at § 1677e(b)(1)(A). No information is missing from the record here as the evidence demonstrates that the mandatory respondents did not use the EBCP.

As observed by Commerce, Baroque Timber "provided customer declarations for 60% of Riverside Plywood's reported customers" certifying non-usage of the EBCP, and Guyu "provided customer declarations for approximately 50% of its reported customers" certifying non-usage. See

Prelim I&D Mem. at 24 nn.124 & 126 (P.R. 263); Letter on Behalf of Guyu to Dep't of Commerce re: Response to Section III at Ex. IV-C-5 (July 15, 2019) (Business Proprietary Document) ("Guyu IQR") (C.R. 23-35); Letter on behalf of Baroque Timber to Dep't of Commerce re: Baroque Timber Initial Questionnaire Response at Ex. 15c (July 15, 2019) (Business Proprietary Document) ("Baroque Timber IQR") (C.R. 99-126).  GOC also confirmed that "none of the U.S. customers of the mandatory respondents or their cross-owned companies applied for, used, benefited from or accrued assistance from Export Buyers Credits from the Ex-Im Bank."  Letter on Behalf of GOC to Dep't of Commerce re: Government of China's Initial Questionnaire Response at 36-37 (July 15, 2019) (Public Version) ("GOC IQR") (P.R. 96-131).

Commerce's use of AFA is improper because it wrongly correlated information concerning the <u>operation</u> of the EBCP with <u>usage</u> of the program.  Commerce claimed that the GOC did not provide information that would allow it to understand the operation of EBCP.  <u>See</u> Final I&D Mem. at Cmt. 9 (P.R. 361).  The Court, however, has long recognized the distinction between the "administration" (operation) of an alleged subsidy program and the "existence and amount of the benefit conferred" (use) under the program.  <u>Essar Steel Ltd. v. United States</u>, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1297 (2010), <u>aff'd in part and rev'd in part on other grounds</u>, 678 F.3d 1268 (Fed. Cir. 2012); <u>see also</u> <u>Archer Daniels Midland Co. v. United States</u>, __ CIT __, __, 917 F. Supp. 2d 1331, 1342 (2013).  Whether credit is extended falls squarely within the realm of the <u>operation of the EBCP</u> and has <u>no bearing on usage</u> of the program.  <u>See</u> <u>Guizhou Tyre Co. v. United States</u>, __ CIT __, __, 348 F. Supp. 3d 1261, 1271 (2018) (explaining that identical findings by Commerce improperly "conflates the {ECBP's} operation with its use").

Information concerning the operation of the ECBP was unnecessary here because the GOC confirmed that "none of the U.S. customers of the mandatory respondents . . . used . . . the Export

Buyers Credits."  GOC IQR at 36-37 (Public Version) (P.R. 96-131).  This was confirmed and documented by mandatory respondents in the form of certified declarations of non-use from unaffiliated customers.  See Guyu IQR at Ex. IV-C-5 (Business Proprietary Document) (C. R. 23-35); Baroque Timber IQR at Ex. 15c  (Business Proprietary Document) (C.R. 99-126).

As a result of alleged amendments to the program in 2013, Commerce argued that it could not verify the mandatory respondents' customer declarations.  See Final I&D Mem. at Cmt. 9 (P.R. 361).  According to Commerce, it would be "unreasonably onerous for Commerce to comb through the business activities of the company respondents' customers" because it can no longer just search its ledgers for the China Ex-Im Bank as funds may be disbursed by third-party banks.  Id.  To the contrary, non-use of the EBCP can be verified based on other information on the record. Commerce could review the underlying documentation related to these loans, regardless of whether the funds came from a third-party bank, to rule out the possibility that mandatory respondents benefitted from funds related to the EBCP.  See Changzhou Trina Solar Energy Co. v. United States, No. 17-00198, 2019 Ct. Intl. Trade LEXIS 138, at *11-12 (Nov. 8, 2019) (remanding for Commerce to attempt verification of customer declarations); see also Guizhou Tyre, Co. Ltd. v. United States, __ CIT __, __, 398 F. Supp. 3d 1315, 1322 (2019) (Commerce "ha{s} the tools at its disposal to substantiate the accuracy of the declarations.").  Commerce could further verify non-use of the EBCP by tying all loans in the aggregate from any source to audited financial statements of the mandatory respondents.  Commerce could similarly verify the customer declarations using this method.

