## UNITED STATES COURT OF INTERNATIONAL TRADE

JIANGSU SENMAO BAMBOO AND WOOD
INDUSTRY CO., LTD. et al.,

        **Plaintiffs,**

SHENZHENSHI HUANWEI WOODS CO.,
LTD., et al.,

        **Plaintiff-Intervenors,**

   **v.**

UNITED STATES,

               **Defendant,**

   **and**

AMERICAN MANUFACTURERS OF
MULTILATYERED WOOD FLOORING,

Defendant-Intervenor.

Before: Timothy M. Reif

Consol. Court No. 20-03885

## ORDER

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record filed by

Plaintiff-Intervenors Shenzhenshi Huanwei Woods., Co., Ltd., Zhejiang Biyork Wood Co., Ltd.,

Jiangsu Guyu International Trading Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd.,

Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan Huijiale

Decoration Material Co., Ltd., and Dalian Jiahong Wood Industry Co., Ltd., and all other papers

and proceedings herein, it is hereby

**ORDERED** that the Plaintiff-Intervenors' motion is granted, and it is further

**ORDERED** that this matter is remanded to the United States Department of Commerce with instructions to issue a new determination consistent with this Court's decision.

_____
Honorable Timothy M. Reif, Judge

Dated: _____, 2021
     New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

**JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. et al.,**

        **Plaintiffs,**

**SHENZHENSHI HUANWEI WOODS CO., LTD., et al.,**

        **Plaintiff-Intervenors,**

    **v.**

**UNITED STATES,**

        **Defendant,**

   **and**

**AMERICAN MANUFACTURERS OF MULTILATYERED WOOD FLOORING,**

**Defendant-Intervenor.**

**Before: Timothy M. Reif**

**Consol. Court No. 20-03885**

---

## PLAINTIFF-INTERVENORS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

This memorandum of points of law is submitted in support of the Motion for Judgment on the agency record submitted by Plaintiff-Intervenors, Shenzhenshi Huanwei Woods., Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., ("Guyu"), Kemian Wood Industry (Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan Huijiale Decoration Material Co., Ltd., and Dalian Jiahong Wood Industry Co., Ltd., foreign exporters of subject merchandise.

Plaintiff-Intervenors challenge certain aspects of the final results of the seventh administrative review of the countervailing duty ("CVD") order on Multilayered Wood Flooring ("MLWF") from the People's Republic of China conducted by the United States Department of Commerce ("Commerce"). *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review*; *2017*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) ("*Final Results"),* and incorporating the Issues and Decision Memorandum: Issues and Decision Memorandum for the Final Results of the 2017 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China (Nov. 20, 2020) ("Final IDM").

Plaintiff-Intervenors respectfully move this Court to remand the case back to Commerce with instructions to reconsider aspects of its determination in accordance with this Court's decision.

Respectfully submitted,

CLARK HILL PLC

 */s/ Mark R. Ludwikowski*
Mark R. Ludwikowski
Courtney Gayle Taylor

1001 Pennsylvania Ave., N.W.
Suite 1300 South
Washington, DC 20004
Tel. (202) 640-6680

*Counsel for Plaintiff-Intervenors*

Dated: May 14, 2021

NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. et al.,** | |
| **Plaintiffs,** | |
| **SHENZHENSHI HUANWEI WOODS CO., LTD., et al.,** | **Before: Timothy M. Reif** |
| **Plaintiff-Intervenors,** | **Consol. Court No. 20-03885** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **AMERICAN MANUFACTURERS OF MULTILATYERED WOOD FLOORING,** | |
| **Defendant-Intervenor.** | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF-INTERVENORS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Mark R. Ludwikowski
Courtney Gayle Taylor
**Clark Hill PLC**

1001 Pennsylvania Ave., N.W.
Suite 1300 South
Washington, DC 20004
Tel. (202) 640-6680

*Counsel for Plaintiff-Intervenors*

Dated: May 14, 2021

NON-CONFIDENTIAL VERSION

**Table of Contents**

ADMINISTRATIVE DETERMINATION UNDER REVIEW ..................................................... 7

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................................... 7

STATEMENT OF FACTS ............................................................................................................ 8

SUMMARY OF ARGUMENT ................................................................................................... 15

STANDARD OF REVIEW AND JURISDICTION .................................................................... 17

ARGUMENT ............................................................................................................................... 18

I.    COMMERCE ERRED BY EXCLUSIVELY RELYING ON CBP DATA TO SELECT
MANDATORY RESPONDENTS ............................................................................................... 18

    A.  Legal Requirements for Selecting Mandatory Respondents .............................................. 18

    B.  Petitioner and Respondents Identified Errors and Proposed Alternatives to Exclusive
Reliance on Flawed CBP Data ................................................................................................. 20

II.   INDIVIDUAL POPLAR FARMERS ARE NOT "AUTHORITIES" ................................. 26

III.  COMMERCE'S FINDING OF CROSS-OWNERSHIP THROUGH BLOOD
RELATIONS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY
TO LAW ...................................................................................................................................... 29

IV.   COMMERCE'S DECISION TO COUNTERVAIL POPLAR CORE SHEETS UNDER
THE PROVISION FOR VENEERS FOR LTAR WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND CONTRARY TO LAW ................................................................................. 31

V.    COMMERCE'S DECISION TO DOUBLE COUNT POPLAR CORE SHEETS FOR LTAR
WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW ....... 35

VI.   COMMERCE'S APPLICATION OF AFA IN FINDING USE AND BENEFIT FROM
THE EXPORT BUYERS CREDIT PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND CONTRARY TO LAW ................................................................................. 36

VII.  COMMERCE'S COUNTERVAILING OF "OTHER SUBSIDIES" IS UNSUPPORTED
BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW ............................................... 40

CONCLUSION ............................................................................................................................ 41

NON-CONFIDENTIAL VERSION

## Table of Authorities

**Cases**

*Changzhou Trina Solar Energy Co. v. United States,* 195 F. Supp. 3d 1334, 1350 (Ct. Int'l Trade 2016) ................................................................................................................... 36

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2018) ..................................................................................................... 37, 39

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, No. 17-00246, 2018 WL 6271653 (Ct. Int'l Trade Nov. 30, 2018) ............................................................................... 37, 39

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ..................... 37, 39

*Consolidated Edison Corp. v. NLRB*, 305 U.S. 197 (1938) ........................................................ 17

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ........................................ 17

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) ...................... 36

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019) ...................... 36

*Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ......... 37, 39

*Husteel Co. v. United States*, 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ............................ 22, 25

*Nippon Steel Corporation v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .............................. 38

*Pakfood Pub. Co. v. United States*, 772 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ....................... 19

*RZBC Group Shareholding Co. v. United States*, No. 15-00022, 2016 WL 3880773 (Ct. Int'l Trade June 30, 2016) ................................................................................................. 36

*Yama Ribbons and Bows Co., Ltd.  v. United States*, Slip Op. 21-50 (Apr. 30, 2021)..... 16, 39, 40

*Yama Ribbons and Bows Co., v. United States*, No. 18-00054, 2019 WL 7373856 (Ct. Int'l Trade Dec. 30, 2019) .................................................................................................. 36, 37

NON-CONFIDENTIAL VERSION

**Statutes**

19 U.S.C. § 1516a ........................................................................................................ 16

19 U.S.C. § 1516a(a)(2)(A)(i)(I) ............................................................................. 16, 17

19 U.S.C. § 1516a(a)(2)(B)(iii) ............................................................................... 16, 17

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................................... 16

19 U.S.C. § 1671a ................................................................................................... 39, 40

19 U.S.C. § 1677 ........................................................................................................ 25

19 U.S.C. § 1677(5)(B) .............................................................................................. 27

19 U.S.C. § 1677(5)(D) .............................................................................................. 36

19 U.S.C. § 1677f-1(2) ........................................................................................... 17, 18

19 U.S.C. § 1677f-1(c)(2)(B) ....................................................................................... 18

19 U.S.C. §§ 1677e(a)-(c) ........................................................................................... 35

19 U.S.C.§ 1671(a)(1) ................................................................................................. 27

28 U.S.C. § 1581(c) .................................................................................................... 16

