IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

| | | |
|---|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD., *et al.*, | ) ) ) ) | Consol. Court No. 20-03885 |
| Consolidated Plaintiffs, | ) ) | |
| JIANGSU GUYU INTERNATIONAL TRADING CO., LTD., *et al.*, | ) ) ) | |
| Consolidated Plaintiffs, | ) ) | |
| EVOLUTIONS FLOORING, INC.*, et al.*, | ) ) | |
| Consolidated Plaintiffs, | ) ) | |
| METROPOLITAN HARDWOOD FLOORS, INC., *et al.*, | ) ) ) | |
| Consolidated Plaintiffs, | ) ) | |
| ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD., *et al.*, | ) ) ) | |
| Consolidated Plaintiffs, | ) ) | |
| and | ) ) | |

Cover
(page 1 of 2)

FINE FURNITURE (SHANGHAI)
LIMITED, *et al.*,

             Plaintiff-Intervenors,

   v.

UNITED STATES,

             Defendant,

      and

AMERICAN MANUFACTURERS OF
MULTILAYERED WOOD FLOORING,

            Defendant-Intervenors.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

           Cover
         (page 2 of 2)

---

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

---

OF COUNSEL:

JONZACHARY FORBES
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
Telephone: (240) 449-5906
Facsimile: (202) 482-8184
Email: JonZachary.Forbes@trade.gov

August 12, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division,  Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-0534
Fax:     (202) 353-0461
Email:    Sonia.M.Orfield@usdoj.gov

*Attorneys for Defendant*

# **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ....................................................................2

    I.    Administrative Determination Under Review ...............................................2

    II.    Statement Of Issues.....................................................................................3

STATEMENT OF FACTS .........................................................................................4

SUMMARY OF ARGUMENT ...................................................................................7

ARGUMENT ...........................................................................................................9

    I.    Standard Of Review ....................................................................................9

    II.    Commerce's Selection Of Jiangsu Guyu For Individual Examination Was Supported By Substantial Evidence And Otherwise In Accordance With Law .........................11

    III.    Commerce's Finding Of Cross-Ownership Between Jiangsu Guyu's Affiliates Was Supported By Substantial Evidence And Otherwise In Accordance With Law .........15

    IV.    Commerce's Inclusion Of Poplar Sheets In The Provision For Veneers For Less Than Adequate Remuneration Subsidy Program Was Supported By Substantial Evidence And Otherwise In Accordance With Law....................................................................17

    V.    Commerce's Inclusion of Harmonized Schedule Category 4412.99 In The Plywood Benchmark Was Supported By Substantial Evidence And Otherwise In Accordance With Law ...............................................................................23

    VI.    Plaintiffs Failed To Substantiate The Claim That Commerce Double Counted Internally-Consumed Plywood In The Plywood For Less Than Adequate Remuneration Calculation ...........................................................................25

    VII.    Commerce's Investigation Of Other Subsidies Was In Accordance With Law Commerce's Determination Based On Adverse Facts Available That Jiangsu Guyu's Supplies Of Poplar Core Sheets Were Authorities Was Supported By Substantial Evidence and Otherwise In Accordance With Law ....................................................26

    VIII.    Commerce's Determination Based On Adverse Facts Available That Jiangsu Guyu's Supplies Of Poplar Core Sheets Were Authorities Was Supported By Substantial Evidence and Otherwise In Accordance With Law ...................................................27

IX.     Commerce's Finding Based On Adverse Facts Available Of Non-Use Of The Export
        Buyer's Credit Program By Baroque Timber and Jiangsu Guyu Was Supported By
        Substantial Evidence And Otherwise In Accordance With Law ................................32

X.      Commerce's Determination Based On Adverse Facts Available That The Electricity
        For Less Than Adequate Remuneration Program Was Specific Was Supported By
        Substantial Evidence And Otherwise In Accordance With Law ...............................42

        A.  Commerce's Specificity Finding Was Supported by Substantial Evidence and
            Other in Accordance with Law…………………………………………… 42

        B.   Commerce's Electricity Benchmark Determination Was Supported by Substantial
             Evidence and Otherwise in Accordance with Law……………………….44

        CONCLUSION..........................................................................................................46

# TABLE OF AUTHORITIES

Cases                                                                                                         Page(s)

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012)......................................................... 13

*Altx, Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004)............................................................................ 10

*Beijin Tianhai Indus. Co., Ltd. v. United States*,
   52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015)........................................................... 23

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
   61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015).................................................... 28, 44

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
   195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016).................................................. passim

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
   352 F. Supp. 3d 1316 (Ct. Intl'l Trade 2018)......................................... 13, 44, 46

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)...................................................................................... 10, 28

*Clearon Corp. v. United States*,
   359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019)......................................................... 32

*Corus Staal BV v. Dep't of Commerce*,
   395 F.3d 1343 (Fed. Cir. 2005)............................................................................ 27

*Dongtai Peak Honey Indus. Co., Ltd. v. United States*,
   777 F.3d 1343 (Fed. Cir. 2015)............................................................................ 13

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012)................................................................. 23, 29, 43

*Essar Steel Ltd. v. United States*,
   721 F.Supp. 2d 1285 (Ct. Int'l Trade 2010)............................................. 29, 42, 43

*Fine Furniture (Shanghai) Ltd. v. United States*,
   748 F.3d 1365 (Fed. Cir. 2014)............................................................................ 29

*Fine Furniture (Shanghai) Ltd. v. United States*,
　865 F. Supp. 2d 1254 (Ct. Int'l Trade 2021) ............................................................ 45

*Gerritsen v. Shirai*,
　979 F.2d 1524 (Fed. Cir. 1992) ............................................................................... 23

*Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*,
　900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ........................................................... 30

*Guizhou Tyre Co., Ltd. v. United States*,
　No. 19-00032, Slip Op. 21-64, 2021 WL 2156474 (Ct. Int'l Trade May 19, 2021) ......... passim

*Husteel Co. v. United States*,
　98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ............................................................. 14

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,
　405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ...................................................... passim

*Jindal Poly Films Limited of India v. United States*,
　439 F. Supp. 3d 1354 (Ct. Int'l Trade 2020) ........................................................... 43

*Maverick Tube v. United States*,
　273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017) ........................................................... 45

*Mitsubishi Heavy Indus., Ltd. v. United States*,
　275 F.3d 1056 (Fed. Cir. 2001) ............................................................................... 10

*Nippon Steel Corp v. United States*,
　337 F.3d 1373 (Fed. Cir. 2003) ............................................................................... 29

*Pakfood Pub. Co. v. United States*,
　753 F. Supp. 2d 1334 (Ct. Int'l Trade 2011) ........................................................... 13

*PSC VSMPO-Avisma Corp. v. United States*,
　688 F.3d 751 (Fed. Cir. 2012) ................................................................................. 13

*RZBC Grp. Shareholding Co. Ltd. v. United States*,
　100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ........................................................... 43

*Sterling Fed. Sys., Inc. v. Goldin*,
　16 F.3d 1177 (Fed. Cir. 1994) ................................................................................. 23

*Sunpreme Inc. v. United States*,
    946 F.3d 1300 (Fed. Cir. 2020) ............................................................................... 10

*Ticaret A.S. v. United States*,
    61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ............................................................. 28

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004) ............................................................................... 10

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ................................................................................................ 10

*United States Steel Corp. v. United States*,
    33 C.I.T.5, 1950 ...................................................................................................... 38

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................................................ 13

*Yantai Timken Co. v. United States,*
    521 F.Supp.2d 1356 (Ct.Int'l Trade 2007) ............................................................. 13

*Zhaoqing New Zhongya Aluminum Co., Ltd. v. United States*,
    961 F. Supp. 2d 1346 (Ct. Int'l Trade 2014) .......................................................... 22

Statutes
19 U.S.C. § 1671 ........................................................................................................ 4, 26

19 U.S.C. § 1673 ......................................................................................................... 15

19 U.S.C. § 1677 .................................................................................................... passim

 Regulations
19 C.F.R. § 351.302 .............................................................................................. passim

19 C.F.R. § 351.311 .................................................................................................... 26

Other Authorities

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 83 Fed. Reg. 62,293 (Dep't of Commerce Dec. 3, 2018) ....... 4

*Chlorinated Isocyanurates from the People's Republic of China: Final Affirmative Countervailing Duty Determination; 2012,*
79 Fed. Reg. 56,560 (Dep't of Commerce Sept. 22, 2014) ................................................... passim

*Countervailing Duties, Final Rule,*
63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) ......................................................... 15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Final Results of Countervailing Duty Administrative Review*; 2015, 83 Fed. Reg. 34,828 (Dep't of Commerce July 23, 2018) ............................................................. 23

*High Pressure Steel Cylinders from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
77 Fed. Reg. 26,738 (Dep't of Commerce May 7, 2012) ............................................................. 28

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019) ............................................................. 4

*Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders,*
77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012) .................................................................. 4

*Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order*,
76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011) ............................................................... 4

*Multilayered Wood Flooring From the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,*
85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) ....................................................... 2, 7

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

_____

|  |  |  |
|---|---|---|
| **JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD.**, *et al.*, | ) ) ) |  |
|  | ) |  |
| **Plaintiffs,** | ) |  |
|  | ) |  |
| **BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD.**, *et al.*, | ) ) |  |
|  | ) |  |
| **Consolidated Plaintiffs,** | ) |  |
|  | ) |  |
| **JIANGSU GUYU INTERNATIONAL TRADING CO., LTD.**, *et al.*, | ) ) |  |
|  | ) |  |
| **Consolidated Plaintiffs,** | ) |  |
|  | ) |  |
| **EVOLUTIONS FLOORING, INC.**, *et al.*, | ) |  |
|  | ) |  |
| **Consolidated Plaintiffs,** | ) |  |
|  | ) |  |
| **METROPOLITAN HARDWOOD FLOORS, INC.**, *et al.*, | ) ) |  |
|  | ) |  |
| **Consolidated Plaintiffs,** | ) |  |
|  | ) |  |
| **ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD.**, *et al.*, | ) ) |  |
|  | ) |  |
| **Consolidated Plaintiffs,** | ) |  |
|  | ) |  |
| **and** | ) |  |
|  | ) |  |
| **FINE FURNITURE (SHANGHAI) LIMITED,** *et al.*, | ) ) |  |
|  | ) |  |
| **Plaintiff-Intervenors,** | ) |  |
|  | ) |  |
| **v.** | ) | **Consol. Court No. 20-03885** |
|  | ) |  |

| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN MANUFACTURERS OF | ) |
| MULTILAYERED WOOD FLOORING, | ) |
| | ) |
| Defendant-Intervenors. | ) |
| _____ | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, defendant, the United States, respectfully responds to the motions for judgment on the agency record, filed by plaintiffs, consolidated plaintiffs, and plaintiff-intervenors, challenging the Department of Commerce's final results in the seventh administrative review of the countervailing duty order covering multilayered wood flooring from the People's Republic of China.  As explained below, the motions should be denied because the final results are supported by substantial evidence and are otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is *Multilayered Wood Flooring From the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) (P.R. 369), and accompanying Issues and Decisions Memorandum (IDM) (P.R. 361) (*Final Results*). The period of review is January 1, 2017, through December 31, 2017.

