## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., ET AL., | ) ) ) |
| Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenors, | ) ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) **Consol. Court No. 20-03885** |
| Defendant, and | ) **Non-confidential Version** ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING | ) ) ) ) |
| Defendant-Intervenors. | ) ) ) |

### REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF CONSOLIDATED PLAINTIFFS AND PLAINTIFF-INTERVENORS FINE FURNITURE (SHANGHAI) LIMITED AND DOUBLE F LIMITED

Kristin H. Mowry
Sarah M. Wyss
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

September 17, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT .................................................................................................................... 1

   I.     COMMERCE UNLAWFULLY DETERMINED THAT POPLAR CORE
SHEETS ARE COVERED BY THE VENEERS FOR LESS THAN ADEQUATE
REMUNERATION PROGRAM .................................................................................. 1

   II.    COMMERCE'S INCLUSION OF HTS 4412.99 DATA IN THE PLYWOOD
BENCHMARK PRICE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND
NOT IN ACCORDANCE WITH LAW ...................................................................... 6

   III.   COMMERCE'S SELECTION OF GUYU AS A MANDATORY RESPONDENT
BASED ON FLAWED CBP DATA WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW ...................... 9

   IV.   COMMERCE'S USE OF AFA TO IMPUTE A BENEFIT UNDER THE EXPORT
BUYERS' CREDIT PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND UNLAWFUL ............................................................................... 12

   V.    COMMERCE'S SPECIFICITY DETERMINATION AND BENCHMARK
CHOICE FOR THE ELECTRICITY FOR LTAR PROGRAM WERE UNSUPPORTED
BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ........... 15

      A.    Commerce's Specificity Finding Was Unsupported by Substantial Evidence and
Otherwise Not in Accordance with Law ................................................................. 15

      B.    Commerce's Electricity Benchmark Determination Was Unsupported by
Substantial Evidence and Not in Accordance with Law ........................................... 18

   VI.   FINE FURNITURE ADOPTS BY REFERENCE ARGUMENTS MADE BY
OTHER PLAINTIFFS .............................................................................................. 20

CONCLUSION .............................................................................................................. 21

i

# TABLE OF AUTHORITIES

**Cases**

Ad Hoc Shrimp Trade Action Comm. v. United States,
__ CIT __, 791 F. Supp. 2d 1327 (2011) ............................................................. 11

Ad Hoc Shrimp Trade Action Comm. v. United States,
__ CIT __, 992 F. Supp. 2d 1302 (2014) ............................................................. 11

Archer Daniels Midland Co. v. United States,
__ CIT __, 917 F. Supp. 2d 1331 (2013) ............................................................. 13

Atl. Sugar, Ltd. v. United States,
744 F.2d 1556 (Fed. Cir. 1984) ........................................................................... 4

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,
__ CIT __, 61 F. Supp. 3d 1306 (2015) ............................................................... 3

Burlington Truck Lines, Inc. v. United States,
371 U.S. 156 (1962) ............................................................................................ 15

Canadian Solar Inc. v. United States,
Ct. No. 19-00178, 2021 Ct. Intl. Trade LEXIS 115 (2021) ................................ 14

Changzhou Trina Solar Energy Co. v. United States,
Ct. No. 16-00157, 2018 Ct. Int'l Trade LEXIS 31 (Mar. 27, 2018) .................... 5

Changzhou Trina Solar Energy Co. v. United States,
Ct. No. 17-00198, 2019 Ct. Intl. Trade LEXIS 138 (Nov. 8, 2019) .................... 14

Changzhou Trina Solar Energy Co. v. United States,
42 CIT __, 352 F. Supp. 3d 1316 (2018) ........................................................... 14

Changzhou Trina Solar Energy Co., Ltd. v. United States,
Consol. Ct. No. 17-00246, 2019 Ct. Intl. Trade LEXIS 144 (Nov. 18, 2019) ........ 14

Chia Far Indus. Factory Co. v. United States,
28 CIT 1336, 343 F. Supp. 2d 1344 (2004) ......................................................... 6

Essar Steel Ltd. v. United States,
34 CIT 1057, 721 F. Supp. 2d 1285 (2010) ................................................... 7, 13

Guizhou Tyre Co. v. United States,
__ CIT __, 348 F. Supp. 3d 1261 (2018) ........................................................... 13

Guizhou Tyre, Co. Ltd. v. United States,
__ CIT __, 398 F. Supp. 3d 1315 (2019) ........................................................... 14

Hebei Jiheng Chems. Co. v. United States,
__, CIT __, 161 F. Supp. 3d 1322 (2016) .................................................... 18, 19

Husteel Co. v. United States,
__CIT__, 98 F. Supp. 3d 1315 (2015) ......................................................... 10, 11

Jiangsu Zhongji Lamination Materials Co. v. United States,
__ CIT __, 405 F. Supp. 3d. 1317 (2019) ........................................................... 17

Nucor Fastener Div. v. United States,
Ct. No. 09-00531, 2013 Ct. Intl. Trade LEXIS 76 (May 24, 2013) ...................... 6

Pakfood Pub. Co. v. United States,
35 CIT 60, 753 F. Supp. 2d 1334 (2011) ........................................................... 10

Rhone Poulenc v. United States,
  899 F.2d 1185 (Fed. Cir. 1990) ...................................................................... 3
Universal Camera Corp. v. NLRB,
  340 U.S. 474, 71 S. Ct. 456, 95 L. Ed. 456 (1951) ................................... 11

**Statutes**

19 U.S.C. § 1677 ............................................................................................ 17
19 U.S.C. § 1677A .......................................................................................... 17
19 U.S.C. § 1677e ........................................................................................... 13

