# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., *et al.*, | ) |
| Plaintiffs, | ) |
| and | ) |
| BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD. and RIVERSIDE PLYWOOD CORPORATION, *et al.*, | ) |
| Consolidated Plaintiffs, | ) Consol. Court No. 20-03885 |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, and | ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) |
| Defendant-Intervenor. | ) |

## CONSOLIDATED PLAINTIFFS' REPLY BRIEF

Francis J. Sailer
Andrew T. Schutz
Kavita Mohan
GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

Dated: September 17, 2021

# TABLE OF CONTENTS

I. COMMERCE'S INCLUSION OF HTS 4412.99 IN CALCULATING THE BENCHMARK FOR PLYWOOD IS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE. 1

II. THE APPLICATION OF AFA TO THE EXPORT BUYER'S CREDIT PROGRAM IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW ................................................................................................................. 7

III. CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ........ 6

*Archer Daniels Midland Co., v. United States*, 917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ..... 10

*Canadian Solar Inc. v. United States*, No. 19-00178, 2021 WL 4026868 (Ct. Int'l Trade Sept. 3, 2021) ................................................................................................................................ passim

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ............................... 9

*Guizhou Tyre Co. v. United States*, No. 19-00032, 2021 WL 2156474 (Ct. Int'l Trade May 19, 2021) ............................................................................................................................. 9, 11, 15

*Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ........... 8, 10

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ......................................... 10

**Statutes**

19 U.S.C. § 1677e ............................................................................................................................ 8

**Administrative Decisions**

*Certain Hot-Rolled Carbon Steel Flat Products from India*, 74 Fed. Reg. 20,923 (May 6, 2009) 6, 7

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Zhejiang Dingli Machinery Co., Ltd. Export Buyer's Credit Verification Questionnaire* (C-570-140) (Sept. 7, 2021) ...................................................................................................... 14

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (March 12, 2021) ................................................................................... 13, 14, 15

*High Pressure Steel Cylinders from the People's Republic of China*, 83 Fed. Reg. 63,741 (Dec. 10, 2018) ........................................................................................................................................ 6

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,* 85 Fed. Reg. 76,011 (Nov. 27, 2020) ........................................................................................................................................ 1

Consolidated Plaintiffs, Baroque Timber Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation (collectively "Baroque") submit this Reply Brief responding to the briefs filed by the Government ("Gov. Br.") and Defendant-Intervenor, American Manufacturers of Multilayered Wood Flooring ("AMMWF" or "Petitioner") ("Pet. Br.").

I. **COMMERCE'S INCLUSION OF HTS 4412.99 IN CALCULATING THE BENCHMARK FOR PLYWOOD IS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

In *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017,* 85 Fed. Reg. 76,011 (Nov. 27, 2020) (**PR 369**), and the accompanying Issues and Decision Memorandum ("IDM") (**PR 361**) (collectively, "Final Results"), Commerce improperly rejected arguments made by Baroque in its administrative case brief that HTS 4412.99 should not be included in the benchmark for plywood because it is laminated wood not used by companies in their production of subject merchandise. As Baroque explained in its Direct Brief, it is the Department's well-established practice to select the most product-specific benchmark possible for use in LTAR calculations. *See* Baroque Br. at 6-9. The Department's determination to include 4412.99, a HTS provision that consists wholly of products that Baroque does not purchase or use and that are not comparable to the products purchased and used by Baroque, in the benchmark for plywood, is entirely unsupported by substantial evidence and not in accordance with law. The Government's and Petitioner's arguments to the contrary in their response briefs are entirely meritless and should be rejected for the reasons enumerated by Baroque in its Direct Brief (*see* Baroque Br. at 9-12) and further explained below.

