## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. et al.,** | |
| Plaintiffs, | |
| **SHENZHENSHI HUANWEI WOODS CO., LTD., et al.,** | **Before: Timothy M. Reif** |
| Plaintiff-Intervenors, | **Consol. Court No. 20-03885** |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **AMERICAN MANUFACTURERS OF MULTILATYERED WOOD FLOORING,** | |
| Defendant-Intervenor. | |

## PLAINTIFF-INTERVENORS'
## REPLY BRIEF

Mark R. Ludwikowski
Courtney Gayle Taylor
**Clark Hill PLC**

1001 Pennsylvania Ave., N.W.
Suite 1300 South
Washington, DC 20004
Tel. (202) 640-6680

*Counsel for Plaintiff-Intervenors*

Dated: September 17, 2021

**Table of Contents**

ARGUMENT .................................................................................................................................... 2

I.   COMMERCE'S ERRORS IN RELYING ON CBP DATA WERE NEITHER SLIGHT
NOR APPROPRIATE IN ITS SELECTION OF MANDATORY RESPONDENTS............ 2

II.  COMMERCE'S INCLUSION OF GUYU'S POPLAR CORE SHEETS IN THE VENEERS
FOR LTAR IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS
CONTRARY TO LAW ........................................................................................................ 7

III. COMMERCE'S DETERMINATION BASED ON AFA THAT GUYU'S POPLAR SHEET
SUPPLIERS ARE "AUTHORITIES IS S NOT SUPPORTED BY SUBSTANTIAL
EVIDENCE AND IS CONTRARY TO LAW ..................................................................... 11

IV. ONCE AGAIN, COMMERCE HAS FAILED TO ADEQUATELY EXPLAIN ITS USE OF
AFA TO FIND USE OF THE EXPORT BUYER'S CREDIT PROGRAM ........................ 13

CONCLUSION .............................................................................................................................. 14

## Table of Authorities

**Cases**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012) .................................................................................................................. 7

*Borusan Mannesmann Boru Sanavi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ............................................................................................... 12

*Guizhou Tyre Co. v. United States,* 348 F. Supp. 3d, 1261 (Ct. Int'l Trade 2018)..................... 14

*Guizhou Tyre Co., Ltd. v. United States*, 2021 WL 2156474 (Ct. Int'l Trade May 19, 2021) ..... 16

*Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247 (Fed. Cir. 2009)....................... 15

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)........................................ 15

*Pakfood Pub. Co. v. United States*, 753 F. Supp. 2d 1334 (Ct. Int'l Trade 2011)........................ 7

*Pakfood Pub. Co. v. United States*, 772 F. Supp. 2d 1327, 1338 (Ct. Int'l Trade 2010) ............... 7

*Rhone Poulenc v. United States*, 899 F. 2d 1185 (Fed. Cir. 1990)............................................... 12

*Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011) ................ 15

**Statutes**

19 U.S.C. § 1677(5)(B)................................................................................................................. 13

19 U.S.C. § 1677f-1(2) .............................................................................................................. 6, 9

19 U.S.C. § 1677f-1(c)(2)(B)......................................................................................................... 7

**Administrative Decisions**

*Multilayered Wood Flooring From the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dep't Commerce Dec. 8, 2011) ........................................... 10

*See Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) ............................................................ 9

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. et al., | |
| **Plaintiffs,** | |
| SHENZHENSHI HUANWEI WOODS CO., LTD., et al., | Before: Timothy M. Reif |
| **Plaintiff-Intervenors,** | Consol. Court No. 20-03885 |
| v. | |
| UNITED STATES, | |
| **Defendant,** | |
| and | |
| AMERICAN MANUFACTURERS OF MULTILATYERED WOOD FLOORING, | |
| **Defendant-Intervenor.** | |

PLAINTIFF-INTERVENORS'
REPLY BRIEF

INTRODUCTION

Plaintiff-Intervenors, Shenzhenshi Huanwei Woods., Co., Ltd., Zhejiang Biyork Wood

Co., Ltd., Jiangsu Guyu International Trading Co., Ltd. ("Guyu"), Kemian Wood Industry

(Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC,

Jiashan Huijiale Decoration Material Co., Ltd., and Dalian Jiahong Wood Industry Co., Ltd., by

and through their attorneys, hereby submit this reply brief in support of their challenge to the

U.S. Department of Commerce's ("Commerce") final results of the seventh administrative

1

review of the countervailing duty ("CVD") order covering multilayered wood flooring from the People's Republic of China.

