**PUBLIC VERSION**



CHAMBERS OF
TIMOTHY M. REIF
JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE
ONE FEDERAL PLAZA
NEW YORK, N.Y. 10278-0001

February 28, 2022

**VIA CM/ECF**

      Re:    *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. et al v. United States*
                Consol. Court No. 20-03885

Dear Counsel:

      Oral argument in this action is scheduled for March 3, 2022, at 11:30 am EST in Courtroom No. 1 of the U.S. Court of International Trade, One Federal Plaza, New York, N.Y., with the option to appear via video conference. In preparation for oral argument, the court would like counsel to be prepared to address the following issues. As the court continues to review the documents in this case or as the argument on Wednesday progresses, the court may decide to ask additional questions.

      Please be advised that the court prefers to conduct oral argument interactively, allowing each party to respond to the question presented before moving on to the next question. To facilitate this interaction, counsel are invited to remain seated for the duration of the hearing.

      The court notes that several of the issues in the case are being challenged by multiple parties. Given the large number of parties and the significant number of issues, the court encourages the parties to select one or two attorneys to respond at the oral argument on each legal issue.

      The court prefers to discuss any confidential information all at once. Those without authorized access to confidential information will not be on the videoconference during the confidential portion of the oral argument. Following the confidential session, the public will be allowed to join the videoconference for the public session.

**PUBLIC VERSION**

I. **Commerce's selection of respondents**

1. During the respondent selection process, American Manufacturers of Multilayered Wood Flooring ("AMMWF") stated in its comments to Commerce that "the CBP data released to the Department in this proceeding appears inaccurate and, as such, unreliable for the purpose of determining which 'exporters and producers account[ed] for the largest volume of subject merchandise' during the period of review." Why does AMMWF now argue that the Customs data are reliable?

2. Plaintiffs assert that Commerce ignored evidence on the record demonstrating that Customs data were flawed. Please clarify the following:

    a. Commerce in its IDM states: "[I]t is Commerce's practice in this proceeding to accept certified Q&V data submitted by individual companies identified in the [Customs] data, limited to information submitted by a company for itself, and to substitute those certified Q&V amounts for the company-specific [Customs] data in our ranking for respondent selection." IDM at 15. Commerce explained that Jiaxing Hengtong was the only company to submit Q&V data during the respondent selection comment period. Please explain.

    b. How, if at all, did Commerce address concerns raised by interested parties about the Customs data?

    c. Did Commerce address adequately the errors in the Customs data identified by petitioner and Jiangsu Senmao by using its conversion methodology to convert the Customs data reported in square meters to cubic meters?

3. Commerce in its IDM explained that respondent selection data are not required to be "flawless" and that the U.S. Court of International Trade ("USCIT") has upheld Commerce's practice of using Customs data to select respondents as long as the data are not "unusable." IDM at 15-16.

    a. What is the threshold for Customs data to be considered "unusable" or unreliable?

    b. Under what circumstances has Commerce previously found Customs data to be unreliable and issued quantity and value questionnaires? Please be prepared to provide examples from past cases and administrative reviews.

4. Commerce explained that no evidence on the record at the time of respondent selection supported the claims that the Customs data were unreliable as a whole. What evidence submitted by the March 21, 2019, deadline supported the claims that Customs data were unreliable?

2

5. Plaintiffs assert that Jiangsu Guyu and Jiangsu Senmao in their responses to Commerce's questionnaires confirmed each company's exports to the United States during the period of review, and further assert that this export information was inconsistent with Customs data.

   a. Did Commerce consider this evidence, and, if not, why?

   b. Please confirm whether the questionnaire responses were submitted after Commerce selected mandatory respondents on May 21, 2019.

   c. If the questionnaire responses were submitted after the May 21, 2019, respondent selection decision, was Commerce required to reconsider its respondent selection?

6. Plaintiffs argue that the record demonstrates that Jiangsu Senmao had higher exports to the United States than those of Jiangsu Guyu.  Given that 19 U.S.C. § 1677f-1(e)(2)(A) permits Commerce to limit its review to the "exporters and producers accounting for the *largest volume* of the subject merchandise from the exporting country," was it lawful for Commerce to reject Jiangsu Senmao's request to be a voluntary respondent in this administrative review?

II. **Commerce's finding of cross-ownership between the affiliates of Jiangsu Guyu**

1. Jiangsu Guyu maintains that Jiangsu Guyu, Shengyu and Shunyang are not cross owned affiliates.

   a. Why did Jiangsu Guyu identify Shengyu, Shunyang and Woyuan as cross-owned affiliates in its response to Commerce's questionnaire?

   b. Is Jiangsu Guyu challenging the finding of cross ownership for Woyuan?

2. [[                                                                                      ]]

III. **Commerce's inclusion of poplar core sheets in the provision of veneers for LTAR subsidy program**

1. In its brief, defendant-intervenor argues: "Plywood is made of veneers (*i.e.*, the various plies), whereas poplar core sheets are themselves a type of veneer." Def.-Intervenor Br. at 17.

   a. If plywood is made of veneers, why did Commerce not include plywood in its veneers for LTAR program?

   b. Please confirm whether poplar core sheets are used in the production of plywood.  If poplar core sheets are used in the production of plywood, is it

3

    plaintiffs' argument that Commerce should have included poplar core sheets in the plywood for LTAR program?

