Slip Op. 22-93

## UNITED STATES COURT OF INTERNATIONAL TRADE

**JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD.; JIANGSU KERI WOOD CO., LTD.; AND SINO-MAPLE (JIANGSU) CO., LTD.,**

               Plaintiffs,

and

**BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD.; RIVERSIDE PLYWOOD CORPORATION; EVOLUTIONS FLOORING, INC.; STRUXTUR, INC.; METROPOLITAN HARDWOOD FLOORS, INC.; FLOOR & DECOR HOLDINGS, INC.; GALLEHER CORP.; GALLEHER LLC; MCI INTERNATIONAL; FINE FURNITURE (SHANGHAI) LIMITED; DOUBLE F LIMITED; AND ZHEJIANG DADONGWU GREENHOME WOOD CO., LTD.,**

               Consolidated Plaintiffs,

and

**SHENZHENSHI HUANWEI WOODS CO., LTD.; ZHEJIANG BIYORK WOOD CO., LTD.; DALIAN QIANQIU WOODEN PRODUCT CO., LTD.; FUSONG JINLONG WOODEN GROUP CO., LTD.; FUSONG JINQIU WOODEN PRODUCT CO., LTD.; FUSONG QIANQIU WOODEN PRODUCT CO., LTD.; DUNHUA CITY JISEN WOOD INDUSTRY CO., LTD.; DALIAN PENGHONG FLOOR PRODUCTS CO., LTD.; DALIAN SHUMAIKE FLOOR MANUFACTURING CO., LTD.; FINE FURNITURE (SHANGHAI) LIMITED; DOUBLE F LIMITED; JIANGSU GUYU INTERNATIONAL TRADING CO., LTD.; KEMIAN WOOD INDUSTRY**

Before: Timothy M. Reif, Judge

Consol. Court No. 20-03885

PUBLIC VERSION

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                                 Page 2

> **(KUNSHAN) CO., LTD.; JIANGSU SIMBA FLOORING CO., LTD.; DONGTAI FUAN UNIVERSAL DYNAMICS, LLC; JIASHAN HUIJIALE DECORATION MATERIAL CO., LTD.; AND DALIAN JIAHONG WOOD INDUSTRY CO., LTD.,**
>
>                     Plaintiff-Intervenors,
>
> v.
>
> **UNITED STATES,**
>
>                     Defendant,
>
> and
>
> **AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,**
>
>                     Defendant-Intervenor.

## <u>OPINION AND ORDER</u>

[The court remands Commerce's Final Determination.]

Dated: August 11, 2022

<u>Jeffrey S. Neeley</u> and <u>Stephen W. Brophy</u>, Husch Blackwell, LLP, of Washington, D.C., argued for plaintiffs Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Jiangsu Keri Wood Co., Ltd., and Sino-Maple (Jiangsu) Co., Ltd.

<u>Gregory S. McCue</u>, Steptoe & Johnson, LLP, of Washington, D.C., argued for consolidated plaintiffs Struxtur, Inc. and Evolutions Flooring, Inc.

<u>Adams C. Lee</u>, Harris Bricken McVay Sliwoski LLP, of Seattle, WA, argued for consolidated plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.

<u>Andrew T. Schutz</u> and <u>Kavita Mohan</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for consolidated plaintiffs Baroque Timber

**PUBLIC VERSION**

Industries (Zhongshan) Co., Ltd., and Riverside Plywood Corporation.  With them on the brief was Francis J. Sailer.

Lizbeth R. Levinson, Fox Rothschild LLP, of Washington, D.C., argued for consolidated plaintiffs Metropolitan Hardwood Floors, Inc., Floor & Décor Holdings, Inc., Galleher Corp., Galleher LLC, and MCI International.  With her on the brief were Ronald M. Wisla and Brittney R. Powell.

Sarah M. Wyss and Wenhui (Flora) Ji, Mowry & Grimson, PLLC, of Washington, D.C., argued for consolidated plaintiffs and plaintiff-intervenors Fine Furniture (Shanghai) Limited and Double F Limited.  With them on the brief was Kristin H. Mowry.

Gregory S. Menegaz and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., argued for plaintiff-intervenors Dalian Penghong Floor Products Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., and Dalian Qianqiu Wooden Product Co., Ltd.  With them on the brief was J. Kevin Horgan.

Mark R. Ludwikowski, Clark Hill PLC of Washington, D.C., argued for plaintiff-intervenors Shenzhenshi Huanwei Woods Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan Huijiale Decoration Material Co., Ltd., and Dalian Jiahong Wood Industry Co., Ltd.  With him on the brief was Courtney Gayle Taylor.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.  Of counsel on the brief was JonZachary Forbes, Office of the Chief Counsel, Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stephanie M. Bell and Theodore P. Brackemyre, Wiley Rein LLP, of Washington, D.C., argued for defendant-intervenor American Manufacturers of Multilayered Wood Flooring.  With them on the brief was Timothy C. Brightbill.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                          Page 4

Reif, Judge:  This action arises from a challenge by plaintiffs, Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), Jiangsu Kerry Wood Co., Ltd. and Sino-Maple (Jiangsu) Co., Ltd. (together, "plaintiffs"), consolidated plaintiffs,[1] consolidated plaintiffs and plaintiff-intervenors Fine Furniture (Shanghai) Limited and Double F Limited (together, "Fine Furniture") and plaintiff-intervenors[2] (all collectively "the moving parties") to the final results published by the Department of Commerce ("Commerce") in *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017* ("Final Determination"), 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) and

---

[1] Consolidated plaintiffs are formed by Struxtur, Inc. and Evolutions Flooring Inc., Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation, Zhejiang Dadongwu GreenHome Wood Co., Ltd., Metropolitan Hardwood Floors, Inc., Floor & Décor Holdings, Inc., Galleher Corp., Galleher LLC and MCI International and Fine Furniture (Shanghai) Limited and Double F Limited ("Fine Furniture").

[2] Plaintiffs-intervenors are formed by Fine Furniture, Shenzhenshi Huanwei Woods Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan Huijiale Decoration Material Co., Ltd., Dalian Jiahong Wood Industry Co., Ltd., Dalian Penghong Floor Products Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., and Dalian Qianqiu Wooden Product Co., Ltd.

**PUBLIC VERSION**

accompanying Issues and Decision Memorandum ("IDM").  Collectively, the moving

parties challenge the final determination with respect to:[3]

(1)   Commerce's selection of mandatory respondents for individual examination;

(2)   Commerce's finding of cross ownership between the affiliates of Jiangsu

Guyu International Trading Co., Ltd. ("Jiangsu Guyu");

(3)   Commerce's inclusion of poplar core sheets in the provision of veneers for

less than adequate renumeration ("LTAR");

(4)   Commerce's inclusion of "internally-consumed plywood" in its plywood for

LTAR calculation;

(5)   Commerce's determination that Jiangsu Guyu's suppliers of poplar cores are

"authorities";

(6)   Commerce's inclusion of Harmonized Schedule Category 4412.99 in

calculating the plywood benchmark;