This Court has repeatedly rejected Commerce's use of AFA based on its alleged inability to verify.  Commerce is obligated to explain the connection between the alleged information GOC failed to provide and its use of AFA.  See Changzhou Trina Solar Energy Co. v. United States, __

CIT __, __, 352 F. Supp. 3d 1316, 1326 (2018) (faulting Commerce for not explaining "why the GOC's failure to explain {EBCP} was necessary to assess claims of non-use and why other information accessible to respondents was insufficient to fill whatever gap was left by the GOC's refusal to provide internal bank records").  After being unable to provide a satisfactory explanation for its use of AFA, Commerce found non-use of the EBCP and removed the corresponding subsidy rate, in order to comply with the Court's remand orders and to "avoid adversely impacting a cooperative party."  See Changzhou Trina Solar Energy Co. v. United States, Consol. Ct. No. 17-00198, slip op. 19-137 (Nov. 8, 2019), Final Results of Redetermination Pursuant to Court Remand (Feb. 28, 2020), ECF No. 136 (Nonconfidential Version); see also Canadian Solar Inc. v. United States, Consol. Ct. No. 18-00184, slip op. 20-23 (Feb. 25, 2020), Final Results of Redetermination Pursuant to Court Remand (June 26, 2020) (Public Document), ECF No. 95.  The Court sustained Commerce's finding of non-use of the EBCP, noting that although "Commerce did not confer with the parties as the court said that it should . . . the court does not find that Commerce's decision to accept the certifications of non-use amounts to noncompliance with the remand."  Changzhou Trina Solar Energy Co. v. United States, Consol. Ct. No. 17-00198, 2020 Ct. Intl. Trade LEXIS 114, at *11 (Aug. 4, 2020).  An agency decision is arbitrary if it treats similar situation differently "without adequate explanation and factual support on the record."  Thai Plastic Bags Indus. Co., Ltd. v. United States, _CIT_, _, 949 F. Supp. 2d 1298, 1302 (2013); see also Transactive Corp. v. United States, 91 F.3d 232, 237(D.C. Cir. 1996) ("{A}n agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.").  In the instant review, with similar facts, Commerce's finding that the mandatory respondents benefited from the EBCP is now arbitrary and capricious by failing to provide an explanation for treating the mandatory respondents here differently.

In sum, Commerce's use of AFA to find use of the EBCP was unsupported by substantial evidence and unlawful because there was no information missing from the record where the GOC and the respondents' customers have provided either affirmative statements or declarations proving non-use of the program. This Court must remand this issue to Commerce with instructions to find non-use of the EBCP by the mandatory respondents and remove any corresponding benefit assigned under this program.

**V. COMMERCE'S SPECIFICITY DETERMINATION AND BENCHMARK CHOICE FOR THE ELECTRICITY FOR LTAR PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND UNLAWFUL**

In the Final Results, Commerce found that the GOC failed to comply with its requests for information and, therefore, relied on AFA to calculate an electricity benefit by using the highest rates amongst the provincial price schedules as benchmarks for each reported electrical category. See Final I&D Mem. at Cmt. 8 (P.R. 361). Commerce's specificity finding for the electricity for LTAR program was unsupported by substantial evidence and unlawful because Commerce failed to connect the information that it found to be missing from the record to its AFA determination and also failed to make factual findings on whether and how the electricity program is specific.

**A. Commerce's Specificity Finding Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

By statute, Commerce may only countervail a program that is specific in certain enumerated ways. See 19 U.S.C. § 1677A(5) (providing that "a countervailable subsidy is a subsidy described in this paragraph which is specific"); see also 19 U.S.C. § 1677A(5A) (providing specificity categories including export subsidies, import replacement subsidies and domestic subsidies). Despite this obligation, Commerce made no precise finding as to how the alleged electricity program was specific in accordance with the Act. Instead, Commerce merely relied on a broad interpretation of its authority to use AFA, stating that "the GOC's provision of electricity

confers a financial contribution and is specific within the meaning of sections 771(5)(D) and

771(5A) of the Act, respectively." Final I&D Mem. at Cmt. 8 (P.R. 361). This reasoning is flawed,

as the Court has held that when applying AFA, Commerce "must still make the necessary factual

findings to satisfy the requirements for countervailability." Changzhou Trina, __ CIT at __, 352

F. Supp. 3d at 1326 (2018); see also 19 U.S.C. § 1677e(a) (requiring Commerce to determine what

specific information is not on the record before using facts available). Even when relying on AFA,

Commerce must still engage in a statutory analysis of the electricity for LTAR program, as the

Court has recognized:

> Simply stating that the GOC did not fully comply is insufficient, Commerce must
> actually engage in an analysis of the information on the record and explain how
> adverse inferences lead to the conclusion that the provision of electricity in China
> is a countervailable subsidy . . . . Commerce must connect the dots: how does the
> GOC's partial response—or failure to respond fully—reasonably lead to a finding
> of a specific subsidy even with use of AFA?

 Changzhou Trina, __ CIT at __, 352 F. Supp. 3d at 1342. Here, Commerce has failed to analyze

information on the record to make the required specificity determination, and therefore, this Court

should reject its determination as unsupported by substantial evidence and unlawful.

Even though Commerce failed to state how the electricity program is specific, the facts on

the record establish that the GOC is not providing subsidized electricity rates to a specific region

or industry. In fact, the electricity tariff rates provided by the GOC "are equally applied to all end

users. No specificity exists with regard to the electricity prices." GOC IQR at 14 (Public Version)

(P.R. 96-131). Here, the GOC did not fail to respond to any questions addressing whether

electricity rates are generally applicable within the provinces (regardless of how they were

determined). There is no basis, therefore, for Commerce to conclude otherwise, even under AFA.