**Other Authorities**

Agreement on Subsidies and Countervailing Measures, Apr. 15, 1994, Marrakesh Agreement

    Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 ........................... 39

**Regulations**

19 CFR § 351.525(b)(6)(vi) ........................................................................................ 28

**Administrative Decisions**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297

    (Dep't Commerce Mar. 14, 2019) ............................................................................. 8

*Multilayered Wood Flooring from China*, 75 Fed. Reg. 70,719 (Int'l Trade Comm'n Oct. 27, 2010) ...................................................................................................................... 8

*Multilayered Wood Flooring From the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't Commerce Dec. 8, 2011) ............................................................ 8

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 Fed. Reg. 22,311 (Dep't Commerce May 15, 2017) .................................................................................................... 20

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) ................................................................................................ 6, 13

*Multilayered Wood Flooring from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 75 Fed. Reg. 70,719 (Dep't Commerce Nov. 18, 2010) ............................ 8

*Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part, 2017*. 85 Fed. Reg. 6908 (Dep't Commerce, Feb. 6, 2020) .................................................................. 12

NON-CONFIDENTIAL VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. et al.,** | |
| **Plaintiffs,** | |
| **SHENZHENSHI HUANWEI WOODS CO., LTD., et al.,** | **Before: Timothy M. Reif** |
| **Plaintiff-Intervenors,** | **Consol. Court No. 20-03885** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **AMERICAN MANUFACTURERS OF MULTILATYERED WOOD FLOORING,** | |
| **Defendant-Intervenor.** | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF-INTERVENORS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

**INTRODUCTION**

Plaintiff-Intervenors, Shenzhenshi Huanwei Woods., Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Jiangsu Guyu International Trading Co., Ltd. ("Guyu"), Kemian Wood Industry (Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan Huijiale Decoration Material Co., Ltd., and Dalian Jiahong Wood Industry Co., Ltd., by and through their attorneys, hereby submit this memorandum in support of their motion for judgment on the agency record challenging the U.S. Department of Commerce's ("Commerce")

NON-CONFIDENTIAL VERSION

final results of the seventh administrative review of the countervailing duty ("CVD") order covering multilayered wood flooring from the People's Republic of China. Commerce erroneously selected Guyu as a mandatory responded in the review based on inaccurate import data from U.S. Customs and Border Protection ("CBP"). Commerce compounded this error in the final results by including poplar core sheets in the Provision for Veneers for less than adequate renumeration ("LTAR") in its calculation of a 122.92 percent CVD rate for Guyu. Plaintiff-Intervenors contest Commerce's assigned rate for Guyu and for the separate rate respondents in this review as well as the underlying determinations leading to this calculation.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

This action seeks judicial review of certain aspects of the final results of the administrative review of the CVD order on Multilayered Wood Flooring ("MLWF") from the People's Republic of China conducted by the United States Department of Commerce ("Commerce"). *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) ("*Final Results*"), and incorporating the Issues and Decision Memorandum: Issues and Decision Memorandum for the Final Results of the 2017 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China (Nov. 20, 2020) ("Final IDM"). The review in question covers entries of MLWF for the period of January 1, 2017 through December 31, 2017.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether Commerce's selection of Guyu as a mandatory respondent for individual examination was based on substantial evidence on the record or in accordance with law?

2.     Whether Commerce's application of adverse facts available ("AFA") to determine that individual poplar farmers are state "authorities" was based on substantial evidence or in accordance with law?

3.     Whether Commerce's finding of cross-ownership between Guyu's affiliates was based on substantial evidence or in accordance with law?

4.     Whether Commerce's determination to countervail poplar core sheets, used as in input in assembling plywood cores within mutlilatyered wood flooring, under the Provision for Veneers for LTAR is based on substantial evidence or in accordance with law?

5.     Whether Commerce's double counting of poplar core sheets in the Provision of Veneers for LTAR, as well as in the Provision for Plywood for LTAR, was based on substantial evidence or in accordance with law?

6.     Whether the rate calculated by Commerce using AFA against the Government of China ("GOC") for the export buyer credit program ("EBCP") was reasonable, based on substantial evidence or in accordance with law?

7.     Whether Commerce's decision to countervail unalleged subsidies under the "Other Subsidies" program was based on substantial evidence or in accordance with law?

## STATEMENT OF FACTS

Commerce initiated the countervailing duty investigation of multilayered wood flooring from the People's Republic of China on November 18, 2010, following filing of the petition on

NON-CONFIDENTIAL VERSION

October 21, 2010.[1] The International Trade Commission ("Commission") simultaneously conducted its investigation.[2]

On October 18, 2011, Commerce issued a countervailing duty order on multilayered wood flooring from the People's Republic of China following an affirmative countervailing duty determination by Commerce and an affirmative injury determination by the Commission.[3] The countervailing duty order remains in effect.

In December 2018, certain interested parties requested that Commerce conduct an annual administrative review on MLWF from the People's Republic of China, and on March 14, 2019, Commerce initiated the seventh administrative review covering the period of January 1, 2017 through December 31, 2017 ("POR").[4]

Commerce subsequently released import data from U.S. Customs and Border Protection ("CBP") for purposes of mandatory respondent selection and solicited comments from interested parties.[5]

Various parties, including Petitioner, American Manufacturers of Multilayered Wood Flooring ("AMMWF" or "Petitioner"), filed such comments with Commerce indicating serious

---

[1] *See Multilayered Wood Flooring from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 75 Fed. Reg. 70,719 (Dep't Commerce Nov. 18, 2010).

[2] *See Multilayered Wood Flooring from China*, 75 Fed. Reg. 70,719 (Int'l Trade Comm'n Oct. 27, 2010).

[3] *See Multilayered Wood Flooring From the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't Commerce Dec. 8, 2011).

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't Commerce Mar. 14, 2019).

[5] *See* Memorandum to Interested Parties: Customs and Border Protection Data for Respondent Selection (March 14, 2019).

**NON-CONFIDENTIAL VERSION**

inaccuracies in the CBP data and requesting that Commerce issue Quantity and Value Questionnaires to Chinese producers and exporters for purposes of respondent selection and to determine their actual export volumes.[6]

Commerce rejected those requests and on May 21, 2019 selected Baroque Timber Industries ("Baroque Timber") and Guyu as the two mandatory respondents in the administrative review on the grounds that they accounted for the largest volume of subject merchandise according to the CBP data.[7] This was the first time that Guyu had been selected by Commerce for individual examination in any proceedings involving multilayered wood flooring from China, which was indicative of the fact that it was not a major exporter of subject merchandise to the United States.[8]

On May 24, 2019, Commerce issued a Countervailing Duty Questionnaire ("Questionnaire") to Guyu as a mandatory respondent in the subject review.[9] The Questionnaire required that Guyu report the total quantity and value of its sales of subject merchandize to the United States during the POR, the same information which CBP data was presumed to have provided. Questionnaire, at III-7.

---

[6] *See e.g.,* Letter on Behalf of AMMWFL Comments on CBP Data and Respondent Selection (March 21, 2019); *see also*, Letter on Behalf of Jiangsu Senmao, Bamboo and Wood Industry Co., Ltd. ("Senmao"): Comments on CBP Data and Request for Issuance Q&V Questionnaires (March 21, 2019).

[7] *See* Memorandum from Suzanne Lam, International Trade Analyst to Irene Darzenta Tzafolias, Director Office VIII: Respondent Selection (May 21, 2020).

[8] *See* Letter on Behalf of Guyu: Request for Extension of Time to File the Response to Section III of the Questionnaire (June 21, 2019).

[9] *See* Letter to Ms. Liu Fang, First Secretary, Embassy of the People's Republic of China (May 24, 2019) ("Questionnaire").

On May 28, 2019, Guyu filed comments on Commerce's respondent selection and included its actual quantity and value of exports to the United States during the POR – the same information which Commerce requested from Guyu in the Questionnaire.[10] Since it was now selected as a mandatory respondent, Guyu attempted to place this information on the record to inform Commerce of the vast disparity between its actual quantity and value information and the CBP data relied upon by Commerce.