2

II.   **Statement Of Issues**

1.   Whether Commerce's selection of respondents for individual examination was supported by substantial evidence and otherwise in accordance with law.

2.   Whether Commerce's finding of cross-ownership between the affiliates of Jiangsu Guyu International Trading Co., Ltd. (Jiangsu Guyu) was based on substantial evidence and in accordance with law.

3.   Whether Commerce's inclusion of poplar core sheets in the Provision of Veneers for Less Than Adequate Remuneration (LTAR) subsidy program was supported by substantial evidence and otherwise in accordance with law.

4.   Whether Commerce's inclusion of Harmonized Schedule Category 4412.99 in the Plywood Benchmark was supported by substantial evidence and otherwise in accordance with law.

5.   Whether Commerce double counted internally-consumed plywood in the Plywood for LTAR calculation.

6.   Whether Commerce's investigation of other non-alleged subsidies was in accordance with law.

7.   Whether Commerce's determination based on adverse facts available (AFA) that Jiangsu Guyu's suppliers of poplar cores were authorities was supported by substantial evidence and otherwise in accordance with law.

8.   Whether Commerce's finding based on adverse facts available that plaintiffs used the Export Buyer's Credit program is supported by substantial evidence and is otherwise in accordance with law.

9. Whether Commerce's use of AFA to make its specificity determination concerning
   the electricity for LTAR program and benchmark selection was supported by
   substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

The Department of Commerce has published a countervailing duty (CVD) order on
multilayered wood flooring (MLWF) from the People's Republic of China.  *See Multilayered
Wood Flooring from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg.
76,693 (Dep't of Commerce Dec. 8, 2011) (*Order*) (P.R. 369); *see also Multilayered Wood
Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty
Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).

On December 4, 2018, Commerce published a notice of an opportunity to request an
administrative review of the order.  *See Antidumping or Countervailing Duty Order, Finding, or
Suspended Investigation; Opportunity to Request Administrative Review*, 83 Fed. Reg. 62,293
(Dep't of Commerce Dec. 3, 2018).  Following timely requests from interested parties,
Commerce initiated the administrative review.  *Initiation of Antidumping and Countervailing
Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019) (P.R. 21).

Pursuant to 19 U.S.C. § 1671(e)(2)(A) and as announced in its Initiation Notice,
Commerce relied on data from U.S. Customs and Border Protection (CBP) for purposes of
respondent selection.  IDM at 14-15.  Commerce placed on the record CBP data concerning
entries of MLWF during the period of review and invited comments.  Memorandum,
"Administrative Review of the Countervailing Duty Order of Multilayered Wood Flooring from
the People's Republic of China:  Customs and Border Protection Data for Respondent Selection"

(Mar. 14, 2019) (P.R. 23, C.R. 1).  Only one respondent, Jiaxing Hengtong Wood Co., Ltd., timely submitted certified quantity and value (Q&V) data in response.  IDM at 15.

Commerce selected Baroque Timber Industries (Baroque Timber) and Jiangsu Guyu as mandatory respondents as the two companies that account for the largest volume of subject merchandise imports during the period of review based on an analysis of the CBP data and certified Q&V information that was timely submitted.  *See* Memorandum, "Countervailing Duty Administrative Review:  Multilayered Wood Flooring from the People's Republic of China: Respondent Selection" (May 21, 2019) (Respondent Selection Memo) (P.R. 57, C.R. 6).  A week after Commerce released its Respondent Selection Memo, and two months after the deadline for the submission of data for purposes of respondent selection, Jiangsu Guyu submitted additional respondent selection comments containing Q&V data on May 28, 2019.  Letter on Behalf of Guyu: Comments on Respondent Selection Memoranda on behalf of Guyu (May 28, 2019) (P.R. 63, C.R. 7).  Commerce rejected these untimely comments pursuant to 19 C.F.R. § 351.302(d)(1)(i).  *See* 2017 Countervailing Administrative Review of Multilayered Wood Flooring from the People's Republic of China:  Rejection of Untimely Respondent Selection Comments (May 30, 2019) (P.R. 65).

Commerce issued questionnaires to Baroque Timber, Jiangsu Guyu, and the government of the People's Republic of China (GOC).  *See* Decision Memorandum for the Preliminary Results in the Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2017 (Jan. 30, 2020) (PDM) (P.R. 263) at 3.  Baroque Timber and Jiangsu Guyu submitted affiliation responses, initial responses, and supplemental responses. *Id.*  In their initial questionnaire responses, Jiangsu Guyu and Baroque Timber claimed non-use for the Export Buyer's Credit program and submitted non-use certifications from a portion of

5

their listed U.S. customers.  *Id.* at 25 (citing Jiangsu Guyu Initial Questionnaire Response (July

15, 2019) (Jiangsu Guyu IQR) at Exhibit IV-C-5 (P.R. 95, C.R. 23); Baroque Timber Initial

Questionnaire Response (July 16, 2019) at Exhibit 15c) (Baroque Timber IQR) (P.R. 132, C.R.

107).  The GOC submitted an initial response and supplemental responses.  *Id.*

On October 17, 2019, Commerce initiated an investigation of four new subsidy programs

alleged by the petitioner, the American Manufacturers of Multilayered Wood Flooring

(AMMWF):  (1) the provision of plywood for LTAR; (2) the provision of sawn wood and

continuously shaped wood for LTAR; (3) the provision of particleboard for LTAR; and (4) the

provision of fiberboard for LTAR.  *See* Decision Memorandum on New Subsidy Allegations

(Oct. 17, 2019) (P.R. 196).

In its response to Commerce's New Subsidies Allegation questionnaire, Jiangsu Guyu

disclosed the poplar core sheet purchases of its affiliate Siyang County Shunyang Wood Co., Ltd

(Shunyang).  IDM at 22.  AMMWF argued poplar core sheets should be included in the veneers

for LTAR subsidy program.  *Id.*

In its preliminary results, Commerce found that countervailable subsidies were being

provided to producers and exporters of multilayered wood flooring through programs including

Provision of Veneers for LTAR, Provision of Electricity for LTAR, Export Buyers' Credit.

PDM at 34-40.  Commerce preliminarily explained its use of facts otherwise available and

adverse inferences pursuant to 19 U.S.C. § 1677e(a), (b) based on the GOC's failure to provide

certain requested information crucial to Commerce's analysis.  PDM at 1.  Specifically, the GOC

failed to provide information necessary to Commerce's determination of whether these producers

of veneers are "authorities" within the meaning of section 771(5)(B) of the Act, information

needed to determine whether the provision of electricity was specific within the meaning of

section 771(5A) of the Act, and information needed to allow Commerce to fully analyze the Export Buyer's Credit program. *See Id.* at 20-21, 24

Following publication of the preliminary results, the petitioner, the GOC, Baroque Timber, and Jiangsu Guyu submitted timely case briefs. Additionally, Commerce received a case brief from Fine Furniture (Shanghai) Limited and Double F Limited (collectively, Fine Furniture) and letters from other interested parties supporting arguments made by the mandatory respondents and the GOC. *Id.* On March 19, 2020, pursuant to 19 C.F.R. § 351.302(d), Commerce rejected Jiangsu Guyu's case brief as it contained untimely new factual information, and instructed Jiangsu Guyu to resubmit a redacted case brief, which it did. *Id.* On March 24, 2020, parties submitted timely rebuttal briefs.

On November 27, 2020, Commerce published the final results, continuing to apply adverse facts available. *Final Results*, 85 Fed. Reg. at 76,011. Commerce calculated a subsidy rate of 14.09 percent for Baroque Timber, and for Jiangsu Guyu, 122.92 percent. *Id.* at 76, 012. The non-reviewed companies' rate assigned based on the weighted average of the calculated subsidy rate for Baroque Timber and Jiangsu Guyu using publicly ranged sales data was 20.75 percent. *Id.*

## SUMMARY OF ARGUMENT

Commerce's reliance on CBP data to select Jiangsu Guyu as a mandatory respondent was supported by substantial evidence and in accordance with law. Commerce adequately addressed concerns relating to the CBP data and found that the dataset, as a whole, was not unreliable. Plaintiffs did not submit evidence, such as Q&V data or Infodrive data, at the time of respondent selection that supported the conclusion that the dataset was unusable.

Commerce's finding of cross-ownership between Jiangsu Guyu's affiliates was supported by substantial evidence and in accordance with law.  Jiangsu Guyu consistently reported Shunyang and Shengyu were cross-owned affiliates in its questionnaire responses and record evidence reported by Jiangsu Guyu supported this determination.

Commerce's inclusion of poplar core sheets in the Provision of Veneers for LTAR Program was supported by substantial evidence and in accordance with law.  Commerce relied upon the language of the order itself to determine that poplar core sheets were covered by the orders' definitions for veneers.  Commerce also considered plaintiffs' counter-arguments and evidence and explained why they were not availing, in light of the order's scope language.

Similarly, Commerce's inclusion of HS 4412.99 in the plywood benchmark was supported by substantial evidence and in accordance with law.  Commerce considered the scope language and Baroque Timber's submissions to determine that HS 4412.99 covers comparable merchandise to respondents' plywood input purchases.

Plaintiffs claim that Commerce doubly-counted internally consumed plywood in its Plywood for LTAR calculation is unavailing.  Plaintiffs did not present any evidence of double counting, nor could Commerce trace which of Shunyang's poplar core sheet (veneer) purchases were used for production of plywood of Shengyu and which of Shengyu's plywood purchases were produced from Shunyang's poplar sheet purchases.

Commerce's investigation of other subsidies was in accordance with law as this Court has previously upheld Commerce's practice of investigating and countervailing non-alleged other subsidies.

Commerce's application of an adverse inference to determine that Jiangsu Guyu's suppliers of poplar cores were authorities within the meaning of 19 U.S.C. § 1677(5)(B) is

8

supported by substantial evidence and in accordance with law.   Commerce has reasonably interpreted the term "public entities" not to exclude small scale enterprises such as individual farmers.

Commerce's AFA determination of use and benefit for the Export Buyer's Credit Program was supported by substantial evidence and otherwise in accordance with law. Commerce defined the gap in the record, explained what information was missing from the record necessary to verify non-use; (2) established how the withheld information created this gap by explaining why the information the GOC refused to give was necessary to verify claims of non-use; and (3) showed that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify.

Finally, Commerce's use of an adverse inference in its specificity determination and electricity benchmark determination in the Electricity for LTAR program was supported by substantial evidence and otherwise in accordance with law.  This Court has previously found that Commerce lawfully applied AFA in its specificity and benchmark determination with regards to this subsidy program; because there is no basis to distinguish the record of this review, the Court should reach the same conclusion here.