**Authorities**

Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results and Partial Rescission
  of Countervailing Duty Administrative Review,
  74 Fed. Reg. 20,923 (Dep't of Commerce May 6, 2009) ........................... 8
Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative
  Countervailing Duty Determination; 2012,
  79 Fed. Reg. 56,560 (Dep't of Commerce Sept. 22, 2014)....................... 16
Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of
  China: Final Affirmative Determination,
  83 Fed. Reg. 9274 (Dep't of Commerce Mar. 5, 2018) ............................. 7
Final Results of Countervailing Duty New Shipper Review: Certain Softwood
  Lumber Products from Canada,
  70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005)........................ 7
High Pressure Steel Cylinders From the People's Republic of China: Final Results of
  Countervailing Duty Administrative Review; 2016,
  83 Fed. Reg. 63,471 (Dep't of Commerce Dec. 10, 2018) ........................ 8
Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial
  Rescission of Countervailing Duty Administrative Review; 2017,
  85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020)........................ 1
Multilayered Wood Flooring From the People's Republic of China: Preliminary Results of
  Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2017,
  85 Fed. Reg. 6,908 (Feb. 6, 2020) ............................................................. 13

**Regulations**

19 C.F.R. § 351.511 ........................................................................................ 5

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiffs and Plaintiff-Intervenors Fine Furniture (Shanghai) Limited and Double F Limited (collectively, "Fine Furniture") reply to the response briefs of Defendant, United States and Defendant-Intervenor, American Manufacturers of Multilayered Wood Flooring ("AMMWF") (collectively, "Defendants").  See Def. Resp. to Pls. Mot. for J. on the Agency R. (Aug. 12, 2021), ECF No. 54 (Nonconfidential Version) ("Def. Br."); Resp. to Mot. For J. on the Agency R. (Aug. 13, 2021), ECF No. 57 (Nonconfidential Version) ("AMMWF Br.").[1]  The United States and AMMWF fail to persuasively counter the arguments set forth by Fine Furniture in its initial brief. See Mem. of Points and Authorities in Supp. of Rule 56.2 Mot. for J. Upon The Agency R. of Consolidated Pls. And Pl.- Intervenors Fine Furniture (Shanghai) Limited and Double F Limited (May 14, 2021), ECF No. 50 (Non-confidential Version) ("FF Br.").  As discussed herein, the Department of Commerce's final results of the seventh administrative review of the countervailing duty ("CVD") order on multilayered wood flooring ("MLWF") from the People's Republic of China remain unsupported by substantial evidence and otherwise not in accordance with law in several respects. See Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) ("Final Results") (P.R. 369), and accompanying Issues and Dec. Mem. ("Final I&D Mem.") (P.R.361).

## ARGUMENT

**I.    COMMERCE UNLAWFULLY DETERMINED THAT POPLAR CORE SHEETS ARE COVERED BY THE VENEERS FOR LESS THAN ADEQUATE REMUNERATION PROGRAM**

In its initial brief, Fine Furniture demonstrated that Commerce erroneously classified

---

[1] All references to parties' briefs are to the nonconfidential/public version unless otherwise noted.

poplar core sheets as veneer in calculating the benefit from the veneers for less than adequate remuneration ("LTAR") program for mandatory respondent Jiangsu Guyu International Trading Co., Ltd. ("Guyu") and its cross-owned affiliate Siyang County Shunyang Wood Co., Ltd. ("Shunyang").  See FF Br. at 15.  Defendants wrongly maintain that Commerce's decision to include poplar core sheets in the veneers for LTAR program was supported by, according to AMMWF, "the scope language, the respondent's own description of these inputs, and the evidence on the record."  AMMWF Br. at 15 (citing Final I&D Memo at 22-26); see also Def. Br. at 18, 20. To the contrary, as discussed below, both the MLWF scope language and evidence put on the record by Guyu support the opposite conclusion.

Relying on the scope language, AMMWF and the United States argue, respectively, that "the scope make{s} no distinction between inner (i.e., core) and outer (i.e., face/back) veneers" and that "the core of multilayered wood flooring may be composed of hardwood or softwood veneers."  AMMWF Br. at 16-17; Def. Br. at 20.  Contrary to Defendants' characterization, the written scope supports Fine Furniture's position in that it explicitly distinguishes between veneers and core in four separate places.  See Final I&D Memo at 3.  The scope:

- describes MLWF as "composed of an assembly of two or more layers or plies of wood veneer(s) in combination with a core;"
- explains that the "several layers {of veneer}, along with the core, are glued or otherwise bonded;"
- lists thickness of plies/veneers separate from thickness of core and
- lists "species used for the face, back and inner veneers" separately from the "core composition."

Final I&D Memo at 3 (emphasis added).  If core sheets were the same as veneers, as Defendants claim, then there would be no need for the scope to make any of the above-listed veneer/core distinctions.