First, the Government repeats arguments from the Final Results that all plywood is a laminate structure, Gov. Br. at 24, citing as support for this statement a definition for plywood

1

found in Baroque's Rebuttal Benchmark Exhibit 4c, at 11-5 (Nov. 25, 2019) **(CR 192-194, PR 232-234)**. That document states that plywood is constructed with layers consisting of "single ply or of two or more plies laminated with their grain direction parallel." However, as Baroque has fully explained, the inclusion of the word "laminated" in this description is taken out of context, as it refers simply to the process of plywood construction and does not mean that "laminated wood" as encompassed under HTS 4412.99 is the same as or similar to the plywood used by Baroque in production. Baroque Br. at 9-10. Furthermore, record evidence demonstrates that plywood and laminated wood are comprised of different materials, undergo different manufacturing processes, and have different applicable standards, as also explained by Baroque in its Direct Brief. *See* Baroque Br. at 10.

Second, the Government argues that Baroque did not provide evidence showing that it primarily used beech and eucalyptus wood. However, the record has uncontroverted evidence demonstrating that Baroque used plywood made *only* of eucalyptus or beech wood, not "laminated wood." *See* Baroque Rebuttal Benchmark at 1 **(CR 192-194, PR 232-234)** ("neither Baroque Timber nor Riverside Plywood use plywood made of bamboo; it is mostly made of eucalyptus or beech wood"). Baroque NSA Response at 2 (Nov. 8, 2019) **(CR 188-190, PR 219-220)** ("A majority of the plywood purchased and used by both companies is made from beech wood or eucalyptus. None of the plywood purchased has tropical wood layers"). Nothing on the record even suggests, let alone indicates, anything to the contrary. Nor has the Government or Petitioner pointed to anything on the record suggesting that Baroque's plywood was made of materials other than beech and eucalyptus wood.

Third, the Government argues that 4412.9999 contains an "Other" category that could presumably cover beech and eucalyptus wood. However, the record shows that at the 10-digit

level, the "Other" category includes "endangered coniferous board veneer particle board" and "coniferous board veneer particle board."

| 4412.9999 | -- Other |
| 4412.9999 10 | The endangered coniferous board veneer particle board |
| 4412.9999 90 | The coniferous board veneer particle board |

Neither of these categories encompass eucalyptus or beech wood. *See* GOC NSA Questionnaire Response at Exhibit NSA-5 (Nov. 8, 2019) **(CR -173-181, PR 216-217)**. In fact, as Baroque explained in its Direct Brief, nothing under HTS 4412.99 references plywood of any kind, let alone plywood made of beech wood or eucalyptus. Thus, there is no basis to conclude, as the Government does without support, that HTS 4412.99 is an appropriate benchmark for plywood. Baroque Br. at 12.

The Government also asserts that the description of the four-digit HTS 4412 is "{p}lywood, veneered panels and similar laminated wood," and that the inclusion of the word "similar" in this context suggests that plywood is, or can be, laminated. Gov. Br. at 24. The Government also states that Baroque's position that plywood is distinct from these other referenced categories renders the word "similar" meaningless. Gov. Br. at 25. There is no basis for this argument. The Court should dismiss the Government's assertions as purely conjectural without any evidentiary basis, let alone a "substantial" one. Indeed, "similar" appears to refer to "veneered panels." The placement of the comma in the exact description of the four-digit HTS is after "plywood" -- "{p}lywood, veneered panels and similar laminated wood." The lack of a comma between "veneered panels" and "similar laminated wood" supports the conclusion that "similar" refers to "veneered panels" not "plywood" in the four-digit HTS description. *See* GOC NSA Questionnaire Response at Exhibit NSA-5 **(CR -173-181, PR 216-217)**. The explanatory notes to 4412.99 further support a conclusion that "plywood" is distinct from "veneered panels"

3

and "laminated wood":

> This heading covers:
>
> (1) Plywood consisting of three or more sheets of wood glued and pressed one on the other and generally disposed so that the grains of successive layers are at an angle; this gives the panels greater strength and, by compensating shrinkage, reduces warping. Each component sheet is known as a "ply" and plywood is usually formed of an odd number of plies, the middle ply being called the "core".
>
> (2) Veneered panels, which are panels consisting of a thin veneer of wood affixed to a base, usually of inferior wood, by glueing under pressure. Wood veneered on to a base other than wood (e.g., panels of plastics) is also classified here provided it is the veneer which gives the panel its essential character.
>
> (3) Similar laminated wood. This group can be divided into two categories :- Blockboard, laminboard and battenboard, in which the core is thick and composed of blocks, laths or battens of wood glued together and surfaced with the outer plies. Panels of this kind are very rigid and strong and can be used without framing or backing.
>
> Panels in which the wooden core is replaced by other materials such as a layer or layers of particle board, fibreboard, wood waste glued together, asbestos or cork.
>
> However, the heading does not cover massive products such as laminated beams and arches (so-called "glulam" products) (generally heading 44.18).