**ARGUMENT**

I.  **COMMERCE'S SELECTION OF GUYU AS A MANDATORY RESPONDENT BASED ON GROSSLY ERRONEOUS CBP DATA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

In their briefs, Defendant and Defendant-Intervenor downplay as minor the insurmountable problems with the Customs and Border Protection ("CBP") data submitted and relied upon by Commerce in its selection of mandatory respondents. *See* Defendant's Response to Plaintiffs' Motions for Judgment on the Agency Record (Aug. 12, 2021) ECF. No. 54 ("Defendant's Br.") at 11; American Manufacturers of Multilayered Wood Flooring ("AMMWF") Response to Motion for Judgment on the Agency Record (Aug. 12, 2021) ECF No. 56 ("AMMWF Br.") at 27-28. Furthermore, Defendant-Intervenor contradicts its March 21, 2019 comments to Commerce indicating that CBP data was flawed and unreliable for purposes of respondent selection in the subject review.[1] Commerce's reliance on this data in selecting Guyu as a mandatory respondent was not supported by substantial evidence or otherwise in accordance with law.

The considerable errors in the CBP data destroy its reliability and are fundamentally the reason why this case is before the Court today. The record evidence cited by various interested parties, including Defendant-Intervenor, demonstrated that the CBP data was grossly flawed and that Guyu was not one of the largest exported during the period of review. Defendant

---

[1] Letter on Behalf of AMMWF Comments on CBP Data and Respondent Selection (March 21, 2019) ("AMMWF Comments on CBP Data") at 3-4, C.R. 5, P.R. 44; Letter on Behalf of Senmao, Comments on CBP Data and Request for Issuance Q&V Questionnaires (Mar. 21, 2019) at 2-3, C.R. 3, P.R. 39.

Intervenor's current backtracking and characterization of these flaws now as "minor" is not just opportunistic but it also undermines the stated objective and methodology set out by Commerce in selecting mandatory respondents when choosing to limit the field surveyed. AMMWF Br. at 27-28.

Defendant-Intervenor asserts that "Plaintiffs do not argue that Jiangsu Guyu was unrepresentative of Chinese producers and exporters of subject flooring during the POR". AMMWF Br. at 28. Whether Guyu is representative becomes irrelevant when the process of selecting it as representative is fundamentally flawed at the outset. Respondent selection should not resemble "Russian roulette" when the statute directs the agency to select "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined" unless it is doing sampling. 19 U.S.C. § 1677f-1(2).

Guyu should have never been selected as a mandatory respondent to begin with and information on the record does not support its selection. The purpose of using CBP data is to select the largest exporters which are by virtue of their size representative of the industry. Commerce has put all its cards in for use of CBP data, so it needs to ensure that this data is usable and reliable – which it is not, as various parties demonstrated during the respondent selection period.

Both Defendant and Defendant-Intervenor mischaracterize the data issues leading to the mandatory respondents' selection. Defendant's Br. at 11; AMMWF at 27-28. No party in this case challenges the ability or prerogative of Commerce to limit the number of companies which are subject to an investigation nor administrative review. However, parties expect Commerce to choose mandatory respondents in accordance to the law and its own stated methodology.

According to Congress, who both empowers and limits Commerce's action, limitation of investigated respondents is to be done through one of two methods, repeated once again below:

> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined. 19 U.S.C. § 1677f-1(2).

In this administrative review, Commerce selected the second option.[2] Therefore it was limited to selecting those exporters and producers accounting for the largest volumes. It has indicated that it will do so through the use of CBP Data, so long as the data is usable and unrebutted.[3] Here, the Department failed to meet this limitation on its methodology, properly placed by this Court.

Commerce was repeatedly informed early in the review, when it could still correct its mistake, by both Defendant-Intervenor and respondents that the CBP data was inaccurate.[4] This Court has ruled that the methodology by which Commerce selects the "exporters and producers accounting for the largest volume," will be upheld if it is "reasonable… and is not arbitrarily applied."[5] Both Defendant and Defendant-Intervenors state that the respondents' failure to submit Q&V submissions limits their ability to challenge Commerce's use of CBP data,

---

[2] *See* Memorandum from Suzanne Lam, International Trade Analyst to Irene Darzenta Tzafolias, Director Office VIII: Respondent Selection (May 21, 2020), at 3, C.R. 6, P.R. 57.

[3] *See Ad Hoc Shrimp Trade Action Committee v. United States*, 828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012); *Pakfood Pub. Co. v. United States*, 753 F. Supp. 2d 1334, 1345 (Ct. Int'l Trade 2011).