2.    In its brief Fine Furniture states: "Even assuming *arguendo* that Commerce reasonably countervailed core sheet purchases under the veneers for LTAR program, at minimum, Commerce's benchmark calculation for poplar core sheets was unsupported by substantial evidence and unlawful because it used data for HTS subheadings that cover veneers." Fine Furniture Br. at 20. If Commerce's inclusion of poplar sheets in the veneers for LTAR program is found to be lawful, why would the veneers benchmark not be "comparable"?

### IV.    Commerce's inclusion of HTS 4412.99 in the plywood benchmark

1.    How is the Chinese description of HTS 4412.99 ("Plywood, veneered panels and similar laminated wood") relevant to the court's analysis?

2.    In its IDM, Commerce explains that "there is a distinction between laminated flooring as described in the scope and wood laminate." IDM at 39. Specifically, Commerce notes that the scope describes laminated flooring as including layers other than wood, and, therefore, concluded that "all plywood is a laminate structure which uses thin layers of wood to form plywood." *Id.* How do plaintiffs respond?

3.    Plaintiffs argue that Commerce ignored evidence in the record that imports to China under HTS 4412.99 are only laminated wood, not plywood.

    a. Was there evidence on the record to support Baroque's claim that imports to China under the HTS code are limited to laminated wood?

    b. Commerce in its IDM found that Baroque did not provide evidence to support Baroque's argument that "imports into China under HS 4412.99 are categorized as laminated wood of the type not used as an input into the production of wood flooring." IDM at 39. Did Baroque provide evidence?

### V.    Commerce's determination that Jiangsu Guyu's suppliers of poplar sheets are authorities

1.    To determine whether the individual private farmers were "authorities," Commerce requested information from the GOC concerning "whether any individual owners, board members, or senior managers were government or CCP officials and the role of any CCP primary organization within the companies." IDM at 29.

    a. Do plaintiffs challenge Commerce's finding that the GOC did not cooperate to the best of its ability to provide Commerce with the requested information?

4

    b. Has the GOC in previous administrative reviews provided similar information to Commerce?

    c. Did the GOC make any attempts to request this information from the CCP? If so, did the GOC inform Commerce of these attempts?

2. Jiangsu Guyu reported that its suppliers were "individual farmers"; however, Commerce found that Jiangsu Guyu "provided minimal information for Commerce to verify its claims." IDM at 32.

    a. Did Jiangsu Guyu provide any information to Commerce to support its claims that its poplar core suppliers were "individuals?"

    b. Can plaintiffs cite any legal authority to support their argument that individuals cannot be found by Commerce to be entities?

## VI. Commerce's use of AFA for the Export Buyer's Credit Program

1. The record states that Baroque Timber provided customer declarations for only 60 percent of Riverside Plywood's reported customers, and Jiangsu Guyu provided customer declarations for approximately 50 percent of its reported customers.

    a. Why did the respondents provide customer declarations for only a percentage of the U.S. customers?

    b. Plaintiffs argue that the USCIT has held consistently that Commerce must attempt to verify evidence of non-use on the record, namely the declarations of non-use from U.S. customers. Do any of the cases cited by plaintiffs involve a review in which the respondents provided non-use declarations for only a percentage of their U.S. customers?

2. The GOC explained that it could not provide the 2013 Administrative Measures because the measures were "internal . . . non-public, and not available for release," and "[the] GOC has *no authority or right to force* the Ex-Im Bank to reveal details of other transactions because those are confidential commercial information belonging to the Ex-Im Bank." IDM at 57-59 (emphasis supplied).

    a. What is the relationship between the China Export-Import Bank ("China Ex-Im Bank") and the GOC?

    b. Has the GOC in previous administrative reviews provided to Commerce confidential information concerning the internal guidelines and administrative measures of institutions such as the China Ex-Im Bank? If so, why are the 2013 Administrative Measures of the China Ex-Im Bank different?

3. Baroque argues that: "Commerce has not used this USD 2 million threshold as the basis for finding non-use in the past and has never explored this threshold in the countless on-site verifications it has conducted at the Ex-Im Bank as a means to determine non-use." Baroque Br. at 31. Please explain.

4. Plaintiffs maintain that Commerce has several options for verification, including visiting the China Ex-Im Bank to review the database, or confirming non-usage by visiting customers and reviewing loan documentation.

    a. Commerce has attempted to visit the China Ex-Im Bank in the past, and repeatedly Commerce has been denied access to the Bank's database. Did Commerce in this review consider going to the China Ex-Im Bank? Is it reasonable for Commerce to not consider this option as a feasible method of verification?

    b. Why did Commerce not verify claims of non-use by visiting the U.S. customers and reviewing loan documentation?

    c. Plaintiffs argue that Commerce can conduct verification by spot-check. Please explain in detail Commerce's spot check verification practice.

5. Plaintiffs note that the GOC explained: "[I]f there is a loan under the [Export Buyer's Credit Program] of the Ex-Im bank, in practice, the Chinese exporter should be involved in the loan evaluation proceeding and/or in the after-loan management." Baroque Br. at 36.

    a. Did the GOC put information on the record, *e.g.* administrative measures, to support its statement?

    b. Based on the above, is it feasible for Commerce to verify non-use with company respondents?

VII. **Commerce's use of AFA to make its determination concerning electricity for LTAR**

1. How do plaintiffs respond to the court's holding with regard to electricity for less than adequate remuneration in *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 41 CIT __, __, 405 F. Supp. 3d 1317 (2017)? How, if at all, do the facts of that case differ from those in the present case?

**PUBLIC VERSION**

Parties may raise other issues that they consider to be of highest importance. Thank you for your assistance and cooperation.

        Sincerely,

        /s/ Timothy M. Reif

        _____
        Timothy M. Reif, Judge