---

[3] Mem. Supp. Pls.' Rule 56.2 Mot. for J. on Agency R., ECF No. 42; Pls.' Rule 56.2 Mot. for J. on Agency R., ECF No. 44; Pl.-Intervenors' Rule 56.2 Mem. Supp. Mot. for J. Upon Agency R., ECF No. 45; Mem. of P. & A. Supp. Consolidated Pl. Zhejiang Dadongwu GreenHome Wood Co., Ltd. Rule 56.2 Mot. for J. on Agency R., ECF. No. 46; Mem. of Law Supp. Consolidated Pls.' Mot. for J. on Agency R., ECF No. 47; Mem. P. & A. Supp. Rule 56.2 Mot. for J. Upon Agency R. of Consol. Pls. and Pl.-Intervenors Fine Furniture (Shanghai) Ltd. and Double F Ltd., ECF No. 49; Consolidated Pls.' 56.2 Mot. for J. on Agency R., ECF No. 51; Pl.-Intervenors' Rule 56.2 Mot. for J. on Agency R., ECF No. 52; Reply Br. of Pls. Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Et. Al., ECF No. 60; Reply Br. Supp. Rule 56.2 Mot. for J. on Agency R. of Consolidated Pls. and Pl.-Intervenors Fine Furniture (Shanghai) Ltd. and Double F Ltd., ECF No. 62; Pls.' Reply Br. to Rule 56.2 Mot. for J. on Agency R., ECF No. 64; Pl.-Intervenors' Reply Br., ECF No. 65; Consolidated Pls.' Reply Br., ECF No. 66; Consolidated Pls.' Reply Br., ECF No. 67; Pl.-Intervenors' Reply Br., ECF No. 68.

**PUBLIC VERSION**

(7)  Commerce's investigation of non-alleged subsidies;

(8)  Commerce's use of adverse facts available ("AFA") for the Export Buyer's

Credit Program ("EBCP"); and,

(9) Commerce's use of AFA to make its specificity determination concerning

electricity for LTAR and benchmark selection.

Defendant United States ("defendant") maintains that the Final Determination is

supported by substantial evidence and is in accordance with law.  Def.'s Resp. to Pls.'

Mot. for J. on Agency R. ("Def. Br."), ECF No. 54.

For reasons addressed below, the court remands the Final Determination with

respect to Commerce's selection of mandatory respondents and defers examination of

the remaining issues until after Commerce issues the remand results.

**BACKGROUND**

On December 8, 2011, Commerce issued a countervailing duty ("CVD") order on

wood flooring from China.  Preliminary Decision Memorandum (Jan. 31, 2020) ("PDM")

at 1, PR 263 (citing *Multilayered Wood Flooring from the People's Republic of China:*

*Countervailing Duty Order*, 76 Fed. Reg. 76,693 (Dec. 8, 2011); *Multilayered Wood*

*Flooring from the People's Republic of China: Amended Antidumping and*

*Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Feb. 3, 2012) (collectively "2011 CVD

Order")).  On December 4, 2018, Commerce published a notice for an opportunity to

request an administrative review of the 2011 CVD Order.  *Id.* (citing *Antidumping or*

*Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request*

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 7

*Administrative Review*, 83 Fed. Reg. 62,293 (Dec. 3, 2018)).  Petitioner, American

Manufacturers of Multilayered Wood Flooring ("AMMWF"), and other interested parties

sent Commerce timely requests, and, on March 14, 2019, Commerce initiated the

administrative review.  *Id.* at 1-2 (footnotes omitted); *see* Initiation of Antidumping and

Countervailing Duty Administrative Reviews (Mar. 14, 2019) ("Initiation Notice"), PR 21.

On May 21, 2019, based on data from U.S. Customs and Border Protection

("Customs"), Commerce selected Baroque Timber Industries (Zhongshan) Co., Ltd.

("Baroque Timber") and Jiangsu Guyu as mandatory respondents.  PDM at 2-3

(footnote omitted).  Between May 24, 2019, and December 19, 2019, Commerce issued

initial and supplemental questionnaires to Baroque Timber, Jiangsu Guyu and the

Government of China ("GOC").  *Id.* at 3 (footnote omitted).  The two companies

submitted affiliation responses, initial responses and supplemental responses.  *Id.*

(footnote omitted).  The GOC provided an initial response and supplemental responses.

*Id.* (footnote omitted).

On October 17, 2019, Commerce initiated an investigation of four new subsidy

programs alleged by petitioner: (1) the provision of plywood for LTAR; (2) the provision

of sawn wood and continuously shaped wood for LTAR; (3) the provision of

particleboard for LTAR; and (4) the provision of fiberboard for LTAR.  *Id.* (footnote

omitted).

On February 6, 2020, Commerce issued its preliminary results.  Preliminary

Results of Review, 85 Fed. Reg. 6,908 (Dep't of Commerce Feb. 6, 2020), PR 264.

**PUBLIC VERSION**

Commerce found that countervailable subsidies were being provided to producers and exporters of multilayered wood flooring programs, including the provision of veneers for LTAR, provision of electricity for LTAR, "other subsidies" self-reported by Baroque Timber and Jiangsu Guyu, and the EBCP.  PDM at 34-41.  Commerce explained that, due to the GOC's failure to provide certain requested information, Commerce applied AFA with respect to electricity for LTAR and the EBCP.  *Id.* at 36-37, 39.  Moreover, Commerce found, as AFA, that certain producers of fiberwood, plywood and veneers are "authorities."  *Id.* at 19-20.  Commerce also applied AFA as to the specificity of various "other subsidies" investigated.  *Id.* at 33.  In its calculations for veneers for LTAR, Commerce included poplar sheets that Jiangsu Guyu reported as purchased by its affiliate, Siyang County Shunyang Wood Co., Ltd.  *Id.* at 34.  Commerce also included Harmonized Tariff Schedule ("HTS") category 4412.99 data in its preliminary benchmark calculations, explaining "that it is appropriate to use these data because it includes plywood used to produce subject merchandise."  *Id.* at 14-15.

Following the release of the preliminary results, petitioner, the GOC, Baroque Timber and Jiangsu Guyu submitted case briefs.[4]  IDM at 2; Def. Br. at 7.  On November 27, 2020, Commerce published the Final Determination and continued to apply AFA.  Final Determination, 85 Fed. Reg. at 76,011; IDM at 7.  Commerce

---

[4] Commerce also received a case brief from Fine Furniture and letters from other interested parties in support of arguments made by mandatory company respondents and the GOC.  Def. Br. at 7.

PUBLIC VERSION

Consol. Court No. 20-03885                                                    Page 9

calculated a subsidy rate of 14.09 percent for Baroque Timber and 122.92 percent for

Jiangsu Guyu as well as a rate of 20.75 percent for non-selected companies.  Final

Determination, 85 Fed. Reg. at 76,012.

## STANDARD OF REVIEW

The court exercises jurisdiction under 28 U.S.C. § 1581(c).  The court will sustain

a determination by Commerce unless it is "unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).[5]

## DISCUSSION

I.      **Commerce's selection of mandatory respondents**

A.      **Background**

This review covered 170 exporters/producers of subject merchandise.  Mem.

From S. Lam through K. Marksberry to I. Darzenta Tzafolias, re: Countervailing Duty

Administrative Review of Multilayered Wood Flooring from the People's Republic of

China: Respondent Selection (May 21, 2019) ("Respondent Selection Mem.") at 2, CR

6, PR 57.  In its Initiation Notice, Commerce explained that "[i]n the event Commerce

limits the number of respondents for individual examination for administrative reviews . .