This exact issue has been in front of the Court on several occasions. See Changzhou Trina,

2019 Ct. Intl. Trade LEXIS 138 at 32; Changzhou Trina, __ CIT at __, 352 F. Supp. 3d at 1343.

This Court should be guided by the persuasive authority and sound reasoning of those prior opinions where the Court has required Commerce, on remand, to explain how it perceives the electricity program to be specific under these circumstances, even in an AFA context.

### B. Commerce's Electricity Benchmark Determination Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

Commerce's electricity benchmark selection was also unsupported by substantial evidence and unreasonable because Commerce's AFA benefit measurement method for the mandatory respondents entailed creating a mix-and-match of rates from [ ███████████ ] in China, depending on which one had the highest rate for the specific electricity user/rate category.  See Prelim I&D Mem. at 35-36 (unchanged in the final results); Mem. from Robert Palmer to the File re: Final Results Calculations for Baroque Timber at Attach. 2, Elec Benchmark Tab (Nov. 23, 2020) (Business Proprietary Document) (C.R. 227-228) ("Baroque Timber Final Cal."); Guyu Final Cal. at Attach. 2, Elec Bench Tab (Business Proprietary Document) (C.R. 229-230).

| | | **Basic Fee** [ ███ | [ ████████ | |
| | | ███ ███ ███ ███ ] | ████████ ] | |
| Rush Hour | [ | ████████ | ████████ | ] |
| Peak | [ | ████████ | █████████ | ] |
| Normal | [ | ██████ | ███████ | ] |
| Valley | [ | ██████ | ███████ | ] |
| Maximum Demand | [ | █ | ████ | ] |
| Transformer | [ | ██ | █████ | ] |

See Baroque Timber Final Cal. at Attach. 2, Elec Benchmark Tab (Business Proprietary Document) (C.R. 227-228) ("Baroque Timber Final Cal."); Guyu Final Cal. at Attach. 2, Elec Bench Tab (Business Proprietary Document) (C.R. 229-230).  Commerce's precise manner of selecting the worst possible rates in all of China is nonsensical and cannot be upheld by the Court, even under AFA, because it "selected the highest non-seasonal provincial rates in China during

31

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

the POR for each applicable user category," which means Commerce <u>imputes electricity rates from</u> [█████] <u>different provinces in China to the same (stationary) facility of the mandatory respondents.</u> Prelim I&D Mem. at 2 (P.R. 265-266). <u>See also</u> Guyu Final Cal. at Attach. 2, Elec Bench Tab (Business Proprietary Document) (C.R. 229-230); Baroque Timber Final Cal. at Attach. 2, Elec Bench Tab (Business Proprietary Document) (C.R. 227-228). To state the obvious, the mandatory respondents' factories cannot be located in multiple different provinces in China at the same time. The law does not permit Commerce to apply strictly punitive measures, even under AFA, and there is no way to view the application of penalty benchmarks to a respondent as if it were located simultaneously in various different places in China as anything but punitive. There is no "gap filling" rationale for applying the maximally punitive rate as if a single company operated simultaneously in different provinces of China.

For these reasons, the Court must find that Commerce's decision to selectively sample the highest provincial electricity rates in its calculation of the electricity benchmark without making required factual findings was not based on substantial evidence and is otherwise not in accordance with law. Accordingly, the Court should remand this issue back to Commerce with instructions to find that the electricity program does not constitute a countervailable subsidy, to remove any corresponding benefit assigned to the mandatory respondents and to recalculate the rate for the non-selected companies.

## CONCLUSION

For the foregoing reasons, Fine Furniture requests that the Court grant its Motion for Judgment on the Agency Record because the Final Results were unsupported by substantial record evidence or unlawful. Fine Furniture also concurs with and incorporates by reference all of Guyu's and Baroque Timber's arguments presented in their Rule 56.2 motions and briefs. To remedy

these errors, Fine Furniture requests that the Court remand the Final Results to Commerce for a determination in accordance with the points of law discussed above.

Respectfully submitted,

<u>Dated</u>: May 14, 2021

/s/ Kristin H. Mowry
Kristin H. Mowry
Sarah M. Wyss
Wenhui "Flora" Ji
*Counsel to Fine Furniture*

33

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Kristin H. Mowry, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 10,308 words.


Dated: <u>May 14, 2021</u>                           <u>/s/ Kristin H. Mowry</u>
                                                     Kristin H. Mowry
                                                     Mowry & Grimson, PLLC
                                                     5335 Wisconsin Avenue, NW, Suite 810
                                                     Washington, D.C. 20015
                                                     202-688-3610
                                                     trade@mowrygrimson.com
                                                     *Counsel to Fine Furniture*