On May 30, 2019, Commerce rejected Guyu's comments on the grounds that they were submitted after the deadline for comment on respondent selection, notwithstanding the fact that the comments included the same quantity and value information which Commerce asked for in the Questionnaire.[11]

On July 15, 2019 Guyu filed its Questionnaire response which again included its actual quantity and value of exports to the United States during the POR. Section III Questionnaire Response on behalf of Guyu (July 15, 2020). This information was materially the same quantity and value information which Guyu had offered to Commerce on May 28, 2019, which Commerce refused to consider for the record at that time.

In addition to identifying subsidy programs from which Guyu received benefits during the POR, in its Questionnaire response the company also responded to the "other subsidies" question at the end of the Questionnaire which requires the respondents to report all government

---

[10] *See* Letter on Behalf of Guyu: Comments on Respondent Selection Memoranda (May 28, 2019).

[11] *See* Letter to Guyu: Rejection of Untimely Respondent Selection Comments (May 30, 2019); *see also* Response to the Department's Rejection of Comments on behalf of Jiangsu Senmao (May 31, 2019); Response on behalf of Senmao on Department's Rejection of Guyu's Comments of May 28, 2019 (June 3, 2019).

NON-CONFIDENTIAL VERSION

assistance received during the POR, or during the course of the established average useful life ("AUL") regardless of whether the assistance was part of any alleged subsidy program.

On August 1, 2019, Commerce extended until August 12, 2019 the deadline for submitting factual information to measure the adequacy of renumeration pursuant to 19 C.F.R. 351.301(c)(3) ("Benchmark Information").[12] Various parties submitted Benchmark Information for measuring the adequacy of renumeration of inputs.[13] These submissions covered the usual inputs used in Commerce's LTAR calculations during the prior six administrative reviews and original investigation.

On October 22, 2019, Commerce sent a New Subsidy Allegations Questionnaire to Guyu which requested information for the provision of the following inputs for LTAR: plywood, sawn wood and continuously shaped wood, particleboard and fiberboard. Guyu responded to this questionnaire on November 8, 2019. In the spirit of cooperation and full disclosure, Guyu reported purchases of poplar core sheets from its affiliate Siyang County Shunyang Wood Co., Ltd ("Shunyang").  In the response, Guyu explained its use of these poplar core sheets in the assembly of plywood cores within multilayered wood flooring.

On November 21, 2019, Petitioner first took the position that poplar core sheets were covered by the veneers LTAR program.[14]  Before then, Guyu had no reason to believe that any subsidy rate would result from these purchases and, in any event, would have been unable to

---

[12] *See* Memorandum to the File: Extension Request for New Subsidy Allegations and Benchmark Information (August 1, 2019).

[13] *See e.g.,* Government of China's Initial Benchmark Submission (August 12, 2019); Benchmark Data Submission on behalf of Baroque Timber (August 12, 2020).

[14] *See* Letter on Behalf of Petitioner: Comments on Jiangsu Guyu's New Subsidy Allegations Questionnaire Response (Nov. 21, 2019).

submit benchmark information on poplar core sheets since the benchmark deadline was two months earlier, on August 12, 2020.

Commerce published its preliminary results on February 6, 2020.[15] In the *Preliminary Results*, Guyu was assigned a CVD rate of 123.26 percent of which 112.23 percent resulted from the "Provision of Veneers for LTAR".

In its calculation of the "Provision of Veneers for LTAR", Commerce treated Guyu's purchases of the input "poplar core sheets" the same as decorative outer layer veneers despite information on the record that Guyu's poplar core sheets are used to make basic plywood cores inside the subject flooring.

On March 6, 2020, Guyu requested that Commerce reopen the record to allow parties to submit information regarding the use of poplar core sheets in the manufacture of multilayered wood flooring.[16] Commerce refused to reopen the record.[17]

On March 13, Guyu filed its administrative case brief challenging certain decisions and findings in Commerce's *Preliminary Results*, including: (1) selection of mandatory respondents; (2) inclusion of poplar core sheets in any benefit calculation and mischaracterization of poplar core sheets as veneers; (3) the application of AFA to determine that individual polar wood farmers are state "authorities"; (4) finding of cross-ownership between Guyu's affiliates; (5) barring parties from submitting factual information, including Benchmark Information, for

---

[15] *See Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part, 2017*. 85 Fed. Reg. 6908 (Dep't Commerce, Feb. 6, 2020) ("*Preliminary Results*").

[16] *See* Letter on Behalf of Guyu: Request to Open the Record for New Factual Information (March 6, 2020).

[17] *See* Letter to Guyu: Denial of New Factual Information Submission Request (March 10, 2020).

NON-CONFIDENTIAL VERSION

poplar wood after Commerce determined poplar core sheets to be veneers; and (6) Commerce's double counting of poplar core sheets in the Provision of Veneers for LTAR, as well as in the Provision for Plywood for LTAR.[18] Guyu also incorporated arguments presented in case briefs by other respondents and the GOC, and on March 24, 2020 filed a rebuttal brief addressing issues raised in Petitioner's administrative case brief.[19]

In their case briefs, other parties argued that: (1) Commerce used an incorrect benchmark to determine LTAR for plywood; (2) the ECBP was not used in this proceeding; and (3) Commerce's countervailing of unalleged subsidies requested through the "other subsidies" question in the Questionnaire was unlawful.[20]

On November 27, 2020, Commerce published the *Final Results*.  Commerce had based its *Preliminary* and *Final Results* on the responses of Guyu and Baroque Timber which it selected as mandatory respondents, despite evidence on the record that they were not the largest exporters during the POR (*i.e.*, respondent selection comments from parties and the quantity and value information submitted by Guyu through its questionnaire response).

In the *Final Results*, just as it had in the *Preliminary Results*, Commerce again countervailed poplar core sheet purchases based on a mischaracterization of core sheets as veneers.

---

[18]  *See* Resubmittal of Case Brief on Behalf of Guyu, (March 19, 2020) ("Guyu Case Brief"); *see also* Case Brief on Behalf of Fine Furniture (Shanghai Limited) and Double F Limited ("Fine Furniture") (March 13, 2020); Case Brief on Behalf of Senmao, Sino-Maple, and Keri Wood (March 13, 2020), Case Brief on Behalf of Government of China ("GOC").

[19]  *See* Rebuttal Case Brief on Behalf of Guyu (March 24, 2020).

[20]  *See* Case Brief on Behalf of Baroque Timber (March 13, 2020); Case Brief on Behalf of GOC (March 13, 2020); Case Brief on Behalf of Fine Furniture (March 13, 2020).

NON-CONFIDENTIAL VERSION

In the *Final Results*, Commerce assigned Baroque Timber a rate of 14.09 percent and assigned Jiangsu Guyu a rate of 122.92 percent. Non-selected respondents subject to review, including Plaintiff-Intervenors, were assigned a margin of 20.75 percent based on the weighted average of the two mandatory respondents.

## SUMMARY OF ARGUMENT

Commerce's calculation of a CVD rate of 122.92 percent for Guyu was unsupported by substantial evidence and otherwise not in accordance with law.

First, Commerce erred in selecting Guyu as a mandatory respondent based exclusively on erroneous CBP import data despite Petitioner and respondents having rebutted the presumption of regularity attaching to such data. Therefore, Commerce's decision to select Guyu was not supported by record evidence and was otherwise contrary to the law.

Second, Commerce's determination that individual poplar farmers are "authorities" is not supported by record evidence and was otherwise contrary to the law. Commerce's reliance on its own Public Bodies Analysis memo shows that the concept of an "authority", as required by the statute and the WTO Agreement, necessitates that a government entity or a commercial entity acting as a government agent be responsible for the passing on of a benefit. An individual farmer is a natural person and does not meet this definition.

Third, Commerce's finding of cross-ownership through blood relations was unsupported by substantial evidence and contrary to law. The Department's assertion in its Issues and Decision Memorandum that "these companies can use or direct the individual assets of the other corporation(s) in essentially the same ways they can use their own assets" is conclusory and unsupported by any evidence on the record.[21]

---

[21] *See* Final IDM, at 18.

Fourth, Commerce's decision to countervail poplar core sheets under the provision for veneers for LTAR was unsupported by substantial evidence and contrary to law. The record demonstrates that poplar core sheets were not used by Guyu as veneers and simply because they are "thin slice{s} of wood" does not make them veneers in the multilayered wood flooring industry. Commerce's decision to countervail Guyu's poplar core sheet purchases is unreasonable and unsupported by substantial evidence.