## ARGUMENT

I.   **Standard Of Review**

Commerce's determinations, findings, or conclusions in a countervailing duty proceeding are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. 1516a(b)(1)(B)(i).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001). Substantial evidence is "more than a mere scintilla" and is evidence that "a reasonable mind might" accept as adequate. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (citation omitted). The agency's findings may be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists. *Id*. at 1308-09. The Court must sustain the determination if it is "reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion." *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with the clear intent of Congress. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).

10

**II.      Commerce's Selection Of Jiangsu Guyu For Individual Examination Was
Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce's selection of Jiangsu Guyu as a mandatory respondent in this review was

lawful and supported by substantial evidence.  Commerce reasonably and lawfully relied upon

CBP data for purposes of respondent selection.  Commerce addressed and considered errors in

those data alleged by parties during the respondent selection process, and reasonably determined

that the evidence on the record during respondent selection did not demonstrate that the CBP

data were on the whole unusable.

In a CVD administrative review, Commerce is directed to calculate individual subsidy

rates for each known exporter and producer of the subject merchandise under review pursuant to

19 U.S.C. § 1677f-1(e)(1).  However, if it is not practicable to examine all companies, such as

when it is faced with a large number of exporters/producers, Commerce may limit its

examination to a reasonable number of such companies.  *Id.* § 1677f-1(e)(2).  Because

Commerce initiated this administrative review with respect to 170 companies, it concluded that it

was not practicable or feasible to individually examine all of them.  Respondent Selection Memo

at 2 (P.R. 57, C.R. 6); IDM at 14.  The statute allows Commerce to limit examination of

exporters or producers to those accounting for the largest volume of subject merchandise

exported during the period of review that can reasonably be examined.  19 U.S.C. § 1677f-

1(e)(2)(A).  Because the statute is silent as to how Commerce must determine which producers

or exporters account for the largest volume of subject merchandise, Commerce has discretion to

choose which particular method to use.  IDM at 14.  Commerce's practice in administrative

reviews is to rely upon CBP data of subject entries.  *Id.* at 15.

Commerce's practice in the Multilayered Wood Flooring from China CVD proceeding

has been to accept certified Q&V data timely submitted by individual companies identified in the

CBP data and substitute those certified amounts for the company-specific CBP data in

Commerce's ranking for respondent selection purposes.  IDM at 15 n.39 (citing Multilayered

Wood Flooring from the People's Republic of China:  Respondent Selection; 2015 (Apr. 3,

2017); Multilayered Wood Flooring from the People's Republic of China:  Respondent

Selection; 2014 (Aug. 5, 2016)).

Here, the deadline for submitting comments on the CBP data, submitting certified Q&V

data, and comments for purposes of respondent selection in this review was March 21, 2019.  *See*

Customs and Border Protection (CBP) Data for Respondent Selection (Mar. 14, 2019) (P.R. 23).

Only one company, Jiaxing Hengtong Wood Co., Ltd., timely submitted its certified Q&V data.

*Id.*; Respondent Selection Memo at 2 (P.R. 57, C.R. 6).  Jiangsu Guyu submitted untimely

additional comments containing Q&V data on May 28, 2019, a week after Commerce had

released its Respondent Selection Memo, and two months after the deadline for the submission

of such data for purposes of consideration in respondent selection.  Letter on Behalf of Guyu:

Comments on Respondent Selection Memoranda on behalf of Guyu (May 28, 2019) (P.R. 63,

C.R. 7).  Commerce rejected these untimely comments under 19 C.F.R. 351.302(d)(1)(i), which

provides that Commerce will not consider untimely filed factual information, written argument,

or other material.  *See* Rejection of Untimely Respondent Selection Comments (May 30, 2019)

(P.R. 65).

Plaintiffs contend that Commerce ignored evidence that tended to show certain errors or

flaws in the CBP data.  *See, e.g.*, Fine Furniture Br. at 12-14; Dalian Penghong Br. at 14;

Shenzhenshi Huanwei Br. at 22.  But as Commerce explained, its practice in this proceeding is

"to accept certified Q&V data submitted by individual companies identified in the CBP data,

limited to information submitted by a company for itself, and to substitute those certified Q&V

amounts for the company-specific CBP data. . . .” during the respondent selection comment

period.  IDM at 15 (P.R. 361).  No party timely presented evidence that would detract from the

reliability of the CBP data and Commerce addressed the parties’ comments concerning the

Jiangsu Guyu data.[1]  In the absence of such evidence, this court has found that “the agency

reasonably concluded that {CBP} data, collected in the regular course of business under penalty

of law for fraud and/or negligence, presents reliably accurate information.”  *Pakfood Pub. Co. v.*

*United States*, 753 F. Supp. 2d 1334, 1344-45 (Ct. Int’l Trade 2011) (citation omitted); *see also*

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 828 F. Supp. 2d 1345, 1351-55 (Ct. Int’l

Trade 2012) (upholding Commerce’s practice of relying on CBP data).  As to the specific alleged

---

[1] The rejection of these respondent selection comments, submitted two months after the established deadline had passed was fully within the discretion of Commerce.  As the Federal Circuit has explained in similar circumstances involving Commerce’s rejection of late submitted factual information, “courts must not improperly intrude upon an agency's power to implement and enforce proper procedures for constructing an agency record.”  *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2012); (citation omitted).  “Absent constitutional constraints or extremely compelling circumstances {,} the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.”  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) (internal quotation marks and citation omitted).  “Accordingly, absent such constraints or circumstances, courts will defer to the judgment of an agency regarding the development of the agency record.”  *PSC VSMPO-Avisma Corp.*, 688 F.3d at 760.  Thus, here where no such constraints are present, “{i}n order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations.”  *Yantai Timken Co. v. United States,* 521 F. Supp. 2d 1356, 1371 (Ct.Int'l Trade 2007).  *See also Dongtai Peak Honey Indus. Co., Ltd. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) (it is not for plaintiffs “to establish Commerce’s deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information.”).  To the extent that plaintiffs suggest that Commerce was required to accept probative information, even if it was untimely, that is not the law.  “A court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.  Indeed, the pursuit of “what the court perceives to be the ‘best’ or ‘correct’ result” would render judicial review “totally unpredictable.”  *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 546 (1978)).

errors, of most note for purposes of this review were reportedly aberrational volumes associated

with certain entries contained in the CBP data.  *See* Shenzhenshi Huanwei Br. at 20-21; Fine

Furniture Br. at 10-11.  Yet Commerce determined that "less than 0.05 percent of the entries in

the CBP data lacked quantity and/or unit of measure" and ensured a uniform unit of measure by

converting "CBP data reported in square meters to cubic meters CBP data reported in square

meters to cubic meters."  IDM at 15.  Moreover, the Court has found that "Commerce's decision

not to use Q&V Questionnaires is a reasonable concession to administrative convenience."  *Ad*

*Hoc Shrimp*, 828 F. Supp. 2d at 1355.

Plaintiffs argue that Commerce may not ignore errors facially apparent in available CBP

data.  *See* Fine Furniture Br. at 12-13 (citing *Husteel Co. v. United States*, 98 F. Supp. 3d 1315,

1327 n.8 (Ct. Int'l Trade 2015) ("'where the same exporter appears multiple times in the same

dataset, it is hardly unreasonable to expect Commerce to recognize that exporter will constitute

only a single respondent.'")  But *Husteel* does not require that Commerce cherry-pick or sift

through CBP data used to rank import volume for respondent selection.  *Husteel* addressed

whether Commerce erred in selecting the number of respondents to examine, not whether the

CBP data were unreliable for use in respondent selection.  IDM at 16 (citing *Husteel*, 98 F. Supp.

3d at 1325-29).  Further, as we have explained above, Commerce addressed the concerns and

raised by parties at the respondent selection stage and reiterated its reasoning in its *Final Results*

-- it did not ignore them.  Respondent Selection Memo at 4-6 (P.R. 57, C.R. 6); IDM at 14-16.

To the extent that *Husteel* is relevant to this case, that is all that Husteel requires.

For these reasons, Commerce's reliance on CBP data and available record evidence at the

time of respondent selection to select Jiangsu Guyu as a mandatory respondent was supported by

substantial evidence and otherwise in accordance with law.  Therefore the resulting weighted-

average margin calculation assigned to non-assigned companies pursuant to 19 U.S.C. § 1673d(c)(5)(A) incorporating the rate assigned to Jiangsu Guyu was equally supported by substantial evidence and in accordance with law.

**III.   Commerce's Finding Of Cross-Ownership Between Jiangsu Guyu's Affiliates Was Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce's finding of cross-ownership between Jiangsu Guyu's affiliates was based on substantial evidence and in accordance with law.  Cross-ownership exists where "one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets."  19 C.F.R. § 351.525(b)(6)(vi).  This standard will normally be met "where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations."  *Id*.  A corporation does not need to own one hundred percent of another corporation for a finding of cross-ownership.  *See Countervailing Duties, Final Rule*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998).

In its initial questionnaire responses, Jiangsu Guyu reported that Jiangsu Shengyu Flooring Co., Ltd. (Shengyu) and Siyang Country Shunyang Wood Co., Ltd. (Shunyang) were cross-owned affiliates.  *See* Jiangsu Guyu's Section A Questionnaire Response (June 21, 2019) (Jiangsu Guyu AQR) at 2-3 (P.R. 84, C.R. 12); Jiangsu Guyu IQR) at 1 (P.R. 95, C.R. 23); and Jiangsu Guyu's Letter, "Response to Section III Supplemental Questionnaire," (Sept. 30, 2019) (Jiangsu Guyu SQR) at 1-3 (P.R. 190, C.R. 147).  Jiangsu Guyu is wholly owned by Shengyu, which produced and supplied all Jiangsu Guyu's subject merchandise during the period of review.  PDM at 9; *see also* Jiangsu Guyu AQR at Exhibit 2 and SQR at 2.  Jiangsu Guyu also reported that Shunyang supplied an input to Shengyu for the production of subject merchandise during the period of review.  *Id*.  Finally, Jiangsu Guyu reported that Shanghai Woyuan

Industrial Co., Ltd. (Woyuan) was the former sole shareholder of Jiangsu Guyu from October 20, 2014, to July 24, 2015.  *Id*.

Based on Jiangsu Guyu's responses, Commerce preliminarily found these companies were cross-owned within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).  PDM at 10.  Jiangsu Guyu consistently reported that Shengyu and Shunyang were cross-owned affiliates until Jiangsu Guyu's case brief where it claimed the companies were not cross-owned, but rather had only familial relationships between shareholders.  Jiangsu Guyu Administrative Case Brief (Mar. 19, 2020) at 7 (P.R. 326, C.R. 223).