Further, as explained in Fine Furniture's opening brief, Commerce's interpretation of the phrase "thin slice of wood" is so expansive that it not only brings core sheets within the definition of "veneer" but also covers plywood under the same broad reading because plywood is, literally, a "thin slice of wood."  <u>See</u> FF Br. at 18.  The United States claims that plywood could not be brought under the veneer definition because these two inputs are defined differently in the scope: "the order's scope language identifies plywood as assembled veneers (<i>e.g.</i>, multiple veneers glued together), and veneers as thin slices of wood (<i>e.g.</i>, individual plies)."  Def. Br. At 18.  The United States utterly ignores that core, like plywood, <u>is also</u> defined differently in the scope and therefore deserves similar treatment.  <u>See, e.g.,</u> FF Br. at 17.  Fundamentally, core sheets are just like plywood in that they are a distinct product from veneers.  If AMMWF had grounds to allege a core sheet for LTAR program, it should have done so like it did for plywood and veneer sheets, but it did not.  Absent that allegation, Commerce was wrong to shoehorn Guyu's core sheet purchases into the veneers for LTAR program and, in doing so, failed to calculate the CVD margin as accurately as possible.  <u>See</u> <u>Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,</u> __ CIT __, __, 61 F. Supp. 3d 1306, 1337 (2015) (citing <u>Rhone Poulenc v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

In addition, Guyu provided Commerce with a plethora of record evidence establishing that core sheets and veneer sheets are two distinct products with differences in type of wood, density, application and pricing.  <u>See</u> FF Br. at 17.  AMMWF ignores these distinctions and maintains that it is irrelevant "{t}hat certain veneers are used to manufacture the core of subject flooring and others are used as the outer and inner layers."  AMMWF Br. at 17.  AMMWF merely repeats Commerce's erroneous conclusion that "poplar core sheets are not a distinct product from veneers" without actually engaging with the record evidence that established the product differences.  <u>Id.</u> at

17. AMMWF's arguments on this point do nothing to redeem Commerce's failure to support its determination with substantial evidence by considering the record as a whole, which includes not only the information that supports the agency's decision, but also evidence that "fairly detracts from the substantiality of the evidence," such as the differences between core and veneer sheets. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Further, as detailed in Fine Furniture's initial brief, Commerce's unlawful inclusion of poplar core sheet purchases under the veneers for LTAR program tarnished its benchmark choice to measure the program and its benchmark data collection process. See FF Br. at 20-23. Due to Guyu's good faith belief that poplar core sheets were not covered by the veneers LTAR program, it did not submit benchmark data for poplar core sheets. AMMWF faults Guyu and claims that the "{i}nterested parties had ample time and multiple opportunities to submit benchmark information covering veneers" and "Jiangsu Guyu misinterpret{ed} . . . the definition of veneer in preparing its questionnaire response." AMMWF Br. at 18. AMMWF's statement about Guyu's misinterpretation of the veneer definition is disingenuous considering that AMMWF's own actions in the underlying review indicate that it did not believe poplar core sheet was covered by the veneers for LTAR program at the time of the benchmark data submission. For example:

1. AMMWF did not allege a subsidy program on poplar core sheets for LTAR or any species of core sheets. It was only after Guyu's response to the NSA Questionnaire that AMMWF argued for the inclusion of poplar core sheets under the definition of veneers.

2. The benchmark data submitted by AMMWF contained data for wood veneers and specified HTS subheadings that do not cover poplar core sheets, showing that AMMWF did not foresee that Commerce would include poplar core sheets in the benchmark calculation for veneers.

3. The only instance where "poplar" appears in AMMWF's benchmark submission is with respect to the plywood benchmark.

See FF Br. at 19.

4

AMMWF now claims that "AMMWF's benchmark and other submissions clearly covered veneers sheets of 'other species' and were not limited to any particular species of wood veneers." See AMMWF Br. at 18 (citing Final I&D Mem. at 23).  Even if the HTS codes covered veneer sheets of "other species," they did not specifically cover poplar sheets.  Further, the differences between poplar core and veneer are not limited to the species.  The products also differ in density, application and type, which requires Commerce to consider a unique benchmark for poplar core sheets consistent with its obligation to select a benchmark that represents "the good or service {bein}g provided." 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(i); see also Changzhou Trina Solar Energy Co. v. United States, No. 16-00157, 2018 Ct. Int'l Trade LEXIS 31, at *15 (Mar. 27, 2018) (recognizing "Commerce's stated preference to utilize the narrowest category of products encompassing the input product." (upholding results of remand redetermination)).  The benchmark data on the record, supplied by parties before they knew that Commerce would include core sheets within the veneers for LTAR program, simply does not reflect "the good" being provided, here, poplar core sheets.  Given the understanding in the industry that core and veneer are separate products and because the subsidy program under review only covered veneers for LTAR, once Commerce decided to include Guyu's poplar core sheet purchases in its veneers for LTAR subsidy rate calculation, the only reasonable determination was for Commerce to allow parties to submit poplar core sheet benchmark data.

In sum, this Court must remand this issue back to Commerce with instruction to 1) remove poplar core sheets from the veneers for LTAR program calculation or, alternatively, 2) reopen the record so that parties can submit benchmark data for poplar core sheets and 3) recalculate the countervailing duty rates for the mandatory respondents and the non-examined companies.

## II.   COMMERCE'S INCLUSION OF HTS 4412.99 DATA IN THE PLYWOOD BENCHMARK PRICE WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