*See* Baroque Benchmark Rebuttal at Exhibit 2b **(CR 192-194, PR 232-234)**. This note describes the distinctions between plywood and laminated woods, demonstrating that plywood is inherently distinct from "veneered panels and similar laminated wood," the other categories covered under the four digit HTS.

Finally, the Government argues that the UN Comtrade description of HS 4412.99 "explicitly excludes particle board, differentiating it from other potential wood flooring inputs." Gov. Br. at 25. However, this is irrelevant and does not address the inherent difference between plywood and laminated wood that are made clear in the explanatory notes to 4412.99 recited

above.

Petitioner's arguments are similarly without merit. Petitioner argues that (1) Commerce has the discretion to use broad benchmarks and need not use benchmark data that are identical to the inputs actually used (Pet. Br. at 20); and (2) Baroque has not provided sufficient evidence that "plywood covered under HTS 4412.99 is not comparable to plywood purchased by the respondents and cannot reasonably represent world market plywood prices." Pet. Br. at 22. Both arguments should be dismissed in full.

As an initial matter, Baroque is not arguing that the benchmark must be identical to the input being valued. Importantly, however, the record evidence summarized above and in Baroques Direct Brief demonstrates that HTS 4412.99 is not at all comparable to Baroque's purchased and used plywood inputs, and thus cannot be used in the LTAR benchmark calculation. Furthermore, Petitioner fails to address the substantial Department precedent cited in Baroque's Direct Brief demonstrating that it is the Department's typical practice to select the most specific data on the record (*see* Baroque Br. at 6-8), a fact that the Department itself has recognized during this administrative review. *See* IDM at 37 (**PR 361**) ("Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product"). Petitioner is also wrong that "Plaintiffs have failed to provide sufficient evidence showing that *plywood* covered under HTS 4412.99 is not comparable to plywood purchased and used by respondents." Pet. Br. at 22. Record evidence demonstrates that HTS 4412.99 does not cover any type of "plywood," but rather is the HTS provision for "laminated wood," as summarized above and discussed in detail in Baroque's Direct Brief. Petitioner has made no attempt to address the substantial record evidence Baroque provided that the laminated wood covered under 4412.99 is not comparable to its plywood purchases. *See* Baroque Br. at 9-13.

5

Moreover, the cases cited by Petitioner to support its position are distinguishable from the facts at hand here. For example, Petitioner cites *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014), to support its position that benchmarks need not be identical but simply comparable -- "The regulation, however, does not manifest such a stringent standard. It requires only that the selected benchmarks be comparable." However, in that case, the Court explained that respondents were arguing that "Commerce must use benchmark prices at the ten and eleven-digit level of specificity, which implies that Commerce must use benchmark prices that are nearly identical to {respondent}'s reported purchases to satisfy the regulation." *Id.* That is not the case here. Baroque has accepted other benchmark prices at the 6-digit level as being suitable for use by the Department when circumstances are appropriate. However, as Baroque has demonstrated based on the record evidence summarized above, 4412.99 *is not comparable* to plywood inputs.

Similarly, *High Pressure Steel Cylinders from the People's Republic of China*, also cited by Petitioner, can be distinguished from the instant case. In that case, the Department rejected arguments made by the respondent that a basket category HTS should not be used to value billet and seamless tube steel. The Department explained in that case that, "the respondent did not identify a compelling reason that we ought not to use the UN Comtrade data." *High Pressure Steel Cylinders from the People's Republic of China*, 83 Fed. Reg. 63,741 (Dec. 10, 2018), and accompanying IDM at Cmt. 3. In contrast, in this case, Baroque has provided substantial record evidence demonstrating that 4412.99 is not comparable to its products.