[4] AMMWF Comments on CBP Data at 3-4, C.R. 5, P.R. 44; Letter on Behalf of Senmao, Comments on CBP Data and Request for Issuance Q&V Questionnaires (Mar. 21, 2019) at 2-3, C.R. 3, P.R. 39.

[5] *Pakfood Pub. Co. v. United States*, 772 F. Supp. 2d 1327, 1338 n.18 (Ct. Int'l Trade 2010) ("*Pakfood I*") (quoting 19 U.S.C. § 1677f-1(c)(2)(B) (2000) (citations omitted).

regardless of errors it may have contained.[6] However, a simple overview of the deadlines in this case demonstrate the inequity and unreasonableness of this statement. The deadline for submitting Q&V questionnaires was March 21, 2019.[7] The Department released CBP data on March 14, 2019, with comments on the data due March 26, 2019.[8] Commerce then relied on such data, despite concerns from Defendant-Intervenors themselves along with numerous other companies, on May 21, 2019 in its Respondent Selection Memorandum.[9]

Defendant's claim that "{n}o party presented evidence that would detract from reliability of the CBP data" is incorrect – multiple parties identified errors in this data as noted above. Defendant's Br. at 13. This claim also completely misses the forest for the trees (while missing the trees too). CBP data is confidential by its nature and Commerce treats it as such. The public does not have ready access to the particulars of CBP's data collection for specific products and timeframe under normal circumstances, let alone within a short deadline set for comments by Commerce. Likewise, foreign respondent companies do not have access to that data nor the vast gulfs in shipments reported, units of quantity used, prices etc. This severely hampers exporters ability to rebut this information on the record and the only way they can do that is through counsel who is under the Administrative Protective Order. It is akin to having one's hand held through a maze while blindfolded. They are not able to compare their shipment volumes against

---

[6] Defendant's Br. at 12-14; AMMWF Br. at 27-28.

[7] *See* Memo from Bob Palmer to All Interested Parties, Customs and Border Protection Data for Respondent Selection (Mar. 14, 2019) C.R. 1, P.R. 23.

[8] *Id.*

[9] *See* Memorandum from Suzanne Lam, International Trade Analyst to Irene Darzenta Tzafolias, Director Office VIII: Respondent Selection (May 21, 2020), at 3, C.R. 6, P.R. 57.

others' in the CBP data. CBP data is based on imports. Respondents are exporters and are not privy to what information their U.S. customers reported to CBP through the import entry system. Importers are also not in the habit of sharing their entry documentation with foreign suppliers.

Commerce's exclusive reliance on CBP data, despite evidence of substantial conversion errors, fails to reasonably identify exporters and producers "accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined" as required by the law and in its own methodology.[10] Furthermore, in light of the errors identified by parties, Commerce could have confirmed the accuracy of the CBP data by issuing Quantity and Value questionnaires as requested by parties in their comments, but Commerce chose not to do so.[11] Instead, the agency proceeded with the unlawful review of Guyu which was erroneously selected as a mandatory respondent.

Commerce's calculation of the countervailing duty rate for non-examined companies, including Plaintiff-Intervenors, was based in part on Guyu's rate, Commerce's calculation of Plaintiff-Intervenors' CVD rate was similarly unsupported by substantial evidence and unlawful. On remand, the Court should instruct Commerce to rescind the mandatory respondent selection of Guyu and recalculate the CVD rate for Guyu and Plaintiff-Intervenors based solely on the CVD rate of Baroque Timber, the other individually examined mandatory respondent.

---

[10] 19 U.S.C. § 1677f-1(2).

[11] *See Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 76,011 (Dep't Commerce Nov. 27, 2020) (final results and partial rescission of countervailing duty admin. rev.; 2017), P.R. 369 ("Final Results") and accompanying Issues and Decision Memorandum ("Final IDM").Cmt. 1, P.R. 361.

## II.  COMMERCE'S INCLUSION OF GUYU'S POPLAR CORE SHEETS IN THE VENEERS FOR LTAR IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

In its response brief, Defendant-Intervenor argues that Commerce properly determined that Guyu's poplar core sheets, which Guyu reported for assembling of plywood cores,[12] purchased from Shunyang are wood veneers based on the scope language which defines a veneer as "a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch. Veneer is referred to as a ply when assembled." AMMWF Br . at 15. Based on this assumption that poplar core sheets are veneers, Defendant-Intervenor further claims that it should not matter whether those veneers are on the outside of the flooring or as part of its core and that the "LTAR program covers *all* veneers regardless of whether they are core, face, or back veneers." AMMWF Br . at 15. However, nowhere do the scope nor the LTAR program allegation say this.