. Commerce intends to select respondents based on [Customs] data for U.S. imports

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                Page 10

during the period of review [("POR")]."[6]  Initiation Notice at 9,297.  On March 14, 2019,

Commerce issued a memorandum to interested parties in which it confirmed its

intention to rely on Customs data to select respondents.  Mem. From B. Palmer to All

Interested Parties, re: Administrative Review of the Countervailing Duty Order of

Multilayered Wood Flooring from the People's Republic of China: Customs and Border

Protection Data for Respondent Selection (Mar. 14, 2019) ("Commerce Mem. to

Interested Parties"), CR 1, PR 23.  Commerce released the Customs data to parties and

requested that interested parties submit comments on the Customs data and

respondent selection by March 21, 2019.  *Id.*

On March 21, 2019, Commerce received timely comments on the Customs data

from AMMWF, Jiaxing Hengtong Wood Co., Ltd. ("Hengtong") and Senmao.

Respondent Selection Mem. at 2.   AMMWF, Hengtong and Senmao all raised concerns

about errors in the Customs data.  Letter from Jeffrey S. Neeley, Husch Blackwell LLP,

to Hon. Wilbur Ross, Sec'y of Commerce, re: Multilayered Wood Flooring from the

People's Republic of China: Comments on CBP Data and Request for Issuance Q&V

_____

[6] Commerce explained:

> Ideally, in an administrative review, Commerce would examine all known
> exporters and producers.  However, in instances where Commerce must
> limit its examination due to the large number of potential respondents
> relative to its resource constraints, Commerce will examine as many
> exporters and producers as is practicable, consistent with its statutory
> obligation.

Respondent Selection Mem. at 2.

PUBLIC VERSION

Consol. Court No. 20-03885                                          Page 11

Questionnaires (Mar. 21, 2019) ("Senmao Comments on CBP Data"), CR 3, PR 39;

Letter from Gregory S. Menegaz, deKieffer & Horgan, PLLC, to Sec'y of Commerce, re:

Multilayered Wood Flooring from the People's Republic of China: Comments on CBP

Data and Respondent Selection (Mar. 21, 2019) ("Hengtong Comments on CBP Data"),

CR 4, PR 40; Letter from Wiley Rein LLP to Sec'y of Commerce, re: Multilayered Wood

Flooring from the People's Republic of China: Comments on CBP Data and Respondent

Selection (Mar. 21, 2019) ("AMMWF Comments on CBP Data"), CR 5, PR 44.

Specifically, interested parties noted "very large entries" of the subject merchandise.

Senmao Comments on CBP Data; *see* Hengtong Comments on CBP Data at 3.

Interested parties explained that "the average 40-foot container has a capacity of 67.7

cubic meters and the number of containers it would take to transport all of this

merchandise is not realistic," Senmao Comments on CBP Data, and, as such,

interested parties maintained that the Customs data indicated "inaccurate reporting."

AMMWF Comments on CBP Data at 4; *see* Hengtong Comments on CBP Data at 3-4.

Interested parties pointed to other errors in the Customs data, including

"inconsistent units of measurement," among others.  AMMWF Comments on CBP Data

at 3.  Hengtong provided its quantity and value ("Q&V") data, and Hengtong and

Senmao each provided an exhibit to support their comments regarding the shipping

container capacity.  Senmao Comments on CBP Data, Ex. 1; Hengtong Comments on

CBP Data (Mar. 21, 2019) at Attachment 1, bar code 3808179-01.  Interested parties

argued that, based on the cited errors, Commerce should not rely on "flawed" Customs

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                                 Page 12

data for respondent selection.  Hengtong Comments on CBP Data at 4; *see* Senmao

Comments on CBP Data.  Accordingly, interested parties requested that Commerce

issue Q&V questionnaires to interested parties and "use the [c]ompanies' own shipment

information for respondent selection."  *Id*. at 4; *see* AMMWF Comments on CBP Data at

4-5;[7] Senmao Comments on CBP Data.

On May 28, 2019, Commerce received a submission of comments on respondent

selection from Jiangsu Guyu.  Letter from Katie Marksberry, Program Manager,

AD/CVD Operations, Office VIII, to Jiangsu Guyu (May 30, 2019) ("Rejection of

Untimely Respondent Selection Comments"), PR 65.  Pursuant to 19 C.F.R. §

351.302(d)(1)(i), Commerce rejected as untimely Jiangsu Guyu's submission and

removed it from the record.  *Id*.  As a result, Commerce did not consider Jiangsu Guyu's

submission in the administrative review.  *Id.*

---

[7] AMMWF argued:

> [D]ue to the deficiencies in the [Customs] data highlighted [in its comments]
> it is critical that the [Commerce] issue Q&V questionnaires to *all* companies
> listed in the [Customs] data.  Since the [[                    ]] cannot be
> relied upon to provide a reasonable estimate of the largest producers and
> exporters of subject merchandise, [Commerce] should not limit its issuance
> of Q&V questionnaires to only the largest companies by volume in the
> [Customs] data.  Rather . . . the [Commerce] should issue a Q&V
> questionnaire to each company listed in [sic] Customs data.

AMMWF Comments on CBP Data at 4-5.

PUBLIC VERSION

**B.      Legal framework**

19 U.S.C. § 1677f-1(e)(1) provides that Commerce "shall determine an individual

countervailable subsidy rate for each known exporter or producer of the subject

merchandise."  The statute provides an exception to the general requirement to

determine individual subsidy rates.  The statute states:

> If [Commerce] determines that it is not practicable to determine individual
> countervailable subsidy rates under paragraph (1) because of the large
> number of exporters or producers involved in the investigation or review,
> [Commerce] may—
>
> > (A) determine individual countervailable subsidy rates for a
> > reasonable number of exporters or producers by limiting its
> > examination to—
> >
> > > . . .
> >
> > > (ii) exporters and producers accounting for the
> > > largest volume of the subject merchandise from
> > > the exporting country that the administering
> > > authority determines can be reasonably
> > > examined[.]

19 U.S.C. § 1677f-1(e)(2)(A)(ii).

**C.      Positions of the parties**

The moving parties argue that Commerce's respondent selection is not

supported by substantial evidence and is not in accordance with law because

Commerce: (1) relied on flawed Customs data, (2) ignored the requests by interested

parties to issue Q&V questionnaires and (3) failed to account adequately for the issues

raised by interested parties in their comments on the Customs data.  *See* Mem. Supp.

**PUBLIC VERSION**

Pls.' Rule 56.2 Mot. for J. on Agency R. ("Pls. Br.") at 9-14, ECF No. 42; Mem. P. & A.

Supp. Rule 56.2 Mot. for J. Upon Agency R. of Consol. Pls. and Pls.-Intervenors Fine

Furniture (Shanghai) Ltd. and Double F Ltd. ("Fine Furniture Br.") at 8-15, ECF No. 49;

Pl.-Intervenors' Rule 56.2 Mot. for J. on the Agency R., ("Pl.-Intervenors Br.") at 18-25,

ECF No. 52.  As a result, the moving parties argue that Commerce did not select the

mandatory respondents that accounted for the largest volume of subject merchandise

as required by the statute.  *See* Pls. Br. at 9-14; Fine Furniture Br. at 11-12.

The moving parties do not challenge Commerce's practice of relying on Customs

data to select respondents for individual examination.  Rather, the moving parties' first

argument is that where interested parties have presented evidence to demonstrate that

the Customs data are unreliable, the data should be supplemented with Q&V

questionnaires.  *See* Fine Furniture Br. at 13-14; Pls. Br. at 11-12.  Specifically, plaintiff-

intervenors assert that Commerce "regularly issues" Q&V questionnaires during its

respondent selection process "both in conjunction with and instead of [Customs] data."