Fifth, Commerce's decision to double count poplar core sheets under provisions for veneers and plywood for LTAR was unsupported by substantial evidence and contrary to law.

Sixth, Commerce's application of AFA in finding use and benefit from the Export Buyers Credit Program was unsupported by substantial evidence and contrary to law. This Court has repeatedly found that Commerce cannot find use and benefit from the Export Buyers Credit Program where there is evidence of non-use. As in *Yama Ribbons and Bows Co., Ltd. v. United States*, the Court should once again remand review of this program to Commerce for consideration of the certificates of non-use by the mandatory respondents.[22]

Finally, Commerce's countervailing of "Other Subsidies" is unsupported by substantial evidence and contrary to law.  Under U.S. law and the commitments made under Article 11.2 of the SCM Agreement, Commerce must initiate an investigation based on specific allegations and evidence, not a broad statement requesting information from private companies.

In summation, the Court should remand this determination to Commerce to rectify the issues identified above.

---

[22] *Yama Ribbons and Bows Co., Ltd. v. United States*, Slip Op. 21-50 (Apr. 30, 2021).

NON-CONFIDENTIAL VERSION

## STANDARD OF REVIEW AND JURISDICTION

This Court must "hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla.  It means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), quoting *Consolidated Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938).  This standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  The existence of substantial evidence must be determined in view of the record as a whole, including "whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera*, 340 U.S. at 488).

Plaintiff-Intervenors bring this action pursuant to section 516A of the Tariff Act of 1930, as amended (19 U.S.C. § 1516a(a)(2)(A)(i)(I) and §§1516a(a)(2)(B)(iii)), which provides that certain antidumping or countervailing duty orders on the record are reviewable by this Court. This Court has exclusive jurisdiction of this action pursuant to 28 U.S.C. § 1581(c), which provides jurisdiction over civil actions commenced under 19 U.S.C. § 1516a. The standard of review, as set forth in section 516A(b)(1)(B)(i) of the Act and reviewed above, 19 U.S.C. § 1516a(b)(1)(B)(i), is whether the determinations, findings, or conclusions of Commerce were "unsupported by substantial evidence on the record, or otherwise not in accordance with law."

On November 27, 2020, Commerce published the *Final Results* in the Federal Register. Plaintiff-Intervenors filed their Summons and Complaint concurrently on December 18, 2020,

NON-CONFIDENTIAL VERSION

within 30 days of said publication.[23] Thus, Plaintiff-Intervenors' Summons and Complaint were timely filed pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii) and USCIT Rule 3(a)(2). On March 1, 2021, the action filed by Plaintiff-Intervenors was consolidated under lead Case No. 20-3885.[24]

## ARGUMENT

## I. COMMERCE ERRED BY EXCLUSIVELY RELYING ON CBP DATA TO SELECT MANDATORY RESPONDENTS

When Commerce uses CBP data to select mandatory respondents in CVD proceedings, a presumption of regularity attaches to this data. The record in the underlying administrative review of MLWF from China contains evidence rebutting this presumption in the form of conversion reporting errors (wrong units of measurement) and quantity and value information reported by Guyu in its Questionnaire response.

Commerce relied exclusively upon import data obtained from CBP to select companies for individual examination despite respondents and Petitioner having rebutted the presumption of regularity attaching to that data. In doing so, Commerce also contravened its own policy to select mandatory respondents by largest volume. Commerce's determination was unsupported by substantial evidence or in accordance with law.

### A.  Legal Requirements for Selecting Mandatory Respondents

Commerce is authorized in specific instances to limit the number of exporters or producers that they agency investigates.[25] The statute allows Commerce to limit the number of

---

[23] *See Jiangsu Guyu International Trading Co., Ltd. v. United States*, Ct. No. 20-03919, ECF Nos. 1 and 9.

[24] *See* Order, ECF 34.

[25] *See* 19 U.S.C. § 1677f-1(2).

exporters or producers reviewed only where the agency either reviews: "(A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined."[26] In this administrative review, Commerce elected to limit the number of exporters or producers reviewed employing the methodology set forth by the second option.[27] In selecting mandatory respondents by largest volume, Commerce relied upon entries that importers identify to CBP as being subject to the CVD Order.

The methodology by which Commerce selects the "exporters and producers accounting for the largest volume," will be upheld if it is "reasonable… and is not arbitrarily applied."[28] However, Commerce's exclusive reliance on CBP data despite evidence of substantial conversion errors fails to reasonably identify exporters and producers "accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined" as significant volumes of subject merchandise are likely misreported by U.S importers. Moreover, the fact that immediately following its respondent selection Commerce was presented with further proof that CBP data was inaccurate when it received Guyu's Questionnaire

[26] *Id.*

[27] *See* Memorandum from Suzanne Lam, International Trade Analyst to Irene Darzenta Tzafolias, Director Office VIII: Respondent Selection (May 21, 2020), at 3.

[28] *Pakfood Pub. Co. v. United States*, 772 F. Supp. 2d 1327, 1338 n.18 (Ct. Int'l Trade 2010) ("*Pakfood I*") (quoting 19 U.S.C. § 1677f-1(c)(2)(B) (2000) (citations omitted).

response, including the company's actual quantity and value information, casts sufficient doubt on the presumption that CBP has assured the accuracy such data for this POR.[29]

### B. Petitioner and Respondents Identified Errors and Proposed Alternatives to Exclusive Reliance on Flawed CBP Data

When Commerce relies upon CBP data to select mandatory respondents, that data is afforded a presumption of regularity. This presumption was rebutted in the underlying administrative CVD review of MLWF from China. The record contains evidence that entries of subject merchandise had not been accurately reported due to inconsistent units of measurement. As Petitioner explained in its respondent selection comments:

> [                                                                                   ]. For example, [                                               ] is reported as having entered shipments of [                                    ] of flooring; and, [                             ] is reported as having entered shipments of [                              ] of flooring. Critically, these shipments-and they are not the only ones-have [                                                      ]. Such a severe difference suggests that these entries have not been accurately reported. Indeed, the [                                                        ]. Further, several entries in the CBP data report [                                    ]. Such entries again suggest inaccurate reporting. Taken together, these errors greatly skew the CBP data such that it is difficult to ascertain which companies accounted for the largest volumes of entries.[30]

Petitioner urged Commerce to alleviate the uncertainty as to which companies accounted for the largest volumes and overcome the deficiencies in the CBP data by issuing Quantity and Value ("Q&V") questionnaires to all companies listed in the CBP data.[31] Commerce regularly issues

---

[29] *See* Guyu's Questionnaire Response (July 15, 2019), at Exhibits II-20 through II-23.

[30] *See* Letter on Behalf of AMMWFL Comments on CBP Data and Respondent Selection (March 21, 2019), at 3-4 (Proprietary Version).

[31] *Id.,* at 4.

NON-CONFIDENTIAL VERSION

these questionnaires as part of its mandatory respondent selection process – both in conjunction with and instead of CBP data.[32] Q&V responses allow Commerce and interested parties to evaluate the accuracy of CBP data because they are provided by the producers and exporters themselves, in contrast to the CBP entry data that are provided by the importers.

Other parties identified the same inaccuracies in the CBP data in this review and urged Commerce to issue Q&V's. Senmao, which requested selection as a voluntary respondent, indicated that [

].[33]

As these comments conveyed, the only reasonable determination was for Commerce to disregard the CBP data and request Q&V responses from exporters, but Commerce refused to do so. There was enough time between the deadline for parties to comment on CBP data (March 21,

---

[32] *See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 Fed. Reg. 22,311 (Dep't Commerce May 15, 2017) and Countervailing Duty Administrative Review: Multilayered Wood Flooring from the People's Republic of China: Respondent Selection: 2014 ("Respondent Selection Memorandum"). In this, the 2014 review of the same CVD order on MLWF from China, parties' submitted concerns over erroneous CBP data put on the record. In response, the Department issued Q&V questionnaires and corrected the issues addressed by the parties, selecting the appropriate, largest-quantity importers as a result of these corrections in the record. *See* Respondent Selection Memorandum at 4.