Shenzhenshi Huanwei argues that Commerce erred in its finding of cross ownership among Jiangsu's affiliates, Shengyu and Shunyang.  *See* Shenzhenshi Huanwei Br. at 15.  Shenzhenshi Huanwei argues the companies are not cross-owned affiliates because the only nexus is a familial tie between shareholders.  *See* Shenzhenshi Huanwei Br. at 34.  This argument is flawed for several reasons.

First, Jiangsu Guyu consistently reported throughout the review that Shengyu and Shunyang were cross-owned affiliates.  IDM at 18 (citing Jiangsu Guyu's AQR at 1-4; Jiangsu Guyu's SQR at 1-3).  It was only in its administrative case brief that Jiangsu Guyu first claimed that the only nexus between the companies is a familial relationship between shareholders. Jiangsu Guyu's Case Brief at 7 (P.R. 326, C.R. 223).  However, Jiangsu Guyu did not adequately explain its previous reports that Shengyu and Shunyang are cross-owned affiliates, and Commerce declined to reconsider its factual finding.  *Id*.

Second, the record contradicts Jiangsu Guyu's assertion that the only nexus is a familial relationship between shareholders.  In fact, Jiangsu Guyu is wholly owned by Shengyu, which produced and supplied Jiangsu Guyu's subject merchandise for export during the period of

16

review.  PDM at 9.  In addition, Jiangsu Guyu reported that Shunyang supplied an input to

Shengyu to produce subject merchandise during the period of review.  *Id*.  Substantial evidence

supports Commerce's finding of cross-owned affiliation, based on Jiangsu Guyu's affiliation

response and the above record facts.  IDM at 18.  Accordingly, Commerce's finding of cross-

ownership between Jiangsu Guyu's affiliates was based on substantial evidence and in

accordance with law.

**IV.    Commerce's Inclusion Of Poplar Sheets In The Provision For Veneers For Less Than Adequate Remuneration Subsidy Program Was Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce classified poplar sheets as veneers for purposes of calculating Jiangsu

Guyu's benefit under the veneers for LTAR program.  This inclusion was supported by

substantial evidence, the scope language of the order, and is otherwise in accordance with

law.

Jiangsu Guyu first reported the poplar sheet purchases of Shunyang, its cross-owned

affiliate, in its new subsidy allegation questionnaire response.  Jiangsu Guyu claimed that

Shunyang's poplar sheets had a different density, thickness and use than the four inputs

outlined in the new subsidy allegation (*i.e.*, plywood, sawn wood and continuously shaped

wood, particleboard and fiberboard).  *See* Jiangsu Guyu's Letter, "Response to New Subsidy

Allegations: Multilayered Wood Flooring from the People's Republic of China" (Nov. 8, 2019)

(Jiangsu Guyu NSA Response) at 1-2 (P.R. 218, C.R. 182).

Subsequently, Commerce issued a supplemental questionnaire providing Jiangsu Guyu an

opportunity: (1) to clarify how it used Shunyang's poplar sheets in the assembly of multilayered

wood flooring and (2) to provide a detailed description of how its poplar core sheets differed

from veneers.  *See* Commerce's Letter, "Second Supplemental Questionnaire" (Dec. 18, 2019)

(P.R. 236) at 3.  In its response, Jiangsu Guyu reported that the use of its poplar core sheets was limited to the assembly of plywood or for the core of multilayered wood flooring.  *See* Jiangsu Guyu's Letter, "Response to Second Supplemental Questionnaire," (Jan. 8, 2020) (Jiangsu Guyu Second SQR) (P.R. 246, C.R. 202) at 2.  Jiangsu Guyu also reported that Shunyang's poplar sheets are thin slices of wood "rotary cut" from poplar wood, which is a softer wood with a lower density than veneers.  *Id.*; *see also* Jiangsu Guyu's NSA Response at 1-2 and Exhibit NSA-4.

In determining whether Shunyang's poplar sheets were veneers, Commerce first looked at the scope of the order.  IDM at 22.  Commerce found that the order explicitly defines a veneer as "a *thin slice of wood, rotary cut*, sliced or sawed from a log, bolt or flitch.  Veneer is referred to as a ply when assembled."  *Order*, 76 Fed. Reg. at 76,694.  Accordingly, Commerce determined that Shunyang's poplar sheets are veneers because they are rotary cut thin slices of wood, and included Shunyang's poplar core sheet purchases in the calculation of the subsidy rate for the provision of veneers for LTAR program.  IDM at 22-23 (citing PDM at 34).

Plaintiffs argue that if Commerce intended to include "all thin slice{s} of wood" within the veneers for LTAR program, then Commerce would have included plywood under the scope of veneers for LTAR program, since plywood is comprised of individual thin slices of wood.  *See, e.g.*, Fine Furniture Br. at 18; Shenzhenshi Huanwei Br. at 32.  However, this argument relies on false equivalence, because plywood and veneers are two distinct wood inputs with separate definitions and benchmarks.  IDM at 23.  In addition, the order's scope language identifies plywood as assembled veneers (*e.g.*, multiple veneers glued together), and veneers as thin slices of wood (*e.g.,* individual plies).  IDM at 3, n.9; PDM at 6 fn. 28.  In other words,

plywood can be composed of multiple veneers, but plywood is not equivalent to a veneer. Specifically, plywood is made from face veneers, back veneers, and core or inner veneers.  IDM at 23; AMMWF's Letter "Multilayered Wood Flooring from the People's Republic of China: New Subsidy Allegations" (Aug. 12, 2019) (AMMWF New Subsidy Allegations) at Exhibit 1, 4-2– 4-5 (P.R. 153, C.R. 129).

Plaintiffs also argue that the petitioner did not intend to cover poplar sheets in the veneers for LTAR program because:  (1) the petitioner did not allege a subsidy program on poplar core sheets or any species of core sheets, and (2) the petitioner's veneer benchmark data do not cover the poplar wood species.  Fine Furniture Br. at 19.  However, the veneers for LTAR program is not limited to a specific species or type of veneer as defined within the scope of the order.  "All multilayered wood flooring is included within the definition of subject merchandise, without regard to…wood species used for the face, back and inner veneers; core composition; and face grade."  IDM at 23.

In addition, the petitioner is not required to provide every type of potential veneer species in its benchmark submission, and nothing on the record of this review suggests that either the petitioner or Commerce intended to exclude poplar sheets from the veneer for LTAR program.  Further, Fine Furniture's argument that the petitioner's benchmark data did not contain the poplar species is irrelevant, because, as Fine Furniture acknowledges, the petitioner's benchmark submission referenced HS code 4408.90, which covers veneer sheets of "other species."  *See, e.g.*, Baroque Timber's Letter, "Second Benchmark Data Submission" (Nov. 13, 2019) (P.R. 222) at Exhibit 2 at IX 44-14.  Only a limited number of wood species are listed individually under separate HTS lines under HTS 4408; thus, a veneer of a species not specifically listed is covered under the "Other" line.  By plaintiffs' logic, any species of

wood veneer not specifically listed under HTS 4408 would not be covered by the veneers for LTAR program, rendering the "Other" line meaningless.

Plaintiffs further contend that Shunyang's poplar sheets are not veneers, because the poplar sheets are made from a low density softer wood that is unattractive and less expensive than face-grade veneers. *See, e.g.*, Fine Furniture Br. at 17-18. Plaintiffs argue that poplar sheets are used for the core, because it is not a visible part of multilayered wood flooring, and therefore, can contain imperfections, whereas face-grade veneers are a visible part of multilayered wood flooring and more expensive, because face-grade veneers need to be a harder wood that can better withstand exposure to wear and tear, and contact with floor substrate. Shenzhenshi Huanwei Br. at 34. Although Commerce acknowledged a common usage of the term "veneer" by the industry, which focuses on face-grade veneers that are visible and are typically harder to withstand wear and tear, Commerce determined that the common usage did not supersede the order's plain language. IDM at 24. The order provides that the core of multilayered wood flooring may be composed of hardwood or softwood veneers: "{t}he core of multilayered wood flooring may be *composed of a range of materials, including but not limited to hardwood or softwood veneer*, particleboard, medium-density fiberboard, high-density fiberboard (HDF), stone and/or plastic composite, or strips of lumber placed edge-to-edge." *Order*, 76 Fed. Reg. at 76,694. In addition, subject merchandise is not limited by wood species, core composition, or face grade:

> All multilayered wood flooring is included within the definition of subject merchandise, *without regard to: dimension (overall thickness, thickness of face ply, thickness of back ply, thickness of core, and thickness of inner plies; width; and length); wood species used for the face, back and inner veneers; core composition; and face grade*.

*Id.* (emphasis added.)

Plaintiffs argue that not all veneers are the same, and that some veneers, like Shunyang's poplar sheets, are specifically used for plywood core.  Shenzhenshi Huanwei Br. at 34.  They further argue that Commerce's determination that Shunyang's poplar sheets are veneers means that its multilayered wood flooring has no core; and therefore, is made of face-grade hardwood veneers.  *Id.* at 33.  Commerce, however, considered this argument concluding that poplar core sheets are not a distinct product from veneers.  IDM at 24. Commerce's determination is supported by the fact that plywood is made from face veneers, back veneers, and core or inner veneers.  *See* AMMWF New Subsidies Allegation at Exhibit 1, 4-2–4-5.  Further, subject flooring is produced with plywood cores made of veneers, including those made with poplar wood.  *Id.* at Exhibit 1, 4-2–4-5, 4-18.  As veneers are not limited by wood species, grade, core composition or type (*i.e.*, hardwood or softwood) as explicitly stated in the scope of the order, Commerce's finding that Shunyang's poplar sheets are veneers and subject to the provision of veneers for LTAR program is supported by substantial evidence and otherwise in accordance with law.

Fine Furniture also contends that Commerce used incorrect benchmark data to calculate the benefit for Shunyang's purchases of poplar core sheets because the data do not contain data for poplar core sheets.  Fine Furniture Br. at 20-22.  Plaintiffs contend that Commerce unlawfully denied Jiangsu Guyu's request to re-open the record .  Fine Furniture Br. at 22; Jiangsu Guyu's Letter, "Request to Open the Record for New Factual Information" (Mar. 6, 2020) (P.R. 304).  Commerce denied this request, because prior to the preliminary determination, Commerce had already extended the benchmark submission deadline by two weeks; thus, Commerce found that Jiangsu Guyu had ample opportunity to submit the information and good cause did not exist pursuant to 19 C.F.R. § 351.302(b) for extending the

deadline again.  IDM at 25; Letter, "Denial of New Factual Information Submission Request"
(Mar. 10, 2020) (P.R. 309).  In addition, prior to the preliminary determination, Commerce
issued multiple questionnaires to Jiangsu Guyu regarding its wood inputs, to which Jiangsu
Guyu responded.  IDM at 25.