As set forth in Fine Furniture's initial brief, Commerce's plywood benchmark calculation for Baroque Timber was unsupported by substantial evidence and not in accordance with law because it failed to adequately account for "factors affecting comparability." See 19 C.F.R. § 351.511(a)(2)(i); Final I&D Mem. at Cmt. 6 (P.R. 361).  AMMWF and Defendant fail to justify Commerce's inclusion of HTS 4412.99 data in the plywood benchmark.  See AMMWF Br. at 19; Def. Br. at 23.  AMMWF argues that "Plaintiffs have failed to provide sufficient evidence showing that plywood covered under HTS 4412.99 are not comparable to plywood purchased by the respondents and cannot reasonably represent world market plywood prices." AMMWF Br. at 22. To the contrary, Baroque Timber definitively established with record evidence that 4412.99 covers laminated wood and certified that Baroque Timber does not use laminated plywood in its production of the subject merchandise.  See Letter on Behalf of Baroque Timber to Dep't of Commerce re: Benchmark Rebuttal at 3 (Nov. 25, 2019) (Public Version) ("Baroque Timber Benchmark Rebuttal") (P.R. 232-234); Letter on Behalf of Baroque Timber to Dep't of Commerce re: Administrative Case Br. at 6-7 (Mar. 13, 2020) (Public Document) (P.R. 312) ("Baroque Timber Case Br.").  Commerce was required to accept Baroque Timber's representation of the composition of its plywood inputs, consistent with the agency's longstanding practice to rely on a company's certified statements about its own operation.  See, eg., Nucor Fastener Div. v. United States, Ct. No. 09-00531, 2013 Ct. Intl. Trade LEXIS 76, at *24 (May 24, 2013); see also Chia Far Indus. Factory Co. v. United States, 28 CIT 1336, 1356, 343 F. Supp. 2d 1344, 1364 (2004).

AMMWF further claimed that "neither Commerce's regulations nor the Court require the narrow approach to the benchmark relied on by Plaintiffs" by referencing Commerce's obligation to "average **all commercially available world market prices** to arrive at the benchmark figure."

See AMMWF Br. at 20 (citing <u>Essar Steel Ltd. v. United States</u>, 34 CIT 1057, 1066, 721 F. Supp. 2d 1285, 1293 (2010)).  AMMWF did not, however, explain how excluding data under a subheading, 4412.99, where the record establishes that such data are irrelevant to the respondents' purchases, would lead to an approach so "narrow" that the benchmark prices would not reflect "all commercially available world market prices." <u>Id.</u>  Instead, by including data under 4412.99, Commerce calculated an overly broad, unrepresentative world market price and neglected its responsibility to account for "factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(i); <u>see also</u> <u>Içdaş Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States</u>, 45 CIT __, __, 498 F. Supp. 3d 1345, 1353 (2021) (Commerce must calculate the world market benchmark price "as accurately as possible.").  Commerce's own past practice further confirms that it is reasonable and necessary to exclude HTS codes from its benchmark calculation that do not represent the specific input subject to a subsidy rate.  <u>See, e.g.</u>, <u>Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination</u>, 83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018), and accompanying Issues and Dec. Mem. at Cmt. 16 (Commerce excluded HTS 7601.20 from the benchmark calculation of unalloyed ingot as HTS 7601.20 includes alloyed ingots); <u>Final Results of Countervailing Duty New Shipper Review: Certain Softwood Lumber Prods. from Canada</u>, 70 Fed. Reg. 56,640 (Dep't of Commerce Sept. 28, 2005), and accompanying Issues and Dec. Mem. at Cmt. 1.

To distract this Court from relevant precedent and regulations, AMMWF cites to cases that are not applicable.  For example, AMMWF argues that Commerce used UN Comtrade data as a benchmark for seamless tube steel in <u>High Pressure Steel Cylinders</u> even though the data included "seamless tube steel sizes that were not used in the production of subject merchandise." <u>See</u> AMMWF Br. at 21 (internal citation omitted).  There, Commerce found that "the respondent did

not identify a compelling reason that we ought not to use the UN Comtrade data." <u>High Pressure Steel Cylinders From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016</u>, 83 Fed. Reg. 63,471 (Dep't of Commerce Dec. 10, 2018), and accompanying Issues and Dec. Mem. at Cmt. 3.  In the present case, however, there are compelling reasons for Commerce to exclude HTS 4412.99 from the plywood benchmark calculation, namely evidence of non-use of the laminated product covered by 4412.99.  <u>See</u> Baroque Timber Case Br at 6-7 (P.R. 312).

AMMWF also incorrectly relies on Commerce's finding that there "is no requirement that the benchmark used in {Commerce's} LTAR analysis be identical to the good sold by the foreign government . . . . In fact, the imposition of such a requirement would likely disqualify most, if not all, potential benchmarks under consideration in a LTAR analysis."  AMMWF Br. at 22 (quoting <u>Certain Hot-Rolled Carbon Steel Flat Prods. from India: Final Results and Partial Rescission of Countervailing Duty Administrative Review</u>, 74 Fed. Reg. 20,923 (Dep't of Commerce May 6, 2009), and accompanying Issues and Dec. Mem. at Cmt. 12)).  In that case, the product characteristic at issue – chemical composition – was so narrow that it "would likely disqualify most, if not all, potential benchmarks."  <u>Id.</u>  Here, the opposite is true.  After removing the inapplicable HTS code, 4412.99, Commerce is still left with a dataset to calculate the plywood benchmark and Defendants make no arguments to the contrary.  What remains true is that Commerce unreasonably included (a) a <u>different</u> type of wood, namely laminated wood, in the benchmark (b) which is listed under a <u>separate</u> HTS code, 4412.99 that (c) Baroque Timber does not use in its production of the subject merchandise.  In light of substantial record evidence, this Court must remand this issue back to Commerce with instructions to exclude data from HTS subheading 4412.99 from the plywood benchmark calculation, recalculate the countervailing duty

**NONCONFIDENTIAL DOCUMENT**
**CONFIDENTIAL INFORMATION REMOVED**

rates for Baroque Timber and, accordingly, revise the rate for non-examined company including Fine Furniture.