*Certain Hot-Rolled Carbon Steel Flat Products from India*, also cited by Petitioner for the proposition that benchmarks need not be identical (*see* Pet. Br. at 22), involved the selection of a Tier 1 benchmark, not a Tier 2 benchmark. *See Certain Hot-Rolled Carbon Steel Flat*

6

*Products from India*, 74 Fed. Reg. 20,923 (May 6, 2009), and accompanying IDM at Cmt. 12. In that case, the Department also noted that it made ***adjustments*** to the benchmark prices to ensure comparability:

> {W}e have adjusted the government and benchmark prices used in our LTAR analysis to ensure comparability to the extent feasible and appropriate. . . . Specifically, we adjusted the benefit calculations to account for differences in Fe content in order ***to ensure that the benchmark fines and lumps prices are of the same Fe content as the fines and lumps Essar purchased from the NMDC***. Id. Further, concerning the lumps Essar purchased from its Brazilian supplier, as petitioners correctly note, Essar itself placed pricing data regarding lumps it purchased from the Brazilian supplier on the record of the prior review and advocated using the prices for purposes of a lumps benchmark.

*Id.* (emphasis added).

For these reasons, and the reasons discussed in Baroque's Direct Brief, the Court should dismiss the Government's and Petitioner's arguments in full and should remand this issue to the Department, directing it to recalculate its benchmark for plywood without the inclusion of HTS 4412.99 data.

## II. THE APPLICATION OF AFA TO THE EXPORT BUYER'S CREDIT PROGRAM IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW

Neither the Government nor Petitioner provides any compelling reasons why the Court should depart from the many decisions it has issued on the application of adverse facts available ("AFA") to the Export Buyer's Credit Program ("EBCP") in a multitude of prior cases under virtually identical circumstances. Rather, both the Government and Petitioner simply repeat arguments made in the Department's IDM and in prior determinations, using reasoning identical to that which has now been reviewed on appeal and rejected by this Court in numerous cases, as addressed by Baroque in its Direct Brief. The Court should reject the Government's and Petitioner's arguments on the EBCP again in this case and remand this issue to the Department.

As Baroque discussed in detail in its Direct Brief, in making an AFA finding, the statute requires the Department to (1) identify a gap in the record, (2) demonstrate that the interested party failed to cooperate by not acting to the best of its ability; and (3) ensure that its overall determination is supported by substantial evidence. *See* Baroque Br. at 13-14, *citing* 19 U.S.C. § 1677e. In addition, in investigating the countervailability of a subsidy, it must be (a) "specific," and (b) provide a financial contribution from (c) a government authority that results in (d) a benefit conferred. Put another way, Commerce's investigation of the countervailability of any alleged subsidy program essentially involves two separate prongs: (1) to determine how the program operates so as to determine countervailability; and (2) to determine whether the respondent received a benefit from the program so as to establish usage. These are separate and independent inquiries. With regard to the EBCP, in the application of AFA, any "gap" identified with respect to the countervailability of the program under prong (1) cannot be automatically applied to prong (2).

First, the Government and Petitioner repeat arguments that Commerce adequately identified a gap in the record because the GOC did not provide it with (1) the 2013 Administrative Measures revisions to the EBCP; and (2) a list of all partner/ correspondent banks involved in the disbursement of funds under the EBCP, and that this information is critical to its understanding of the program, without which it is not able to verify the completely independent inquiry regarding use or non-use. Gov. Br. at 33-36, Pet. Br. at 32. As multiple decisions by this Court have now held, any gap resulting from the absence of the missing documents relates solely to an **understanding** of the operation of the program and not to establishing **usage** of this program. *See, e.g., Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270-1 (Ct. Int'l Trade 2018) ("While the Department did note that information as to the functioning of the

Program was missing, this finding was rendered immaterial by responses from both Guizhou and the GOC as to the Program's use. This defect proves fatal to Commerce's imposition of AFA"). *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019) ("While Commerce is, no doubt, curious as to all of the inner workings of many Chinese programs, mere curiosity is not enough. Commerce must either provide an adequate answer as to why the information it seeks 'to fully understand the operation of the program' is necessary to fill a gap as to {respondent}'s products and their sale, or rely on the information it has on the record."). Most recently, in *Canadian Solar Inc. v. United States*, No. 19-00178, 2021 WL 4026868, at *14 (Ct. Int'l Trade Sept. 3, 2021) ("Canadian Solar"), this Court explained that "there is no gap in this record as it stands regarding EBCP usage because the Mandatory Respondents have provided evidence of non-use in the form of customer certifications."[1]