In fact, the rest scope of the scope language contradicts Defendant-Intervenor's claim as it specifically distinguishes *core* from *veneers,* and thus *plywood* from *veneers*. The scope provides that "multilayered wood flooring is composed of an assembly of two or more layers or plies of wood veneer(s) in combination with *core*."[13] The scope language is clear that veneers are distinct from core; if veneers were meant to be the same as core, then the language "in combination with core" would be superfluous.

The scope's separation of these two parts of MLWF – plywood core and veneer – is consistent with Guyu's understanding as a producer.[14] As Guyu explained to Commerce, the

---

[12] *Id.* at 22.

[13] *Multilayered Wood Flooring From the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 76,693, 76,694 (Dep't Commerce Dec. 8, 2011).

[14] *See* Letter on Behalf of Guyu to Dep't of Commerce re: Response to Second Supplemental Questionnaire, at 2 (Jan. 8, 2020), C.R. 202, P.R. 247.

core/veneer distinction is fundamental to the production of MLWF, where core made of less durable wood species such as poplar is used for the interior of MLWF and veneers, commonly known as "face veneers" are used for the decorative surface portion of the MLWF.[15]

If, as Defendant-Intervenor claims, all veneers are the same regardless of their location in the flooring, then the scope of the MLWF case could simply be "an assembly of two or more layers or plies of wood veneer(s)." Then what is the core? Why is the core even needed in the definition?

The answer is either: 1) that the core is needed because without it an assembly of simply veneers is not *multilayered* wood flooring (or engineered flooring as it is otherwise known); or 2) the core is the same as veneers, and thus it is not needed in MLWF nor the scope of this case.

We know that the latter cannot be true because that is not how the scope is written. We also know this because Commerce has said that "the scope identifies plywood as assembled veneers (*e.g.*, multiple veneers glued together), and veneers as thin slices, but plywood *is not equivalent to a veneer*. Specifically, plywood is made from face veneers, back veneers, and core or inner veneers."[16] Indeed, Commerce's position that "plywood and veneers are two distinct wood inputs with separate definitions and benchmarks" AMMWF Br . at 17. supports that cores (plywood) and veneers are two distinct parts of MLWF. Until this seventh annual review, Commerce has never in the history of this case shoehorned sheets used in the production of a mandatory's plywood cores under the LTAR veneer program. It is trying to do so now by

---

[15] *See* Guyu Second Supplemental Questionnaire Response (Jan. 8, 2020), C.R. 202-210.

[16] Final IDM, at 23.

unlawfully applying LTAR provisions across Guyu's purchases of poplar core sheets from Shunyang by virtue of alleged cross-ownership.

Commerce cannot have it both ways. Either poplar core sheets are used as veneers or they are used as plywood. The record confirms that they are NOT used as veneers and establishes that Guyu used poplar core sheets to make plywood as reported by Guyu in its response to Commerce's supplemental questionnaire.[17] By Commerce's own interpretation, if plywood is not the same as a veneer then poplar core sheets cannot be counted as both inputs to plywood and as veneers. Moreover, the cost of a core plywood input cannot be nearly [    ] times more than the cost of veneers which are used on the outside of the flooring.[18] This would be absurd from a commercial and practical standpoint, at least in the MLWF industry, which considers plywood and veneers as separate products. Commerce's misclassification of poplar core sheets as veneer is highlighted by the veneer benchmark price, which is [

] thus exaggerating the CVD margin exponentially.[19] Thus,

---

[17] *See* Final IDM, at 22; Guyu's Second Supplemental Questionnaire (Jan. 8, 2020) at 2, C.R. 202, P.R. 247.