Pl.-Intervenors Br. at 20-21(citing *Multilayered Wood Flooring From the People's*

*Republic of China: Final Results and Partial Rescission of Countervailing Duty*

*Administrative Review; 2014,* 82 Fed. Reg. 22,311 (Dep't of Commerce May 15, 2017)

and Mem. From M. Kolberg through D. S. Mermelstein to J. Maeder, re: Countervailing

Duty Administrative Review: Multilayered Wood Flooring from the People's Republic of

China: Respondent Selection: 2014 (Aug. 5, 2016) ("2014 Respondent Selection

Mem."), bar code 3495046-01).

**PUBLIC VERSION**

The moving parties assert that the data demonstrate that Commerce failed to select an exporter that represented the largest volume of subject merchandise. *See* Pls. Br. at 10; Fine Furniture Br. at 11; Pl.-Intervenors Br. at 18.  Plaintiffs note that interested parties submitted comments on the Customs data, noting errors.  Pls. Br. at 11 (citing Senmao Comments on CBP Data).  The cited errors include [[

                              ]] which could not be accurate."  *Id.* (citing Senmao Comments on CBP Data).  Plaintiffs maintain that such entries are "simply not realistic and demonstrated that there were errors in the [Customs] data, possibly resulting from misplaced decimals or reporting the incorrect unit of measure."  *Id.* (citation omitted); *see* Pl.-Intervenors Br. at 20-21.  The moving parties note further that even petitioner, AMMWF, in its comments on the Customs data recognized the errors in the data and requested that Commerce issue Q&V questionnaires.  *See* Fine Furniture Br. at 9-10 (quoting AMMWF Comments on CBP Data at 3-4); Pl.-Intervenors Br. at 20 (quoting AMMWF Comments on CBP Data at 3-4).

The moving parties argue that the Court has held that the "accuracy [sic] [Customs] data is a rebuttable presumption, and its reliability should only be upheld in [the] 'absence of evidence to the contrary.'"  Fine Furniture Br. at 13 (quoting *Pakfood Pub. Co. v. United States*, 35 CIT 60, 74, 753 F. Supp. 2d 1334, 1376 (2011)).  Moreover, the moving parties note that the Court has held that Commerce is required to address evidence on the record that challenges the accuracy of Customs data, Pls. Br. at 6 (citing *Ad Hoc Shrimp Trade Action Comm. v. United States* ("*Ad Hoc Shrimp II*"),

PUBLIC VERSION

36 CIT 419, 422, 828 F. Supp. 2d 1345, 1350 (2012)), and that in "Commerce's refusal

to adequately consider the record evidence, Commerce ultimately failed to select

exporters and producers accounting for the largest volume of the subject merchandise

as directed by the statute." *Id.*

      Plaintiffs also challenge Commerce's finding that "'no party has provided

evidence to support the claim' that [Jiangsu] Guyu should not be selected" or that the

Customs data were "unreliable." *Id.* at 10.  Plaintiffs argue that Commerce does not

state "how the parties should have obtained this additional confidential information from

Jiangsu Guyu" and maintain that the only method to obtain such information required

that Commerce take further investigative action. *Id.* at 12.  The moving parties note that

Commerce had "sufficient time" between the deadline for comments on the Customs

data (March 21, 2019) and the date of Commerce's Respondent Selection

Memorandum (May 21, 2019) either to send out Q&V questionnaires or to seek further

information from Customs regarding the entries of Jiangsu Guyu. *Id.*; *see* Fine

Furniture Br. at 10.

      The moving parties' second argument is that Jiangsu Guyu did, in fact, submit its

Q&V data to Commerce "to inform Commerce of the vast disparity between its actual

quantity and value information and the [Customs] data relied upon by Commerce."  Pl.-

Intervenors Br. at 23.  The moving parties note that Jiangsu Guyu initially provided the

Q&V data to Commerce on May 28, 2019; however, Commerce rejected the comments

as untimely. *Id.*  Plaintiffs challenge Commerce's rejection of Jiangsu Guyu's comments

**PUBLIC VERSION**

as untimely, asserting that Commerce's regulation, 19 C.F.R. § 351.301(c)(5), permits the submission of factual information up to 30 days before the preliminary determination.  Pls. Br. at 12-13 (citing 19 C.F.R. § 351.301(c)(5)).

The moving parties note that Jiangsu Guyu also provided the same Q&V data to Commerce in its CVD questionnaire response.  Pls. Br. at 13; Pl.-Intervenors Br. at 19. Accordingly, the moving parties maintain that the Q&V data provided by Jiangsu Guyu are "further proof" that the Customs data were not reliable, Pl.-Intervenors Br. at 19, and assert that Commerce "could have selected another mandatory [respondent] or selected Senmao as a voluntary respondent before the preliminary results were issued in February 2020."  Pls. Br. at 13.

Finally, the moving parties argue that Commerce's calculation of the CVD rate for non-selected companies was based, in part, on the rate of Jiangsu Guyu, and, as such, the CVD rate for non-selected companies is unsupported by substantial evidence and not in accordance with law.  *See* Pls. Br. at 14-16; Fine Furniture Br. at 14; *see also* Pl.-Intervenors' Reply Br. ("Pl.-Intervenors Reply Br.") at 6, ECF No. 68.  The moving parties assert that Commerce needs either to select an additional mandatory respondent or re-calculate the margin for non-selected respondents using only the margin assigned to Baroque Timber.  Pls. Br. at 16; Fine Furniture Br. at 14; Pl.-Intervenors Reply Br. at 6.  The moving parties maintain that such a request is consistent with the decisions of this Court.  Fine Furniture Br. at 14-15 (citing *Fine*

**PUBLIC VERSION**

Consol. Court No. 20-03885                                              Page 18

*Furniture (Shanghai) Ltd. v. United States*, 45 CIT __, __, Slip Op. 21-27 at 2 (Mar. 3, 2021)).

Defendant asserts that Commerce addressed and considered the concerns about the Customs data alleged by the interested parties during the respondent selection process and determined that evidence on the record during respondent selection did not demonstrate that the Customs data were unreliable.  Def. Br. at 7. Defendant argues that 19 U.S.C. § 1677f-1(e)(2)(A) permits Commerce to "limit examination of exporters or producers to those accounting for the largest volume of subject merchandise exported during the [POR] that can reasonably be examined."  *Id.* at 11 (citing 19 U.S.C. § 1677f-1(e)(2)(A)).  Defendant argues that "[b]ecause the statute is silent as to how Commerce must determine which producers or exporters account for the largest volume of subject merchandise, Commerce has discretion to choose which particular method to use."  *Id.* (citing IDM at 14).  Defendant explains that "Commerce's practice in administrative reviews is to rely upon [Customs] data of subject entries" to determine the largest producer or exporter.  *Id.* (citing IDM at 15).  Defendant argues that "Commerce's reliance on [Customs] data and [information on the record] at the time of respondent selection to select Jiangsu Guyu as a mandatory respondent was supported by substantial evidence and otherwise in accordance with law."  *Id.* at 14.  Accordingly, defendant maintains that the weighted-average margin calculation assigned to non-selected companies pursuant to 19 U.S.C. § 1673d(c)(5)(A) was also lawful.  *Id.* at 14-15.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                              Page 19

Similarly, defendant-intervenor argues that Commerce exercised its discretion properly in its use of Customs data to select mandatory respondents and asserts that the Court previously has upheld Commerce's use of Customs data.  *See* Resp. to Mot. for J. on Agency R. ("Def.-Intervenor Br.") at 27-30, ECF No. 56.