[33] Letter on Behalf of Senmao: Comments on CBP Data and Request for Issuance of Q&V Questionnaires (Mar. 21, 2019), at 2-3 (Proprietary Version).

NON-CONFIDENTIAL VERSION

2019), and the date of Commerce's Respondent Selection Memorandum (May 21, 2019), to at least issue Q&V's to a select few companies that appeared to be the largest exporters in the CBP data, flawed as it was.

This Court has found that it is unreasonable for Commerce to ignore facial evidence of CBP data errors.[34] Here, Commerce did exactly that and selected Guyu and Baroque Timber as mandatory respondents.[35] Commerce reasoned that Guyu and Baroque Timber were chosen as they accounted "for the largest volume of subject merchandise that can be reasonably examined" based on "entry data obtained from CBP."[36] The agency's position, reiterated in the *Final Results*,[37] disregarded claims made by interested parties regarding the unreliability of the CBP data.[38] Commerce stated in its selection memorandum that "no party has provided evidence to support the claim" that Guyu should not be selected nor had they "provided any information on the record regarding the CBP's data collection methodology or other documents to support their claims that the CBP data is unreliable."[39]

---

[34] *See Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1327 n.8 (Ct. Int'l Trade 2015) (finding that where "Commerce wishes to rely on CBP data for respondent selection, it is unreasonable for Commerce to ignore evidence on the face of that data suggesting that the actual number of potential respondents is likely less than the number of companies separately listed").

[35] *See* Mem. to Irene Darzenta Tzafolias from Suzanne Lam re: Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Respondent Selection (May 21, 2019) ("Respondent Selection Memo") at 4.

[36] *Id.* at 4-5.

[37] *See* Final IDM, at 14-16.

[38] *See* Respondent Selection Memo at 5.

[39] *Id.* at 5.

NON-CONFIDENTIAL VERSION

Commerce's explanation is insufficient because it is well understood that detailed import entry information reported to CBP is confidential and that exporters and Petitioner would not have access to such data. Importers are not in the habit of sharing their shipment information with the public or their own suppliers, nor is CBP willing to detail its methods of collecting and recording this data.

After selecting Guyu and Baroque Timber as mandatory respondents, on May 24, 2019, Commerce issued the review Questionnaire to Guyu.[40] The Questionnaire required that Guyu report the total quantity and value of its sales of subject merchandize to the United States during the POR, the same information which CBP data was presumed to have provided.[41]

On May 28, 2019, Guyu filed comments on Commerce's respondent selection and included its actual quantity and value of exports to the United States during the POR – the same information which Commerce requested from Guyu in the Questionnaire.[42] Since it was now selected as a mandatory respondent, Guyu attempted to place this information on the record to inform Commerce of the vast disparity between its actual quantity and value information and the CBP data relied upon by Commerce. However, on May 30, 2019, Commerce rejected Guyu's comments on the grounds that they were submitted after the deadline for comment on respondent

---

[40] *See* Letter to Ms. Liu Fang, First Secretary, Embassy of the People's Republic of China (May 24, 2019) ("Questionnaire").

[41] *See* Questionnaire, at III-7.

[42] Letter on Behalf of Guyu: Comments on Respondent Selection Memoranda on behalf of Guyu (May 28, 2019) (Rejected).

selection, notwithstanding the fact that the comments included the same quantity and value information which Commerce asked for in the Questionnaire.[43]

On July 15, 2019 Guyu filed its Questionnaire response which again included its actual quantity and value of exports to the United States during the POR. Section III Questionnaire Response on behalf of Guyu (July 15, 2020). This information was materially the same quantity and value information which Guyu had offered to Commerce on May 28, 2019, which Commerce refused to consider for the record at that time.  In the Questionnaire response, Guyu reported that its sales of subject merchandise to the United States during 2017 (the POR) were

[                                                                              ][44] This is exponentially less than the

[                            ][45] from the CBP data relied upon for Guyu by Commerce in its respondent selection process.

 In its *Final Results,* Commerce attempted to justify its respondent selection and distinguish it from the Court's decision in *Husteel Co. v. United States* as irrelevant as the issue in that case was the number of respondents selected rather than whether CBP data was unreliable for respondent selection.[46] However, the Court determined in *Husteel Co.* that Commerce cannot turn a blind eye to arguments made by parties regarding respondent selection, regardless of the

---

[43] *See* Letter to Guyu: Rejection of Untimely Respondent Selection Comments (May 30, 2019); *see also* Response to the Department's Rejection of Comments on behalf of Jiangsu Senmao (May 31, 2019); Response on behalf of Senmao on Department's Rejection of Guyu's Comments of May 28, 2019 (June 3, 2019).

[44] *See* Guyu Questionnaire Response (July 15, 2019), at Exhibit II-20. *See* Conversion calculator *https://www.convertunits.com/from/kilo+gram/to/cubic+metre*

[45] Data from Commerce to File Pertaining to Interested Parties CBP Data (March 14, 2019).

[46] *See* Final IDM at 16.

discretion afforded to the agency by Congress in this process.[47] In *Husteel Co.*, Commerce limited the investigation to two parties based solely on the volumes reported by CBP without regard to the representation of the manufacturing companies on the state of the industry as a whole due to differences between products imported to the United States from different companies (*i.e.,* Commerce relied solely on the second option allowed in the statute, without regard for the reasonableness of that selection as a representative sample).[48] Here, parties have argued that Commerce failed to meet the requirements of the second option in the statute, largest import volumes, prior to even evaluating whether the selected companies were representative of the industry as a whole.

Commerce continued to rely exclusively on flawed CBP data in the *Final Results* but did not provide appropriate justification for its course. The administrative convenience of CBP data and the fact that they are obtained through government authority are inadequate bases to rely upon for respondent selection in light of evidence casting doubt on the accuracy of that data. Because Petitioner and respondents carried their burden of rebutting the presumption of regularity, Commerce's unwillingness to consider the evidence of unit conversion errors on the record makes its exclusive reliance only on flawed CBP data not supported by substantial evidence or otherwise in accordance with law. The Court should therefore remand to Commerce with instruction to rescind the respondent selection of Guyu in the underlying administrative review.

---

[47] *Husteel Co. v. United States*, 98 F. Supp.3d 1315, 1331 (Ct. Int'l Trade 2015).

[48] *Id.*

NON-CONFIDENTIAL VERSION

## II.   INDIVIDUAL POPLAR FARMERS ARE NOT "AUTHORITIES"

In the *Final* Results, Commerce determined that individual farmers which supplied Guyu with poplar core sheets are "authorities" within the meaning of section 771(B) of the Act 19 U.S.C. § 1677.[49] Commerce reached this conclusion using AFA and claimed that the GOC withheld information regarding Guyu's input suppliers.[50] Commerce's decision ignores the basic fact that these farmers are individuals and private natural persons, and therefore, the questions posed by Commerce in its standard Input Producer Appendix are inapplicable to such suppliers because they are intended for "entities" and "companies."  Commerce claimed that

> CCP {Chinese Communist Party} officials are present in... Guyu's (including Shengyu and Shunyang) input suppliers as individual owners, managers and members of the boards of directors, and that this gives the CCP, as the government, meaningful control over these companies and their resources.[51]

Commerce cited to its Public Bodies Analysis Memoranda ("PBAM"), noting that "an entity with significant CCP presence on its board or in management or in party committees may be controlled, such that it possesses, exercises, or is vested with governmental authority."[52]

However, Commerce's assumption is based entirely on the concept of "entities" as enterprises and the GOC's control over them, as well as on corporate governance and industrial policy as it concerns those enterprises. In fact, the PBAM do not focus on natural persons. Rather, they are replete with references to enterprises and government control over them. The

---

[49] *See* Final IDM at 29.

[50] *Id*. at 30.

[51] *See* Prelim. IDM, at 20.