Plaintiffs argue that Jiangsu Guyu did not provide benchmark data for poplar wood
during the accepted time frame, because it understood that poplar core sheets were used for
plywood, not veneers.  Fine Furniture Br. at 22.  Therefore, it was not until the preliminary
results that plaintiffs recognized that Shunyang's poplar sheets could be veneers and
Commerce should have assented to reopening the record.  *Id.*  However, Commerce's initial
questionnaire included the provision of veneers for LTAR program and, as explained above,
the order itself defines a veneer.  IDM at 25.  Jiangsu Guyu reported that its poplar wood
sheets are thin slices of wood that are "rotary cut," which is nearly identical to the language
that is used to define veneers in the scope.  *Id.*  Accordingly, Commerce reasonably
determined that all parties had ample notice of the definition of veneer being applied in this
proceeding, and it was not necessary to allow all interested parties an opportunity to submit
new factual information, notwithstanding Jiangsu Guyu's misinterpretation of the definition of
veneer in preparing its questionnaire response.

Commerce's benchmark selection was not unreasonable.  Commerce found that the
veneer benchmark data that were timely submitted by the petitioner and Baroque Timber are
sufficient and usable in its calculation of the provision of veneers for LTAR program, because
they include "other species" of wood and are not limited to certain reported species.
Accordingly, Commerce did not abuse its discretion by declining to reopen the record.  *See
Zhaoqing New Zhongya Aluminum Co., Ltd. v. United States*, 961 F. Supp. 2d 1346, 1355 (Ct.

Int'l Trade 2014) (citing *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994)

(quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)) (stating that an agency

abuses discretion, *inter alia*, when its determination "follows from a record that contains no

evidence on which the {agency} could rationally base its decision." (alteration in original)).  In

light of the high threshold for overturning Commerce's decisions regarding the collection of

factual information, *see Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir.

2012), Commerce's reliance on benchmark data to calculate the benefit for Shunyang's

purchases of poplar core sheets was reasonable.

**V.    Commerce's Inclusion of Harmonized Schedule Category 4412.99 In The Plywood Benchmark Was Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce's inclusion of UN Comtrade export data for Harmonized Schedule (HS)

category 4412.99 for valuing plywood was supported by substantial evidence and in

accordance with law.  Generally, Commerce's practice is to rely on data reflecting the

narrowest category of products encompassing the input product.  IDM at 37; *see, e.g.*,

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the*

*People's Republic of China:  Final Results of Countervailing Duty Administrative Review*;

2015, 83 Fed. Reg. 34,828 (Dep't of Commerce July 23, 2018), and accompanying IDM at

Comment 3.  When selecting benchmark prices for input purchases, Commerce may select

benchmarks that are comparable merchandise, not identical merchandise.  IDM at 34 (citing

*Beijin Tianhai Indus. Co., Ltd. v. United States*, 52 F. Supp. 3d 1351, 1369 (Ct. Int'l Trade

2015); *see also* 19 C.F.R § 351.511(a)(2)(ii).

Baroque Timber argues that HS 4412.99 ("Plywood; with at least one outer ply of non-

coniferous wood, not containing particle board") should not be included in the plywood

benchmark because it is a laminated wood not used in production.  Baroque Timber Br. at 9-11.  As an initial matter, there is a distinction between laminated flooring, as described in the order's scope language, and wood laminate.  As the *Order* describes, laminated flooring includes layers other than wood.  *Order*, 76 Fed. Reg. at 76,694.  Baroque Timber reported that plywood is constructed with layers consisting of "a single ply or of two or more plies laminated with their grain direction parallel."  *See* Baroque Timber's Letter, "Benchmark Rebuttal: 2017 Administrative Review of the Countervailing Duty Order on Multilayered Wood Flooring from the People's Republic of China (C-570-971)" (Nov. 25, 2019) (Baroque Timber's Benchmark Rebuttal) at Exhibit 4c 11-5 (P.R. 232, C.R. 192).  In other words, all plywood is a laminate structure which uses thin layers of wood to form plywood.  While Baroque Timber asserts that imports into China under HS 4412.99 are categorized as laminated wood of the type not used as an input into the production of wood flooring, beech wood and eucalyptus wood, Baroque Timber did not provide evidence showing that it primarily used beech and eucalyptus wood.  IDM at 39.  Even so, HS 4412.9999 contains an "Other" category, that would conceivably cover beech and eucalyptus wood.  GOC New Subsidy Allegation Response (Nov. 8, 2019) at Exhibit NSA-5 (GOC NSA Response) (C.R. 181).  Baroque Timber argues that, because the descriptions listed under the Chinese HS 4412.99 do not explicitly mention plywood, this indicates an inherent difference between plywood and laminated wood.  Baroque Timber Br. at 12.  However, the Chinese description of the four-digit HS 4412, *i.e.*, "{p}lywood, veneered panels and similar laminated wood," suggests that plywood is, or can be, laminated.  *See* GOC NSA Response at Exhibit NSA-5 (C.R. 181).  In addition, the UN Comtrade description of HS 4412.99 explicitly excludes particle board, differentiating it from other potential wood flooring inputs.  IDM at 39.

Baroque Timber argues that the description provided of each of the terms plywood, veneer panels, and similar laminated wood indicates that plywood is distinct from similar laminated wood; however, this interpretation renders the word "similar" meaningless. Therefore, based on the description of HS 4412.99, Commerce reasonably found that this HS code covers products that are comparable to the plywood input used by the mandatory respondents in this proceeding. Thus, Commerce's continued inclusion of HS 4412.99 in the plywood benchmark for the purpose of valuing plywood was supported by substantial evidence and otherwise in accordance with law.

## VI.   Plaintiffs Failed To Substantiate The Claim That Commerce Double Counted Internally-Consumed Plywood In The Plywood For Less Than Adequate Remuneration Calculation

Shenzhenshi Huanwei argues that Commerce double counted internally-consumed plywood in the plywood for the LTAR calculation. Shenzhenshi Huanwei Br. at 35-36. In the final results, Commerce calculated a 112.23 percent rate for Jiangsu Guyu's purchases of poplar core sheets using the Provision of Veneers for LTAR program. Commerce also calculated a 7.13 percent rate for Jiangsu Guyu under the Provision of Plywood for LTAR program. Commerce considered the claim that by countervailing both the veneer purchases (*i.e.*, poplar core sheets) of Shunyang, a cross-owned affiliate of Jiangsu Guyu used to produce plywood, and the plywood purchases made by Shenyang, another cross-owned affiliate, from Shunyang, there was effective double counting. IDM at 25-26. However, plaintiffs failed to cite any record evidence that would indicate double counting. *Id.* at 26. Further, the available record evidence did not permit Commerce to trace which of Shunyang's poplar sheet (veneer) purchases were used for production of plywood of Shengyu and which of Shengyu's plywood purchases were produced

from Shunyang's poplar sheet purchases.  *Id.*  In the absence of any record evidence supporting

plaintiffs' claim, this Court should uphold Commerce's Plywood for LTAR benefit calculation.

## VII.  Commerce's Investigation Of Other Subsidies Was In Accordance With Law

Investigations into potentially countervailable subsidies are generally either initiated by

Commerce or result from a petition by a domestic interested party on behalf of an industry.  IDM

at 68; 19 U.S.C. § 1671a(a), (b).  If during an administrative proceeding, which includes

administrative reviews, Commerce "discovers a practice which appears to be a countervailable

subsidy," then Commerce "*shall* include the practice, subsidy, or subsidy program in the

proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy

with respect to the merchandise which is the subject of the proceeding."  19 U.S.C. § 1677d

(emphasis added); *see also* 19 C.F.R. § 351.311(b).

Shenzhenshi Huanwei contends that any initiation of investigation into a potential

countervailable subsidy must be supported by an allegation citing specific evidence of financial

contribution, specificity, and benefit conferred.  Shenzhenshi Huanwei Br. at 40.  However, "the

elements of a countervailable subsidy need not be identified before examining non-alleged

subsidies."  *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d

1317, 1342-43 (Ct. Int'l Trade 2019).

Shenzhenshi Huanwei further argues that Commerce's practice of asking parties to

declare and list all other subsidies is contrary to 19 U.S.C. § 1671a, which, in its reading,

requires specific allegations.  Shenzhenshi Huanwei Br. at 41.  Pursuant to 19 U.S.C. § 1677d,

however, Commerce has an affirmative obligation to seek information on, and include in a

proceeding, all subsidy practices that might benefit the subject merchandise.  IDM at 68.  The

statutory framework does not impose a limitation on Commerce from inquiring about other

subsidies and instead vests Commerce with broad investigative discretion.  *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334, 1346 (Ct. Int'l Trade 2016).  In this way, Commerce is not limited to passively or indirectly discovering a potentially countervailable practice, but may request parties' cooperation in identifying the full scope of governmental subsidization in the production of subject merchandise.  *See Trina Solar*, 195 F. Supp. 3d at 1346.

Finally, Shenzhenshi Huanwei argues that Commerce's practice is in contravention of Article 11.2 of the Agreement on Subsidies and Countervailing Measures.  Shenzhenshi Huanwei Br. at 40.  As Commerce explained, "{Commerce's} CVD laws are consistent with {its} WTO obligations" and, in any event, those obligations do not have any power to change U.S. law.  IDM at 70.  Plaintiffs do not identify any WTO Panel or Appellate Body Reports that would demonstrate that Commerce's CVD practices do not conform with the United States' WTO obligations.  Even if there was such evidence, it would not be binding on this Court.  *See Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1348 (Fed. Cir. 2005).  "{I}t is the {Tariff Act of 1930} and {Commerce's} regulations that have direct legal effect under U.S. law, and not the WTO Agreements or WTO reports."  IDM at 70.  Because Commerce has acted consistently with its statutory authority, Commerce's investigation of non-alleged other subsidies was in accordance with law.

**VIII.   Commerce's Determination Based On Adverse Facts Available That Jiangsu Guyu's Supplies Of Poplar Core Sheets Were Authorities Was Supported By <u>Substantial Evidence and Otherwise In Accordance With Law</u>**

Commerce's AFA determination that Jiangsu Guyu's suppliers of poplar cores were authorities within the meaning of 19 U.S.C. § 1677(5)(B) is supported by substantial evidence and in accordance with law.  A subsidy may be found where an authority provides a financial

contribution "to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). An

authority is defined as "a government of a country or any public entity within the territory of the

country." 19 U.S.C. § 1677(5)(B). Congress has not defined "public entity," leaving it to

Commerce to supply a reasonable interpretation of the term. *See Borusan Mannesmann Boru*

*Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2015);

*Chevron*, 468 U.S. at 843. '

Commerce requested information from the GOC to determine whether the suppliers of

poplar sheets are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B). Commerce CVD

Questionnaire at II-27 to II-29 (P.R. 61)). Commerce asked the GOC to provide information on

whether any individual owners, board members, or senior managers were government or Chinese

Communist Party (CCP) officials and the role of any CCP primary organization in the

companies. *Id*. The GOC responded that it is "unable to require the CCP, the People's congress,

the {Chinese People's Political Consultative Conference} (CPPCC), or the other entities as

mentioned in the question to provide the information." IDM at 29 (citing GOC's IQR at 86).