## III. COMMERCE'S SELECTION OF GUYU AS A MANDATORY RESPONDENT BASED ON FLAWED CBP DATA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce purported to select the mandatory respondents that accounted "for the largest volume of subject merchandise that can be reasonably examined" in accordance with 19 U.S.C. § 1677f-1(2) and based that determination "primarily on entry data obtained from CBP" that was [ ██████████████████████████████████ ]. See Mem. from Suzanne Lam to Irene Darzenta Tzafolias re: Respondent Selection at 4-5 (May 21, 2019) (Business Proprietary Document) ("Respondent Selection Mem.") (C.R. 6). Defendants ignored Commerce's obligation to rely on CBP data that does not contain flaws or errors, with AMMWF stating that "Commerce's reliance on CBP data to select Baroque Timber and Jiangsu Guyu as mandatory respondents was supported by the record evidence and in accordance with the statute." AMMWF Br. at 27. As detailed in Fine Furniture's opening brief, various parties submitted timely comments on Commerce's respondent selection data and reported serious concerns regarding the reliability of the CBP data with respect to [ ████████████████ ] of the subject merchandize, including AMMWF itself. See FF Br. at 9-10. As these comments conveyed, the degree of error in the CBP data was so large that the only reasonable determination was for Commerce to disregard or clarify the CBP data as to [ ████ ]. In a change to its position during the proceeding, AMMWF now argues that "that there is no compelling evidence on the record of this administrative review that the remaining entries in the CBP data are incorrect and ought not, therefore, to be used to select respondents." AMMWF Br. at 28; but see Letter on Behalf of AMMWF to Dep't of Commerce re: Comments on CBP Data and Respondent Selection at 3-4 (Mar. 21, 2019) (Business Proprietary

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

Document) (C.R. 5) (AMMWF argued that the exports to United States as reported in the CBP data are not accurate because "[ ███████████████████████████████████

██████████████████████████████████ ] of flooring, {which is} [ ████████████

██████████████████████████████████ ]."). To the contrary, the record is flush with evidence that the CBP data were flawed and did not support the selection of Guyu as mandatory respondent, rendering Commerce's determination unsupported by substantial evidence.  See FF Br. at 9-10.

AMMWF further argues that "{t}his Court has upheld the Commerce's practice of relying on CBP data and not issuing quantity and value questionnaires to select mandatory respondents as long as the CBP data are not unusable."  AMMWF Br. at 27 (citing Pakfood Pub. Co. v. United States, 35 CIT 60, 71-73, 753 F. Supp. 2d 1334, 1344-45 (2011)).  Pakfood, however, stands for the proposition that Commerce's reliance on CBP data is only reasonable to the extent that the CBP data are accurate and usable.  Pakfood Pub. Co., 35 CIT at 73, 753 F. Supp. 2d at 1345 (upholding Commerce's use of CBP data because there was no evidence showing that the CBP data "are in some way inaccurate or distortive").  The facts here are exactly the opposite.  The record shows that [ ████████████ ] in the CBP dataset were strikingly inaccurate and implausible, and, therefore, Commerce had no grounds to continue to presume that the CBP data were reliable.

The facts here are more analogous to Husteel Co. v. United States, __CIT__, 98 F. Supp. 3d 1315 (2015), cited by Fine Furniture in its opening brief.  See FF Br. at 12. There, the Court found it unreasonable for Commerce to ignore facial evidence of CBP data errors.  See Husteel Co. v. United States, __ CIT__, __, 98 F. Supp. 3d 1315, 1327 n.8 (2015).  Defendants try to distinguish Husteel by arguing that issue in Husteel was the selection of the number of respondents.

See AMMWF Br. at 28; Def. Br. at 14.  Defendants, however, fail to appreciate that the Husteel

Court also ruled that it was unlawful for Commerce to ignore evidence suggesting errors or flaws

in CBP data for respondent selection.  See Husteel, __ CIT at __, 98 F. Supp. 3d at 1327.  Here,

Commerce did just that; it ignored flaws in the CBP data that [ ███████████████████████

████████████████████████████ ], thereby rendering its selection of

Guyu as a mandatory respondent unsupported by substantial evidence.

AMMWF further argues that Fine Furniture's claims are deficient to the extent that it did

"not argue that the merchandise of the respondent selected is not representative of the Chinese

industry."   AMMWF Br. at 29.   How can Fine Furniture or any other party assess the

representativeness of Guyu with flawed data?  AMMWF does not explain.  Further, even if there

were evidence that Guyu is somehow representative of the Chinese industry, that does not excuse

Commerce of the obligation to rely on accurate CBP data and to account for the CBP data flaws

brought to Commerce's attention in a timely manner by numerous parties.  See Ad Hoc Shrimp

Trade Action Comm. v. United States, __ CIT __, __, 992 F. Supp. 2d 1302, 1310 (2014) ("Where

the record presents evidence that rebuts the presumption that CBP has assured the accuracy of such

data, Commerce must account for such evidence when making its relative sales volume

determinations.") (citing Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, __,

791 F. Supp. 2d 1327, 1333-34 (2011) (relying on Universal Camera Corp. v. NLRB, 340 U.S.

474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951))).

In a pivot away from the inaccuracies of the data, the United States attempts to frame this

as a failure of Guyu to submit timely quantity and value ("Q&V") data.  The United States asserts

that "the deadline for submitting comments on the CBP data, submitting certified Q&V data, and

comments for purposes of respondent selection in this review was March 21, 2019" and that Guyu

did not submit a Q&V response per that deadline.  Def. Br. at 12 (citing Mem. from Bob Palmer

to All Interested Parties re: Administrative Review of the Countervailing Duty Order of

Multilayered Wood Flooring from the People's Republic of China: Customs and Border Protection

Data for Respondent Selection at 1 (Mar. 14, 2019) (Public Document) ("CBP Data for

Respondent Selection") (P.R. 23).  Defendant misrepresents Commerce's respondent selection

data memorandum, which called for both Q&V submissions and comments by March 21, 2019.