Furthermore, the record of this proceeding does not reflect the respondent's failure to cooperate by not acting to the best of its ability. As an initial matter, the Government and Petitioner both mischaracterize the GOC's responses to the Department's questionnaires by stating that the GOC "refused to provide" the requested information concerning the 2013 Administrative Measures revisions and the list of partner banks. Gov. Br. at 34, Pet. Br. at 32. In fact, as the Government itself acknowledges, "the GOC stated that the 2013 guidelines are internal to the Ex-Im Bank, non-public, and not available for release; the GOC further claimed to have no authority to compel the Ex-Im Bank to provide a copy of the 2013 guidelines, and indicated that they would therefore not be provided." *See* Gov. Br. at 34, citing GOC's Letter,

---

[1] In a recent case before this Court, the Court found that the missing information identified by the Department constituted a "gap" in the record. *Guizhou Tyre Co. v. United States*, No. 19-00032, 2021 WL 2156474, at *33 (Ct. Int'l Trade May 19, 2021) ("Guizhou Tyre 2021"). Notably, however, even in that case, the Court also explained that the Department did not explain why the missing information was necessary to verify non-use. *Id*.

9

"Government of China's Supplemental Questionnaire Response," (Oct. 28, 2019) (GOC SQR) at 5 (**PR 207, CR 161**). These responses hardly reflect a failure to cooperate, and the GOC should not have been faulted for not providing the Department with information it did not have the authority to provide, despite its best efforts. The Court has instructed that "{a}n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; *i.e.*, under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003). Further, it is important to note that even if the Court were to find that the GOC's actions here were non-cooperative, it is not the GOC that is the respondent in this proceeding, it is, rather, Baroque. "Although Commerce can apply adverse facts that collaterally impact a cooperating party, 'Commerce should seek to avoid such impact if relevant information exists elsewhere on the record.'" *Canadian Solar*, 2021 WL 4026868, at *14, *citing Archer Daniels Midland Co., v. United States*, 917 F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013); *see also Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1270 (Ct. Int'l Trade 2018) ("To apply AFA in circumstances where relevant information exists elsewhere on the record — that is, solely to deter non-cooperation or 'simply to punish' — ... that is a fate this court should sidestep")(citation omitted).

Second, the Government and Petitioner then continue to argue that without the missing information on the 2013 revisions and the names of partner banks, they are unable to verify non-use of the program. Gov. Br. at 35-38, Pet. Br. at 33. They present myriad reasons for this, all of which were addressed by Baroque in its Direct Brief and all of which have been dismissed in countless previous cases where the Court has been presented with them. For example, in *Guizhou*

10

*Tyre 2021*, the Court rejected Commerce's reasons as to why respondent's certifications regarding non-use were unverifiable:

> {I}n the Final Determination, Commerce concluded that without the information from the GOC regarding the threshold and third-party banks, Commerce could not verify claims of non-use; however, **Commerce failed to explain why this information was critical to Commerce's verification process.** Similarly, Commerce determined that it could not rely on information from the respondents and their customers to establish non-use, including the self-certifications, because the information was "unverifiable"; however, **Commerce neglected to explain the reasoning behind this finding.**

*Guizhou Tyre 2021*, 2021 WL 2156474, at *44 (emphasis added).[2] In the most recent *Canadian Solar* case, the Court had requested supplemental briefing from mandatory respondents as to how to conduct a verification of the EBCP, to which the Government had an opportunity to respond in detail. There, the Government cited the same reasons as to why the missing information was necessary to its verification of non-use as it cites in this case. The Court addressed all of these reasons in detail and rejected Commerce's arguments that non-use of the EBCP was unverifiable, stating –