[18] *See* Mem. from Robert Palmer to the File re: Final Results Calculations for Jiangsu Guyu International Trading Co., Ltd. (Guyu), at Attach. 2, Veneer Bench Tab, Shuyang Veneer Tab (Nov. 23, 2020) (Business Proprietary Document) ("Guyu Final Cal.") (C.R. 229-230) [

]

[19] *Id.* A review of Commerce's preliminary subsidy rate calculation demonstrates the absurdity of this finding: of the total 123.26 percent rate assigned to Guyu, 112.23 percent was attributable to the Provision of Veneers for LTAR and just 7.49 percent to the Provision for Plywood and the Provision for Fiberboard combined. *See* Commerce Memorandum: Preliminary Results Calculations for Jiangsu Guyu International Trading Co., Ltd. (Feb. 3, 2020), at 8, C.R. 213, P.R. 265.

this unreasonable action by Commerce is contrary to its obligation to calculate margins as accurately as possible.[20]

There are two only two LTAR programs on the record that are relevant to this issue: 1) LTAR for plywood, and 2) LTAR for veneers.[21] There is no separate LTAR program for "veneers in plywood" or "veneers in cores", and no allegation of such program was made by Petitioner. If, as Commerce asserts "the scope identifies plywood as assembled veneers",[22] and as Petitioner claims "the veneers for LTAR program covers *all* veneers", then what is the need for a separate plywood for LTAR program? AMMWF Br . at 17. Separate LTAR programs are necessary because plywood and veneers are distinct components of MLWF and Commerce cannot simply apply the veneer LTAR program to various sheets assembled in the plywood in place of an existing LTAR program for said plywood.

Based on the differences in characteristics and uses of poplar core sheets and veneers, the absence of poplar core sheets from any new subsidy allegation, and the disparate prices of each, Commerce's decision to include poplar core sheets in the veneers for LTAR subsidy calculation is contrary to record evidence and not in accordance with law. To remedy this error, the Court should remand to Commerce with instructions to recalculate the veneers for LTAR subsidy rate by excluding Guyu's poplar core sheet purchases.

---

[20] *See Borusan Mannesmann Boru Sanavi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1337 (Ct. Int'l Trade 2015) (citing *Rhone Poulenc v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990)).

[21] *See* Guyu Final Cal. C.R. 229-230, P.R. 365-366.

[22] Final IDM, at 23.

### III. COMMERCE'S DETERMINATION BASED ON AFA THAT GUYU'S POPLAR SHEET SUPPLIERS ARE "AUTHORITIES IS S NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

Defendant and Defendant-Intervenor argue that the agency appropriately found the individual private farmers that supplied Shunyang with poplar sheets to be "authorities" within the meaning of the statute and that GOC's failure to provide information to dispute this warranted the use of AFA for each input for LTAR programs in this proceeding. *See* Defendant Br. at 27; AMMWF Br . at 23. Commerce's automatic use of complete AFA in finding that these private farmers are "authorities" is not warranted. Commerce claims that it "requested information from the GOC to determine whether the suppliers of poplar sheets are 'authorities' within the meaning of 19 U.S.C. § 1677(5)(B)" and that because "GOC withheld requested information, Commerce determined that the GOC failed to cooperate by not acting to the best of its ability to comply with Commerce's request for information. Defendant Br. at 28, 29. However, the record does not support Commerce's explanation.

Commerce asked Guyu in a supplemental NSA dated December 18, 2019 to provide the supplier' name and address for each of Shunyang's purchases of poplar core sheets.[23] Guyu provided a response to this supplemental questionnaire on January 8, 2020, including the information about the suppliers which Commerce requested.[24]  However, the agency never asked the GOC to provide information with respect to those suppliers. There is no such request regarding poplar sheet suppliers in Commerce's initial Section II questionnaire issued to the

---

[23] Guyu Second Supplemental Questionnaire (Dec. 18, 2019) at 3-4, C.R. 195, P.R. 236.

[24] Guyu Second Supplemental Questionnaire Response (Jan. 8, 2020) at 2-3, Exhibit Supp 2-4, C.R. 202-210, P.R. 247-248.

GOC on May 24, 2019.[25] Commerce also never asked the GOC to provide information about the suppliers in the GOC's second supplemental questionnaire, dated December 19, 2020.[26] In fact the supplemental questionnaire did not contain any question regarding veneers or suppliers of veneers, even though it was issued one day after Commerce's supplemental to Guyu which asked about the poplar core sheet suppliers.

There is no basis to punish Guyu through AFA for GOC's non-responsiveness when Commerce never asked the GOC to provide information which the agency subsequently alleged to be missing from the record. This Court has explained that in order to rely on AFA, Commerce must make an "initial finding… that material information was missing from the record."[27] Commerce has not made a finding that it is missing "material information" in order to determine whether poplar farmers are "authorities." Guyu provided the information it was able to obtain regarding these suppliers. An adverse inference cannot be applied to Guyu through the use facts otherwise available – let alone AFA – which is only appropriate to "fill gaps" in the record for Commerce to complete its calculation.[28] Thus, the prerequisite for the use of facts otherwise

---

[25] Countervailing Duty Questionnaire (May 24, 2019), P.R. 61.