**D.    Analysis**

**1.    Commerce's selection of mandatory respondents based on the Customs data**

To determine whether Commerce's selection of mandatory respondents is supported by substantial evidence, the court must examine the evidence that was on the record available to Commerce in making its determination.  As such, the court addresses first the moving parties' argument that Commerce should have considered in its respondent selection determination the Q&V data submitted by Jiangsu Guyu after the deadline for comments on the Customs data.

**i.    Commerce's rejection of the Q&V data submitted by Jiangsu Guyu**

The moving parties challenge Commerce's rejection of the Q&V data submitted by Jiangsu Guyu in its submissions to Commerce after the deadline for comments on the Customs data.  In particular, plaintiffs assert that no law prevents Commerce from reconsidering its respondent selection and that 19 C.F.R. § 351.301(c)(5) "allow[s] the submission of factual information up to the date that is 30 days prior to the preliminary determination and Jiangsu Guyu's submission was well within that deadline."  Pls. Br. at 12-13 (citing 19 C.F.R. § 351.301(c)(5)).  The moving parties note further that, on July

**PUBLIC VERSION**

15, 2019, Jiangsu Guyu filed its questionnaire response and included its "actual quantity and value of exports to the United States during the POR," which were "materially the same" Q&V data that Jiangsu Guyu had attempted initially to provide to Commerce on May 28, 2019.  Pl.-Intervenors Br. at 24.  The moving parties argue that, after receiving the questionnaire response from Jiangsu Guyu, Commerce had "absolute confirmation" that Senmao was a larger exporter than Jiangsu Guyu during the POR; however, the moving parties assert that Commerce failed to reconsider the respondent selection data to account for the Q&V data.  Pls. Br. at 13.  Defendant maintains that Commerce's rejection of Jiangsu Guyu's submissions after the deadline was in accordance with 19 C.F.R. § 351.302(d)(1)(i).  Def. Br. at 12-13.

In a memorandum to the interested parties, Commerce set the deadline for comments on the Customs data for March 21, 2019.  Commerce Mem. to Interested Parties; *see* Initiation Notice, 84 Fed. Reg. at 9,297.  AMMWF, Senmao and Hengtong submitted their comments, including Q&V data from Hengtong, by the deadline.  *See* Senmao Comments on CBP Data; Hengtong Comments on CBP Data; AMMWF Comments on CBP Data.  On May 21, 2019, Commerce selected Baroque Timber and Jiangsu Guyu as mandatory respondents, *see* Respondent Selection Mem. at 1, and on May 24, 2019, Commerce requested that Baroque Timber and Jiangsu Guyu complete CVD questionnaires.  *See* 2017 Countervailing Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Questionnaire (May 24, 2019) at 1, PR 61.  On May 28, 2019 — more than two months

**PUBLIC VERSION**

after the deadline for comments on the Customs data — Jiangsu Guyu submitted

comments regarding respondent selection, including Q&V data.  *See* Rejection of

Untimely Respondent Selection Comments.  On May 30, 2019, pursuant to 19 C.F.R. §

351.302(d)(1)(i), Commerce rejected Jiangsu Guyu's submission as "untimely" and

explained that Commerce was "removing this untimely submission from the record and

will not consider it in this administrative review."  *Id*.

       19 C.F.R. § 351.302(d)(1)(i) directs Commerce to reject "untimely filed factual

information, written argument, or other material."  19 C.F.R. § 351.302(d)(1)(i).

Consequently, Commerce was required by its regulation to reject the untimely

submissions by Jiangsu Guyu.  The moving parties argue that 19 C.F.R. §

351.301(c)(5) allowed Jiangsu Guyu to submit information after the March 21, 2019

deadline, and up to 30 days before the preliminary determination; *see* Pls. Br. at 12-13;

however, the regulation applies to submissions that "clearly explain why the information

contained therein does not meet the definition of factual information described in §

351.102(b)(21)(i)-(iv), and . . . provide a detailed narrative of exactly what information is

contained in the submission and why it should be considered."  19 C.F.R. §

351.301(c)(5).  The moving parties in their briefs fail to articulate to the court how, if at

all, the submissions to Commerce on May 28, 2019, by Jiangsu Guyu, met the

requirements of 19 C.F.R. § 351.301(c)(5).  Accordingly, the court determines that

Commerce's rejection of the untimely factual information on May 30, 2019, was lawful.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 22

Moreover, this Court has recognized that "the statute indicates that respondent selection is within Commerce's discretion." *Kyocera Solar, Inc. v. United States*, 41 CIT __, __, 253 F. Supp. 3d 1294, 1318 (2017) (citing 19 U.S.C. §§ 1677f-1(c)(2)(A)-(B)).[8]

_____

[8] The court in *Kyocera Solar* examined 19 U.S.C. § 1677f-1 in the context of an antidumping proceeding. *Kyocera Solar, Inc. v. United States*, 41 CIT __, 253 F. Supp. 3d 1294 (2017).  Here, the court notes that the language pertaining to the determination of the antidumping duty margin under 19 U.S.C. § 1677f-1(c)(2)(A)-(B) is analogous to the determination of the countervailing subsidy rate under 19 U.S.C. § 1677f-1(e)(2)(A)(i)-(ii).  19 U.S.C. § 1677f-1(c)(2) provides:

> If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—

> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

> (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

19 U.S.C. § 1677f-1(c)(2)(A)-(B).

Similarly, 19 U.S.C. § 1677f-1(e)(2)(A) states:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—

> (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to— (footnote continued)

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                      Page 23

As Commerce explained, "[its] intended respondent selection methodology was clearly stated in the Initiation Notice."  IDM at 16 (emphasis removed).  Jiangsu Guyu and other interested parties had the opportunity to comment on the Customs data prior to the deadline.

The moving parties argue further that Commerce should have reconsidered its respondent selection once Commerce accepted Q&V data from Jiangsu Guyu in Jiangsu Guyu's CVD questionnaire response on July 15, 2019.  *See* Pls. Br. at 13. Nevertheless, "there is no indication in the statute that the selection process is to evolve as the proceedings and scope evolve.  The opposite is suggested by the limiting phrases 'based on information available to [Commerce] at the time of selection' and 'that can be reasonably examined.'"[9]  *Kyocera Solar*, 41 CIT at __, 253 F. Supp. 3d at 1318 (citing 19 U.S.C. § 1677f-1(c)(2)(A)-(B)) (alteration in original) (internal citation omitted).

---

(i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or

(ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined[.]

19 U.S.C. § 1677f-1(e)(2)(A)(i)-(ii).

[9] *See supra* note 8.

**PUBLIC VERSION**

Accordingly, the court limits its assessment to the comments submitted to

Commerce by the deadline.  As such, the court will consider whether, based on the

information that Commerce had at the time of respondent selection, the decision to

select Jiangsu Guyu and Baroque Timber as respondents is supported by substantial

evidence and in accordance with law.

> ii.   **Commerce's use of the Customs data for respondent selection**

The moving parties argue that the Court has established that the reliability of

Customs data is a "rebuttable presumption", and Commerce is required to consider

evidence on the record that challenges that accuracy of Customs data.  Fine Furniture

Br. at 13; *see* Pls. Br. at 6, 13 (citing *Ad Hoc Shrimp II*, 36 CIT at 422, 828 F. Supp. 2d

at 1350); *see also* Pl.-Intervenors Br. at 22 (citing *Husteel Co., Ltd. v. United States*, 39

CIT __, __ n.8, 98 F. Supp. 3d 1315, 1327 n.8 (2015)).  The moving parties argue that

Commerce did not address the comments made by interested parties on the Customs

data during the respondent selection process, including comments on several

inconsistencies in the data and requests for Commerce to issue Q&V questionnaires to

confirm the accuracy of the Customs data.  *See* Fine Furniture Br. at 4; Pls. Br. at 6.