[52] *Id.*

NON-CONFIDENTIAL VERSION

first of these memoranda is titled: "Update of the Public Bodies Analysis of State-Invested Enterprises in China for Countervailing Duty Purposes."[53] The title of another memorandum included with the PBAM is "The Relevance of the Chinese Communist Party for the Limited Purpose of Determining Whether Particular Enterprises Should be Considered to be "Public Bodies" Within the Context of a Countervailing Duty Investigation".[54]

> The memorandum further states:
>
> Therefore, based on record evidence in these Section 129 proceedings and in other countervailing duty proceedings involving imports from the People's Republic of China (China), the Department's public body analysis includes an inquiry into the role of CCP representatives in enterprises, in order to develop sufficient information to enable the Department to determine whether the presence and role of any such CCP officials may inform a finding of government control over such enterprises.[55]

The PBAM cover entities which Commerce believes are controlled by the CCP. According to Commerce, these include: Central Entities;[56] Local Entities: Congresses and Committees;[57] Villagers' Committees;[58] and Ministries.[59] There is no mention whatsoever of individuals or natural persons. That is because individuals (like the poplar farmers in this instance) are not public bodies or entities.

---

[53] Public Bodies Analysis Memo, at Attachment I.

[54] *Id*., at Attachment III.

[55] *Id*., at 2.

[56] *Id*., at 13-20.

[57] *Id*., at 15.

[58] Public Bodies Analysis Memo, at 17.

[59] *Id*., at 19.

NON-CONFIDENTIAL VERSION

As its title clearly indicates, the focus of the PBAM on public bodies. Commerce's assertion in this case has taken the meaning of "public bodies" to an absurd and unlawful extreme. The statute defines a countervailable subsidy as "the case in which an authority . . . provides a financial contribution to a person and a benefit is thereby conferred."[60] This Court has recognized that "the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which resulted in Congress passing 19 U.S.C. § 1677(5)(B), clarifies that Congress intended "the term 'person' to identify the commercial entity, such as a firm or industry, to which the government or public body provides a financial contribution."[61]

Similarly, the statute, at 19 U.S.C.§ 1671(a)(1) instructs that if :

the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States" then "a countervailing duty shall be imposed upon such merchandise."

In both authorities cited above, the terms "public body" and "public entity" are used interchangeably. An individual private poplar farmer does not meet either of these definitions, nor is the farmer an "enterprise" as described by Commerce's PBAM.

In its *Final Results*, Commerce persists in its assertion that the government in China can influence even individual farmers:

(1) by 'state-invested enterprise,' Commerce means enterprises in which the government of China has an ownership stake *of any size*'[62] (Emphasis added.).

---

[60] 19 U.S.C. § 1677(5)(B).

[61] *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1363 (Ct. Intl Trade 2015) (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. DOC. NO. 103-316, at 925 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4239).

[62] Public Bodies Analysis Memoranda at Attachment I, "Update of the 2012 Public Bodies Analysis of State- Invested Enterprises in China for Countervailing Duty Purposes" (Feb. 27, 2019) at 2.

(2) The decision by the Department that the "CCP exercises 'ultimate control *over citizens* and resources, including authority over issues and resources as varied as family and economic planning, as well as the military'[63] (Emphasis added.); and

(3) that the CCP exerts significant control over economic activities in China.[64]

Based on this loose interpretation, Commerce could use AFA to determine any person was the entire state of China and able to confer a benefit, simply from an absence of information regarding their affiliation with the CCP or a community-based organization. This is an aggressive and unlawful overstep of the WTO Agreement, the statute, and Commerce's own regulatory interpretation. Based on the foregoing, Commerce's determination that individual poplar farmers are "authorities" and meet the definition of enterprise, public body, or public entity is contrary to law.

## III.   COMMERCE'S FINDING OF CROSS-OWNERSHIP THROUGH BLOOD RELATIONS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

In the *Final Results*, Commerce continued to find that Guyu, Shunyang, and Jiangsu Shengyu Flooring Co., Ltd. ("Shengyu") were cross-owned within the meaning of 19 CFR § 351.525(b)(6)(vi) by virtue of common ownership.[65] By making this connection, Commerce attributed subsidies allegedly passed by individual poplar farmers on to Shunyang for its

---

[63]*See* Public Bodies Analysis Memoranda at Attachment III, "The Relevance Of The Chinese Communist Party For The Limited Purpose Of Determining Whether Particular Enterprises Should Be Considered To Be 'Public Bodies' Within The Context Of A Countervailing Duty Investigation" (May 18, 2012) at 33.

[64] *Id*.

[65] *See* Final IDM at 18.

purchases of poplar core sheets, and therefore through to Guyu. Commerce's CVD questionnaire defines cross-ownership as:

> Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross- owned (for example, cross-ownership exists between two companies owned by the same parent).[66]

As Guyu explained in its Questionnaire response, the only nexus between Shunyang and Shengyu is a family relationship between their shareholders.[67] [          ], a shareholder of Shunyang, is the father of [          ], the shareholder of Guyu and Shengyu.[68] This relationship does not allow either of these individuals to "direct the individual assets of another company in essentially the same ways it can use its own assets."[69] Moreover, neither company "holds, directly or indirectly, a majority voting interest in the other."[70]

Accordingly, a simple family relationship between the shareholders of Shunyang and Shengyu does not establish that either of these companies is legally or operationally in a position to exercise restraint or direction over the other so as to control them within the meaning of the statute. Nor, contrary to the Department's assertions, does Guyu's identification of the

---

[66] *See* CVD Questionnaire (May 24, 2019), at III-3.

[67] See Guyu Section III Supplemental Questionnaire Response (Sept. 30, 2019) ("Guyu SQR") at 2-3.

[68] *See* Guyu Section III Initial Questionnaire Response (July 15, 2019) ("Guyu IQR") at Exhibit II-1.

[69] *See* CVD Questionnaire (May 24, 2019) at III-3.

[70] *Id.*

companies as affiliates.[71]  Commerce's assertion that "these companies can use or direct the individual assets of the other corporation(s) in essentially the same ways they can use their own assets"[72] is conclusory and Commerce's application of LTAR provisions across these companies was unlawful and unsupported by substantial evidence.

## IV.   COMMERCE'S DECISION TO COUNTERVAIL POPLAR CORE SHEETS UNDER THE PROVISION FOR VENEERS FOR LTAR WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

On October 22, 2019, nearly four months before Commerce's *Preliminary Results* were issued, Commerce sent a New Subsidy Allegations Questionnaire ("NSA Questionnaire") to Guyu which requested information for the provision of the following inputs for LTAR: *plywood*, sawn wood and continuously shaped wood, particleboard and fiberboard. In the spirit of full cooperation, in its response to the NSA Questionnaire Guyu reported purchases of poplar core sheets from its affiliate Shunyang and indicated that poplar core sheets are made from lower density (softer) wood and are used for manufacture of the plywood core (core being the interior layer of the flooring).[73] Guyu contrasted this to face veneers made of higher density (harder) wood used for flooring surfaces which can withstand wear and tear unlike poplar.[74]

Guyu had no reason to expect that Commerce would equate poplar core sheets with the veneers LTAR program since Guyu used poplar to make plywood cores. Commerce never made a separate subsidy allegation on core sheets as it did for plywood and veneers. Petitioner also

---

[71] *See* IDM at 18.

[72] *Id.*

[73] *See* Guyu's Response to New Subsidy Allegations: Multilayered Wood Flooring from the People's Republic of China (November 8, 2019), at 1-2 ("NSA Questionnaire Response").

[74] *Id.*

never included poplar core sheets in any of its submissions prior to Guyu's NSA Questionnaire response. The only instance where "poplar" appears is in Petitioner's benchmark submission with respect to the plywood benchmark.[75] For this Petitioner reported commodities under Harmonized Tariff Schedule ("HTS") 4412.33 covering "{p}lywood; with sheets of wood only; not bamboo; each ply 6mm or less, with at least one outer ply of alder, ash beech, birch, cherry, chestnut, elm, eucalyptus, hickory, horse chestnut, lime, maple, oak, plane, poplar, aspen, robinia, tulipwood or walnut."[76] However, even this HTS subheading does not cover "poplar core sheets", but rather wooden flooring with an outer ply made of poplar, which is different from core made of poplar.

If Commerce had intended to include core sheets under the veneers LTAR program, then Commerce would have included plywood under this program as well since plywood is made of individual thin slices of wood sandwiched together at different angles.