The GOC failed to provide documentation requested by Commerce. *Id.* (citing GOC's IQR at 65

and at Exhibit 51). In prior CVD proceedings, the GOC's responses indicate that it is able to

access information similar to the information Commerce requested. *Id.* (citing *High Pressure*

*Steel Cylinders from the People's Republic of China: Final Affirmative Countervailing Duty*

*Determination*, 77 Fed. Reg. 26,738 (Dep't of Commerce May 7, 2012), and accompanying IDM

at 13).

During a CVD proceeding, Commerce may fill in the gaps with "facts otherwise

available" (1) if necessary, information is not available on the record, or (2) if an interested party

(A) withholds information requested by Commerce, (B) fails to provide such information in the

form and manner requested, (C) significantly impedes the proceeding, or (D) provides

information on which Commerce relies but cannot be verified.  19 U.S.C. § 1677e(a).  Further,

Commerce has the authority to apply adverse facts available where an interested party has failed

to cooperate to the best of its ability when complying with a request for information.  19 U.S.C. §

1677e(b); *see also Nippon Steel Corp v. United States*, 337 F.3d 1373, 1384 (Fed. Cir. 2003).  A

party has complied to the best of their ability when it "has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."  *Id*. at

1382.  Commerce requires information from both the foreign government in question and the

foreign producers or exporters during CVD proceedings.  *See Fine Furniture (Shanghai) Ltd. v.

United States*, 748 F.3d 1365, 1369-70 (Fed. Cir. 2014) (acknowledging the need for Commerce

to solicit information from foreign governments in CVD proceedings and sustaining application

of AFA based on a foreign government's failure to cooperate to the best of its ability).

Commerce may request information from governments regarding a "financial contribution",

including the status of an entity as an authority, and "specificity" elements of a subsidy.  *See

Essar Steel Ltd. v. United States*, 721 F.Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *aff'd in part,

rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012).   In 2015, the statute was

amended to provide that Commerce "is not required to determine, or make any adjustments to, a

countervailable subsidy rate . . . based on any assumptions about information the interested party

would have provided if the interested party had complied with the request for information."  19

U.S.C. § 1677e(b)(1)(B).  Because GOC withheld requested information, Commerce determined

that the GOC failed to cooperate by not acting to the best of its ability to comply with

Commerce's request for information. Consequently, Commerce found that AFA was warranted

pursuant to section 776(b) of the Act and determined that the producers were "authorities" within

the meaning of 771(5)(B) of the Act.  Dalian Penghong and Shenzhenshi Huanwei argue

Commerce's use of AFA to determine that suppliers of poplar cores were authorities is contrary

to law.  *See* Dalian Penghong Br. at 14; *see also* Shenzhenshi Huanwei Br. at 31.  The parties

argue that the definition of authorities cannot extend to suppliers that are individual farmers,

because the Public Bodies Analysis Memorandum does not mention whether individuals or

natural persons may be public entities.  *See* Dalian Penghong Br. at 19; *see also* Shenzhenshi

Huanwei Br. at 30.  However, Commerce reasonably interpreted the term "public entities" to

include Jiangsu Guyu's suppliers of poplar cores.

This Court has previously stated the statutory term "public entities" is not defined and,

thus, Commerce's reasonable interpretation of the statute should be given deference.  *See, e.g.*,

*Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*, 900 F. Supp. 2d 1362,

1377 (Ct. Int'l Trade 2013).  When considering which enterprises qualify as public entities in the

context of CVD investigations, Commerce has determined that "the CCP exercises 'ultimate

control *over citizens* and resources, including authority over issues and resources as varied as

family and economic planning, as well as the military.'"  IDM at 31 (citing Public Bodies

Analysis Memoranda at Attachment I (Feb. 27, 2019), at 2 (Public Bodies Memoranda) (P.R.

286)).  Further, Commerce has found that the CCP "exerts significant control over economic

activities in China."  IDM at 31.

Based upon these findings, Commerce has reasonably interpreted the term "public

entities" to include individual farmers, such as Jiangsu Guyu's poplar core suppliers.  IDM at 31-

32.  There is no evidence that small scale enterprises such as individual farmers cannot also be

controlled by the GOC, or CCP, and thus fall under the definition of authorities.  Rather,

Commerce has defined a "state-invested enterprise" as an enterprise in which the GOC has "an

ownership stake of any size." *Id*. (citing Public Bodies Memoranda at Attachment I, at 2). The size of the enterprise is immaterial to whether the enterprise is controlled by the GOC or CCP. Therefore, Commerce reasonably found individual poplar core suppliers fall within the definition of authorities.

Dalian Penghong and Shenzhenshi Huanwei argue that Commerce erred in applying AFA to its determination that Jiangsu Guyu's poplar core suppliers were authorities. *See* Dalian Penghong Br. at 18; *see also* Shenzhenshi Huanwei Br. at 30. Commerce's determination is in accordance with law. Here, the GOC withheld information and impeded Commerce's investigation. The GOC also failed to comply to the best of its ability. Commerce requested information from the GOC to determine whether any individual owners, board members, or senior managers "were government or CCP officials and the role of any CCP primary organization within the companies." IDM at 29. The GOC responded that it was unable to require the CCP or other mentioned entities to provide the information requested. However, in prior CVD proceedings, demonstrate that the GOC has access to information similar to the information requested. *Id*. Further, the GOC did not promptly explain what attempts it made to obtain any of the requested information or propose to provide this information in an alternate form. IDM at 30.

Because the GOC did not cooperate to the best of its ability with Commerce's request for information regarding the poplar core suppliers, Commerce was unable to complete a full analysis regarding the authority status of the poplar core suppliers. Therefore, Commerce's use of an adverse inference in determining the producers were "authorities" within the meaning of section 19 U.S.C. § 1677(5)(B) is supported by substantial evidence and in accordance with law. *Id*. at 30.

31

**IX.    Commerce's Finding Based On Adverse Facts Available Of Non-Use Of The Export Buyer's Credit Program By Baroque Timber and Jiangsu Guyu Was Supported By Substantial Evidence And Otherwise In Accordance With Law**

The Court should sustain Commerce's application of adverse facts available to the Export Buyer's Credit (EBC) Program.  Commerce's decision to apply adverse facts available to the Export Buyer's Credit Program was supported by substantial evidence and in accordance with law.

This Court previously has held that "only the government of China, and in particular the {China} Ex-Im {Bank}, could provide and verify the information needed to determine whether a benefit was conferred to Respondents during the {period of review} from the Export Buyer's Credit Program." *Trina Solar*, 195 F. Supp. 3d at 1355.  As this Court explained, "{b}ecause the {government of China}—the sole party with access to the necessary information—submitted information that could not be verified and failed to act to the best of its ability by preventing Commerce from verifying this information, Commerce reasonably applied 19 U.S.C. §§ 1677e(a)(2)(D) and 1677e(b)." *Id*.  The record supports the same conclusion here.

This Court, however, has previously rejected Commerce's explanation of its use of adverse inferences to determine the use and benefit of the Export Buyer's Credit Program in a number of prior cases. *See*, *e.g.*, *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019).  Specifically, the Court has explained that Commerce failed to:

> "(1) define the gap in the record explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the GOC refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify."

*Guizhou Tyre Co., Ltd. v. United States*, No. 19-00032, Slip Op. 21-64, 2021 WL 2156474 at

*32 (Ct. Int'l Trade May 19, 2021) (quoting *Jiangsu Zhongji Lamination Materials Co., Ltd. v.*

*United States*, 405 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019)).  We respectfully submit that

Commerce has provided a reasoned explanation of its determination in this review that addresses

the concerns raised in prior decisions of this Court.

Commerce has identified that a gap in the record that was created by the Government of

China's refusal to provide information Commerce requested in this proceeding regarding the

operation of the Export Buyer's Credit Program.  *See Guizhou Tyre 2021*, 2021 WL 2156474 at

*32.  In its initial CVD questionnaire response, the GOC provided the 2000 Administrative

Measures, which confirmed that the Ex-Im Bank strictly limits the provision of export buyer's

credits to business contracts exceeding USD 2 million.  Letter on Behalf of GOC to Dep't of

Commerce re: Government of China's Initial Questionnaire Response (July 15, 2019) (GOC

IQR)  at Exhibit 37 (P.R. 96-131, C.R. 58).  The GOC also provided a copy of its 7th

Supplemental Response in the Countervailing Duty Investigation of Certain Amorphous Silica

Fabric from the People's Republic of China.  *Id.* at Exhibit 36 (C.R. 58).  Information in that

document indicates that the GOC revised this program in 2013 to eliminate the $2 million

minimum requirement for a contract to be eligible for the program.  *Id.*  Likewise, that document

indicates that the credits are not sent directly from China's Ex-Im Bank to the customers.  *Id.*

Thus, Commerce requested that the GOC also provide original and translated copies of any laws,

regulations or other governing documents cited by the GOC in the Export Buyer's Credit

Supplemental Questionnaire Response.  Commerce CVD Questionnaire Section II at 6.  This

request included the 2013 Administrative Measures revisions to the EBC Program.  *Id.*  The

GOC failed to provide the 2013 Revisions.  GOC IQR at 9-10.

Based upon this omission, Commerce again requested that the GOC provide the 2013 Revisions.  Commerce's Letter, "Multilayered Wood Flooring from the People's Republic of China: 2017 Countervailing Duty Administrative Review" (Oct. 4, 2019) (GOC First Supplemental) at 4 (P.R. 191, C.R. 159).  In response, the GOC stated that the 2013 guidelines are internal to the Ex-Im Bank, non-public, and not available for release; the GOC further claimed to have no authority to compel the Ex-Im Bank to provide a copy of the 2013 guidelines, and indicated that they would therefore not be provided.  GOC's Letter, "Government of China's Supplemental Questionnaire Response," (Oct. 28, 2019) (GOC SQR) at 5 (P.R. 207, C.R. 161)..  Commerce also requested a list of all partner/correspondent banks involved in the disbursement of funds under the Export Buyer's Credit Program.  IDM at 56.  Instead of providing the requested information, the GOC stated that Commerce's question was not applicable.  *Id.* at 5.

Thus, the GOC twice refused to provide the requested information concerning the 2013 program revisions, which Commerce requires in order to analyze how the program functions. IDM at 57.  Despite being the sole party that "could provide and verify the information needed to determine whether a benefit was conferred to Respondents during the {period of review} from the Export Buyer's Credit Program," the Chinese government failed to provide answers to Commerce's repeated questions.  *Trina Solar*, 195 F. Supp. 3d at 1334-35.  The information the Government of China declined to provide establishes the first element of the showing that has been required by the Court for applying AFA with respect to the Export Buyer's Credit Program – a gap in the information necessary to verify non-use.  *See Guizhou Tyre*, 2021 WL 2156474 at *32.