See CBP Data for Respondent Selection (Mar. 14, 2019) (P.R. 23).  Per that memorandum, as

explained above and in Fine Furniture's opening brief, parties submitted timely comments

exposing the [                  ] and putting Commerce squarely on notice that

respondent selection could not accurately be based on the CBP data [         ].  See

FF Br. at 9-10.  Commerce did not need a separate Q&V submission from Guyu to know that the

CBP data were unusable to measure [        ].

     Based on record evidence filed by both domestic producers and foreign exporters, which

explained to Commerce that the [                               ],

Commerce's decision to select Guyu as a mandatory respondent was unsupported by substantial

evidence and not in accordance with law.  This Court, therefore, must remand this issue back to

Commerce with instructions to remove Guyu as a mandatory respondent and recalculate the non-

examined company rate for Fine Furniture based on Baroque Timber's rate alone.

## IV.  COMMERCE'S USE OF AFA TO IMPUTE A BENEFIT UNDER THE EXPORT BUYERS' CREDIT PROGRAM WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND UNLAWFUL

     Commerce's use of AFA in its Export Buyers' Credit Program ("EBCP") determination

was unsupported by substantial evidence and is unlawful.  Before applying AFA, Commerce must

demonstrate that information is missing on the record because of a party's noncooperation.  See

19 U.S.C. § 1677e(a), (b)(1).  Here, there is no information missing from the record, which undisputedly establishes Baroque Timber's and Guyu's non-use of the EBCP.  Baroque Timber "provided customer declarations for 60% of Riverside Plywood's reported customers" certifying non-usage of the EBCP, and Guyu "provided customer declarations for approximately 50% of its reported customers" certifying non-usage.  Multilayered Wood Flooring From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Intent To Rescind Review, in Part; 2017, 85 Fed. Reg. 6908 (Feb. 6, 2020), and accompanying Issues and Dec. Mem. at 24 nn.124 & 126 ("Prelim I&D Mem.") (P.R. 263).  Commerce's AFA application was, therefore, unsupported by substantial evidence because the mandatory respondents established their non-use of the program with factual evidence.

Defendants' basic arguments are that the certifications of non-use placed on the record by respondents are inadequate to address concerns related to the allegedly missing information not supplied by the GOC.  See Def. Br. at 39; AMMWF Br. at 33.  In making this claim, Defendants turn a blind eye to the thoroughly established distinction between the "administration" (operation) of an alleged subsidy program and the "existence and amount of the benefit conferred" (use) under the program.  Essar Steel Ltd. v. United States, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1297 (2010), aff'd in part and rev'd in part on other grounds, 678 F.3d 1268 (Fed. Cir. 2012); see also Archer Daniels Midland Co. v. United States, __ CIT __, __, 917 F. Supp. 2d 1331, 1342 (2013).  Missing information related to the operation of the EBCP has no bearing on usage of the program.  See Guizhou Tyre Co. v. United States, __ CIT __, __, 348 F. Supp. 3d 1261, 1271 (2018) (explaining that identical findings by Commerce improperly "conflates the {ECBP's} operation with its use").

Further, the United States attempts to discredit the certified non-use customer declarations

by asserting that the "certifications are unverifiable" because "no{n} use cannot be verified by examining the customer's records."  Def. Br. at 39.  To the contrary, as explained in Fine Furniture's initial brief, non-use of the EBCP can in fact be verified by various methods.  See FF Br. at 27.  Further, the Court recently rejected the United States' claim that customer certifications of non-use are unverifiable.  See Canadian Solar Inc. v. United States, Ct. No. 19-00178, 2021 Ct. Intl. Trade LEXIS 115 at *41 (2021) (citing Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1316, 1326–27 (2018) ("Commerce has not reasonably shown that the customer certifications are unverifiable on the record."); see also Changzhou Trina Solar Energy Co., Ltd. v. United States, Consol. Ct. No. 17-00246, 2019 Ct. Intl. Trade LEXIS 144, at *1–3 (Nov. 18, 2019).  Furthermore, interested parties provided Commerce various methods that it could use to verify non-use.  For example, Commerce could review the underlying documentation related to these loans, regardless of whether the funds came from a third-party bank, to rule out the possibility that mandatory respondents benefitted from funds related to the EBCP.  See Changzhou Trina Solar Energy Co. v. United States, No. 17-00198, 2019 Ct. Intl. Trade LEXIS 138, at *11-12 (Nov. 8, 2019)  (remanding for Commerce to attempt verification of customer declarations); see also Guizhou Tyre, Co. Ltd. v. United States, __ CIT __, __, 389 F. Supp. 3d 1315, 1322 (2019) (Commerce "ha{s} the tools at its disposal to substantiate the accuracy of the declarations.").  The United States further claims that, "{t}he record of this proceeding does not contain certifications for all customers, as have been provided in some cases" even though Commerce nor the Court has listed this as a requirement to prove non-use of the EBCP.  Def. Br. at 39.