> Commerce's arguments that EBCP non-usage is unverifiable without the names of the partner banks lack sufficient support. See I&D Memo at 32. Commerce posits that to verify use of a loan program, it would typically examine the company's subledgers for references to the party making the financial contribution and request underlying documentation from specific entries to confirm the origin of each loan. Gov. Supp. Br. at 10; see also I&D Memo at 32–33. Because it does not know the names of the partner

---

[2] Baroque notes that in *Guizhou Tyre 2021*, the Court stated that "This court, however, is not prepared to conclude that — in situations in which a respondent significantly impedes a CVD proceeding by repeatedly withholding information requested by Commerce or by providing incomplete responses to questionnaires — Commerce must attempt verification to conclude that verification is not possible or overly burdensome." *Guizhou Tyre 2021*, 2021 WL 2156474, at *42. Baroque respectfully clarifies that there is no record evidence that *respondents* did not cooperate or repeatedly withhold information, either in *Guizhou Tyre* or in this case. The missing information was sought from the GOC. As noted above, the Court has held in previous cases that the Department should seek to avoid collateral adverse impacts on a cooperating party. *See e.g., Canadian Solar*, 2021 WL 4026868, at *14.

11

> banks that may disburse loans under the EBCP, Commerce claims it would have to review underlying documentation for all loans reflected in the subledger to determine whether any loan was associated with the EBCP. Gov. Supp. Br. at 10. This review would be "an unreasonably onerous undertaking for any company that received more than a small number of loans." Id. (citing I&D Memo at 33). Commerce, because it never proceeded to attempt verification, does not indicate the number of loans in question and does not demonstrate how burdensome verification would be here, however. ***The court acknowledges that verification would appear to be easier if Commerce had access to the names of the partner banks and could review specific entries in a customer's subledger, and that Commerce is entitled to consider the burden of verification on agency resources. See Torrington Co. v. United States, 68 F.3d 1347, 1351–52 (Fed. Cir. 1995). But here, Commerce has provided insufficient evidence to conclude that verification by the usual spot check of the customer records would be unduly burdensome. This record also suggests that Commerce would have likely had adequate opportunity to attempt verification as Mandatory Respondents offered to aid Commerce's verification efforts and indicated that they would encourage unaffiliated customers to do the same. Commerce made no such attempt and its claims of unverifiability are unavailing***.

*Canadian Solar*, 2021 WL 4026868, at *15 (emphasis added). The Court further held that Commerce's other reasons for claiming verification was not feasible were unsupported by substantial evidence:

> Commerce also argues that the lack of sample EBCP paperwork prevents verification at the U.S. customer because even if Commerce were to review the underlying documentation of every customer loan, it would not understand "whether/how that documentation would indicate China Ex-Im involvement." I&D Memo at 33. ***Commerce has not provided a reasonable explanation for why verification is unfeasible without examples of forms. Commerce simply assumes that documents demonstrating EBCP use would be unidentifiable and incomprehensible without guidance from the sample paperwork. Having apparently not reviewed or requested any customer loans records for an inquiry into EBCP, despite apparently having opportunity to do so, Commerce has a limited basis for this assumption***.

> Nor has Commerce shown why verification at the respondent is unfeasible. The record demonstrates that the exporter would be involved in various stages of the EBCP. See e.g., GOC Initial CVD Questionnaire Response at 127–28 (stating "Normally, if export buyer's credits are provided by the EX-IM bank, the Chinese exporter is aware of the buyers

12

> receipt of the loans and is involved in the loan evaluation proceeding and, in particular, is involved in post-lending loan management conducted by the EX-IM Bank.") Commerce argued that it cannot verify usage at the exporter because Commerce lacks the sample paperwork and information regarding the disbursing banks requested from the GOC, and it needed a "better understanding of the program before it could verify it." I&D Memo at 34–35; Gov. Supp. Br. at 8–10. Specifically, Commerce noted it would be unable to confirm non-use by "examining books and records which can be reconciled to audited financial statements or other documents, such as tax returns." Id. at 35. ***But Commerce does not sufficiently explain why it would be unable to conduct an adequate review of Canadian Solar and Jinko's accounting records, especially where, as here, the record indicates that Commerce would likely have Respondent's cooperation in such a review. Commerce failed to demonstrate that a fuller understanding of the functioning of the EBCP is required to verify non-use of the program.***

*Canadian Solar*, 2021 WL 4026868, at *15 (emphases added).