[26] GOC Second Supplemental Questionnaire (Dec. 19, 2019), P.R. 238.

[27] *Guizhou Tyre Co. v. United States,* 348 F. Supp. 3d, 1261, 1270 (Ct. Int'l Trade 2018) ("*Guizhou I*").

[28] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (stating that the use of facts otherwise available is to "fill in the gaps" when "Commerce has received less than the full and complete facts needed to make a determination"); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1255 (Fed. Cir. 2009) (noting that "{t}he legislative history of the URAA thus reveals that Congress intended § 1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the antidumping laws"); *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) ("Commerce can only use facts otherwise available to fill a gap in the record").

available pursuant to section 1677e(a) is a "gap" on the record resulting from missing information. In the present case, since Commerce never asked the GOC about the poplar suppliers and thus never provided the GOC with an opportunity to address whether they are "authorities" no gap exists regarding the nature and identity of these suppliers as private parties. Even if a "gap" were to exist, the GOC cooperated to the best of its ability and therefore the application of AFA is not warranted.

## IV. COMMERCE HAS AGAIN FAILED TO ADEQUATELY EXPLAIN ITS USE OF AFA TO FIND USE OF THE EXPORT BUYER'S CREDIT PROGRAM

Both Defendant and Defendant-Intervenor make much fanfare of recent updates to the reasoning of Commerce in applying AFA to the Export Buyer's Credit Program ("EBCP").[29] However, both fail to address the underlying issue that is outstanding in Commerce's application of this reasoning- how non-use is unverifiable due to the outstanding documentation by the GOC. While this has been detailed in a multitude of this Court's decisions in recent years, it is aptly best summarized as a disconnect between what Commerce states is missing from the record and how that relates to the ability (or not) to verify non-use of the program by respondents. Here, as in other cases involving the EBCP,[30] Commerce has failed to make that important link and once again its decision to countervail the EBCP using AFA is being challenged. This Court very adeptly summarized this situation in its recent decision in *Guizhou Tyre Co., Ltd. v. United*

---

[29] Defendant's Br. at 27; AMMWF Br. at 23.

[30] *See Guizhou Tyre Co., Ltd. v. United States*, 2021 WL 2156474 (Ct. Int'l Trade May 19, 2021) ("Commerce has failed to explain its decision not to verify the self-certifications. Accordingly, the court remands this matter back to Commerce for further explanation…the court encourages Commerce to outline step-by-step its verification methodology, and articulate each of the reasons that verification of the self-certifications, whether Commerce were to use its typical methodology or by alternative feasible methods of verification, is 'insurmountable' or would result in unreliable information.").

*States*, 2021 WL 2156474 (Ct. Int'l Trade May 19, 2021) when it compared the endless return of this issue to the film Groundhog Day.[31] In keeping with this same spirit of deja vu, we again urge this court to remand this issue to Commerce with instructions for the agency to adequately explain its reasoning for not verifying the certifications of non-use in this case and the erroneous application of AFA.

## CONCLUSION

For the reasons outlined above, along with those in our motion for judgment on the agency record, we respectfully request that the Court issue such relief as requested in the complaint of this case and remand the decision to the Department of Commerce for reconsideration of the outlined issues.

Respectfully Submitted,

/s/ Mark R. Ludwikowski
Mark R. Ludwikowski
Courtney Gayle Taylor
**CLARK HILL, PLC**

1001 Pennsylvania Ave., N.W.
Suite 1300 South
Washington, D.C. 20004
(202) 640-6680
mludwikowski@ClarkHill.com
*Attorneys for Plaintiff-Intervenors*

Dated: September 17, 2021

---

[31] *Guizhou Tyre Co., Ltd. v. United States*, 2021 WL 2156474 (Ct. Int'l Trade May 19, 2021).

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff-Intervenors Reply Brief, as computed by Clark Hill's word processing system Microsoft Office Professional, is <u>4509</u> words, less than the 7,000 word limit.

*/s/ Mark R. Ludwikowski*
Mark R. Ludwikowski

*Counsel for Plaintiff-Intervenor*

Dated: September 17, 2021

**CERTIFICATE OF SERVICE**

A true and accurate copy of the foregoing was electronically filed on September 17, 2021, via the

Court's ECF filing system, which automatically serves notice on counsel of record.

*/s/ Mark R. Ludwikowski*
Mark R. Ludwikowski

*Counsel for Plaintiff-Intervenor*

Dated: September 17, 2021