The moving parties maintain that Commerce did not address the cited errors in the

Customs data, and, therefore, Commerce failed to select respondents accounting for

the largest volume of the subject merchandise as required by the statute.  *See* Pls. Br.

at 6.

**PUBLIC VERSION**

Defendant and defendant-intervenor argue that the Court has upheld Commerce's practice of using Customs data for respondent selection.  Def. Br. at 13 (citing *Pakfood*, 35 CIT at 72-73, 753 F. Supp. 2d at 1344-45; *Ad Hoc Shrimp II*, 36 CIT at 423-29, 828 F. Supp. 2d at 1351-55); Def.-Intervenor Br. at 27 (citing *Pakfood*, 35 CIT at 72-73, 753 F. Supp. 2d at 1344-45).  Defendant maintains that Commerce addressed the cited errors in the Customs data, and, therefore, Commerce's selection of mandatory respondents is lawful.  Def. Br. at 7, 13.

The Court has recognized Commerce's methodology of selecting respondents based on Customs data.  *See, e.g.*, *Ad Hoc Shrimp Trade Action Co. v. United States*, 35 CIT 1110, 1115, 791 F. Supp. 2d 1327, 1332 (2011) ("*Ad Hoc Shrimp I*") (explaining that "because Customs officers have a duty to assure the accuracy of information submitted to that agency by penalizing negligent or fraudulent omissions and/or inaccurate submissions, [Customs] data are presumptively reliable as evidence of respondent-specific POR entry volumes.") (citing *Pakfood*, 35 CIT at 73-74, 753 F. Supp. 2d. at 1345-46).  Moreover, the Court has held consistently "that, in the absence of evidence to the contrary, the data obtained by Customs officials in their regular course of business is accurate."  *Pakfood*, 35 CIT at 74, 753 F. Supp. 2d at 1345-46; *see Ad Hoc Shrimp II*, 36 CIT at 422-23, 427, 828 F. Supp. 2d at 1350, 1354. Nevertheless, where information on the record "detracts from the weight of the data relied on," Commerce must account for such information in its respondent selection determination.  *Ad Hoc Shrimp I*, 35 CIT at 1115-17, 791 F. Supp. 2d at 1332-34.

**PUBLIC VERSION**

In the comments on the Customs data, interested parties raised four main concerns regarding the Customs data.  To determine whether Commerce's respondent selection determination was supported by substantial evidence, the court will examine whether Commerce addressed adequately both the arguments made by interested parties and the evidence on the record detracting from the reliability of the Customs data.

## I.        Inconsistent units of measurement

In their comments on the Customs data, Hengtong and AMMWF noted that certain entries of the subject merchandise in the Customs data are recorded in square meters while other entries are recorded in cubic meters.  Hengtong Comments on CBP Data at 2; AMMWF Comments on CBP Data at 3.  AMMWF noted further that there are entries recorded in meters and asserted that this unit of measurement is "likely inaccurate" because measuring in meters is not typical for wood flooring.  AMMWF Comments on CBP Data at 3.  AMMWF argued further that as "there is no uniform way to convert meters, square meters, and cubic meters into a single, comparable unit of measurement, it is not possible to identify, let alone compare, the entry volumes of specific companies listed in the [Customs] data."  *Id*.

Commerce acknowledged that the Customs data are reported in cubic meters and square meters.  Commerce explained that:

> To ensure a uniform unit of measure, we converted the [Customs] data reported in [square meters] to [cubic meters] by relying on a conversion methodology used in previous administrative reviews of wood flooring.  Specifically, we multiplied the values reported in [square meters]

**PUBLIC VERSION**

> by 0.015 mm, which is the midpoint of the range of the average thickness
> of wood flooring (between 0.012 mm and 0.018 mm), to calculate [cubic
> meters].

Respondent Selection Mem. at 5 (internal footnote omitted) (citation omitted); *see also*

IDM at 15 (Commerce explained that "[t]o address this longstanding issue" of certain

entries being reported in square meters and other entries in cubic meters, Commerce

used the same conversion methodology that it used in previous administrative reviews

of wood flooring.)

Commerce's explanation for its conversion of square meters to cubic meters is

reasonable because Commerce explained that its actions were consistent with its past

practice of "relying on a conversion methodology that has been used in previous

administrative reviews of wood flooring since the first administrative review."[10]  IDM at

15 (citing Mem. From J. Saenz through K. Marksberry to I. Darzenta Tzafolias re:

Countervailing Duty Administrative Review: Multilayered Wood Flooring From the

People's Republic of China: Respondent Selection: 2015 ("2015 Respondent Selection

Mem.") (Apr. 3, 2017), bar code 3559952-01)[11]; *see* IDM at 15 n.38; *Association of*

---

[10] In its 2015 administrative review, Commerce explained: "To convert square meters to cubic meters, we relied on a conversion methodology suggested by the petitioner in the 2011 administrative review, and which we have used in the three previous reviews."  Mem. From J. Saenz through K. Marksberry to I. Darzenta Tzafolias re: Countervailing Duty Administrative Review: Multilayered Wood Flooring From the People's Republic of China: Respondent Selection: 2015 (Apr. 3, 2017) at 2, bar code 3559952-01.

[11] The court notes that Commerce cited the 2015 Respondent Selection Memorandum with the date of April 7, 2017.  *See* Respondent Selection Mem. at 5 n.12.  The date of the document is April 3, 2017.

PUBLIC VERSION

Consol. Court No. 20-03885                                               Page 28

*American School Paper Suppliers v. United States*, 35 CIT 1046, 1054, 791 F. Supp. 2d

1292, 1301 ("A court may measure Commerce's reasonableness by determining

whether Commerce's actions are consistent with a past practice or stated policy.").

      Commerce did not, however, address the comments made by interested parties

noting the entry in the Customs data recorded in meters.  Line entry 6254 in the

Customs data is recorded in meters.  *See* Commerce Mem. to Interested Parties,

Attachment; Respondent Selection Mem.; IDM at 14-16.  Commerce failed to provide

any explanation for this entry, despite the fact that during the respondent selection

process AMMWF alerted Commerce of the apparent error in the Customs data by

explaining that meters is not a "standard" unit of measurement for wood flooring.

AMMWF Comments on CBP Data at 3.

      Accordingly, the court concludes that Commerce addressed adequately the

comments made by interested parties concerning the different entries recorded in

square meters and cubic meters; however, Commerce failed to address the entry

recorded in meters, and, therefore, Commerce did not account for a cited abnormality in

the Customs data.

## II.     Names

      Hengtong argues that the method by which Commerce sorted the Customs data

by company name means that "no single total figure reflects a company's total entries

because slight variations in a company name, such as with or without commas and

periods in writing "co., ltd." and name abbreviations are not taken into consideration in

PUBLIC VERSION

the total import volume".  Hengtong Comments on CBP Data at 2.  Commerce

responded to Hengtong's argument, explaining: "With respect to the parties' arguments

regarding the minor name variations in the [Customs] data, we found that combining the

minor name variations did not alter the rank of the top ten exporters/producers that

account for the largest volume of entries into the United States during the POR."