Despite evidence to the contrary, in its *Preliminary Results* Commerce determined that "Shunyang's reported poplar core sheets are veneers."[77] Commerce based this purely on semantics, specifically on one line in the scope of the CVD order – "thin slice of wood," the definition provided for "veneer."[78] Commerce explained:

---

[75] *See* Letter on behalf of AMMWF to Commerce re: Multilayered Wood Flooring from the People's Republic of China: Other Factual Information and Benchmark Pricing Information Regarding New Subsidy Allegations at Exhibit 1 (Nov. 13, 2019).

[76] *Id.*

[77] Decision Memorandum for the Preliminary Results in the Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017 (January 31, 2020), at 18 ("Prelim IDM").

[78] *Id.* at 34.

However, as described above under "Scope of the Order," at footnote 4, a "veneer" is a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch. Veneer is referred to as a ply when assembled. The poplar core sheets purchased by Shunyang are thin slices of wood, which, as previously noted, are veneers as defined by the scope. Accordingly, for these preliminary results, we have included these poplar core sheet purchases in our calculation of veneers for LTAR.[79]

Commerce presented no evidence from this or any prior record in the MLWF proceeding to support that poplar core sheets were used as "veneers" rather than for plywood cores as Guyu demonstrated. Commerce's determination to countervail Guyu's poplar core sheet purchases was unreasonable and illogical. It made it so there was virtually no core and that most of Guyu's flooring – and its cost – was made up of expensive face-grade hardwood veneers. A review of Commerce's preliminary subsidy rate calculation demonstrates the irrationality of this finding: of the total 123.26 percent rate assigned to Guyu, 112.23 percent was attributable to the Provision of Veneers for LTAR and just 7.49 percent to the Provision for Plywood and the Provision for Fiberboard combined.[80]

Commerce's reliance on the definition of "veneer" from the Scope of the Order was misplaced given contrary evidence on the record that Guyu used poplar core sheets to make plywood.  In fact, the Scope provides that

> Multilayered wood flooring is composed of an assembly of two or more layers or plies of wood veneer(s) *in combination with a core*. The several layers, *along with the core*, are glued or otherwise bonded together to form a final assembled product.[81]

---

[79] *Id.*

[80] *See* Commerce Memorandum: Preliminary Results Calculations for Jiangsu Guyu International Trading Co., Ltd., (January 31, 2020), at 8.

[81] *See* Prelim. IDM at 6 (emphasis added).

The Scope language clearly differentiates "veneers" from "core".  In other words, MLWF consists of two parts, veneer(s) and a core, whereby veneer refers to parts other than the core (which may be a face veneer or back veneer).

Furthermore, Guyu explained in its NSA Questionnaire Response, there are notable differences between veneers and poplar core sheets, such as type of wood, application, density and pricing.[82]

Since Commerce had disregarded this evidence, Guyu requested that the agency allow parties to provide additional information regarding the use of poplar core sheets in the manufacture of MLWF.[83] Even though Commerce had six months to review such information before the *Final Results*, it refused to reopen the record.[84]

As Guyu explained in its case brief, Commerce's determination "fails to consider that poplar is not used by Guyu as a face-grade veneer. Rather, as a lower density (softer wood) it is used as an input in the plywood core of the MLWF. Specifically,

> one of Poplar's only downsides is its softness… **Seldom used for its appearance**… Poplar is a utility wood in nearly every sense. It's used for pallets, crates, upholstered furniture frames, pulpwood, and **plywood.**"[85]

The fact that poplar core sheets are "thin slice{s} of wood" does not make them veneers in the MLWF industry. Plywood too consists of "thin slice{s} of wood" stacked on top of each other. However, Commerce did not include plywood under the veneers LTAR program. Instead,

---

[82] *See* NSA Questionnaire Response at 1, and Exhibit NSA-4.

[83] *See* Guyu's Request to Open the Record for New Factual Information (March 6, 2020).

[84] *See* Letter to Guyu: Denial of New Factual Information Submission Request (March 10, 2020).

[85] Guyu Case Brief, at 10; citing to Benchmark Data Submission of Baroque Timber (August 12, 2019).

Commerce considered plywood a different subsidy and issued a questionnaire with respect to it (i.e., the NSA Questionnaire). Both core sheets and plywood are distinct from veneers. The fact that Commerce has separate LTAR programs for veneers and plywood is a confirmation of this difference. Commerce cannot shoehorn core into the veneers LTAR program without a new subsidy allegation of core sheets.

Commerce continued to group poplar core sheets under the LTAR program in its *Final Results* calculation in which of the total 122.92 percent final rate assigned to Guyu, 112.23 percent was under the Provision of Veneers for LTAR, and just 7.15 was under the Provisions of Plywood and Fiberboard for LTAR combined.[86] This conclusion ignored commercial reality, the physical differences between core sheets and veneers, disparate pricing between the two, and the lack of any subsidy allegation on core sheets in the review. Accordingly, Commerce's determination to countervail Guyu's poplar core sheet purchases is unreasonable and unsupported by substantial evidence.

## V. COMMERCE'S DECISION TO DOUBLE COUNT POPLAR CORE SHEETS FOR LTAR WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

In the *Final Results,* Commerce calculated a 112.23 rate for Guyu's purchases of poplar core sheets using the Provision of Veneers for LTAR.  Commerce also calculated a 7.13 rate for Guyu under the Provision of Plywood for LTAR. Commerce erred in counting internally consumed poplar as part of the latter calculation.

As noted, Shunyang purchased the poplar core sheets as materials to produce plywood, and then sold the plywood to Shengyu as core material to produce MLWF. Commerce treated

---

[86] *See* Commerce Memorandum: Final Results Calculations for Jiangsu Guyu International Trading Co., Ltd. (November 23, 2020), at 3.

NON-CONFIDENTIAL VERSION

Shunyang and Shengyu as affiliated and, thus, collapsed them. However, only poplar core sheets (not the internally consumed plywood) should be treated as purchased materials for LTAR purposes.

In other words, where the company purchased an input for LTAR (*i.e.,* poplar core sheets) in the production of the final product (*i.e.,* plywood), and that final product has already been itself found to be an LTAR input for production of another product (*i.e.*, MLWF), the original inputs should not be double counted under separate LTAR programs.

## VI.   COMMERCE'S APPLICATION OF AFA IN FINDING USE AND BENEFIT FROM THE EXPORT BUYERS CREDIT PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

Commerce's application of AFA to determine the countervailability of the Export Buyers Credit Program ("EBCP") is unsupported by substantial evidence on the record and otherwise contrary to the law.

This Court has repeatedly held that AFA may only be applied after the requirements of countervailability have been met, and that when Commerce invokes its authority to use AFA "the agency must still make the necessary factual findings to satisfy the requirements for countervailability." *See* 19 U.S.C. §§ 1677e(a)-(c) (providing that, even when using facts otherwise available with adverse inferences, Commerce must still point to actual information on the record to make required factual determinations.)[87]

---

[87] *See Changzhou Trina Solar Energy Co. v. United States,* 195 F. Supp. 3d 1334, 1350 (Ct. Int'l Trade 2016); *see also Yama Ribbons and Bows Co., v. United States*, No. 18-00054, 2019 WL 7373856 (Ct. Int'l Trade Dec. 30, 2019); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019); *Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019); *RZBC Group Shareholding Co. v. United States*, No. 15-00022, 2016 WL 3880773 (Ct. Int'l Trade June 30, 2016) at *5 ("{the Department}'s obligation when drawing an adverse inference based on a lack of cooperation by a foreign government is to avoid collaterally impacting respondents to the extent practicable by examining the record for replacement information.").

NON-CONFIDENTIAL VERSION

Commerce's governing statute defines "financial contribution" as "the direct transfer of funds, such as grants, loans, and equity infusions, or potential direct transfer of funds or liabilities, such as loan guarantees."[88]

Both case law and the statute require the application of AFA to be conditioned on cases in which a respondent fails to complete its burden of proof when there is a financial contribution. The record demonstrates that Guyu did not use the EBCP, and none of their customers applied for, used, or benefitted from this program during the period of review.[89]

As the Court stated in *Yama Ribbons,* the question is whether the respondents did or did not use or benefit from the program.[90] In *Yama Ribbons*, as well as in *Guizhou Tyre*, *Trina Solar*, and *Clearon Corp.*, the CIT held that when the evidence on the record indicates that the EBCP was not used, the Department cannot apply AFA to determine it was used.[91]  Furthermore, the

---

[88] *See* 19 U.S.C. § 1677(5)(D) (definition of "financial contribution") (emphasis added).