The GOC asserted that "none of the U.S. customers of the mandatory respondents or their cross-owned companies applied for, used, benefited from or accrued assistance from Export

Buyers Credits from the Ex-Im Bank.  GOC IQR at 36-37..  The GOC explained that to make

this determination, it: (1) obtained the list of U.S. customers from the respondents; and (2) the

China Ex-Im Bank searched its records and confirmed that none of the respondents used the

export buyer's credits during the POI.  *Id.*  The GOC's response indicated that exporters would

know whether there was an interaction between the China Ex-Im Bank and the borrowers (i.e.,

the respondents' U.S. customers, who are not participating in this proceeding), but neither the

GOC, nor the respondent companies, provided sufficient information for Commerce to

understand this interaction or how this information would be reflected in the respondent

companies' (or their U.S. customers') books and records.  IDM at 62.  Commerce's long-

standing verification methods rely on ensuring that it has the complete universe of information to

confirm whether and to what extent a respondent exporter had received loans from a state-owned

bank.  IDM at 52-53.

> If Commerce were attempting to confirm whether and to what
> extent a respondent exporter had received loans from a state-
> owned bank, for example, its first step would be to examine the
> company's balance sheets to derive the exact amount of lending
> outstanding during the period of examination. Second, once that
> figure was confirmed, Commerce would examine subledgers or
> bank statements containing the details of all individual loans.
> Because Commerce could tie or trace the subledgers or bank
> statements to the total amount of outstanding lending derived from
> the balance sheets, it could be assured that the subledgers were
> complete and that it therefore had the entire universe of loan
> information available for further scrutiny. After examining the
> subledgers for references to the state-owned banks (for example,
> "Account 201-02: Short-term lending, Industrial and Commercial
> Bank of China"), Commerce's third step would be to select
> specific entries from the subledger and request to see underlying
> documentation, such as applications and loan agreements, in order
> to confirm the accuracy of the subledger details.

IDM at 53.  Thus, without the requested information regarding key elements of the program's function on which Commerce has relied to assess use of the program, but which have apparently changed, Commerce cannot verify non-use.  IDM at 13, 57.

For instance, at one time, Commerce understood that the Ex-Im Bank strictly limited the provision of export buyer's credits to business contracts exceeding $ 2 million.  As discussed above, however, information in the GOC's 7th Supplemental Response in the Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China indicates that the GOC revised this program in 2013 to eliminate this minimum requirement. *Compare* GOC IQR at Exhibit 36 *with* GOC IQR at Exhibit 37 (C.R. 58); *see also* IDM at 57. The GOC's refusal to provide the requested 2013 Revisions to the program, *see* Commerce CVD Questionnaire Section II at 6; GOC IQR at 9-10, eliminates one technique that Commerce can use to narrow the scope of transactions that must be verified – examining the dollar value of the contracts between a mandatory respondent and its customer.  IDM at 57.  If the program continues to be limited to contracts between a respondent and its customer that exceed $2 million, this limits the universe of loans that might be encompassed by the program.  *Id.* However, if the program is no longer limited to contracts that exceed $2 million, this expands the pool of loans that are potentially connected to the program increasing the difficulty of verifying non-use.  *Id.*  By providing unverifiable assurances that other rules regarding the program remained in effect rather than the requested information, the GOC impeded Commerce's ability to understand how the EBC program operates and how non-use can be verified.  *Id.*

Similarly, Commerce lacks critical information regarding the process by which the export buyer credits are extended to foreign importers.  IDM at 58.  In the past, Commerce had understood that the credits would flow directly from the Ex-Im Bank to a foreign importer,

making verification possible by examining the financial statements and books and records of
U.S. customers for evidence of loans provided directly from the China Ex-Im Bank to the U.S.
customer.  *See* IDM at 52, 58; *Chlorinated Isocyanurates from the People's Republic of China:
Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (Dep't of
Cmmerce Sept. 22, 2014), and accompanying IDM at 15.  However, Commerce's understanding
of this element of the program has also changed.  In particular, in the *Silica Fabric Investigation*,
Commerce identified that the rules implementing the Export Buyer's Credit Program appear to
indicate that the China Ex-Im Bank's payment is instead disbursed to U.S. customers via an
intermediary Chinese bank or banks.  IDM at 58, 60.  Based on record evidence, it appeared that:
(1) customers can open loan accounts for disbursements through this program with other banks;
(2) the funds are first sent from the China Ex-Im Bank to the importer's account, which could be
at the China Ex-Im Bank or other banks; and (3) these funds are then sent to the exporter's bank
account.  *Id.* at 59, 60.  Given the complicated structure of loan disbursements for this program,
Commerce requires a complete understanding of how this program is administered by the China
Ex-Im Bank to verify claims of non-use.  *Id.* at 60.  Further, Commerce needs to know the
identities of the intermediary banks, which the Government of China declined to provide.  *Id.*

Commerce requires this information regarding the program's use of third-party banks
because it would be the names of these banks, not the name "China Ex-Im Bank," that would
appear in the subledgers of the U.S. customers if they received the credits.  IDM at 60-61.
Without such guidance as to which banks or loans should be subject to scrutiny, it would be
unreasonably onerous, if not impossible for Commerce to comb through the business activities of
the company respondents' customers as part of a verification for each company.  IDM at 61.
Similarly, the lack of other requested information, such as information regarding the application

and approval process for the credits and the documentation involved prevent Commerce from understanding which of the company respondents' customers' records indicate that they have participated in the program.  IDM at 61-62.  Thus, Commerce has "established that the withheld information" – the 2013 revisions, which provide internal guidelines for how this program is administered, and information on the partner/correspondent banks – "was necessary to verify claims of non-use" by the Government of China, "stat{ing} the reasons that the missing information about two core elements in the operation of the program — the existence (or not) of a minimum dollar threshold and the participation of third-party banks — was "crucial to the verification of the program," as required by the second prong of the analysis set forth in *Guizhou Tyre*, 2021 WL 2156474 at \*32, \*34.

When a government withholds information, Commerce may use information on the record provided by a respondent company to fill in the gaps created by the lack of cooperation by the government.  *See, e.g.*, *United States Steel Corp. v. United States*, 33 C.I.T. 1935, 1950 (2009).  The third prong of the Court's analysis in *Guizhou Tyre* examines whether such information is a viable alternative to AFA.  Thus, this Court has required Commerce to address whether Commerce can verify and rely on other record information.  *Guizhou Tyre* 2021, 2021 WL 2156474 at \*32.

Here, the record includes customer declarations for some of the customers at issue. Specifically, Baroque Timber "provided customer declarations for 60% of Riverside Plywood's reported customers" certifying non-usage of the EBCP, and Guyu "provided customer declarations for approximately 50% of its reported customers" certifying non-usage.  *See* PDM at 24 nn.124 & 126 (P.R. 263); Letter on Behalf of Guyu to Dep't of Commerce re: Response to Section III at Ex. IV-C-5 (July 15, 2019) (C.R. 23-35); Letter on behalf of Baroque Timber to

Dep't of Commerce re: Baroque Timber Initial Questionnaire Response at Ex. 15c (July 15, 2019) (C.R. 99-126).  Although at one time verification of such certifications appeared to be possible based on an earlier understanding of the program, *see* IDM at 54, based upon more recent information about the program, "only withheld information can fill the gap" in the record. *Guizhou Tyre*, 2021 WL 2156474 at *32.  The record of this proceeding does not contain certifications for all customers, as have been provided in some cases.  *See id.* at *30 ("the two respondents provided signed self-certifications from each of their customers attesting to non-use of the program").  Further, customer certifications are unverifiable for the same reason that China's assertion of not use cannot be verified by examining the customer's records: the record is missing key information about the function of the program that would enable Commerce to determine whether a customer received loans from the program by looking at its records.  IDM at 63.

Without knowing the identities of the banks that disburse the loans, Commerce cannot verify that the U.S. customers did not use the program though its typical non-use verification procedures, *i.e.*, by examining whether there were any correspondent banks in the subledger.  *Id.* at 63-64.  Nor could Commerce narrow down the company's lending to a subset of loans likely to be the export buyer's credits (*i.e.*, loans from the correspondent banks).  *Id.*  Thus, verifying non-use of the program without knowledge of the correspondent banks would require Commerce to view the underlying documentation for *all* entries from the subledger *to attempt* to confirm the origin of each loan—*i.e.*, whether the loan was provided from the China Ex-Im Bank via an intermediary bank.  *Id.*  This would be an extremely onerous undertaking for any company that received more than a small number of loans.

Further, even when Commerce has no means of limiting the universe of transactions before it begins verification, Commerce typically, at a minimum, knows what it is looking for when it begins reviewing transactions.  IDM at 65.  Here, because Commerce lacks any guidance as to what indicia are associated with the loans, such as a sample application, and other documents making up the "paper trail" of a direct or indirect export credit from the China Ex-Im Bank, examining the underlying documentation for entries in a customer's subledger would be of no value.  *Id.*  Instead, because of its lack of understanding of what documentation is associated with EBC loans, and whether/how that documentation would indicate China Ex-Im Bank involvement this procedure would likely confirm only whether banks were correctly identified in the subledger —not necessarily whether those banks were correspondent banks participating in the EBC Program.  *Id.*  Thus, even were Commerce to attempt to verify respondents' non-use of the EBC Program, notwithstanding its lack of knowledge of which banks are intermediary/correspondent banks, by examining *each* loan received by *each* of the respondents' U.S. customers, Commerce still would not be able to verify which loans were loans made in the ordinary course versus loans made as part of the EBC Program.  *Id.* at 61-62.  Without knowing what records, databases, or supporting documentation would signify receipt of a loan Commerce would be left to hunt for a needle in the proverbial haystack.  *Id.*

Importantly, this same sample "paper trail" would be necessary even if the GOC provided the list of correspondent banks.  For instance, assuming that one of the correspondent banks is HSBC, Commerce would need to know how to differentiate an ordinary HSBC loan from an HSBC loan originating from, facilitated by, or guaranteed by the China Ex-Im Bank.  *Id.*  In order to do this, Commerce would need to know what underlying documentation to look for in order to determine whether particular subledger entries for HSBC might actually reflect China

Ex-Im Bank financing: specific applications; correspondence; abbreviations; account numbers; or other indicia of China Ex-Im Bank involvement.  *Id.*  Even if such documentation were complete, and identified China Ex-Im Bank involvement, without a thorough understanding of the program, Commerce might not recognize indicia of such involvement.  Understanding the operation of the program is not, a pure matter of determining whether there is a financial contribution or whether a subsidy is specific.  A complete understanding of the program provides a "roadmap" for the verifiers by which they can conduct an effective verification of usage.  *Id.* at 62.  "{A}bsent a well-documented understanding of how an exporter would be involved in the application of its customer for an export buyer credit and what records the exporter might retain, {Commerce} would have no way of knowing whether the records we review at a company verification necessarily include any applications or compliance records that an exporter might have. . . .".  *Trina Solar,* 195 F. Supp. 3d at 1350.  Plaintiffs do not demonstrate otherwise, but simply assert, without basis that Commerce "could review the underlying documentation related to these loans" without regard to the fact that Commerce does not know what loans are involved or what the documentation consists of.  Fine Furniture Br. at 27.  Accordingly, Commerce has shown that only the withheld information can fill the gap by explaining why the other information on the record is impossible to verify.  *See Guizhou Tyre*, 2021 WL 2156474 at *32.