AMMWF also argues that the "Plaintiffs' claims that the missing information was unnecessary are unpersuasive" because "it is Commerce's role to decide what information is

necessary to assess the extent to which a subsidy program is used." AMMWF Br. at 33.  Even though Commerce has the discretionary authority to decide what information is necessary, this discretion is not unfettered or absolute. There needs to be a connection between the facts and Commerce's determination, which is not the case here.  Commerce must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).  Here, any information omitted from the GOC's response is irrelevant to verifying the respondents' reported non-use of the program and Commerce's failure to find otherwise was unsupported by substantial evidence and not in accordance with law. Nothing in the Defendants' briefs distinguish this case from the long and growing line of decisions cited by Fine Furniture where the Court has properly remanded Commerce's EBCP determinations and ultimately sustained the removal the associated CVD rate.  This Court should follow that well-reasoned precedent.

## V.   COMMERCE'S SPECIFICITY DETERMINATION AND BENCHMARK CHOICE FOR THE ELECTRICITY FOR LTAR PROGRAM WERE UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce's specificity finding for the electricity for LTAR program was unsupported by substantial evidence and unlawful because Commerce failed to connect the information that it found to be missing from the record to its AFA determination and also failed to make factual findings on whether and how the electricity program is specific.  See Final I&D Mem. at Cmt. 8 (P.R. 361).  Additionally, Commerce's reliance on AFA to calculate an electricity benefit by using the highest rates amongst the provincial price schedules as benchmarks for each reported electrical category is unsupported by substantial evidence and contrary to law.  See id.

### A. Commerce's Specificity Finding Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

In response to Fine Furniture's claim that Commerce failed to explain how the electricity

for LTAR program is specific, the United States argues that "Commerce had to rely on facts available subject to adverse inferences to complete the specificity determination because the GOC's failure to cooperate inhibited Commerce from determining specificity." Def. Br. at 43. On the contrary, as explained below and in Fine Furniture's opening brief, the facts on the record establish that the GOC is not providing subsidized electricity rates to a specific region or industry. See FF Br. at 30. AMMWF relied on Commerce's determination in Chlorinated Isocyanurates to argue that "when key information . . .regarding a subsidy program is missing from the record because of a party's failure to cooperate with the investigation, Commerce may be unable to delve fully into the specificity question." See AMMWF Br. at 40-41 (citing Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative Countervailing Duty Determination; 2012, 79 Fed. Reg. 56,560 (Dep't of Commerce Sept. 22, 2014), and accompanying Issues and Dec. Mem. at 9-10). The record information here, however, shows that there is no key information missing. The electricity tariff rates provided by the GOC "are equally applied to all end users {and no} specificity exists with regard to the electricity prices." Letter on behalf of the Gov't of China to Dep't of Commerce re: Government of China's Initial Questionnaire Resp. Multilayered Wood Flooring From the People's Republic of China at 14 (July 15, 2019) (Public Version) ("GOC IQR") (P.R. 96-131). There is no basis, therefore, for Commerce to conclude otherwise, even under AFA.

Additionally, Defendants misrepresent Commerce's discretionary authority in applying AFA. AMMWF claims that AFA is warranted here because the purpose of AFA is to promote cooperation with Commerce's information requests by ensuring that uncooperative parties do not receive better outcome through non-cooperation than they would through cooperation. AMMWF Br. at 40 (citing SAA at 870, 1994 U.S.C.C.A.N at 4199). The United States attempts to justify

Commerce's AFA application here by arguing that GOC "refuse{d} to provide certain details regarding variation of provincial electricity rates and whether these rates were calculated based on market principles." Def. Br. at 46 (citing Jiangsu Zhongji Lamination Materials Co. v. United States, __ CIT __, __, 405 F. Supp. 3d. 1317, 1339 (2019)).  Neither position recognizes that Commerce's authority to apply AFA is limited in that, even under AFA, Commerce "must still make the necessary factual findings to satisfy the requirements for countervailability," including determining how the program is specific. Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 195 F. Supp. 3d at 1350, 1351 (2016); see also 19 U.S.C. § 1677e(a) (requiring Commerce to determine what specific information is not on the record before using facts available).  Even when relying on AFA, Commerce must still engage in a statutory and record analysis of the electricity for LTAR program and "connect the dots: how does the GOC's partial response—or failure to respond fully—reasonably lead to a finding of a specific subsidy even with use of AFA?" Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 352 F. Supp. 3d 1316, 1342.  Here, Commerce failed to analyze information on the record to make the required specificity determination, and therefore, this Court should reject its determination as unsupported by substantial evidence and unlawful.

What remains true despite Defendants' best arguments is that by statute, Commerce may only countervail a program that is specific in certain enumerated ways.  See 19 U.S.C. § 1677A(5) (providing that "a countervailable subsidy is a subsidy described in this paragraph which is specific"); see also 19 U.S.C. § 1677 (5)(A)-(5A) (providing specificity categories including export subsidies, import replacement subsidies and domestic subsidies).  Despite this obligation, Commerce made no precise finding as to how the alleged electricity program was specific in accordance with the Act, rendering its determination unsupported by substantial evidence and

otherwise not in accordance with law.

**B. Commerce's Electricity Benchmark Determination Was Unsupported by Substantial Evidence and Not in Accordance with Law**

AMMWF claims that "Fine Furniture fail{ed} to demonstrate that Commerce's benchmark selection was inconsistent with the statute or the record." AMMWF Br. at 42. As demonstrated in Fine Furniture's opening brief, however, Commerce's AFA benefit measurement method was unsupported by the record in numerous ways. Fundamentally, and most egregiously, in making its benchmark selections, Commerce created a mix-and-match of rates from [ ████████ ████ ] in China, depending on which one had the highest rate for a given electricity user/rate category. See FF Br. at 31 (Confidential Version). Commerce's precise manner of selecting the worst possible rates in all of China is nonsensical and cannot be upheld by the Court, even under AFA, because it "selected the highest non-seasonal provincial rates in China during the POR for each applicable user category," which means Commerce <u>imputes electricity rates from [ ██ ] different provinces in China to the same (stationary) facility of the mandatory respondents</u>. Prelim I&D Mem. at 37 (P.R. 265-266);  see also Guyu Final Cal. at Attach. 2, Elec Bench Tab (Business Proprietary Document); Baroque Timber Final Cal. at Attach. 2, Elec Bench Tab (Business Proprietary Document) (C.R. 227-228).