In this case, as in *Canadian Solar*, the Department made no attempt to verify non-use of the EBCP or explain why verification "by the usual spot check of the customer records would be unduly burdensome." Nor did it review or request "any customer loans records for an inquiry into EBCP" or explain why verification at the respondent was not feasible, despite record evidence that the exporter itself would be involved at various stages of the EBCP. *See* Baroque Br. at 36, *citing* GOC Initial Questionnaire Response at 111 (**CR 36-98, PR 96-131**).

As Baroque discussed in its Direct Brief, Commerce's ability to rely on information provided by a respondent's U.S. customers, such as underlying loan documents, to demonstrate non-use has now been clearly demonstrated by Commerce's decision in *Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (Mar. 12, 2021), and accompanying IDM ("*VSEs*"). In *VSEs*, the Department actually accepted a respondent's submission of a U.S. customer's underlying loan documents and loan reconciliation as sufficient evidence of non-use. Commerce noted that a loan "reconciliation" demonstrated the

purpose of each financing instrument and "lending agreements . . . show the purpose of each of {the} debt instruments and the parties involved in the financing' of loans." *Id*. at Cmt. 2. The finding in *VSEs* shows that Commerce can indeed review a U.S. customer's information to establish non-use and, thus, declarations of non-use are in fact verifiable. Thus, there is no basis for Commerce's claims that the "missing" information requested regarding the operation of the program is necessary to the verification of use.

Indeed, in the recent investigation of *Mobile Access Equipment from China*, the Department is, in fact, conducting a verification of the EBCP, demonstrating that verification, in fact, is feasible. *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Zhejiang Dingli Machinery Co., Ltd. Export Buyer's Credit Verification Questionnaire* (C-570-140) (Sept. 7, 2021), Barcode 4158064, available at https://access.trade.gov/login.aspx. Commerce's failure to even attempt to verify non-use in this case and to instead apply adverse inferences to cooperative respondents, is unsupported by record evidence and not in accordance with the law.

The Government's and Petitioner's remaining arguments are equally without merit and should be dismissed. The Government argues that customer certifications are unverifiable because Baroque provided only 60 percent of Riverside Plywood's customers' non-use certifications and that, in any case, these customer certifications cannot be verified without information about the functioning of the program. Gov. Br. at 38-39. However, as discussed above and in Baroque's Direct Brief, Baroque itself certified non-use and record evidence demonstrates that an exporter is involved with various stages of the EBCP. The Department has not provided a sufficient reason why it would be unable to conduct verification of non-use through the respondent. Furthermore, it is routine in AD/CVD investigations for the Department

to rely on sampling or spot-checks for verification.

Petitioner also argues that this Court should ignore the mountain of prior precedent because in this case "Commerce thoroughly explained its rationale for applying AFA to the GOC, describing in greater detail than it did in prior proceedings." Pet. Br. at 36. However, as Baroque explained in detail in its Direct Brief and above, while Commerce's explanations may be getting wordier, they continue to be unsupported by substantial evidence, particularly in key respects as explained by the Court in *Canadian Solar* and *Guizhou Tyre 2021*. In addition, the fact that the Department verified non-use in *VSEs* and in another current investigation demonstrates there is no basis for the Government's position that *usage* of the EBCP is unverifiable without the missing information about the operation of the program on the record.

### III. CONCLUSION

For the reasons discussed above, Baroque requests that this Court hold that Commerce's Final Results are unsupported by substantial evidence and otherwise not in accordance with law, and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Francis J. Sailer
Kavita Mohan

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

Dated: September 17, 2021

# CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Baroque Timber Industries (Zhongshan) Co., Ltd.'s and Riverside Plywood Corporation's Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2013, is 4,934 words, less than the 7,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Consolidated Plaintiffs, Baroque Timber
Industries (Zhongshan) Co., Ltd. and
Riverside Plywood Corporation*

Dated: September 17, 2021