Respondent Selection Mem. at 5.

In their comments on the Customs data, the interested parties failed to state with

any particularity how the variations in the company names compromised the reliability of

the Customs data, and, therefore, the court concludes that Commerce's explanation is

reasonable.

### III.    Entries with no unit of measurement and volume of zero

In its comments, AMMWF noted that there were many entries in the Customs

data that had "no unit of measurement and a volume of '0'".  AMMWF Comments on

CBP Data at 4.  Commerce in its IDM explained: "Our analysis indicates that less than

0.05 percent of the entries in the [Customs] data lacked quantity and/or unit of

measure."  IDM at 15.

Again, interested parties in their comments to Commerce and the moving parties

in their briefs failed to articulate how entries that lack a unit of measurement or have a

volume of "0" affect the overall reliability of the Customs data.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                      Page 30

## IV.    Large entries of subject merchandise

In each of their submissions, Senmao, Hengtong and AMMWF alerted

Commerce that the Customs data contained large entries that were not realistic and

suggested inaccurate reporting.  Specifically, Senmao noted that "very large entries

from four companies",[12] including [[                                        ]], "range from

[[                                        ]] and are all far larger than any entry from

any other Chinese company on a per-entry basis, and simply are not credible."

Senmao Comments on CBP Data; *see also* AMMWF Comments on CBP Data at 3-4.[13]

Moreover, Senmao and Hengtong noted that the average 40-foot container holds a

capacity of 67.7 cubic meters of goods.  Senmao Comments on CBP Data; Hengtong

Comments on CBP Data at 3.  Senmao noted that Senmao has been selected as one of

two largest exporters in previous administrative reviews.  Senmao Comments on CBP

Data.  Senmao stated further that [[                                        ]]

---

[12] In its comments, Senmao points to four companies in the Customs data, including
[[
    ]].  Senmao Comments on CBP Data.

[13]  In its comments on the Customs data, AMMWF stated:

> [[                    ]] is reported as having entered shipments of [[        ]]
> and [[            ]] cubic meters of flooring; and, [[                    ]] is
> reported as having entered shipments of [[                    ]]
> cubic meters of flooring.  Critically, these shipments—and they are not the
> only ones—have [[
>                                        ]].  Such a severe difference suggests
> that these entries have not been accurately reported.

AMMWF Comments on CBP Data at 3-4 (internal footnotes omitted).

**PUBLIC VERSION**

[[

                                        ]].  This cannot be correct.  Moreover . . . the number of

containers it would take to transport all of this merchandise is not realistic, particularly in

a single entry."  *Id.*  As such, the interested parties argued that the unrealistic data could

be explained only by "misplaced decimals or reporting [of] the incorrect unit of

measure", *id.* — *i.e.*, some entries were recorded in cubic meters but should have been

reported in square meters or kilograms.  *See* Hengtong Comments on CBP Data at 3;

AMMWF Comments on CBP Data at 3.

      In response to interested parties' arguments, Commerce stated: "Although

certain interested parties argue that the [Customs] data are unreliable, we find that no

party has provided evidence to support this claim.  Specifically, there is no record

evidence that the [Customs] data contain unusual entry quantities such that the entire

[Customs] dataset is called into question."  Respondent Selection Mem. at 5.  Moreover,

in its IDM, Commerce acknowledged the argument made by interested parties that the

Customs data "demonstrate that entries made by certain companies far exceed a

reasonable quantity for a single entry."  IDM at 15.  Nevertheless, Commerce

maintained that "no evidence (*e.g.*, Q&V data, Infodrive data, *etc.*) was placed on the

record at the time of respondent selection which contradicted the [Customs] data or

otherwise demonstrated that the [Customs] dataset was unreliable in its entirety."  *Id.*

      Commerce did not address directly the arguments made by interested parties or

the evidence provided in their comments that pointed to unrealistic shipment entries that

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                                 Page 32

contradicted and, thereby, undermined the reliability of the Customs data.  In their

comments on the Customs data, Senmao and Hengtong included an exhibit providing

information about shipping containers that noted the maximum capacity of 67.7 cubic

meters for 40-foot containers.  *See* Senmao Comments on CBP Data, Ex. 1; Hengtong

Comments on CBP Data (Mar. 21, 2019) at Attachment 1, bar code 3808325-01.  As

noted by the moving parties during the oral argument, Commerce "know[s] . . . [or]

should know . . . what typical shipment volumes are. . . .  [C]ommon sense alone says

that [[                                                                                        ]] . . . is

simply . . . not only out of the norm, but it's totally unreasonable to think that's true."

Confidential Oral Arg. Tr. at 22:21-23:2, ECF No. 78.  Moreover, during the respondent

selection process, Hengtong provided Q&V data that directly contradicted Customs

data.  In its comments on the Customs data, Hengtong stated that the Customs data

contained [[                                                             ]] and a "quantity of [[            ]]

[cubic meters] for each for a total of [[        ]] [cubic meters]."  Hengtong Comments on

CBP Data at 3.  In contrast, the actual quantity and value of the subject merchandise

that Hengtong submitted to Commerce was [[          ]] square meters and [[            ]]

cubic meters.  *Id*.

Commerce accepted the Q&V data submitted by Hengtong and explained that

the agency "substituted those amounts for the [Customs] data for Hengtong in our

ranking."  Respondent Selection Mem.at 5.  Nonetheless, Commerce continued to find

that "there is *no compelling evidence* on the record of this administrative review that the

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 33

*remaining entries* in the [Customs] data are incorrect and ought not, therefore, to be

used to select respondents." *Id*. at 5-6 (emphasis supplied).  Commerce stated further

that there is no information on the record that the Customs data "contain unusual entry

quantities." *Id*. at 5.

Commerce's explanation disregards the stark contrast between the entries

presented in the Q&V data provided by Hengtong and the Customs data and disregards

as well Commerce's own experience in previous administrative reviews under the 2011

CVD Order.[14]  *See* Senmao Comments on CBP Data.  Indeed, in previous

administrative reviews under the 2011 CVD Order, Commerce requested Q&V data

from certain interested parties based on comments on the Customs data "concerning

the reliability of the . . . data."  Mem. From J. Saenz through K. Marksberry to I.

Darzenta Tzafolias re: Countervailing Duty Administrative Review: Multilayered Wood

Flooring From the People's Republic of China: Respondent Selection: 2016 (June 4,

2018) ("2016 Respondent Selection Mem.") at 2, bar code 3714517-01; *see* 2015

Respondent Selection Mem.; 2014 Respondent Selection Mem.; *see also* Mem. From

D. McClure to The File, Countervailing Duty Administrative Review of Multilayered

---

[14] The cited concerns regarding the reliability of Customs data in previous reviews also "detracts from the weight" of the Customs data in this review.  *Ad Hoc Shrimp I*, 35 CIT at 1115-16, 791 F. Supp. 2d at 1332-33 ("The fact that, in the immediately preceding review, Commerce discovered significant inaccuracies, undetected by Customs, in the [Customs] entry volume data for subject merchandise from the very same respondents as those covered in this review casts sufficient doubt on the presumption that Customs has assured the accuracy of such data for this POR.") (internal footnote omitted).

**PUBLIC VERSION**

Wood Flooring From the People's Republic of China; 2015 re: Phone Call Regarding

Submission of Quantity and Value Data by Dalian Penghong Floor Products Co., Ltd.