[89] *See* Guyu's Questionnaire Response (July 15, 2019) ("Guyu IQR"), at 12 and Exhibit IV-C-5; and GOC's Supplemental Questionnaire Response," (Oct. 28, 2019), at Exhibit SQ-4.

[90] *See Yama Ribbons*, 2019 WL 7373856 at *4.

[91] *Id.; see also Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2018) ("{The Department} . . . did not explain why the GOC's failure to explain {EBC} program was necessary to assess claims of non-use and why other information accessible to respondents was insufficient to fill whatever gap was left by the GOC's refusal to provide internal bank records."); *Changzhou Trina Solar Energy Co., Ltd. v. United States*, No. 17-00246, 2018 WL 6271653 (Ct. Int'l Trade Nov. 30, 2018) at *3 (noting that "prior to applying AFA, {the Department} must first demonstrate that the GOC's failure to provide information left a gap in the record and subsequently explain how using facts available with an adverse inference reasonably leads to a given conclusion"); *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1271 (Ct. Int'l Trade 2018) (noting that where Plaintiffs certified the non-use of the program by its customers, "{the Department} improperly conflate{d} the program's operation with its use" when it applied AFA); *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1357 (Ct. Int'l Trade 2019) (holding {the Department}'s application of AFA was not supported by substantial evidence and contrary to law where "Heze and the GOC provided a good deal of evidence that Heze's U.S. and non-U.S. customers did not use the Export Buyer's Credit Program-evidence that, in accordance with the Department's past practice, was sufficient to demonstrate non-use.").

Federal Circuit has held that "{a}n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for the Department to expect that more forthcoming responses should have been made, *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown."[92]

In this review, the mandatory respondents, including Guyu, asserted that their customers did not utilize this program.[93] Furthermore, the GOC provided evidence that none of the mandatory respondents' customers utilized the program through a comprehensive search of the China Ex-Im database.[94] Commerce rejected this evidence of non-use by stating that "{w}e have no way of verifying such statements without the GOC providing us with the requested documents which would allow us to then properly examine its claims of non-use."[95]

Chiefly, Commerce asserted that it was unable to verify non-use because "the potential recipients of export buyer's credits are not limited to the customers of the company respondents, as they may be received by third-party banks and institutions."[96]  However, Commerce's assertions ignore evidence submitted on the record by the GOC and mandatory respondents. The GOC's explanation of the program, as consistent with other cases, is that the customer must apply for the credit program with the China Ex-Im Bank. The China-Ex Im Bank would

---

[92] *Nippon Steel Corporation v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003).

[93] *See* Guyu IQR at 12, Exhibit IV-C-5.

[94] *See* GOC's SQR at Exhibit SQ-4.

[95] *See* Final IDM at 65.

[96] *Id.* at 64.

therefore have a record of such a customer, regardless of whether the disbursement was allocated through partner banks, as alleged by Commerce.

Commerce also continues to stubbornly countervail the EBCP where no evidence exists on the record despite numerous recent decisions by this Court striking down the agency's position.[97] The Court should follow the reasoning it most recently gave in *Yama Ribbons and Bows Co., Ltd.  v. United States*, as it is directly analogous to this review.[98] There, as in the instant proceeding, Commerce applied AFA to find "use" of the EBCP program despite record evidence of the company's statement that the customers did not use the program, declarations from the company's U.S. customers stating that they did not use the program, and the PRC government's the company's customer list against EX-IM Bank records and reporting its having found none of the customers in the records of the EBCP.[99] The record of this proceeding is identical, with Guyu confirming non-use, providing customer declarations of non-use, and the GOC confirming no record in the EX-IM Bank's database of those customers.[100] In *Yama*, the Court concluded that there was therefore "no evidence on the record of the review to support a finding that any U.S. customer of Yama used the EBCP, and the record contained evidence

---

[97] *See Yama Ribbons and Bows Co., Ltd.  v. United States*, Slip Op. 21-50 (Apr. 30, 2021); *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2018); *Changzhou Trina Solar Energy Co., Ltd. v. United States*, No. 17-00246, 2018 WL 6271653 (Ct. Int'l Trade Nov. 30, 2018); *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1271 (Ct. Int'l Trade 2018); *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1357 (Ct. Int'l Trade 2019).

[98] *Yama Ribbons and Bows Co., Ltd.  v. United States*, Slip Op. 21-50 (Apr. 30, 2021).

[99] *See id.* at 14-15.

[100] *See* Guyu Section III Initial Questionnaire Response (July 15, 2019) ("Guyu IQR") at 12; Guyu IQR at Exhibit IV-C-5; and Government of China's Supplemental Questionnaire Response," (Oct. 28, 2019) ("GOC's SQR") at Exhibit SQ-4.

refuting any such finding."[101] We ask that this Court similarly find that the Department failed to adequately consider the evidence presented by Guyu that the EBCP was not used by its customers and remand for a proper and fair consideration of the evidence presented.

## VII.   COMMERCE'S COUNTERVAILING OF "OTHER SUBSIDIES" IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

Commerce's questions regarding "other subsidies" run counter to the domestic law and WTO Agreements. As a result, application of AFA to these programs is unlawful.

Under 19 U.S.C. § 1671a, investigations on subsidy programs are initiated only after sufficient evidence of financial contribution, specificity, and benefit is found or presented. Therefore, each allegation of a subsidy is subject to a Department review to establish whether the allegation is properly framed and supported by sufficient evidence. Initiation on that allegation can therefore only occur following a properly-framed allegation based on specific evidence.

Similarly, the United States' commitment under Article 11.2 of the SCM Agreement dictates that investigations may not be initiated on the basis of "simple assertion, unsubstantiated by relevant evidence."[102] Sufficient evidence with regard to the existence, amount, and nature of a subsidy must be presented for Commerce to initiate the investigation of another program, consistent with Article 11.2(iii). Therefore, in the absence of allegations and sufficient evidence in respect of "other" subsidies, Commerce cannot investigate such subsidies, should they exist, much less apply AFA to determine their measure.

---

[101] *Yama Ribbons and Bows Co., Ltd.  v. United States*, Slip Op. 21-50 (Apr. 30, 2021) at 22.

[102] Agreement on Subsidies and Countervailing Measures, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 ("SCM Agreement") at Article 11.2.

Commerce's practice in asking parties, particularly other governments, to declare and list "all other subsidies" runs counter to U.S. law as enumerated in 19 U.S.C. § 1671a. U.S. law clearly requires an allegation of subsidy and an initiation of an investigation into the alleged program once Commerce has concluded that the allegation is properly structured and supported by evidence. As "all other subsidies" is a program that is neither alleged nor initiated upon, it is improper for Commerce to apply AFA or any calculated measure upon this so-called program.

## CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.  Plaintiff-Intervenors respectfully request that this Court remand this matter to Commerce so that the agency may fix the errors identified above.

Respectfully Submitted,

/s/ Mark R. Ludwikowski
Mark R. Ludwikowski
Courtney G. Taylor
**CLARK HILL, PLC**

1001 Pennsylvania Ave., N.W.
Suite 1300 South
Washington, D.C. 20004
(202) 640-6680
mludwikowski@ClarkHill.com
*Attorneys for Plaintiff-Intervenors*

Dated: May 14, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff-Intervenors Memorandum of Law in Support of its 56.2 Motion, as computed by Clark Hill's word processing system Microsoft Office Professional, is <u>9953</u> words, less than the 14,000 word limit.


*/s/ Mark R. Ludwikowski*
Mark R. Ludwikowski

*Counsel for Plaintiff-Intervenor*

Dated: May 14, 2021

## CERTIFICATE OF SERVICE

A true and accurate copy of the foregoing was electronically filed on May 14, 2021, via the Court's

ECF filing system, which automatically serves notice on counsel of record..

_/s/ Mark R. Ludwikowski_
Mark R. Ludwikowski

_Counsel for Plaintiff-Intervenor_

Dated: May 14, 2021