   Thus, Commerce reasonably determined that necessary information was missing from the record, the GOC withheld information that was requested, that this significantly impeded this proceeding, and that the GOC failed to cooperate to the best of its ability.  Therefore, Commerce's determination to use an adverse inference in selecting from the facts otherwise available and finding, as facts otherwise available with an adverse inference, that Baroque

Timber and Jiangsu Guyu had used and benefitted from the program, was supported by

substantial evidence and otherwise in accordance with law.

X.   **Commerce's Determination Based On Adverse Facts Available That The Electricity For Less Than Adequate Remuneration Program Was Specific Was Supported By Substantial Evidence And Otherwise In Accordance With Law**

      A.   Commerce's Specificity Finding Was Supported by Substantial Evidence and Other in Accordance with Law

Commerce's specificity determination concerning the electricity for LTAR program,

based on an adverse inference, is supported by substantial evidence and otherwise in accordance

with law.  A countervailable subsidy requires an authority to provide a specific financial

contribution which confers a benefit.  19 U.S.C. § 1677(5)(B).  A countervailable subsidy is

specific where it is limited to a smaller group of recipients, if an industry or enterprise

predominately uses the subsidy, the subsidy is limited to industries within a designated

geographical region, or the manner in which the subsidy is granted indicates that an enterprise or

industry is favored over others.  19 U.S.C. § 1677 (5A)(D)(iii)-(iv).

Here, Commerce requested information from the GOC to determine whether the

provision of electricity was specific, such as the derivation of electricity prices at the provincial

level, the procedure for adjusting retail electricity tariffs, and the role of the National

Development and Reform Commission (NDRC) and the provincial governments in this process.

IDM at 43-44.  The GOC failed to provide the information necessary for Commerce to complete

an analysis of specificity.  *Id*.  The GOC failed to explain how the prices in the electricity tariff

schedules were derived, including the specific factors or information relied upon by the NRDC

and the respective roles and nature of the cooperation between the NDRC and the provincial

governments in setting prices.  IDM at 44.  Thus, because the GOC refused to provide the

requested information, Commerce's use of AFA to find that the electricity for less than adequate

remuneration program was specific was supported by substantial evidence and otherwise in accordance with law.

Where a government fails to respond to Commerce's requests for information to the best of their ability, Commerce may use adverse facts available to find that a program is specific. *See Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *affd in part and rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012); *see also RZBC Grp. Shareholding Co. Ltd. v. United States*, 100 F. Supp. 3d 1288, 1296-97 (Ct. Int'l Trade 2015). Commerce will usually find that a government has provided a financial contribution to a specific industry where a government fails to act to the best of its ability. *See Essar Steel*, 721 F. Supp. 2d. at 1297*; see also Jindal Poly Films Limited of India v. United States*, 439 F. Supp. 3d 1354, 1363 (Ct. Int'l Trade 2020) (holding Commerce's use of AFA to fill in the gaps is reasonable where a government failed to provide the information necessary to make a specificity determination).

Fine Furniture argues that Commerce erred in its use of AFA because Commerce must still analyze information to make a finding of specificity. Fine Furniture Br. at 34. Fine Furniture ignores the fact that Commerce had to rely on facts available subject to adverse inferences to complete the specificity determination because the GOC's failure to cooperate inhibited Commerce from determining specificity. IDM at 45. Where the record shows that the GOC's failure to provide information inhibited Commerce from determining specificity, this Court has sustained Commerce's use of AFA to find specificity, without determining exactly how the subsidy was specific is supported by substantial evidence. *Jiangsu Zhongji Lamination Materials Co. Ltd. v. United States*, 405 F. Supp. 3d 1317, 1338 (Ct. Int'l Trade 2019). Similar to *Jiangsu Zhongji*, the record evidence here strongly suggests the GOC's failure to provide

information regarding the province's control over electricity pricing inhibited Commerce from

determining specificity.  For example, the GOC claimed that the NDRC no longer has the

responsibility of setting prices within each province.  IDM 44.  However, the record indicates

that NRDC Electricity Price Adjustment Notice(s) in effect during the period of review direct

provinces to reduce prices and report those changes to the NDRC, and although Commerce

requested supplemental information the GOC "failed to fully explain the roles and nature of the

cooperation between the NDRC and provinces in deriving electricity price adjustments.  PDM at

22.  Thus, because the GOC's failure to provide information inhibited Commerce from

determining specificity, Commerce's use of AFA to find specificity is supported by substantial

evidence.

> B.     Commerce's Electricity Benchmark Determination Was Supported by Substantial
>        Evidence and Otherwise in Accordance with Law

A countervailable subsidy requires an authority to provide a specific financial

contribution which confers a benefit.  19 U.S.C. § 1677(5)(B).  A benefit normally exists where a

service or good is conferred for less than adequate renumeration.  *Borusan*, 61 F. Supp. 3d at

1314.  To determine whether a benefit is conferred, Commerce usually compares a calculated

benchmark with the respondent's reported government price for the good or service provided.

*See* 19 C.F.R. § 351.511.  Where the government is the only available source of the good,

Commerce determines the adequacy of renumeration by "assessing whether the government

price is consistent with market principles."  I*d*. § 351.511(a)(2)(iii).  In regard to government-

provided goods such as electricity, Commerce "first examines how the government-owned utility

company sets its rates and then determines whether a respondent receives a price that is better

than that afforded other companies or industries purchasing comparable amounts of electricity."

*Jiangsu Zhongji Lamination Materials Co.*, 405 F. Supp. 3d at 1335 (citing *Maverick Tube v. United States*, 273 F. Supp. 3d 1293, 1300 (Ct. Int'l Trade 2017)).

This Court has previously sustained Commerce use of an adverse inference to find determinations concerning electricity subsidies were appropriate where the parties did not provide enough information to determine whether the rate was in accordance with market principles. *Compare Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1262-63 (Ct. Int'l Trade 2021), *with Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316 (Ct. Intl'l Trade 2018) (*Trina Solar 2018*) (explaining where the record has alternative information provided by a respondent, Commerce must explain what information is missing or deficient before relying on AFA determinations). In *Fine Furniture*, Commerce requested information from the GOC necessary to calculate the benchmark. The GOC withheld the necessary information and no alternative information pertaining to the benchmark was available on the record. *Id.* at 1213. The Court held that Commerce's use of AFA in determinations is appropriate where parties withheld necessary information and no alternative information is available on the record. *Id.*

Here, Commerce's selection of the highest provincial electricity rates in its calculation of the electricity benchmark was supported by substantial evidence and otherwise in accordance with law. Commerce applied AFA to determinate the appropriate benchmark after GOC's refusal to provide the information requested resulted in Commerce being unable to determine whether the electricity rates submitted by the GOC were calculated based on market principles. IDM at 45. Commerce requested information on how Chinese provincial schedules are calculated and why they differ. IDM 44-45. This information could have contributed to Commerce's analysis of an appropriate benchmark in this program. No alternative information

was available on the record to complete the analysis, thus, Commerce applied AFA to select the highest electricity rates on record as the appropriate benchmark determination. *Id.* Because the GOC failed to provide the necessary information, Commerce was unable to determine whether the electricity rates submitted by the GOC were calculated based on market principles. Thus, Commerce's use of AFA in the benchmark selection was appropriate to fill in the gaps.

Fine Furniture argues that Commerce's AFA method of selecting the highest rates from each province is nonsensical because respondents' factories could not be present in different provinces at the same time. Commerce may select, as an adverse inference, the highest rates to set a benchmark where the GOC "refuses to provide certain details regarding variation of provincial electricity rates and whether these rates were calculated based on market principles." *Jiangsu Zhonghi Lamination Materials Co.*, 405 F. Supp. 3d. at 1339 (*citing Trina Solar 2018*, 352 F. Supp. 3d at 1343). Commerce's selection of the highest rates as an adverse inference is, therefore, within Commerce's lawful discretion. *See Jiangsu Zhonghi Lamination Materials Co.*, 405 F. Supp. 3d. at 1338-39.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions for judgment on the agency record and sustain Commerce's final results.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

JONZACHARY FORBES
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
Telephone: (240) 449-5906
Facsimile: (202) 482-8184
Email: JonZachary.Forbes@trade.gov


August 12, 2021

/s/ Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-0534
Fax:         (202) 353-0461
Email:        Sonia.M.Orfield@usdoj.gov

*Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 13,603 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Sonia M. Orfield

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**
_____

| | |
|---|---|
| **JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD.**, _et al._,<br><br>          **Plaintiffs,**<br><br>**BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD.**, _et al._,<br><br>          **Consolidated Plaintiffs,**<br><br>**JIANGSU GUYU INTERNATIONAL TRADING CO., LTD.**, _et al._,<br><br>          **Consolidated Plaintiffs,**<br><br>**EVOLUTIONS FLOORING, INC.**, _et al._,<br><br>          **Consolidated Plaintiffs,**<br><br>**METROPOLITAN HARDWOOD FLOORS, INC.**, _et al._,<br><br>          **Consolidated Plaintiffs,**<br><br>**ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD.**, _et al._,<br><br>          **Consolidated Plaintiffs,**<br><br>          **and**<br><br>**FINE FURNITURE (SHANGHAI) LIMITED**, _et al._,<br><br>          **Plaintiff-Intervenors,**<br><br>          **v.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Consol. Court No. 20-03885** |

|                                                       |     |
|-------------------------------------------------------|-----|
| **UNITED STATES,**                                    | )   |
|                                                       | )   |
|                                                       | )   |
| **Defendant,**                                        | )   |
|                                                       | )   |
| **and**                                               | )   |
|                                                       | )   |
| **AMERICAN MANUFACTURERS OF**                         | )   |
| **MULTILAYERED WOOD FLOORING,**                       | )   |
|                                                       | )   |
| **Defendant-Intervenors.**                            | )   |

**ORDER**

Upon consideration of the plaintiff's motion for judgment upon the agency record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED, that the plaintiff's motion is denied; and it is further

ORDERED, that the underlying final results of administrative review are sustained, and it

is further

ORDERED, that final judgment is entered for the United States.

_____
Timothy M. Reif, Judge

Dated: _____, 2021
New York, New York

50