AMMWF cited to the Court's decision in <u>Hebei Jiheng</u>, claiming that "this Court has upheld Commerce's decision to use AFA in constructing a Chinese electricity benchmark under similar circumstances. For example, in <u>Hebei Jiheng</u> Chemicals, plaintiffs argued that Commerce inappropriately created an electricity benchmark based on various electricity rates on the record." AMMWF Br. at 43 (citing <u>Hebei Jiheng Chems. Co. v. United States</u>, __, CIT __, __, 161 F. Supp. 3d 1322, 1328-32 (2016)). AMMWF's reliance on that case is flawed, however, because the issues in <u>Hebei Jiheng</u> were different from the present case. There, Plaintiff challenged 1) Commerce's

selection of a Zhejiang benchmark rate schedule rather than a Southern Heibi benchmark schedule and 2) "Commerce's use of the Zhejiang rates for large industry, rather than the (lower) Zhejiang rates for 'the production of chlor-alkali products.'" Hebei Jiheng Chems. Co., __ CIT at __, 161 F. Supp. 3d at 1328-32. The Plaintiff in Hebei Jiheng Chems. Co. did not claim, as Fine Furniture does here, that Commerce's entire benchmark selection framework is unlawful because it uses multiple provinces as benchmarks for a respondent that is only located in one physical place.

Moreover, even though Commerce failed make a finding as to how the alleged electricity program was specific in accordance with the Act, see FF Br. at 29, its benchmark selection illustrates that any future finding by Commerce that the electricity program is regionally specific could not be upheld by the Court. When selecting benchmarks from multiple provinces to measure the benefit of different elements of a single electricity bill, Commerce, in effect, determined that all areas in China received subsidized electricity prices because no single factory could ever be located in multiple provinces simultaneously. In fact, Commerce's benchmark selection ensures that every single Chinese manufacturer in this review, and historically in every other proceeding in which the electricity program has been alleged, is found to be located in a subsidized region. Following Commerce's history reviewing this program and benchmark selection logic, no Chinese respondent ever can escape a subsidy rate related to this program.

Commerce's methodology here is contrary to law in that it is a complete abrogation of its own regulatory obligation to identify a benchmark that represents an unsubsidized, market price for the input. See 19 C.F.R. § 351.511(a)(2)(ii) ("If there is no usable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, the Secretary will seek to measure the adequacy of remuneration by comparing the government price to a world market price"). In the context of a regional electricity program, which Commerce has yet to

establish, Commerce must select a benchmark that represents the <u>unsubsidized</u> region.  Here, however, where its selected benchmarks reflect a mix and match of the highest prices in various categories and fees from different provinces, Commerce fails to identify a single region that is not subsidized.

The law does not permit Commerce to apply strictly punitive measures, even under AFA, and there is no way to view the application of penalty benchmarks to a respondent as if it were located simultaneously in various different places in China as anything but punitive.  Accordingly, the Court should remand this issue back to Commerce with instructions to find that the electricity program does not constitute a countervailable subsidy, to remove any corresponding benefit assigned to the mandatory respondents and to recalculate the rate for the non-selected companies.

## VI.   FINE FURNITURE ADOPTS BY REFERENCE ARGUMENTS MADE BY OTHER PLAINTIFFS

In the interest of avoiding duplication through repetition of arguments, Fine Furniture hereby adopts and incorporates by reference the arguments of other plaintiffs[2] to the extent they challenge the response briefs of United States and AMMWF and are not inconsistent with the above arguments.

---

[2] Baroque Timber Industries (Zhongshan) Co., Ltd., Dalian Jiahong Wood Industry Co., Ltd., Dalian Penghong Floor Products Co., Ltd., Dalian Qianqiu Wooden Product Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Double F Limited, Dunhua City Jisen Wood Industry Co., Ltd., Evolutions Flooring, Inc., Fine Furniture (Shanghai) Limited, Floor & Decor Holdings, Inc., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., Galleher Corp., Galleher, LLC, Jiangsu Guyu International Trading Co., Ltd., Jiangsu Keri Wood Co., Ltd., Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Jiashan HuiJiaLe Decoration Material Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., MCI International, Metropolitan Hardwood Floors, Inc., Riverside Plywood Corporation, Shenzhenshi Huanwei Woods Co., Ltd., Sino-Maple (JiangSu) Co., Ltd., Struxtur, Inc., Zhejiang Biyork Wood Co., Ltd. and Zhejiang Dadongwu GreenHome Wood Co., Ltd.

## CONCLUSION

For the foregoing reasons, the Court should grant Fine Furniture's motion for judgment on the agency record and remand the Final Results for redetermination consistent with the points of law and record evidence discussed in Fine Furniture's initial brief and this reply brief.

                                                  Respectfully submitted,

Dated: September 17, 2021                   /s/ Kristin H. Mowry
                                                  Kristin H. Mowry
                                                  Sarah M. Wyss
                                                  *Counsel to Fine Furniture*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Kristin H. Mowry, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,552 words.

<u>Dated</u>: September 17, 2021

/s/ Kristin H. Mowry
Kristin H. Mowry
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Fine Furniture*