(Mar. 9, 2017), bar code 3549920-01.  Moreover, Senmao in its comments reminded

Commerce that in the two most recent administrative reviews, Commerce selected

Senmao as one of the two largest exporters.  Senmao Comments on CBP Data; *see*

2016 Respondent Selection Mem.; 2015 Respondent Selection Mem.  With this fact in

mind, Senmao explained that the Customs data provide that a single entry by [[

                                                                                ]] is "larger

than the total volume imported from [[          ]] during the entire POR, which amounted to

[[          ]] cubic meters."  Senmao Comments on CBP Data.

        In *Pakfood*, the court upheld Commerce's decision to rely on Customs data for

respondent selection, noting that on remand Commerce explained that the agency

would use Q&V questionnaires in circumstances in which the Customs data are

"unreliable, inconsistent, or fail[] to provide 'adequate relevant information for

determining the relative volume of imports.'"  *Pakfood*, 35 CIT at 71, 753 F. Supp. 2d at

1343-44.  Commerce's explanation fails to account for the standard set for Q&V

questionnaires in *Pakfood* and fails to address Commerce's actions in previous

administrative reviews of requesting Q&V data from a select number of interested

parties to supplement Customs data where interested parties have raised concerns

about the reliability of the data.  *See* Respondent Selection Mem. at 4-5; IDM at 14-16.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                          Page 35

The parties' comments on the Customs data and the evidence on the record at the time of respondent selection, including the Q&V data submitted by Hengtong and the exhibits submitted by Senmao and Hengtong concerning container capacity, indicated that there were inconsistencies in the Customs data.  Commerce failed to consider evidence that challenged the reliability of the Customs data and failed to seek such information by issuing Q&V questionnaires or requesting such data from Jiangsu Guyu.  Accordingly, Commerce's selection of Jiangsu Guyu and Baroque Timber as mandatory respondents is not supported by substantial evidence and the court remands the respondent selection determination to Commerce for reconsideration.

**2.    Commerce's margin for non-selected companies**

The moving parties argue that the margin that Commerce used for non-examined companies was based on an average of margins assigned to Baroque Timber and Jiangsu Guyu, and, therefore, the CVD rate for non-selected companies is unsupported by substantial evidence and not in accordance with law.  *See* Pls. Br. at 14-16; Fine Furniture Br. at 14-15; *see also* Pl.-Intervenors Reply Br. at 6.  Defendant maintains that the selection of mandatory respondents is supported by substantial evidence, and, therefore, the resulting margin assigned to non-selected companies is lawful.  Def. Br. at 14-15.

The Court has held that 19 U.S.C. § 1677f-1 grants Commerce the authority to calculate the rate for non-examined companies based on the individual margins of the largest exporters because under § 1677f-1(c)(2)(B) "the examined respondents are

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                          Page 36

treated as representative of other respondents by virtue of being the largest

exporters." *Qingdao Qihang Tyre Co., Ltd. v. United States*, 42 CIT __, __, 308 F.

Supp. 3d 1329, 1362.  The court in *Qingdao* examined the calculation of the rate for

non-selected companies in an antidumping case; however, the same principle applies in

the countervailing duty context.[15]  Accordingly, where there is a question of whether the

selected respondents were the largest exporters during the POR, the respondents can

neither be treated as representative nor can they be relied upon by Commerce to

calculate the rate for non-examined companies.  As Commerce's selection of

mandatory respondents is not supported by substantial evidence, the calculation of the

rate for non-selected companies using the individual margins assigned to Jiangsu Guyu

and Baroque Timber was not reasonable, and, therefore, the court remands to

Commerce for reconsideration the calculation of the rate for non-selected companies.

## II.    Remaining issues challenging the Final Determination

The court has determined that Commerce's selection of mandatory respondents

is unsupported by substantial evidence.  Accordingly, the court will reserve the

examination of the remaining issues raised by the moving parties and related

arguments challenging the Final Determination until Commerce reconsiders, consistent

with this decision, Commerce's respondent selection on remand.

## CONCLUSION

---

[15]  *See supra* note 8 for an explanation of the similarity in the applicable language under
19 U.S.C. § 1677f-1 for countervailing duty proceedings and antidumping proceedings.

**PUBLIC VERSION**

NBC's sitcom *Parks and Recreation* ran for seven seasons following the everyday adventures of a group of local government employees working in the Parks and Recreation Department of Pawnee, a fictional town in Indiana.  In one episode, Leslie Knope (portrayed by Amy Poehler) is working to open the smallest park in Indiana with her co-worker, friend and later husband, Ben Wyatt (portrayed by Adam Scott).  Ben informs Leslie that this project will be the last one they work on together. Leslie, wanting to spend more time with Ben, attempts to delay the opening of the park. Ben sees through Leslie's actions and claims that she "steamrolls" her colleagues. Upset by the circumstances, Leslie decides to seek counsel from her best friend, Ann Perkins (portrayed by Rashida Jones).

Leslie: "Whose fault is this?  I demand to know!"

Ann: "Actually . . . ."

Leslie: "Ben thinks that I'm a steamroller.  That's unbelievable.  How dare he think that I'm a steamroller."

(Ann attempts to interject, and Leslie speaks over her.)

Leslie: "I know.  He's going through a phase right now and eventually we're going to be friends again."

Ann: "No, what I was going to say is that you really are —"

Leslie: (Interrupting again) "Working too hard.  I know.  Ann, you keep starting all of these sentences and not finish —"

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                                 Page 38

Ann: "You're a steamroller!  You are a massive, enormous runaway steamroller with no

brakes and a cement brick on the gas pedal.  You made me watch all eight *Harry Potter*

movies.  I don't even like *Harry Potter*!"

Leslie: "That's insane!  You love *Harry Potter*!  You've seen all eight movies!"[16]

* * *

In conclusion, the court remands the Final Determination to Commerce to

reconsider its selection of mandatory respondents for individual examination and

address the comments made by interested parties concerning the reliability of the

Customs data for respondent selection.  In ordering this remand, the court notes for

Commerce the key importance of deciding correctly foundational aspects in any

investigation or review.  Those foundational aspects include respondent selection.

Commerce should be mindful that as it conducts an investigation or review, it is building

an edifice and needs to take particular care to ensure that the foundations are strong.

When, as in this case, they are not, it can result in a substantial use of resources — by

the parties as well as the Court.  Further, time is lost in ensuring a timely and definitive

resolution of the matters for all parties concerned.  Upon receiving the remand results,

the court will address the remaining arguments — to the extent that they remain

relevant — presented by the moving parties challenging the Final Determination.

Based on the foregoing reasons, it is hereby

---

[16] *Parks and Recreation: Smallest Park* (NBC television broadcast Nov. 17, 2011).

**PUBLIC VERSION**

Consol. Court No. 20-03885                                            Page 39

     **ORDERED** that the Final Determination is remanded to Commerce for reconsideration to make a finding consistent with this opinion to address interested parties' comments on the use of Customs data for respondent selection; it is further

     **ORDERED** that the court reserves decision on the remaining issues presented by the moving parties challenging the Final Determination until the results of the remand are before the court; it is further

     **ORDERED** that Commerce shall file its remand redetermination within 90 days following the date of this Opinion and Order; it is further

     **ORDERED** that, within 14 days of the date of filing of Commerce's remand redetermination, Commerce must file an index and copies of any new administrative record documents; it is further

     **ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand redetermination with the court.

                                      /s/      Timothy M. Reif
                                      Timothy M. Reif, Judge

Dated:   August 11, 2022
        New York, New York