Slip Op. 25-28

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., ET AL.,**<br><br>Plaintiffs,<br><br>and<br><br>**FINE FURNITURE (SHANGHAI) LIMITED, ET AL.,**<br><br>Plaintiff-Intervenors,<br><br>and<br><br>**BAROQUE TIMBER INDUSTRIES (ZHONGSHAN) CO., LTD., ET AL.,**<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING,**<br><br>Defendant-Intervenor. | **Before: Timothy M. Reif, Judge**<br>**Consol. Court No. 20-03885**<br><br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part certain aspects of Commerce's Final Results and Second Remand Results.]

Dated: March 24, 2025

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                      Page 2

Stephen William Brophy, Husch Blackwell LLP, of Washington, D.C., argued for plaintiffs Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., Jiangsu Keri Wood Co., Ltd. and Sino-Maple (JiangSu) Co., Ltd.  With him on the brief was Jeffrey S. Neeley.

Adams C. Lee, Harris Bricken Sliwoski LLP, of Seattle, WA, for consolidated plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.

Gregory S. McCue, Steptoe LLP, of Washington, D.C., for consolidated plaintiffs Struxtur, Inc. and Evolutions Flooring Inc.

Francis J. Sailer, Andrew T. Schutz and Kavita Mohan, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for consolidated plaintiffs Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation.

Mark Rett Ludwikowski, Clark Hill PLC, of Washington, D.C., argued for plaintiff-intervenors Shenzhenshi Huanwei Woods Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan HuiJiaLe Decoration Material Co., Ltd. and Dalian Jiahong Wood Industry Co., Ltd. With him on the brief were William Sjoberg, R. Kevin Williams, Kelsey Christensen and Sally Alghazali.

Kristin H. Mowry and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, D.C., for consolidated plaintiff and plaintiff-intervenors Fine Furniture (Shanghai) Ltd. and Double F Ltd.

Brittney R. Powell and Lizbeth R. Levinson, Fox Rothschild LLP, of Washington, D.C., for consolidated plaintiffs Metropolitan Hardwood Floors, Inc., Floor & Décor Holdings, Inc., Galleher Corp., Galleher LLC and MCI International.

Kelly M. Geddes, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patrica M. McCarthy, Director and Tara K. Hogan, Assistant Director.  Of counsel on the brief was JonZachary Forbes, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill, Stephani M. Bell and Theodore P. Brackemyre, Wiley Rein LLP, of Washington, D.C., for defendant-intervenor American Manufacturers of Multilayered Wood Flooring.

**PUBLIC VERSION**

Reif, Judge:  This action is a challenge to the final results and second remand results of the U.S. Department of Commerce ("Commerce") in its administrative review of the countervailing duty order on multilayered wood flooring from the People's Republic of China.  *Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Recission of Countervailing Duty Administrative Review* ("Final Results"), 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) and accompanying Issues and Decision Memorandum ("IDM").

In *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States* ("*Jiangsu Senmao I*"), 46 CIT __, 589 F. Supp. 3d 1195 (2022), the Court remanded Commerce's Final Results for reconsideration (1) to address interested parties' comments on the use of U.S. Customs and Border Protection ("CBP") data for respondent selection and (2) to reconsider the calculation of the rate for non-selected companies.  The Court also deferred examination of the remaining issues challenging the Final Results "until Commerce reconsiders, consistent with this decision, Commerce's respondent selection on remand."  *Id.* at __, 589 F. Supp. 3d at 1214.

In the Second Remand Order, the Court granted defendant's unopposed motion requesting a voluntary remand to consider the effect of a decision of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), YC *Rubber Co. (N. Am.) LLC v. United States*, No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022), on Commerce's respondent selection and non-examined company rate determinations in this review.  Def. Mot. for Voluntary Remand at 1-2, ECF No. 113; Second Remand Order at 1-2, ECF No. 114.

For the reasons that follow, the court remands Commerce's Final Results and Second Remand Results.

## BACKGROUND

On December 8, 2011, Commerce issued the subject countervailing duty ("CVD") order on wood flooring from China. *Multilayered Wood Flooring from the People's Republic of China: Countervailing Duty Order* ("*CVD Order*"), 76 Fed. Reg. 76,693 (Dep't of Commerce Dec. 8, 2011); *Multilayered Wood Flooring from the People's Republic of China: Amended Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 5,484 (Dep't of Commerce Feb. 3, 2012).

On December 4, 2018, Commerce published a notice for an opportunity to request an administrative review of the 2011 *CVD Order*. Preliminary Decision Memorandum (Jan. 31, 2020) ("PDM") at 1, PR 263 (citing *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 83 Fed. Reg. 62,293 (Dep't of Commerce Dec. 3, 2018)). Petitioner American Manufacturers of Multilayered Wood Flooring ("AMMWF"), and other interested parties, sent Commerce timely requests, and, on March 14, 2019, Commerce initiated the administrative review. *Id.* at 1-2; *see* Initiation of Antidumping and Countervailing Duty Administrative Reviews (Mar. 14, 2019), PR 21.

On May 21, 2019, Commerce selected Baroque Timber Industries (Zhongshan) Co., Ltd. ("Baroque Timber") and Jiangsu Guyu International Trading Co., Ltd. ("Jiangsu Guyu") as mandatory respondents because Commerce had determined, based on data from CBP, that Baroque Timber and Jiangsu Guyu were "the two companies that account for the largest volume of subject merchandise imports" during the period of

review ("POR").  Respondent Selection Memorandum (May 21, 2019) at 6, CR 6, PR 57; *see* PDM at 2-3.

Between May 24, 2019, and December 19, 2019, Commerce issued initial and supplemental questionnaires to Baroque Timber, Jiangsu Guyu and the Government of China ("GOC").  PDM at 3.  The two companies submitted affiliation responses, initial responses and supplemental responses.  *Id.*  The GOC provided an initial response and supplemental responses.  *Id.*

On October 17, 2019, Commerce initiated an investigation of four new subsidy allegations raised by AMMWF for "additional input products that may be used to produce subject multilayered wood flooring": (1) the provision of plywood for less than adequate remuneration ("LTAR"); (2) the provision of sawn wood and continuously shaped wood for LTAR; (3) the provision of particleboard for LTAR; and (4) the provision of fiberboard for LTAR.  *Id.*; *see* AMMWF's New Subsidy Allegations (Aug. 12, 2019) at 7, CR 128-139, PR 152-163.

On February 6, 2020, Commerce issued its preliminary results.  Preliminary Results of Review, 85 Fed. Reg. 6,908 (Dep't of Commerce Feb. 6, 2020), PR 264.  Commerce found that countervailable subsidies were being provided to producers and exporters of multilayered wood flooring programs, including the provision of veneers for LTAR, the provision of plywood for LTAR, the provision of electricity for LTAR, "other subsidies" self-reported by Baroque Timber and Jiangsu Guyu, and the Export Buyers Credit Program ("EBCP").  PDM at 34-41.  Commerce explained that, due to the GOC's failure to provide certain requested information, Commerce applied adverse facts available ("AFA") with respect to electricity for LTAR and the EBCP.  *Id.* at 36-37, 39.

Moreover, Commerce found, using AFA, that certain producers of fiberwood, plywood and veneers were "authorities" as defined by 19 U.S.C. § 1677(5)(B).  *Id.* at 13, 19-20.  Commerce also applied AFA to find that various "other subsidies" investigated were specific.  *Id.* at 33.  In its calculations of veneers for LTAR, Commerce included poplar core sheets that Jiangsu Guyu reported as purchased by its affiliate, Siyang County Shunyang Wood Co., Ltd. ("Shunyang").  *Id.* at 34.  Commerce also included Harmonized Schedule ("HS") category 4412.99 data in its preliminary benchmark calculations, explaining "that it is appropriate to use these data because it includes plywood used to produce subject merchandise."  *Id.* at 14-15.

Following the release of the preliminary results, petitioners, the GOC, Baroque Timber and Jiangsu Guyu submitted case briefs.  IDM at 2; Def.'s Resp. to Pls.' Mots. for J. on the Agency R. ("Def. Br.") at 7, ECF No. 54.  On November 27, 2020, Commerce published the Final Results and continued to apply AFA.  *Final Results*, 85 Fed. Reg. at 76,011; IDM at 7.  Commerce calculated a subsidy rate of 14.09 percent for Baroque Timber and 122.92 percent for Jiangsu Guyu, as well as a rate of 20.75 percent for the non-selected companies.  *Final Results*, 85 Fed. Reg. at 76,012.

Plaintiffs Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao"), Jiangsu Kerry Wood Co., Ltd. and Sino-Maple (Jiangsu) Co., Ltd. (collectively, "plaintiffs"), consolidated plaintiffs[1], consolidated plaintiffs and plaintiff-intervenors Fine

---

[1] Consolidated plaintiffs are formed by Struxtur, Inc. and Evolutions Flooring Inc., Baroque Timber Industries (Zhongshan) Co., Ltd. and Riverside Plywood Corporation, Zhejiang Dadongwu GreenHome Wood Co., Ltd, Metropolitan Hardwood Floors, Inc., Floor & Décor Holdings, Inc., Galleher Corp., Galleher LLC and MCI International and Fine Furniture (Shanghai) Limited and Double F Furniture ("Fine Furniture").

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                          Page 7

Furniture (Shanghai) Limited and Double F Limited (together, "Fine Furniture") and

plaintiff-intervenors[2] (all collectively, the "moving parties") challenged certain aspects of

the Final Results.  Collectively, the moving parties raised nine issues for the court's

review:

      (1) Commerce's selection of mandatory respondents for individual examination;

      (2) Commerce's finding of cross ownership between the affiliates of Jiangsu

Guyu;

      (3) Commerce's inclusion of poplar core sheets in the provision of veneers for

LTAR;

      (4) Commerce's inclusion of "internally-consumed plywood" in its plywood for

LTAR calculation;

      (5) Commerce's determination that Jiangsu Guyu's suppliers of poplar cores are

"authorities";

      (6) Commerce's inclusion of Harmonized Schedule Category 4412.99 in

calculating the plywood benchmark;

      (7) Commerce's investigation of non-alleged subsidies;

      (8) Commerce's use of AFA for the EBCP; and

---

[2] Plaintiff-intervenors are formed by Fine Furniture, Shenzhenshi Huanwei Woods Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, Jiashan Huijiale Decoration Material Co., Ltd., Dalian Jiahong Wood Industry Co., Ltd., Dalian Penghong Floor Products Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd. and Dalian Qianqiu Wooden Product Co., Ltd.

PUBLIC VERSION

(9) Commerce's use of AFA to make its specificity determination concerning electricity for LTAR and to select the electricity benchmark.

On August 11, 2022, this Court issued its decision in *Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1195.  In that decision, the Court held that Commerce's selection of Jiangsu Guyu and Baroque Timber as mandatory respondents was not supported by substantial evidence.  *Id.* at __, 589 F. Supp. 3d at 1213.  The Court held also that, because Commerce's selection of mandatory respondents was not supported by substantial evidence, the calculation of the all-others rate "using the individual margins assigned to Jiangsu Guyu and Baroque Timber was not reasonable."  *Id.* at __, 589 F. Supp. 3d at 1214.  For those reasons, the Court remanded to Commerce for reconsideration Commerce's respondent selection determination and the calculation of the all-others rate.  *Id.*  The Court reserved examination of the remaining issues raised by moving parties and stated that it would address the remaining arguments "to the extent they remain relevant" after receiving the remand results.  *Id.* at __, 589 F. Supp. 3d at 1215.

On October 17, 2022, Commerce published the Draft Results of Redetermination Pursuant to Court Remand.  Draft Results of Redetermination Pursuant to Court Remand (Oct. 17, 2022) ("Draft First Remand Results"), RPR 1 RCR 1.

**PUBLIC VERSION**

On October 26 and 27, 2022, Jiangsu Senmao, AMMWF, Fine Furniture, Jiangsu Guyu and the SRA Companies[3] provided comments on the Draft First Remand Results. Final Results of Redetermination Pursuant to Court Remand (Dec. 7, 2022) ("First Remand Results") at 1-2, RPR 10, RCR 4.

On December 7, 2022, Commerce published its First Remand Results in which, based on the parties' comments regarding the use of CBP data for respondent selection, Commerce: (1) deselected Jiangsu Guyu as a mandatory respondent; (2) assigned Jiangsu Guyu's individually calculated rate to itself; and (3) "relied solely on Baroque Timber's individually calculated CVD subsidy rate as the rate assigned to non-selected companies under review." First Remand Results at 2-3.

On January 11, 2023, plaintiffs, Evolutions, Jiangsu Guyu, AMMWF and Metropolitan Hardwood Floors filed comments in opposition to the First Remand Results. Plaintiffs' Cmts. in Opp'n to First Remand Results ("Pls. First Br. on Remand"), ECF No. 106; Jiangsu Guyu Cmts. in Opp'n to First Remand Results ("Jiangsu Guyu First Br. on Remand"), ECF No. 109; Def.-Intervenor's Cmts. in Opp'n to First Remand Results ("Def.-Intervenor First Br. on Remand"), ECF No. 110; Metropolitan Hardwood Floors' Cmts. in Opp'n to First Remand Results, ECF No. 112; *see* Evolutions Cmts. on First Remand Results, ECF No. 108.

---

[3] These parties are Dalian Penghong Floor Products Co., Ltd., Dalian Shumaike Floor Manufacturing Co., Ltd., Dunhua City Jisen Wood Industry Co., Ltd., Fusong Jinlong Wooden Group Co., Ltd., Fusong Jinqiu Wooden Product Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd. and Dalian Qianqiu Wooden Product Co., Ltd., Chinese exporters of subject merchandise, who supported and incorporated by reference the comments made on the draft remand results by respondents. First Remand Results at 15.

After the submission of the first remand results, the Federal Circuit issued the final mandate in *YC Rubber*, 2022 WL 3711377.  In *YC Rubber*, the Federal Circuit held that when Commerce is required to calculate an average dumping margin from "'a reasonable number of exporters or producers'" to assign to exporters or producers that were not individually investigated, "a 'reasonable number' is generally more than one." *Id*. at *4 (quoting 19 U.S.C. § 1677f-1(c)(2)).

On February 14, 2023, defendant filed an unopposed motion requesting a voluntary remand to consider the effect of *YC Rubber* on Commerce's respondent selection and non-examined company rate determinations in this review.  Def. Mot. for Voluntary Remand at 2.  On that same day, the court granted the motion.  Second Remand Order at 1.

On March 31, 2023, Commerce published its Second Remand Results in which Commerce concluded "that it is reasonable and in accordance with law to continue to decline to select a replacement mandatory respondent in this review" and made no changes to the First Remand Results.  Final Results of Redetermination Pursuant to Court Remand (Mar. 31, 2023) ("Second Remand Results"), at 2-3, ECF No. 119.  The court herein addresses parties' arguments in opposition to the Second Remand Results as well as parties' arguments in the initial challenge to the Final Results.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction under 28 U.S.C. § 1581(c).  On remand, the court will sustain a determination by Commerce if the determination is "in accordance with the remand order . . . supported by substantial evidence[] and . . . otherwise in accordance

**PUBLIC VERSION**

with law." *MacLean-Fogg Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1349,

1355 (2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see Prime Time Com. LLC v. United

States*, 45 CIT __, __, 495 F. Supp. 3d 1308, 1313 (2021) (quoting 19 U.S.C. §

1516a(b)(1)(B)(i)).

The "substantial evidence" standard requires "more than a mere scintilla" of

evidence, *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co.

of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)), "but is satisfied by 'something less than the

weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir.

2004) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.

Cir. 1984)). "To implement this standard, Commerce must provide a 'rational connection

between the facts found and the choice made.'" *YC Rubber*, 2022 WL 3711377, at *3

(citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Federal Circuit has stated that for a reviewing court to "fulfill [its] obligation"

to evaluate whether a determination by Commerce is supported by substantial evidence

and is in accordance with law, Commerce is required to "examine the record and

articulate a satisfactory explanation for its action." *CS Wind Viet. Co. v. United States*,

832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v.

United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)); *see Husteel Co. v. United States*,

31 CIT 740, 748, 491 F. Supp. 2d 1283, 1291 (2007) ("An agency's determination is not

supported by substantial evidence where the agency fails to adequately explain the

basis on which the agency made its decision." (citing *Viraj Forgings, Ltd. v. United

States,* 28 CIT 2086, 2089, 350 F. Supp. 2d 1316, 1320 (2004))).

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 12

In addition, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)).  However, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

**DISCUSSION**

I.    **Respondent selection**

A.    **Legal framework**

19 U.S.C. § 1677f-1(e)(1) provides that "in determining countervailable subsidy rates . . . , the administering authority shall determine an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise."

However, if a large number of exporters or producers is involved in the investigation or review such that "it is not practicable to determine individual countervailable subsidy rates under paragraph (1)," Commerce may "determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting examination to—exporters and producers accounting for the

PUBLIC VERSION

largest volume of the subject merchandise from the exporting country that the

administering authority determines can be reasonably examined[.]"  19 U.S.C. § 1677f-

1(e)(2)(A)(ii).

The statute further provides that "[t]he individual countervailable subsidy rates

determined under subparagraph (A) shall be used to determine the all-others rate under

section 1671d(c)(5) of this title."  *Id.* § 1677f-1(e)(2).

### B.    Analysis

#### 1.    Whether Commerce's decision on remand to select a single mandatory respondent after deselecting Jiangsu Guyu was in accordance with the statute

The issue before the court is whether Commerce's decision on remand to select

a single mandatory respondent after deselecting Jiangsu Guyu was consistent with the

statute.

Plaintiffs argue that Commerce should select an additional mandatory

respondent pursuant to § 1677f-1 and consistent with the Federal Circuit's holding in *YC*

*Rubber.*  Pls.' Comments in Opp'n to the Final Results of Redetermination Pursuant to

Court Remand ("Pls. Second Br. on Remand") at 5-7, ECF No. 121.  In that case, the

Federal Circuit interpreted the statute to "generally require[] that the 'reasonable

number' [of mandatory respondents] is greater than one."  *YC Rubber*, 2022 WL

3711377, at *3.

Defendant responds that Commerce "reasonably interpreted . . . *YC Rubber* as

instructing that if Commerce departs from the norm of selecting more than one

mandatory respondent when multiple companies had requested review and when

Commerce has decided to limit its individual examination to a 'reasonable number' of exporters or producers, [Commerce] must demonstrate that it is 'reasonable' to do so." Def.'s Comments Supporting Remand Redetermination ("Def. Br. on Remand") at 18, ECF No. 130.  Defendant contends that in the instant case, in light of the administrative burden of reviewing an additional respondent at this stage as well as the purported "representativeness" of Baroque Timber's rate, Commerce's decision to rely only on Baroque Timber's rate for the all-others rate was "consistent with *YC Rubber*."  *Id.* at 19-20.

The court concludes that Commerce's decision was not consistent with the statute.

Commerce determined that it was not practicable to investigate individually all exporters or producers of the subject merchandise and chose instead to examine "a reasonable number" of exporters or producers pursuant to § 1677f-1(e)(2)(A)(ii).  First Remand Results at 17; Second Remand Results at 20-21.

Section 1677f-1(e)(1) establishes a general rule wherein Commerce is required to "determine an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise."  Section 1677f-1(e)(2) provides an exception to the general rule for when Commerce "determines that it is not practicable to determine individual countervailable subsidy rates . . . because of the large number of exporters or producers involved in the investigation or review."  As relevant here, § 1677f-1(e)(2)(A)(ii) allows Commerce to "limit[] its examination" to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined."  In addition, §

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                                 Page 15

1677f-1(e)(2) directs Commerce to use the "individual countervailable subsidy rates" calculated under that subsection "to determine the all-others rate under [§ 1671d(c)(5)]." Section 1671d(c)(5)(A) in turn states that "the all-others rate shall be an amount equal to the weighted average countervailable subsidy rates established for exporters and producers individually investigated."

In *YC Rubber*, 2022 WL 3711377, at *3, the Federal Circuit examined whether Commerce acted in accordance with law when Commerce used a single mandatory respondent in calculating the all-others rate. There, Commerce initially selected two mandatory respondents in the second administrative review of an antidumping order, but one of the two respondents withdrew from the review two weeks after Commerce issued its first questionnaire. *Id.* at *1-2. So, Commerce "use[d] a single mandatory respondent" to calculate the weighted-average dumping margin, which Commerce applied to all participants in the review. *Id.*

The Court began: "The question is whether the statute permits Commerce to review a single exporter or producer when multiple have requested review and Commerce has not demonstrated that it was otherwise reasonable to calculate the all-others rate based on only one respondent." *Id.* at *3.

In that case, the Federal Circuit held that Commerce's decision was "contrary to the statute's unambiguous language" because the statute requires that the all-others rate be based on the weighted average of "a 'reasonable number' [of exporters or producers]," which the court concluded "is generally more than one." *Id.*

PUBLIC VERSION

The court considers the holding of the Federal Circuit in *YC Rubber* apposite to this case.[4]  Here, Commerce based its all-others rate on the weighted average countervailable subsidy rate of a single mandatory respondent, which the Federal Circuit concluded in *YC Rubber* was "contrary to the statute's unambiguous language." *Id.*

Defendant maintains that *YC Rubber* does not require Commerce in the instant case to select an additional mandatory respondent.  Def. Br. on Remand at 18-21. Defendant observes correctly that the Federal Circuit stated that Commerce could rely on one mandatory respondent where Commerce "demonstrated that it was otherwise reasonable" to do so to calculate the all-others rate.  *Id.* at 18.  According to defendant, Commerce acted reasonably for two reasons in basing the all-others rate on only Baroque Timber's CVD rate.  *Id.* at 18-21.  First, defendant points out that in *YC Rubber* one of the selected companies withdrew from the review only two weeks after Commerce issued its first questionnaire, while in the instant case Commerce "fully reviewed two companies throughout the administrative review," and was left with one mandatory respondent "only after the Court remanded the case."  *Id.* at 17.  Commerce in its remand results explained that "reviewing an additional mandatory respondent" at this stage would impose on Commerce a "significant administrative burden."  *Id.* at 19

---

[4] *YC Rubber, Co. (North America) LLC v. United States*, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022), addressed 19 U.S.C. §§ 1677f-1(c)(2) and 1673d(c)(5), which pertain to respondent selection and calculation of the all-others rate in antidumping investigations or reviews.  But the provisions at issue in the instant case pertaining to countervailing duty investigations and reviews mirror in all material respects the statutory requirements that the Federal Circuit examined in *YC Rubber*.  For that reason, the Federal Circuit's analysis in that case is apposite to the instant case.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 17

(quoting Second Remand Results at 12).  Second, Commerce stated also that "record

evidence supports the conclusion that Baroque Timber's data is reasonably

representative of other exporters and producers."  *Id.* at 20 (citing Second Remand

Results at 8).

Neither justification for Commerce's actions in this case is persuasive.  *YC

Rubber* applies with particular force in this case given Commerce's actions.  It is true, as

defendant points out, that Commerce was left with only one mandatory respondent only

after remand and not in the early stages of Commerce's investigation.  However, that is

the case only because Commerce failed at the outset of its investigation and thereafter

"to consider evidence that challenged the reliability" of the CBP data on which

Commerce was relying to select Jiangsu Guyu as the second mandatory respondent.[5]

*Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1213.  As this Court detailed in its

---

[5] Defendant asserts that "reopening the record and conducting a full investigation of an
entirely new respondent would impose an unreasonable administrative burden on
Commerce and would lead to excessively prolonged reviews in any cases where, like
here, the number of mandatory respondents was reduced on remand for reasons
unforeseeable at the beginning of the review."  Def. Br. on Remand at 6-7.  There may
be circumstances in which after remand Commerce is left with a single mandatory
respondent, Commerce would not be required to select an additional mandatory to
include in the all-others rate.  However, in the case before the court, defendant's
contention that it was "unforeseeable" that Commerce would be left with a single
mandatory respondent after remand is not accurate.  As noted, numerous interested
parties, including both respondents and defendant-intervenor AMMWF, brought to
Commerce's attention that the CBP data on which Commerce relied for its respondent
selection included "unrealistically" large quantities for Jiangsu Guyu.  Comments on
CBP Data and Request for Issuance of Q&V Questionnaires on behalf of Jiangsu
Senmao (Mar. 21, 2019), CR 3, PR 39; Letter from Wiley Rein LLP to Secretary of
Commerce Pertaining to AMMWF Comments on CBP Data and Respondent Selection
(Mar. 22, 2019), CR 5, PR 44.  Commerce declined to issue Q&V questionnaires and
continued to rely on the flawed CBP data.  Due to these obvious and significant errors in
Commerce's respondent selection, it was or should have been foreseeable to
Commerce that it could be left with a single mandatory respondent after remand.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 18

initial remand to Commerce, numerous interested parties (including both petitioner and respondents) brought to Commerce's attention the unreliability of the CBP data; Commerce repeatedly ignored these entreaties. *Id.* at __, 589 F. Supp. 3d at 1211-13. As this Court noted in response to the Federal Circuit's holding in *YC Rubber*:

> As the *YC Rubber II* court indicated with its use of the modifier "generally," answering that question in any particular situation will require the agency to balance considerations such as the resources available to it, the speed with which it can identify another respondent, and the agency's deadlines for completing the segment.

*YC Rubber Co. (North America) LLC v. United* States, 48 CIT __, __, 711 F. Supp. 3d 1387, 1398 (2024).

In the "particular situation" of this case, Commerce may not now profess that there is not sufficient time or that selection of a second respondent at this stage would impose too great a cost in terms of agency resources. *Id.* Commerce was presented at the initial stages of its investigation with ample opportunity to make a course correction. *Both* petitioner and respondents flagged apparent irregularities in the data — an unusual circumstance that should have been an even brighter red flag to Commerce. Such a course correction would have been consistent with agency resources and statutory deadlines.

In fact, the court is disappointed that Commerce has now allowed this error to fester — and, as a consequence, to use valuable resources of the parties and the court — not only through the review, not only to require one remand, but now to require yet a second remand. All of this time, and all of these resources could have been put to better use had Commerce simply accepted at the outset the error that it made.

**PUBLIC VERSION**

Commerce's final argument for relying on a single mandatory respondent is the relative volume of Baroque Timber's exports to the United States.  Commerce maintained that Baroque Timber's rate was "representative" because it was the [[       ]] exporter during the POR and because its quantity of exports [[

                                                    ]].  Second Remand Results at 22.

This argument fails as well.  In every investigation or review, there will necessarily be a [[       ]] exporter or producer.  As plaintiffs state: "[W]hile it might be reasonable to select a single mandatory if the [[       ]] exporter accounted for the vast majority of exports during the POR, those are not the facts here."  Pls. Second Br. on Remand at 9.

Accordingly, Commerce has not "demonstrated that it was otherwise reasonable to calculate the all-others rate based on only one respondent."  *YC Rubber*, 2022 WL 3711377, at *3.  On remand, Commerce is required to "correct the error it made when it decided, contrary to [§ 1677f-1(e)(2)]," to base the all-others rate on the single mandatory respondent in this case, Baroque Timber.  *Siemens Gamesa Renewable Energy v. United States*, 47 CIT __, __, 632 F. Supp. 3d 1337, 1348 (2023).  Moreover, because Commerce decided to proceed according to largest export volume under § 1677f-1(e)(2)(A)(ii), the court directs Commerce to select for examination Jiangsu Senmao, which was one of the two "exporters or producers accounting for the largest volume of the subject merchandise" during the POR.

**PUBLIC VERSION**

> **2.    Whether Commerce was required to include Jiangsu Guyu's individually calculated rate in the non-selected company "all-others" rate**

The court addresses next whether Commerce's decision to exclude Jiangsu Guyu's individually calculated rate from the all-others rate was consistent with the First Remand Order and in accordance with law.

In the *Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1214, this Court stated:

> [W]here there is a question of whether the selected respondents were the largest exporters during the POR, the respondents can neither be treated as representative nor can they be relied upon by Commerce to calculate the rate for non-examined companies. As Commerce's selection of mandatory respondents is not supported by substantial evidence, the calculation of the rate for non-selected companies using the individual margins assigned to Jiangsu Guyu and Baroque Timber was not reasonable, and, therefore, the court remands to Commerce for reconsideration the calculation of the rate for non-selected companies.

On remand, Commerce removed from the CBP data [[   ]] entries "with unrealistically large quantities" and concluded Jiangsu Guyu was "no longer one of the top two exporters during the [POR]."  First Remand Results at 12; Second Remand Results at 23.  In the draft remand, Commerce initially "determined that it was appropriate to include Jiangsu Guyu's rate in the calculation of the non-selected rate, in accordance with [§ 1671d(c)(5)(A)]."  First Remand Results at 14 (citing Draft First Remand Results at 14-17).  However, in the final results of redetermination Commerce revised that draft conclusion and determined that "the selection of Jiangsu Guyu as a mandatory respondent was not supported by substantial evidence," and for that reason "deselecting Jiangsu Guyu as a mandatory respondent would be appropriate."  *Id.* at 12;

Second Remand Results at 23.  Commerce relied on the language quoted above from the First Remand Order.  First Remand Results at 14 (citing *Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1214).

AMMWF opposes this aspect of Commerce's Final Results.  Def.-Intervenor First Br. on Remand at 2-3.  According to AMMWF, Commerce and this Court erred in concluding that the data for erroneously selected mandatory respondents cannot be relied upon in calculating the all-others rate.  *Id.*  AMMWF asserts that in calculating the all-others rate, "the statute plainly requires Commerce to use all CVD rates calculated for individually investigated producers that are not zero, *de minimis*, or based entirely on adverse facts available."  *Id.* at 3-4 (quoting 19 U.S.C. § 1671d(c)(5)(A)(i)).

Commerce's decision to exclude Jiangsu Guyu's rate from the calculation of the all-others rate was consistent with the statute.

19 U.S.C. § 1677f-1(e) governs Commerce's "[d]etermination of [the] countervailable subsidy rate":

(1) General rule
　　In determining countervailable subsidy rates under section 1671b(d), 1671d(c), or 1675(a) of this title, the administering authority shall determine an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise.
(2) Exception
　　If the administering authority determines that it is not practicable to determine individual subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
　　　　(A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—

**PUBLIC VERSION**

(i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of the selection, or

(ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or

(B) determine a country-wide subsidy rate to be applied to all exporters and producers.

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

The statute directs Commerce under the "general rule" to find "an individual countervailable subsidy rate for each known exporter or producer." *Id.* Where Commerce decides that it is not practicable to determine individual subsidy rates for each exporter or producer, the statute gives Commerce three options. As relevant here, under subsection (2)(A)(ii), Commerce "may . . . determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to . . . *exporters and producers accounting for the largest volume of the subject merchandise* from the exporting country that the administering authority determines can be reasonably examined." *Id.* (emphasis supplied). The statute directs further: "The individual countervailable subsidy rates determined under subparagraph (A) *shall be used* to determine the all-others rate under section 1671d(c)(5) . . . ." *Id.* (emphasis supplied).

**PUBLIC VERSION**

In short, subsection (A)(ii) states unambiguously that where Commerce decides to "limit[] its examination," Commerce "shall . . . use[] . . . [the] . . . individual countervailable subsidy rates" of "exporters and producers accounting for the largest volume of the subject merchandise" to determine the all-others rate.

Commerce's initial selection of Jiangsu Guyu as a mandatory respondent was not supported by substantial evidence. *Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1214. Commerce then determined on remand — and AMMWF does not contest — that Commerce's initial determination that Jiangsu Guyu was one of the largest exporters or producers was not correct and that in fact Jiangsu Guyu *was not* one of the "exporters and producers accounting for the largest volume of the subject merchandise." First Remand Results at 12; Second Remand Results at 4. For that reason, Commerce's decision to exclude Jiangsu Guyu's rate from the calculation of the all-others rate is in accordance with the statute.

AMMWF maintains that the statute requires Commerce to include Jiangsu Guyu's rate in its calculation of the all-others rate solely because Jiangsu Guyu was "individually investigated." Def.-Intervenor First Br. on Remand at 3-5. The court declines, as it must, to read "individually investigated" under § 1671d(c)(5)(A) in a way that renders the requirements of § 1677f-1(e)(2)(A) "inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[A] statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (internal citation omitted)). The structure of the statute limits the exporters or producers that Commerce may use in calculating the all-

**PUBLIC VERSION**

others rate.  Section 1677f-1(e)(2)(A) prescribes specific parameters that Commerce is

to apply in selecting the exporters and producers that may serve as the basis for the all-

others rate under that provision.  In this case, Commerce proceeded according to

subsection (e)(2)(A)(ii), which allows Commerce to "limit[] its examination" to "exporters

and producers accounting for the largest volume of the subject merchandise from the

exporting country that [Commerce] determines can be reasonably examined."  This

Court and the Federal Circuit have stated repeatedly that the statutory scheme reflects

"an assumption" that "using data from the largest volume exporters" "can be viewed as

representative of all exporters."  *Albemarle Corp. & Subsidiaries v. United States*, 821

F.3d 1345, 1353 (Fed. Cir. 2016); *Qingdao Qihang Tyre Co., Ltd. v. United States*, 42

CIT __, __, 308 F. Supp. 3d 1329, 1362 (2018) ("[T]he examined respondents are

treated as representative of other respondents by virtue of being the largest

exporters.").

AMMWF would require Commerce to include within the all-others rate the

subsidy rate from an exporter or producer that Commerce selected *erroneously* for

individual investigation and that the record demonstrates is *not* one of the largest

exporters or producers.  Such a reading would result in the court rendering "inoperative"

§ 1677f-1(e)(2)(A).  Accordingly, the court declines to do so.

**PUBLIC VERSION**

AMMWF further maintains that the Federal Circuit in *MacLean-Fogg Co. v. United States*, 753 F.3d 1237 (Fed. Cir. 2014), applied § 1671d(c)(5)(A)[6] such that the rate of any company individually investigated be included in the calculation of the all-others rate. Def.-Intervenor First Br. on Remand at 7. *MacLean-Fogg* is inapposite. The Federal Circuit's holding in *MacLean-Fogg* is limited to the question of whether "individually investigated" under § 1671d(c)(5)(A) includes within its scope the individually calculated rates of voluntary respondents. 753 F.3d at 1246 ("Accordingly, 'exporters and producers individually investigated' in the context of 19 U.S.C. § 1671d(c)(5)(A) must be read to encompass the voluntary respondents."). *MacLean-Fogg* does not require that the rates for exporters or producers selected incorrectly as mandatory respondents under § 1677f-1(e)(2)(A)(ii) be included in the "all-others" rate under § 1671d(c)(5)(A) — even if that incorrectly selected company was individually investigated.

In sum, Commerce's decision to exclude Jiangsu Guyu's rate from the calculation of the all-others rate was consistent with the Court's remand order and in accordance with the statute.

---

[6] Section 1671d(c)(5) governs Commerce's calculation of the all-others rate in an investigation. However, Commerce looks to that section also for purposes of calculating the all-others rate in administrative reviews. *See* Second Remand Results at 14; *see also YC Rubber Co. (N. Am.) LLC v. United States*, 48 CIT __, __, 711 F. Supp. 3d 1387, 1397 (2024) ("Thus, even accepting that section 1673d(c)(5) does not apply to administrative reviews on its face, it may be appropriate to take account of its requirements when the agency applies section 1677f-1(c)(2), even in administrative reviews.").

**PUBLIC VERSION**

> **3.    Whether Commerce's decision to continue to apply to Jiangsu Guyu its individually calculated rate after deselecting it as a mandatory respondent complies with the court's remand order, is supported by substantial evidence and is in accordance with law**

The court addresses next Commerce's decision to continue to apply to Jiangsu Guyu its individually calculated rate.  In *Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1213, the Court held that Commerce's selection of Jiangsu Guyu and Baroque Timber as mandatory respondents was not supported by substantial evidence because "Commerce failed to consider evidence that challenged the reliability of the Customs data and failed to seek such information by issuing Q&V questionnaires or requesting such data from Jiangsu Guyu."  The Court concluded for that reason that Commerce's "calculation of the rate for non-selected companies using the individual margins assigned to Jiangsu Guyu and Baroque Timber was not reasonable."  *Id.* at __, 589 F. Supp. 3d at 1214.  The Court then remanded to Commerce to reconsider the calculation of the rate for non-selected companies.  *Id.*

On remand, Commerce "exclude[d] [Jiangsu Guyu's] rate from the calculation of the non-selected company rate" because "Jiangsu Guyu is no longer one of the top two exporters."  Second Remand Results at 18.  However, Commerce "continued to apply Jiangsu Guyu's individually calculated CVD rate to Jiangsu Guyu" because its rate "[was] based on substantive record evidence and [was] calculated using the compan[y's] own submitted data."  First Remand Results at 13; *see also* Second Remand Results at 18.  For that reason, Commerce concluded that "to assign [Jiangsu

Consol. Court No. 20-03885                                                    Page 27

Guyu]" the non-selected company rate "would yield a less accurate outcome."  First

Remand Results at 24; Second Remand Results at 18.

Jiangsu Guyu challenges that decision with four arguments: (1) Commerce "did

not, in effect, 'deselect[] Jiangsu Guyu, in accordance with the Court's First Remand

Order' because the Department continues to apply an individually calculated rate to

Jiangsu Guyu," Pl.-Intervenors' Comments on Remand Results ("Pl.-Intervenors Second

Br. on Remand") at 2, ECF No. 124; (2) Commerce's decision to continue to apply to

Jiangsu Guyu its individually calculated rate "lacks statutory authority"[7], Pl.-Intervenors'

Comments in Opp'n to Remand Results ("Pl.-Intervenors First Br. on Remand") at 2,

ECF No. 109; (3) "the rate calculated for Guyu was not supported by substantial

evidence . . . as Guyu should not have been individually investigated *ab initio*"; and (4)

the information on which Jiangsu Guyu's individually calculated rate was based was

"fruit of the poisonous tree," and "unlawfully obtained" thereby "[taking] away Guyu's

ability to participate in this administrative review as a non-investigative company," *Id.* at

7.  Jiangsu Guyu asserts for these reasons that Commerce should assign to Jiangsu

Guyu the all-others rate.  *Id.* at 2, 7-9.

Each of Jiangsu Guyu's arguments fails.  First, Commerce's decision is

consistent with the statute.  In both the First and the Second Remand Results,

Commerce addressed plaintiff's arguments and explained that "it would be inappropriate

to assign Jiangsu Guyu the same rate as non-selected companies" because §

---

[7] On this point, Jiangsu Guyu relies on and incorporates by reference the "statutory analysis presented by respondents in their Comments on the Draft Remand Results." Pl.-Intervenors First Br. on Remand at 2.

PUBLIC VERSION

1671d(c)(1) "describes the 'all-others rate' as applicable to 'the exporters and producers

not individually investigated.'"  First Remand Results at 13-14; Second Remand Results

at 18.  Commerce then noted that Jiangsu Guyu was in fact "an individually investigated

exporter/producer, which remains true despite Commerce's reevaluation of Jiangsu

Guyu as a mandatory respondent."  First Remand Results at 13-14.  The statute

provides that the "all-others" rate applies only to those exporters or producers not

individually investigated:

> (1) Effect of affirmative determination by the administering authority
>> If the determination of the administering authority under subsection (a) is affirmative, then—
>>> (A) . . .
>>> (B)(i) the administering authority shall—
>>>> (I) determine an estimated individual countervailable subsidy rate *for each exporter or producer individually investigated*, and, in accordance with paragraph (5), an estimated all-others rate for all exporters and producers *not individually investigated* and for new exporters and producers within the meaning of section 1675(a)(2)(B) of this title . . . .

19 U.S.C. § 1671d(c)(1) (emphases supplied).

Jiangsu Guyu does not dispute that it was individually investigated.  Pl.-

Intervenors First Br. on Remand at 1-2.  Therefore, the statute does not permit

Commerce to apply the all-others rate to Jiangsu Guyu.

The "general rule" set out at § 1677f-1(e)(1) buttresses this conclusion.  That

"general rule" requires that Commerce "determine an individual countervailable subsidy

rate for each known exporter or producer," a rule that in turn evinces a congressional

**PUBLIC VERSION**

preference for accuracy and specificity in the calculation of countervailable subsidy rates. *Id.* § 1677f-1(e)(1).[8]

Second, Commerce's decision is supported by substantial evidence. Commerce explained that "[n]either the Court's remand decision nor the evidence on the record with respect to CBP data entries invalidates the individual subsidy rates calculated for Jiangsu Guyu and Baroque Timber, as those rates were based on substantive record evidence and were calculated using the companies [sic] own submitted data." First Remand Results at 13.

Third, Commerce's decision to continue to apply to Jiangsu Guyu its individually calculated rate is consistent with this Court's remand order. In *Jiangsu Senmao I*, 46 CIT at __, 589 F. Supp. 3d at 1214, the Court stated: "[W]here there is a question of whether the selected respondents were the largest exporters during the POR, the respondents can neither be treated as representative nor can they be relied upon by Commerce to calculate the rate for non-examined companies." The Court therefore "remand[ed] to Commerce for reconsideration the calculation of the rate for non-

---

[8] The Statement of Administrative Action ("SAA") further supports Commerce's decision to apply to Jiangsu Guyu its individually calculated rate:

> Section 264(a) of the bills amends section 703(d)(1) to provide that when Commerce issues an affirmative preliminary CVD determination, *it will determine an individual countervailable subsidy rate to be applied to each exporter and producer individually investigated* and an all-others rate to be applied to those exporters and producers who were not individually investigated. . . . Section 705(c)(1)(B) would apply similar rules to affirmative final CVD determinations.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 941 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209.

selected companies." *Id.* Consistent with the Court's remand order, Commerce excluded from the all-others rate the individually calculated rate of Jiangsu Guyu. The Court did not instruct Commerce as to whether it should continue to apply to Jiangsu Guyu its individually calculated rate.

Finally, the countervailable subsidy rate that Commerce calculated for Jiangsu Guyu, as Commerce stated, "result[ed] from an individual examination of [Jiangsu Guyu's] own company-specific information on the record." First Remand Results at 13. Jiangsu Guyu's assertion that its information was "fruit of the poisonous tree" misunderstands its "rights" under the countervailing duty law: "[T]here is no right not to be subject to review or individual examination." *Diamond Sawblades Mfrs. Coal. v. United States*, 43 CIT __, __, 359 F. Supp. 3d 1374, 1380 (2019).

In sum, Commerce's decision to apply to Jiangsu Guyu its individually calculated rate complied with the Court's remand order, is supported by substantial evidence and is in accordance with law.

## II.  Commerce's finding of cross-ownership between the affiliates of Jiangsu Guyu

The court turns next to the remaining arguments of the moving parties in the initial challenge to Commerce's Final Results.

### A.  Background

Commerce determined preliminarily that Jiangsu Guyu[9] is a "trading company," and "pursuant to 19 CFR 351.525(c), '[b]enefits from subsidies provided to a trading

---

[9] Jiangsu Guyu is "an exporter that is wholly owned by [Shengyu], which is a producer of subject merchandise." PDM at 9.

PUBLIC VERSION

company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm which is producing subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated.'"  PDM at 10.  Commerce concluded that Jiangsu Guyu, Shengyu, Shunyang and Woyuan were "cross-owned within the meaning of 19 CFR 351.525(b)(6)(vi) by virtue of common ownership."  *Id.*  Commerce preliminarily concluded also that "Shengyu is a parent company that produces subject merchandise" and, in accordance with 19 C.F.R. § 351.525(b)(iii), Commerce "attribute[d] subsidies to the consolidated sales of [Shengyu] and its subsidiaries."  *Id.*  Commerce found next that Shunyang "is a cross-owned input supplier," and, in accordance with § 351.525(b)(iv), Commerce "attribute[d] subsidies received by [Shunyang] to the combined sales of the downstream products produced by Shengyu."  *Id.*

Jiangsu Guyu argued in its case brief "for the first time in [the] review . . . that Shengyu and Shunyang are not cross-owned, because there exists only a 'simple family relationship between shareholders.'"  IDM at 18.

However, in the Final Results, Commerce "continue[d] to find that Jiangsu Guyu, Shengyu, Shunyang, and [Woyuan] are cross-owned . . . by virtue of common ownership" because "[t]hroughout [the] review, Jiangsu Guyu has consistently reported that Shengyu and Shunyang are cross-owned affiliates."  *Id.*  Commerce continued to find also that "Shunyang is a cross-owned input supplier," and therefore "attribute[d] subsidies received by Shunyang to the combined sales of the products produced by Shengyu and Shunyang."  *Id.*

PUBLIC VERSION

### B.    Legal Framework

Commerce "normally will attribute a subsidy to the products produced by the corporation that received the subsidy."  19 C.F.R. § 351.525(b)(6)(i).  However, subsidies received by cross-owned companies are jointly attributed to subject merchandise produced by both corporations.  *Id.* § 351.525(b)(6)(ii).  In addition, "[i]f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, [Commerce] will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations." *Id.* § 351.525(b)(6)(iv).

Commerce's regulations define "cross-ownership" as existing "between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations."  *Id.* § 351.525(b)(6)(vi).

Commerce in the instant CVD questionnaire added to the definition of cross-ownership and stated:  "[I]f two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent)."  Countervailing Duty Questionnaire (May 24, 2019) at III-3, PR 61.

19 U.S.C. § 1677(33) defines "affiliated" or "affiliated persons" to include, inter alia: "[m]embers of a family, including . . . lineal descendants," "[a]ny person directly or

PUBLIC VERSION

indirectly owning, controlling, or holding with power to vote, 5 percent or more" of the

voting shares of any organization, "[t]wo or more persons directly or indirectly

controlling, controlled by, or under common control with, any person," and "[a]ny person

who controls any other person and such other person."  The statute states further that

"a person shall be considered to control another person if the person is legally or

operationally in a position to exercise restraint or direction over the other person."  *Id.*

However, as this Court has recognized, "[t]he regulatory preamble expressly

distinguishes the 'cross-ownership' defined by 19 C.F.R. § 351.525(b)(6)(vi) from the

broader concept of 'affiliation,' found in 19 U.S.C. § 1677(33)."  *Nantong Uniphos*

*Chems. Co. v. United States*, Slip Op. 18-78, 2018 WL 3134845, at *3 n.3 (CIT June 25,

2018) (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't of Commerce

Nov. 25, 1998)).  "Affiliation is seen as a lower bar."  *Id.*; *see also Beijing Tianhai Indus.*

*Co. v. United States*, 39 CIT __, __ n.20, 52 F. Supp. 3d 1351, 1366 n.20 (2015) ("As is

made clear by the statute and Commerce's regulations, entities may share an affiliate

relationship absent cross-ownership between them.").

**C.    Analysis**

The court addresses next whether Commerce's finding of cross-ownership among

Jiangsu Guyu, Shunyang and Shengyu is supported by substantial evidence and is in

accordance with law.

In the Final Results, Commerce concluded that Jiangsu Guyu, Shengyu,

Shunyang and Woyuan "are cross-owned within the meaning of 19 CFR

351.525(b)(6)(vi) by virtue of common ownership."  IDM at 19.  Plaintiff-intervenors

argue that Jiangsu Guyu, Shengyu and Shunyang are not cross-owned.  Mem. of Law

PUBLIC VERSION

in Supp. of Pl.-Intervenors' Rule 56.2 Mot. for J. on the Agency R. ("Pl.-Intervenors

MJAR") at 29-31, ECF No. 52-53.  According to plaintiff-intervenors, "the only nexus

between Shunyang and Shengyu is a family relationship between their shareholders."

*Id.* at 30.  Plaintiff-intervenors maintain that this familial relationship "does not allow

either of these individuals to 'direct the individual assets of another company in

essentially the same ways it can use its own assets,'" and, for that reason, "Commerce's

application of LTAR provisions across these companies was unlawful and unsupported

by substantial evidence."  *Id.* at 30-31.

Commerce's conclusion that Jiangsu Guyu, Shengyu, Shunyang and Woyuan are

cross-owned is supported by substantial evidence.

With respect to cross-ownership, Commerce's regulation states:

Cross-ownership exists between two or more corporations where one corporation can use or direct the assets of the other corporation(s) in essentially the same ways it can use its own assets.  Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.

19 C.F.R. § 351.525(b)(6)(vi).

To start, the court notes that the regulation provides that "normally" cross-

ownership is met where there is "majority voting ownership" between two corporations

or where there is "common ownership" of two or more corporations.  *Id.*  However, the

regulation does not preclude a finding of cross-ownership in other circumstances in

which "one corporation can use or direct the assets of the other corporation[] in

essentially the same ways it can use its own assets."  *Id.*

As Commerce stated in the IDM, throughout the review, Jiangsu Guyu "reported

that Shengyu and Shunyang are cross-owned affiliates."  IDM at 18.  In Commerce's

**PUBLIC VERSION**

affiliation questionnaire, Commerce defined cross-ownership and requested that

respondents:

> [P]rovide a <u>complete</u> questionnaire response for those affiliates where
> "cross ownership" exists, and <u>one</u> of the following situations exists:
>
> - the cross-owned company produces the subject
>   merchandise; <u>or</u>
> - the cross-owned company is a holding company or a parent
>   company (with its own operations) of your company; <u>or</u>
> - the cross-owned company supplies an input product to you
>   for production of the downstream product produced by the
>   respondent; <u>or</u>
> - the cross-owned company has received a subsidy and
>   transferred it to your company.

Response to Section III Identifying Affiliated Companies on behalf of Jiangsu Guyu

(June 21, 2019) ("Jiangsu Guyu Affiliation Response") at 2-3, CR 12, PR 84.

In response to Commerce's request, Jiangsu Guyu stated that it would "provide .

. . complete responses for" Shengyu, Shunyang and Woyuan because (1) "during the

POR, Guyu was [[                                        ]]"; (2) "during the POR, [[          ]] was

jointly owned by [[          ]] and [[              ]], who are the [[

                                                                ]]; and (3) [[

          ]] shareholder of Jiangsu Guyu.  *Id.* at 3.  Jiangsu Guyu repeated

these assertions in a supplemental questionnaire response.  *See* Response to Section

III Supplemental Questionnaire on behalf of Jiangsu Guyu (Sept. 30, 2019) at 2-3, CR

147-158, PR 190 ("In accordance with the definition of the [sic] 'cross-ownership', and

the criteria for affiliates . . . Guyu also provided complete questionnaire responses for

[Shengyu, Shunyang and Woyuan].").[10]  Jiangsu Guyu reported further that [[


        ]].  Jiangsu Guyu Affiliation Response at Ex. 2.

    "[T]he consideration underlying [the cross-ownership rule] is the merging of

corporate interests."  *Nantong Uniphos*, 2018 WL 3134845, at *2.  Based on the above,

Commerce found that Jiangsu Guyu reported consistently in response to Commerce's

questionnaires that Jiangsu Guyu, Shengyu, Shunyang and Woyuan were cross-owned

affiliates.  Then, after Commerce preliminarily determined that the companies were

"cross-owned . . . by virtue of common ownership," Jiangsu Guyu argued in its case

brief that Shengyu and Shunyang are not cross-owned "because there exists only a

'simple family relationship between shareholders.'"  IDM at 18.  However, Jiangsu Guyu

failed to explain the reasons that it represented to Commerce previously and repeatedly

that the companies were cross-owned.  *See* Resubmittal of Case Brief on behalf of

Jiangsu Guyu (Mar. 19, 2020) ("Jiangsu Guyu Case Br."), CR 223-224, PR 326-327.

    Commerce explained that it determined, in accordance with 19 C.F.R. §

351.525(b)(6)(vi), that cross-ownership existed between the companies "because these

companies can use or direct the individual assets of the other corporation(s) in

essentially the same ways they can use their own assets."  IDM at 18.  Commerce

---

[10] Jiangsu Guyu referred to Shengyu and Shunyang as cross-owned affiliates a second
time in the supplemental questionnaire response by agreeing to a Commerce request
"to unbracket the names of Shengyu and Shunyang "[i]n order for Commerce to be
able to discuss [Jiangsu Guyu's] cross-owned affiliates on the record."  Response to
Section III Supplemental Questionnaire on Behalf of Jiangsu Guyu (Sept. 30, 2019) at
3, CR 190, PR 147-158.

PUBLIC VERSION

continued that it considered "aspects of potential affiliation/cross-ownership between these companies, including familial relationships, ownership, and shareholder interests." *Id.*

Commerce noted further that the preamble to the final rule "clarifies Commerce's cross-ownership standard," and states:  "[T]he interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits). . . .  Cross-ownership does not require one corporation to own 100 percent of the other corporation.  Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations."  *Id.* at 18-19 (citing *Countervailing Duties*, 63 Fed Reg. at 65,401).

Based on the questionnaire responses of Jiangsu Guyu and Commerce's explanation of its analysis, Commerce's finding of cross-ownership is supported by substantial evidence and is in accordance with law.

## III.    Commerce's inclusion of Harmonized Schedule category 4412.99 in the plywood benchmark

### A.    Background

When measuring the adequacy of remuneration, Commerce will normally "compar[e] the government price to a market-determined price for the good or service resulting from actual transactions in the country in question," referred to as a tier one benchmark.  19 C.F.R. § 351.511(a)(2)(i).  However, if Commerce determines that "there is no useable market-determined price with which to make the [tier one] comparison,"

PUBLIC VERSION

Commerce will "compar[e] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." *Id.* § 351.511(a)(2)(ii).

Because the GOC did not respond to Commerce's CVD questionnaire, Commerce determined, as AFA, that the domestic prices for the provision of inputs for LTAR "are distorted by the government's involvement in those markets." PDM at 14. For that reason, Commerce relied on "world market prices" — referred to as a "tier two" benchmark. *Id.* To calculate the plywood benchmark, Commerce used world export data from certain UN Comtrade for Harmonized Schedule ("HS") categories, including HS 4412.99, which Commerce concluded "covers products that are comparable to the plywood input used by the mandatory respondents." IDM at 37, 39; PDM at 14-15.

### B.    Legal framework

19 U.S.C. § 1677(5)(E)(iv) governs Commerce's selection of benchmarks for use in calculating the LTAR subsidy rate and states that "[a] benefit shall normally be treated as conferred where there is a benefit to the recipient, including—":

> [I]n the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.
>
> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

Commerce's regulation further defines "adequate remuneration" and provides that, where, as here, "there is no useable market-determined price with which to make

the comparison . . . [Commerce] will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii).  The regulation continues:  "Where there is more than one commercially available world market price, [Commerce] will average such prices to the extent practicable, making due allowances for factors affecting comparability."  *Id*.

### C.    Analysis

The issue before the court is whether Commerce's decision to include in the plywood benchmark calculation for Baroque Timber HS category 4412.99 is supported by substantial evidence and is in accordance with law.

Baroque Timber argues that Commerce's decision to include in the benchmark calculation HS category 4412.99 is unsupported by substantial evidence and is not in accordance with law because it is "Commerce's practice to select the most product-specific benchmark possible for use in LTAR calculations" and HS category 4412.99 "consists wholly of products that Baroque did not purchase."  Mem. Law in Supp. of Consol. Pls.' Mot. for J. on Agency R. ("Baroque Timber MJAR") at 7, 13, ECF No. 47.

HS category 4412 covers "[p]lywood, veneered panels and similar laminated wood."  New Subsidy Allegations Questionnaire Response of the Government of the People's Republic of China (Nov. 8, 2019) ("GOC NSA Response"), Ex. NSA-5 at 319, CR 173-181, PR 216-217.  HS category 4412.99 refers to "[p]lywood, veneered panels and similar laminated wood: Other: Other."  Second Benchmark Data Submission on behalf of Baroque Timber (Nov. 13, 2019) ("Baroque Timber Second Benchmark Data Submission"), Ex. 2 at 44-32, PR 222-225.  Data on the record from the GOC

**PUBLIC VERSION**

demonstrated that the products imported into China at the eight-digit level under HS

4412.99 consisted of certain types of "laminated wood."  GOC NSA Response, Ex.

NSA-5 at 322.

 In response to Baroque Timber's assertion that imports into China under HS

4412.99 "are categorized as laminated wood of the type not used as an input into the

production of wood flooring," Commerce concluded that "Baroque Timber has not

provided evidence to support this contention."  IDM at 39.  Commerce commented in

further support that: (1) "the Chinese description of . . . 4412, *i.e.*, '[p]lywood, veneered

panels and similar laminated wood,' also suggests that plywood is, or can be,

laminated"; and (2) "the UN Comtrade description of HS 4412.99 explicitly excludes

particle board, differentiating it from other potential wood flooring inputs."  *Id.*

Commerce determined for these reasons that HS category 4412.99 "covers products

that are comparable to the plywood input used by the mandatory respondents."  *Id.*

 Before the court, Baroque Timber and Fine Furniture challenge Commerce's

inclusion of HS 4412.99 in the benchmark calculation with two principal arguments.

First, Baroque Timber argues that Commerce's assertion that "all plywood is a laminate

structure which uses thin layers of wood to form plywood," *id.*, is unsupported by the

record.  Baroque Timber MJAR at 10-11.  Baroque Timber insists instead that the record

establishes that "plywood is a categorically distinct product from laminated wood."  *Id.* at

10.  Baroque Timber reasons that Commerce's decision to include HS 4412.99 in the

plywood benchmark is not in accordance with law because: (1) plywood and laminated

wood refer to distinct products; and (2) laminated wood was not used in the production

of Baroque Timber's wood flooring.  *Id.*

Second, Baroque Timber asserts that Commerce's conclusion that Baroque did not "provide evidence" that "imports into China under HS 4412.99 are categorized as laminated wood of the type not used as an input into the production of wood flooring" "ignores uncontroverted record evidence."  *Id.* at 11 (quoting IDM at 39).  Baroque Timber cites: (1) its submissions in which it stated that its plywood "is *mostly* made of eucalyptus or beech wood," not laminated wood, *id.* (quoting Benchmark Rebuttal of Baroque Timber (Nov. 25, 2019) ("Baroque Timber Benchmark Rebuttal") at 1, CR 192-194, PR 232-234 (emphasis supplied)); and (2) import data from the GOC that Baroque Timber asserts "demonstrat[e] that imports into China under HTS 4412.99 are not plywood but instead are *only* 'laminated wood.'"  *Id.* (emphasis supplied) (citing GOC NSA Response, Ex. NSA-5).

The court addresses each point in turn.  For the reasons that follow, the court concludes that Commerce's decision to include in the plywood for LTAR benchmark calculation data from HS 4412.99 is unsupported by substantial evidence.

### 1.    Commerce's conclusion that "all plywood is a laminate structure"

Commerce in the IDM asserted that "all plywood is a laminate structure which uses thin layers of wood to form plywood," and so HS 4412.99 subcategories referencing "laminated wood" are "comparable to the plywood input used by the mandatory respondents."  IDM at 39.  Commerce reached this conclusion for two reasons.  First, Commerce relied on a single sentence in a report submitted by Baroque Timber that stated in reference to plywood:  "A layer [of plywood] can consist of a single ply or of two or more plies laminated with their grain direction parallel."  *Id.* (quoting

Baroque Timber Benchmark Rebuttal, Ex. 4c at 11-5).  Second, Commerce referenced

"[t]he Chinese description of the four-digit HS 4412," which stated that the category

covered "[p]lywood, veneered panels *and similar laminated wood*."  *Id.* (alteration in

original) (emphasis supplied) (quoting GOC NSA Response, Ex. NSA-5).  Commerce

reasoned that this description "also suggests that plywood is, or can be, laminated."  *Id.*

      Commerce's conclusion that "all plywood is a laminate structure," and that for

that reason HS 4412.99 covers products "comparable" to Baroque Timber's plywood

input is unsupported by substantial evidence.  The record demonstrates to the contrary

that "plywood" and "laminated wood" are distinct products covered by distinct HS

subcategories.

      To start, the excerpt from the report, titled "Wood-Based Composite Materials,"

that Commerce cited in the IDM does not support Commerce's position that "all plywood

is a laminate structure."  *Id.*  The paragraph from which Commerce drew this excerpt

states:

> Plywood is a panel product built up wholly or primarily of sheets of veneer
> called plies.  It is constructed with an odd number of layers with the grain
> direction of adjacent layers oriented perpendicular to one another.  A layer
> can consist of a single ply *or of two or more plies laminated* with their grain
> direction parallel.

Baroque Timber Benchmark Rebuttal, Ex. 4c at 11-5 (emphasis supplied).

      The court does not consider this excerpt supportive of Commerce's conclusion.

Rather, the excerpt indicates that a single layer of plywood may or may not be

laminated, depending on whether the layer consists of a single ply or of two or more

plies laminated together.

**PUBLIC VERSION**

Moreover, the report considered in its entirety supports Baroque Timber's

position that plywood and laminated wood are in fact distinct products.  Most notably,

the report is organized into sections that address "plywood" separately from types of

"laminated" lumber:

> This chapter is organized into three sections.  The first section covers
> conventional wood-based composite panels.  Materials, adhesives, and
> additives common to conventional wood-based composites are
> summarized.  Specific products addressed include panel products *such as
> plywood*, oriented strandboard, particleboard, and fiberboard. . . .  The
> second section covers structural composite lumber, *including glued-
> laminated timber*, *laminated veneer lumber*, parallel strand lumber,
> *laminated strand lumber*, and oriented strand lumber.  Wood-nonwood
> composites are discussed in the third section . . . .

*Id.* at 11-2 (emphases supplied).

The distinction between plywood and laminated wood is reflected also in other

portions of the report, including two tables that indicate that "plywood" and types of

"laminated timber" have different classifications and performance standards.  *Id.* at tbl.

11-1 (classification), tbl. 11-2 (performance standards); *see also id.* at fig. 11-4

(distinguishing "plywood" from "laminated strand lumber" and "laminated veneer

lumber").

Commerce cited also the "Chinese description of the four-digit HS 4412, *i.e.*,

"[p]lywood, veneered panels and similar laminated wood."  IDM at 39 (alteration in

original) (quoting GOC NSA Response, Ex. NSA-5).  According to Commerce, this

description supports the conclusion that plywood is also laminated wood.  However, the

exhibit that Commerce cited for this assertion provides detailed HS subcategories that

**PUBLIC VERSION**

differentiate clearly types of "plywood" from types of "laminated wood."[11]  *Compare*

GOC NSA Response, Ex. NSA-5 at 319 (referring to, e.g., "[p]lywood consisting solely

of sheets of wood, with at least one outer ply of non-coniferous wood"), *with id.* at 322

(referring to, e.g., "[l]aminated wood with at least one outer ply of non-coniferous

wood").  As a consequence, Commerce's determination that "all plywood is a laminate

structure" and that therefore HS 4412.99 covers products comparable to plaintiff's

plywood input is not supported by substantial evidence.[12]  IDM at 39.

> ### 2.    Commerce's conclusion that HS category 4412.99 "covers products that are comparable" to Baroque Timber's plywood inputs

Commerce concluded that the record did not support Baroque Timber's position

that Baroque Timber did not use products covered under HS 4412.99.  Commerce's

conclusion in this regard is contradicted by uncontroverted data in the record.

The GOC submitted to the record import statistics showing that imports into

China during the POR under HS 4412.99 consisted of laminated wood, among other

material, not plywood.  GOC NSA Response, Ex. NSA-5 at 322-23 (listing the products

imported into China under HS category 4412.99); *see also* Baroque Timber MJAR at 11-

---

[11] The court notes moreover that the general rule of construction that a qualifying clause (i.e., "similar laminated wood") refers only to its immediate antecedent (i.e., "veneered panels") provides further support for Baroque Timber's position that plywood and laminated wood are distinct products.  *See Rule of last antecedent*, Black's Law Dictionary (12th ed. 2024).

[12] Commerce relied also on the UN Comtrade description of HS 4412.99, which "explicitly excludes particle board," and therefore further "differentiat[es] [HS 4412.99] from other potential wood flooring inputs."  IDM at 39.  The court does not understand the relevance of the point.  That HS 4412.99 excludes particleboard does not support the conclusion that Commerce reached that the laminated wood covered by HS 4412.99 is comparable to Baroque Timber's plywood input.

12.  Moreover, Baroque Timber reported that it did not use "laminated wood" in the

production of its wood flooring but instead used "plywood . . . mostly made of eucalyptus

or beech wood."  Baroque Timber Benchmark Rebuttal at 2-3.  Indeed, Commerce

credited this information in the PDM and the IDM when Commerce determined to

exclude certain HS categories from the plywood for LTAR benchmark because, inter

alia, "Baroque Timber report[ed] that its plywood is made from eucalyptus, not bamboo,

and using [the HS categories with bamboo] data to calculate its benchmark would not

properly represent Baroque Timber [sic] or Riverside Plywood's plywood purchases."

PDM at 15 (citing Baroque Timber Benchmark Rebuttal at 2); IDM at 38.  Accordingly,

Commerce's conclusion that Baroque Timber did not provide support for its position that

it did not use products imported under HS 4412.99 is unsupported by substantial

evidence.

AMMWF maintains that "Commerce properly included world export data from UN

Comtrade for HTS category 4412.99 in its plywood for LTAR benchmark calculations"

because "[p]lywood covered by HTS 4412.99 does not need to be identical to that

purchased by Baroque Timber."  Resp. to Mot. for J. on the Agency R. ("Def.-Intervenor

Resp. Br.") at 19-20, ECF No. 56 (citing *Archer Daniels Midland Co. v. United States*, 38

CIT 216, 228, 968 F. Supp. 2d 1269, 1279 (2014)).  AMMWF relies on decisions of this

Court as well as previous determinations for the proposition that Commerce's

benchmark selection "does not require 'perfection'" and that "Commerce is required only

to select benchmarks that are comparable merchandise, not identical."  *Id.* at 21 (first

citing IDM at 37-38; then citing 19 C.F.R. § 351.511(a)(2)(ii); *Beijing Tianhai Indus.*, 39

CIT at __, 52 F. Supp. 3d at 1369; *High Pressure Steel Cylinders from the People's*

**PUBLIC VERSION**

*Republic of China: Final Results of Countervailing Duty Administrative Review; 2016* ("*High Pressure Steel Cylinders from China*"), 83 Fed. Reg. 63,471 (Dep't of Commerce Dec. 10, 2018) and accompanying IDM (Dep't of Commerce Nov. 30, 2018) at 16-17).

       19 U.S.C. § 1677(5)(E)(iv) provides that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." Such "prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

       Commerce's regulation provides that, under a tier-two benchmark analysis, "[Commerce] will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). "Where there is more than one commercially available world market price, [Commerce] will average such prices to the extent practicable, *making due allowances for factors affecting comparability*." *Id.* (emphasis supplied).

       In applying § 1677(5)(E)(iv) and § 351.511(a)(2)(ii), Commerce has a practice of "rely[ing] on data reflecting the narrowest category of products encompassing the input product." IDM at 37 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015* ("*Solar Cells from China*"), 83 Fed. Reg. 34,828 (Dep't of Commerce July 23, 2018) and accompanying IDM (Dep't of Commerce July 12, 2018) at cmt. 3; *Certain Uncoated Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg.

**PUBLIC VERSION**

3,110 (Dep't of Commerce Jan. 20, 2016) and accompanying IDM (Dep't of Commerce

Jan. 8, 2016) at 25-26).  To that end, where there are sufficient benchmark data on the

record and there is sufficient evidence to support the respondent's claim that "it does not

purchase" a certain product, Commerce will not include data for that product in the

benchmark calculation.[13]  IDM at 38; *Countervailing Duty Investigation of Certain*

*Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83

Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018) and accompanying IDM (Dep't of

Commerce Feb. 26, 2018) at cmt. 16 (citing Commerce's "practice" and revising the

benchmark to exclude alloyed ingot where the respondent demonstrated that it

purchased only unalloyed aluminum ingot); *Certain Coated Paper Suitable for High-*

*Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative*

*Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Dep't of Commerce Sept. 27,

2010) and accompanying IDM (Dep't of Commerce Sept. 20, 2010) at cmt. 11 (removing

certain HS categories from the benchmark calculation because products under those

categories were "normally used for the production of other products").  As stated above,

Baroque Timber submitted uncontroverted data in the record that it did not use products

covered by HS 4412.99.  In addition, the record contains sufficient benchmark data from

other HS categories that cover specifically "plywood."  IDM at 38 ("The record contains

several HS categories of plywood which are considered comparable to the plywood

---

[13] In fact, in the instant case Commerce applied this practice to exclude data from
certain contested HS categories because Baroque Timber had demonstrated that it did
not use the products covered by those categories in the production of its wood flooring.
*See* IDM at 37-38.

input used by the mandatory respondents."); PDM at 15 (listing the HS categories used to value the plywood benchmark). For those reasons, Commerce's decision to include HS 4412.99 in the plywood for LTAR benchmark calculation is unsupported by substantial evidence.

Moreover, the cases and determinations on which AMMWF relies are inapposite. For example, *Certain Hot-Rolled Carbon Steel Flat Products from India* involved the selection of a tier-one benchmark, not a tier-two benchmark as in the instant case. *Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results and Partial Rescission of Countervailing Duty Administrative Review*, 74 Fed. Reg. 20,923 (Dep't of Commerce May 6, 2009) and accompanying IDM (Dep't of Commerce Apr. 29, 2009) at cmt. 12. Also in that decision, Commerce observed that the alleged difference in the "chemical composition" between the selected benchmark and respondent's product was such that it "would likely disqualify most, if not all, potential benchmarks." *Id.* By contrast, Commerce is left with numerous possible plywood benchmarks after the exclusion of HS 4412.99. *See* PDM at 15. *High Pressure Steel Cylinders from China* is likewise inapposite. *High Pressure Steel Cylinders from China* IDM at cmt. 3. There, Commerce declined respondent's request that Commerce discard the UN Comtrade Data in favor of respondent's proposed Metal Expert Russian price data because "the respondent did not identify a compelling reason that [Commerce] ought not to use the UN Comtrade data." *Id.* Here, however, Baroque Timber and Fine Furniture seek to

exclude a single HS category based on substantial record evidence that Baroque

Timber did not use products covered by that category.[14]

In sum, Commerce's decision to include HS 4412.99 in the plywood for LTAR

benchmark calculation is unsupported by substantial evidence.  The court therefore

remands to Commerce for reconsideration Commerce's decision to include in the

plywood for LTAR benchmark calculation data from HS 4412.99.

## IV.    Commerce's inclusion of poplar core sheets in the provision of veneers for less than adequate remuneration subsidy programs

### A.    Background

On May 24, 2019, Commerce issued to mandatory respondents the initial CVD

questionnaire, in which Commerce stated that it was investigating the provision of

certain inputs for LTAR: standing timber, cut timber, veneers, formaldehyde and urea.

Countervailing Duty Questionnaire at III-13.  In its response, Jiangsu Guyu reported that

[[                                                        ]] purchased veneers.  Response to Section III

Questionnaire on behalf of Jiangsu Guyu (July 15, 2019) at 12, CR 23-35, PR 95.  On

August 13, 2019, AMMWF submitted to Commerce "new subsidy allegations" ("NSAs"),

alleging four additional subsidy programs pertaining to certain inputs for LTAR: (1)

provision of plywood for LTAR; (2) provision of sawn wood and continuously shaped

wood for LTAR; (3) provision of particleboard for LTAR; and (4) provision of fiberboard

---

[14] *Archer Daniels Midland Co. v. United States* is also inapposite.  38 CIT 216, 228, 968
F. Supp. 2d 1269, 1279 (2014) (rejecting respondent's argument that "Commerce must
use benchmark prices at the *ten and eleven-digit level of specificity*, which implies that
Commerce must use benchmark prices that are nearly identical to [respondent's]
reported purchases to satisfy the regulation" (emphasis supplied)).

PUBLIC VERSION

for LTAR.  PDM at 3.  On August 22, 2019, the GOC responded with NSA rebuttal
comments.  *Id.*

On October 17, 2019, Commerce initiated an investigation on all four NSAs
alleged by AMMWF, *id.*, and later sent a new subsidy allegations questionnaire ("NSA
Questionnaire") to Jiangsu Guyu.  The NSA Questionnaire requested information with
respect to the alleged provision of the four additional inputs for LTAR.  Response to New
Subsidy Allegations on behalf of Jiangsu Guyu (Nov. 8, 2019) ("Jiangsu Guyu NSA
Response"), attach. 1, CR 182-187, PR 218.

Jiangsu Guyu reported that its cross-owned affiliate Shunyang purchased poplar
core sheets during the POR and claimed that "poplar core sheets are made from lower
density (softer) wood and are used for manufacture of the plywood core (core being the
interior layer of the flooring)."  Pl.-Intervenors MJAR at 31 (citing Jiangsu Guyu NSA
Response, attach. 1 at 1-2).  Jiangsu Guyu contrasted the poplar core sheets with the
face veneers that Jiangsu Guyu reported in response to Commerce's initial CVD
Questionnaire, explaining that face veneers were "made of higher density (harder) wood
used for flooring surfaces which can withstand wear and tear unlike poplar."  *Id.*; *see
also* PDM at 34.  Jiangsu Guyu asserted for that reason that poplar core sheet "falls
outside the range of the" inputs for which Commerce was requesting information.
Jiangsu Guyu NSA Response, attach. 1 at 1.

Commerce then issued a supplemental questionnaire to allow Jiangsu Guyu an
opportunity to explain further: (1) how poplar core sheets are used in the assembly of
plywood and multilayered wood flooring; and (2) the reasons that poplar core sheets are
different from veneers.  Second Supplemental Questionnaire for Jiangsu Guyu (Dec.

18, 2019) at 3, CR 195, PR 236.  In response, Jiangsu Guyu referenced its response to

the NSA Questionnaire and stated that poplar core sheet is "rotary-cut."  Response to

Second Supplemental Questionnaire on behalf of Jiangsu Guyu (Jan. 8, 2020)

("Jiangsu Guyu Second Supplemental Response") at 2, CR 202-210, PR 247-248.

Jiangsu Guyu repeated that it considered poplar core sheet to differ from veneer "in

several other aspects, including but not limited to" the "nature of the wood," its "usage"

and its "legal definition" under the scope of the order.  *Id.*  With respect to usage,

Jiangsu Guyu stated that due to the low density of poplar core sheet, its "usage is

limited to assembly of plywood, or for the 'core' of multilayered wood flooring, but it

cannot be used for the outer [[          ]] of wood flooring."  *Id.*

On January 31, 2020, Commerce issued the PDM, in which Commerce

concluded preliminarily that Shunyang's poplar core sheets were veneers under the

scope of the order.  PDM at 18, 34.

In addition to arguing that poplar core sheets are not "veneers" under the scope

of the order, Fine Furniture and Jiangsu Guyu argued before Commerce that Commerce

used incorrect benchmark data to calculate the benefit for Shunyang's purchases of

poplar core sheets because those benchmarks do not contain data for poplar core

sheets.  IDM at 25.  Jiangsu Guyu requested that Commerce reopen the record to allow

interested parties to provide additional benchmark data.  *Id.*; Commerce's Denial of New

Factual Information (Mar. 10, 2020), PR 309.  Jiangsu Guyu argued also that

Commerce "double count[ed]" internally consumed plywood in the plywood for LTAR

calculation by including Shengyu's purchases of plywood in the plywood for LTAR

PUBLIC VERSION

calculation in addition to including Shunyang's poplar core sheet purchases in the veneers for LTAR calculation. IDM at 25.

Commerce denied Jiangsu Guyu's request to submit as "new factual information" additional benchmark information for the veneers for LTAR subsidy calculation because Jiangsu Guyu "had multiple opportunities to submit information on the record with respect to its popular [sic] wood input." Commerce's Denial of New Factual Information. In the Final Results, Commerce found that the poplar core sheets that Shunyang purchased are "thin slice[s] of wood, rotary cut," which are veneers as defined by the scope of the order. IDM at 22-23. Accordingly, Commerce determined that Shunyang's poplar core sheets were veneers for the purposes of calculating the benefit received by Jiangsu Guyu under the veneers for LTAR program. *Id.* Commerce determined also that Jiangsu Guyu failed to "substantiate its claim that Commerce is double counting internally-consumed plywood in the plywood for LTAR calculation." *Id.* at 25.

**B.    Legal framework**

A subsidy is countervailable if: (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5).

**C.    Analysis**

The court concludes that Commerce's decision to include Jiangsu Guyu's poplar core sheets in the veneers for LTAR subsidy program is supported by substantial evidence. However, the court is unable to determine at this time whether Commerce's veneers for LTAR benchmark calculation is supported by substantial evidence, and, for

PUBLIC VERSION

that reason, the court remands to Commerce for a more thorough explanation the

veneers for LTAR benchmark calculation, as discussed below.

### 1.    Commerce's inclusion of the poplar core sheets in the veneers for LTAR program

The court addresses next whether Commerce's decision to include poplar core

sheets in the provision of veneers for LTAR subsidy program is supported by substantial

evidence and is in accordance with law.

Plaintiff-intervenors and consolidated plaintiffs Fine Furniture and Double F

Limited assert that Commerce's veneers for LTAR subsidy rate calculation for Jiangsu

Guyu is not supported by substantial evidence and is not in accordance with law.

Plaintiff-intervenors contend specifically that Commerce's conclusion that poplar core

sheets are veneers is based "purely on semantics, specifically on one line in the scope

of the CVD order — 'thin slice of wood,' the definition provided for 'veneer.'"  Pl.-

Intervenors MJAR at 32.  Plaintiff-intervenors continue that "[t]he Scope language

clearly differentiates 'veneers' from 'core.'  In other words, MLWF consists of two parts,

veneer(s) and a core, whereby veneer refers to parts other than the core."  *Id.* at 34.

According to plaintiff-intervenors, Jiangsu Guyu "had no reason to expect that

Commerce would equate poplar core sheets with the veneers LTAR program" because:

(1) Jiangsu Guyu used the poplar to make plywood cores; (2) "Commerce never made a

separate subsidy allegation on the poplar core sheets as it did for plywood and

veneers"; and (3) petitioner "never included poplar core sheets in any of its

submissions."  *Id.* at 31-32.  Plaintiff-intervenors note in addition that "[t]he only instance

where 'poplar' appears is in Petitioner's benchmark submission with respect to the

Consol. Court No. 20-03885                                                    Page 54

*plywood* benchmark." *Id.* at 32 (emphasis supplied) (citing AMMWF's Other Factual

Information and Benchmark Pricing Information Regarding New Subsidy Allegations

(Nov. 13, 2019), Ex. 1, PR 226-228).  Plaintiff-intervenors state that had Commerce

"intended to include core sheets under the veneers LTAR program, then Commerce

would have included plywood under this program as well since plywood is made of

individual thin slices of wood sandwiched together at different angles." *Id.*  Plaintiff-

intervenors argue in summary that Commerce's reliance on the definition of "veneer"

from the scope of the order "was misplaced given contrary evidence on the record that

Guyu used poplar core sheets to make plywood," and that Commerce could not

"shoehorn core into the veneers LTAR program without a new subsidy allegation of core

sheets." *Id.* at 33, 35.  For these reasons, plaintiff-intervenors request that the court

remand to Commerce to recalculate the veneers for LTAR subsidy rate after excluding

Jiangsu Guyu's poplar core sheet purchases.

    The court concludes that Commerce's decision to include the poplar core sheets

in the provision of veneers for LTAR program is supported by substantial evidence.

    Commerce relied on the scope of the order in concluding that the poplar core

sheets may be included in the veneers for LTAR subsidy calculation.  Commerce noted

that the attempts of Fine Furniture and Jiangsu Guyu to distinguish the poplar core

sheets from "veneers" were "focused on the common usage of the term 'veneer' by the

industry, [which] does not supersede the plain language of the scope."  IDM at 24.

Commerce has defined the scope of the orders as follows:

> Multilayered wood flooring is composed of an assembly of two or more
> layers or plies of wood veneer(s) in combination with a core.  The several
> layers, along with the core, are glued or otherwise bonded together to form

**PUBLIC VERSION**

a final assembled product. . . .  All multilayered wood flooring is included within the definition of the subject merchandise regardless of whether the product meets a particular industry or similar standard.  *The core of multilayered wood flooring may be composed of a range of materials, including but not limited to hardwood or softwood veneer*, particleboard, medium-density fiberboard, high-density fiberboard ("HDF"), stone and/or plastic composite, or strips of lumber placed edge-to-edge.

PDM at 6-7 (emphasis supplied) (footnotes omitted) (citing *Multilayered Wood Flooring from the People's Republic of China: Final Clarification of the Scope of the Antidumping and Countervailing Duty Orders*, 82 Fed. Reg. 27,799 (Dep't of Commerce June 19, 2017)).

In a footnote, Commerce defined "veneer":

A "veneer" is a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch.  Veneer is referred to as a ply when assembled.

*Id.* at 6 n.28.  Based on this scope, Commerce in the PDM stated:

Guyu contends that Shunyang's poplar core sheet input is substantially different from the face veneer purchases it reported.  However, as described above under "Scope of the Order," . . . a "veneer" is a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch.  Veneer is referred to as a ply when assembled.  The poplar core sheets purchased by Shunyang are thin slices of wood, which, as previously noted, are veneers as defined by the scope.  Accordingly, for these preliminary results, we have included these poplar core sheet purchases in our calculation of veneers for LTAR.

PDM at 34 (footnotes omitted).  In the Final Results, Commerce continued to treat Shunyang's poplar core sheets as veneers under the scope of the order because Jiangsu Guyu reported that the sheets are "thin slices of wood 'rotary cut' from poplar wood."  IDM at 22-23 (citing Jiangsu Guyu Second Supplemental Response at 2); *see also* PDM at 6 n.28 (defining "veneer" under the scope of the order as "a thin slice of wood, rotary cut, sliced or sawed from a log, bolt or flitch").

Consol. Court No. 20-03885                                                    Page 56

With respect to the arguments raised by respondents that Commerce relied on an "overly broad" definition of "veneer" in including the poplar core sheets, and that such a definition would seem to require the inclusion of plywood also in the veneers for LTAR subsidy program, Commerce explained its reasoning. Specifically, Commerce explained that "plywood and veneers are two distinct wood inputs with separate definitions and benchmarks." IDM at 23. Commerce then relied again on the scope of the order, which "identifies plywood as assembled veneers (*e.g.*, multiple veneers glued together), and veneers as thin slices of wood (*e.g.*, individual plies). In other words, plywood can be composed of multiple veneers, but plywood is not equivalent to a veneer." *Id.*

Commerce went on to explain the reasons that the absence of a reference to "poplar core sheets" in AMMWF's submissions did not limit Commerce's ability to identify the poplar core sheets as an input to be included in the veneers for LTAR subsidy calculation. Commerce explained specifically that: (1) "the veneers for LTAR program is not limited to a specific species or type of veneer as defined within the scope of the *Order*"; and (2) "the petitioner is not required to provide every type of potential veneer species in its benchmark submission." *Id.*; *see also* PDM at 6 (defining the scope of the order and stating that "[a]ll multilayered wood flooring is included within the definition of subject merchandise, without regard to . . . wood species used for the face, back and inner veneers; core composition; and face grade").

Based on the above analysis, Commerce's decision to include poplar core sheets in the veneers for LTAR subsidy program is supported by substantial evidence.

### 2.    Commerce's calculation of the veneers for LTAR benchmark

The court turns next to whether Commerce's calculation of the veneers for LTAR benchmark is supported by substantial evidence.

Commerce rejected Jiangsu Guyu's request of March 6, 2020, to submit new factual information pertaining to the veneers for LTAR subsidy calculation because there was "no good cause . . . to accept Guyu's request."  Commerce's Denial of New Factual Information at 2 (citing 19 C.F.R. § 351.301(a)).  In that rejection letter, Commerce noted that: (1) "the Order includes a definition of 'veneer'"; (2) the initial and supplemental questionnaires requested that Jiangsu Guyu provide information with respect to the provision of veneers for LTAR; and (3) Commerce had already extended the deadline for parties to submit benchmark information, "yet Guyu provided no benchmark information for Commerce's consideration."  *Id.* at 1-2; IDM at 25.  Commerce determined for these reasons that "all parties had ample notice of the definition of veneer being applied in this proceeding, and it is not necessary to allow all interested parties an opportunity to submit new factual information, notwithstanding Jiangsu Guyu [sic] misinterpretation of the definition of veneer in preparing its questionnaire response."  IDM at 25.  Commerce concluded also that the veneer benchmark data that AMMWF and Baroque Timber submitted were "sufficient" and "usable" in Commerce's calculation of the veneer benchmark.  *Id.*

### a.    Whether Commerce abused its discretion in refusing to reopen the record to accept additional benchmark information

The court addresses first whether Commerce abused its discretion in refusing Jiangsu Guyu's request that Commerce accept additional benchmark information.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                                 Page 58

Fine Furniture and Jiangsu Guyu argue that Commerce erred in refusing to allow Jiangsu Guyu to submit more accurate benchmark data.  *Id.* at 25; Pl.-Intervenors MJAR at 13, 34.  Jiangsu Guyu and Fine Furniture state that prior to the preliminary results, Jiangsu Guyu "had no reason to expect that Commerce would equate poplar core sheets with the veneers LTAR program since Guyu used poplar to make plywood cores."  Pl.-Intervenors MJAR at 31.  Fine Furniture argues that "Commerce's refusal of more accurate benchmark data and its decision to conduct an unreasonable comparison with a flawed benchmark is not supported by the evidence on the record and unlawful [sic]."  Mem. of Points and Authorities in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. of Consol. Pls. and Pl.-Intervenors ("Fine Furniture MJAR") at 22, ECF No. at 49-50 (citing *China Steel Corp. v. United States*, 43 CIT __, __, 393 F. Supp. 3d 1322, 1342 (2019)).

The court concludes that Commerce did not abuse its discretion in denying Jiangsu Guyu's request that Commerce allow interested parties to submit after the preliminary results additional benchmark information.

As Commerce explained in the IDM, "Commerce's initial questionnaire included the provision of veneers for LTAR program and the scope of the *Order* explicitly contains a definition of veneer."  IDM at 25.  Moreover, even if it had not been clear to Jiangsu Guyu when it received the initial questionnaire that the poplar core sheets were veneers under the scope of the order, Jiangsu Guyu itself indicated in its NSA response that it understood that there was a possibility that Commerce could determine to treat the poplar core sheets as veneers.  *See* Jiangsu Guyu NSA Response at 2 (highlighting differences between "face veneer" and "poplar core sheets"); *see also id.*, Ex. NSA-3

**PUBLIC VERSION**

(reporting Jiangsu Guyu's purchases of [[                              ]]).[15]  Also prior to the

preliminary results, AMMWF argued to Commerce that Jiangsu Guyu's poplar core

sheets were veneers under the scope of the order.  AMMWF's Comments on Jiangsu

Guyu's New Subsidy Allegations Questionnaire Response (Nov. 22, 2019) at 2-3, CR

191, PR 230.  Jiangsu Guyu does not represent to the court that it could not at that time

submit benchmark data.  *See* 19 C.F.R. § 351.301(c)(3)(ii) (2017) (requiring that

"submissions of factual information . . . to measure adequacy of remuneration" be filed

"no later than 30 days before the scheduled date of the preliminary results of review").

And yet, Jiangsu Guyu made no attempt to submit *any* benchmark data — specific to

poplar core sheets or otherwise — until after Commerce issued the preliminary results.

PDM at 3-4 (stating that the GOC, Baroque Timber and AMMWF submitted benchmark

data).

 "Ultimately, the burden of creating an adequate record lies with the respondents,

not Commerce."  *Chia Far Indus. Factory Co. v. United States*, 28 CIT 1337, 1354, 343

F. Supp. 2d 1344, 1362 (2004); *Chinsung Indus. Co. v. United States*, 13 CIT 103, 106,

705 F. Supp. 598, 601 (1989).  For the reasons discussed above, Jiangsu Guyu had

notice and opportunity to submit to the record benchmark data specific to poplar core

sheets but chose not to do so.  Accordingly, Commerce did not abuse its discretion in

---

[15] The court notes also that subsequent to Jiangsu Guyu's NSA Response, in which
Jiangsu Guyu reported for the first time its purchases of poplar core sheets, the other
mandatory respondent Baroque Timber submitted to Commerce benchmark data for
use in Commerce's preliminary results to measure the adequacy of remuneration for
Baroque Timber's reported plywood and fiberboard purchases.  *See* Baroque Timber
Second Benchmark Data Submission.

PUBLIC VERSION

refusing to reopen the record following the preliminary results to allow for the

submission of additional benchmark data.

> **b.    Whether Commerce's veneers for LTAR benchmark calculation is supported by substantial evidence**

The court considers whether Commerce's veneers for LTAR benchmark

calculation is supported by substantial evidence.

Fine Furniture argues that, even assuming that Commerce's decision to

countervail poplar core sheet purchases under the veneers for LTAR program was

reasonable, Commerce's benchmark calculation for poplar core sheets is unsupported

by substantial evidence and is unlawful because it used data for HS subheadings that

cover "face-grade veneers."  Fine Furniture MJAR at 15, 20-22.  According to Fine

Furniture, "the record is clear that Guyu reported purchases of poplar core sheet," and

that Jiangsu Guyu made clear in its submissions to Commerce that "poplar core sheet

and face veneer are subject to different benchmark prices."  *Id.* at 21.  Fine Furniture

continues that "[d]espite Guyu's clear statement to differentiate face veneer from poplar

core sheet, Commerce used import data under veneer HTS subheadings 4408.10,

4408.39, and 4408.90 to calculate the benchmark for Guyu's poplar core sheet

purchases," which Fine Furniture asserts cover "veneer sheets and not poplar core

sheets."  *Id.* at 21-22.

The court does not have a basis to determine whether Commerce's calculation of

the veneers for LTAR subsidy rate is supported by substantial evidence.  Specifically,

Commerce did not explain the reasons that the "other species" of veneers then included

in the benchmark data satisfied Commerce's obligation under the statute and regulation

PUBLIC VERSION

to measure the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided."  19 U.S.C. § 1677(5)(E)(iv).

Commerce is required to determine the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided," which includes "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*  Commerce regulations require that Commerce consider "product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(i) (2017).  Commerce practice "is normally to rely on data reflecting the narrowest category of products encompassing the input product."  IDM at 37 (citing *Solar Cells from China* IDM at cmt. 3).

Jiangsu Guyu reported to Commerce the differences between poplar core sheet and face veneer with respect to source, density and usage.  Jiangsu Guyu NSA Response, attach. 1 at 2.  Jiangsu Guyu submitted also to Commerce that the two products are "subject to different benchmark prices."  *Id.*; *see also* Jiangsu Guyu Second Supplemental Response at 2 (explaining further the differences between poplar core sheet and veneer).  However, Commerce in the instant IDM did not address these purported differences but instead stated only:

> Commerce finds that the veneer benchmark data that was [sic] timely submitted by the petitioner and Baroque Timber, the other mandatory respondent in this review, are sufficient and usable in our calculation of the provision of veneers for LTAR program, because it includes data for "other species" of wood, and is not limited to certain reported species.

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                      Page 62

IDM at 25.[16]

      "Commerce must explain the basis for its decisions; while its explanations do not

have to be perfect, the path of Commerce's decision must be reasonably discernable to

a reviewing court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed.

Cir. 2009).  Commerce's explanation in the instant IDM was conclusory and did not

explicate the reasons that the benchmark data in the record were consistent with

Commerce practice, the regulation or the statute.  In particular, Commerce did not

explain the reasons that the veneer benchmark data in the record, including the data

pertaining to "other species" of wood, were "sufficient" or "usable," IDM at 25, in light of

Commerce's obligation to determine the adequacy of remuneration "in relation to

prevailing market conditions for the good or service being provided."  19 U.S.C. §

1677(5)(E)(iv); *see also* 19 C.F.R. § 351.511(a)(2)(ii).  For that reason, the court

---

[16] Commerce used import data under veneer HS subheadings 4408.10, 4408.39 and
4408.90 to calculate the benchmark for Jiangsu Guyu's poplar cores sheet purchases:

    4408.10:  Sheets for veneering (including those obtained by slicing laminated
    wood), for plywood or for similar laminated wood and other wood, sawn
    lengthwise, sliced or peeled, whether or not planed, sanded spliced or joint-
    ended, of a thickness not exceeding 6 mm: Coniferous.

    4408.39:  Sheets for veneering (including those obtained by slicing laminated
    wood), for plywood or for similar laminated wood and other wood, sawn
    lengthwise, sliced or peeled, whether or not planed, sanded spliced or joint-
    ended, of a thickness not exceeding 6 mm: Of tropical wood: other.

    4408.90:  Sheets for veneering (including those obtained by slicing laminated
    wood), for plywood or for similar laminated wood and other wood, sawn
    lengthwise, sliced or peeled, whether or not planed, sanded spliced or joint-
    ended, of a thickness not exceeding 6 mm: other.

Baroque Timber Second Benchmark Data Submission, Ex. 2 at 44-14.

PUBLIC VERSION

remands for reconsideration Commerce's conclusion that the existing benchmark data on the record for veneers were "sufficient" and "usable" for Jiangsu Guyu's reported poplar core sheet purchases.

On remand, Commerce may elect to (1) exercise its discretion to reopen the record and accept additional benchmark information, as proposed by Jiangsu Guyu, or (2) provide a more thorough explanation of Commerce's conclusion that the existing benchmark data for veneers on the record are sufficient in terms of Commerce practice, its regulations or the statute to apply to Jiangsu Guyu's poplar core sheets.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("The decision to reopen the record is best left to the agency . . . .").

### 3.    Whether Commerce double counted internally-consumed plywood in the plywood for LTAR calculation

The court examines next whether Commerce double counted internally consumed plywood by countervailing both: (1) the poplar core sheet purchases of Shunyang in the veneers for LTAR program; and (2) the plywood purchases of Shengyu in the plywood for LTAR program.

As noted, all of Jiangsu Guyu's subject merchandise exports to the United States during the POR were produced and supplied by Shengyu, a cross-owned affiliate of Jiangsu Guyu.  PDM at 9.  Jiangsu Guyu reported that Shengyu purchased fiberboard, plywood and veneers during the POR.  *Id.* at 18.  Commerce calculated preliminarily a subsidy rate of 7.47 percent for the provision of plywood for LTAR to Shengyu.  *Id.* at 35-36.  Jiangsu Guyu reported also that its other cross-owned affiliate, Shunyang,

**PUBLIC VERSION**

purchased poplar core sheets during the POR.[17]  *Id.* at 18.  Commerce calculated

preliminarily a subsidy rate of 112.23 percent for the provision of veneers for LTAR to

Shengyu and Shunyang.  *Id.* at 35.

In the IDM, Commerce concluded that Jiangsu Guyu argued in its case brief that "where the company purchased an

input for LTAR (*i.e.*, poplar core sheets) in the production of the final product (*i.e.*,

plywood), and that final product has already itself been found to be an LTAR input for

production of another product (*i.e.*, MLWF), the original inputs should not be double

counted under separate LTAR programs."  Jiangsu Guyu Case Br. at 16.

In the IDM, Commerce concluded that Jiangsu Guyu could not "substantiate its

claim that Commerce is double counting internally-consumed plywood in the plywood

for LTAR calculation."[18]  IDM at 25.  Commerce concluded, therefore, that it would

"countervail both Shunyang's poplar sheet purchases and Shengyu's plywood

purchases."  *Id.* at 26.

Plaintiff-intervenors argue before the court that "Commerce erred in counting

internally consumed poplar as part" of the plywood for LTAR subsidy calculation.  Pl.-

Intervenors MJAR at 35-36.  According to plaintiff-intervenors, Commerce could not

countervail under separate subsidy programs the "original input" of poplar core sheets

---

[17] As described above, Commerce concluded that the poplar core sheets were "veneers" as defined by the scope of the order.

[18] The court notes that in Jiangsu Guyu's case brief — to which Commerce was responding in the IDM — Jiangsu Guyu argued that Commerce "erred in counting internally consumed *plywood* as part of the" provision of plywood for LTAR calculation. Jiangsu Guyu Case Br. at 15 (emphasis supplied).  Before the court, Jiangsu Guyu argues instead that Commerce "erred in counting internally consumed *poplar* as part of the" provision of plywood for LTAR calculation.  Pl.-Intervenors MJAR at 35 (emphasis supplied).

PUBLIC VERSION

as veneers while also countervailing plywood — which plaintiff-intervenors assert was

produced using the poplar core sheets — to be used in MLWF.  *Id.*

Plaintiff-intervenors' argument fails because, as Commerce observed, "Jiangsu

Guyu did not provide any record evidence to support" its claim of double counting.  IDM

at 26.[19]  In the absence of any material in the record substantiating plaintiff-intervenors'

claim that Commerce impermissibly double counted Jiangsu Guyu's poplar core sheet,

Commerce's decision to countervail both Shunyang's poplar core sheet purchases and

Shengyu's plywood purchases was reasonable.

## V.    Commerce's investigation of other non-alleged subsidies

### A.    Background

During the review, Commerce requested that respondents disclose to Commerce

"other subsidies."  PDM at 31-33, 39-41.  Baroque Timber and Jiangsu Guyu reported

receiving "other subsidies," which included numerous grants and direct taxes.  *Id.*  Then,

because the GOC "did not respond to the 'other subsidies' portion of Commerce's Initial

Questionnaire with respect to these programs," Commerce preliminarily determined to

base its determination on AFA.  *Id.* at 39-41.  The GOC challenged Commerce's

decision to request that mandatory respondents disclose "other subsidies" that were

"not the subject of any allegation raised by the petitioner."  IDM at 66-67.  The GOC

argued before Commerce that the subsidy margins calculated for respondents using

information provided in response to Commerce's "other subsidies" request "is contrary

---

[19] Commerce explained also that "it is not possible for Commerce to trace which of Shunyang's poplar sheet purchases were used to produce plywood for Shengyu and which of Shengyu's plywood purchases were produced from Shunyang's poplar sheet purchases."  IDM at 26.

Consol. Court No. 20-03885                                            Page 66

to law" because "investigations may only commence after sufficient evidence of financial

contribution, specificity and benefit is found or presented."  *Id.* at 66.

Commerce explained in the IDM that "[a]fter an investigation has been initiated,"

19 U.S.C. § 1671a and 19 C.F.R. § 351.311(b) "mandate that Commerce examine

practices or programs discovered during the course of that investigation, and any

subsequent review, if they appear to provide a countervailable subsidy."  *Id.* at 68.

Commerce concluded that it "acted consistently" with its statutory authority and its

practice, as well as the obligations of the United States at the World Trade Organization

("WTO"), with respect to "other subsidies" reported by Baroque Timber and Jiangsu

Guyu.  *Id.* at 70.

    **B.    Legal framework**

When Commerce discovers a practice that appears to be a countervailable

subsidy, but that was not alleged in the petition, Commerce "shall include the practice,

subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy

program appears to be a countervailable subsidy with respect to the merchandise which

is the subject of the proceeding."  19 U.S.C. § 1677d(1); *see also* 19 C.F.R. §

351.311(b) (stating that Commerce "will examine" a practice not alleged by petitioners

that Commerce discovers and that "appears to provide a countervailable subsidy").

    **C.    Analysis**

The court concludes that Commerce's decision to investigation and apply AFA to

"other subsidies" as reported by respondents is in accordance with law.  The language

of the statute is clear that Commerce is required to investigate "subsidy practices

discovered during a proceeding," 19 U.S.C. § 1677d:

PUBLIC VERSION

> If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition, . . . then the administering authority —
>
> > (1) *shall include* the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding[.]

(emphasis supplied).  Commerce regulations likewise state that Commerce "will examine" such a practice if Commerce "concludes that sufficient time remains" before the final determination.  19 C.F.R. § 351.311(b).  There is no limitation in the statute or regulation on Commerce's ability to inquire into the existence of "other subsidy" programs during an investigation or review.

In *Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1342-43 (2019), this Court addressed and rejected the argument that Jiangsu Guyu raises in the instant case.  There, plaintiff asserted that "Commerce unlawfully investigated 'other subsidy' programs because it failed to identify any evidence that the subsidies appeared to be specific and countervailable before initiating an investigation into the programs, in violation of 19 U.S.C. § 1677d."  *Id.* at __, 405 F. Supp. 3d at 1342.  The Court stated that plaintiff's argument was "misguided" because "the elements of a countervailable subsidy need not be identified before examining non-alleged subsidies."  *Id.* at __, 405 F. Supp. 3d at 1342-43.  Indeed, the statute "vests [Commerce] with broad investigative discretion."  *Changzhou Trina Solar Energy Co. v. United States*, 40 CIT __, __, 195 F. Supp. 3d 1334, 1346 (2016).  Accordingly, "Commerce's inquiry concerning the full scope of governmental assistance provided by [a government] and received by the Respondents in the production of subject

PUBLIC VERSION

merchandise [is] within [Commerce's] independent investigative authority pursuant to 19

U.S.C. §§ 1671a(a) and 1677d."  *Id.*

      The statute states moreover that when a respondent fails to provide requested

information by Commerce's deadline or significantly impedes a proceeding, Commerce

"shall . . . use the facts otherwise available in reaching the applicable determination."

19 U.S.C. § 1677e(a)(2)(A)-(D).  If Commerce determines that a respondent has failed

to cooperate to the best of its ability, Commerce "may use an inference that is adverse

to the interests of that party in selecting from among the facts otherwise available."  *Id.* §

1677e(b)(1)(A).

      In this review, Commerce requested that respondents disclose other subsidies

and asked that the GOC answer questions regarding "all other assistance."  IDM at 69.

Commerce explained that "the GOC hindered Commerce's efforts to examine the 'full

scope of governmental assistance,' and to consolidate all relevant subsidies into this

review when it withheld information responsive to Commerce's requests for information."

*Id.*  Commerce found further that the GOC's failure to provide complete responses in a

timely manner to Commerce's other assistance questions "reflects a deliberate and

unilateral decision that the discovered subsidies were not relevant to Commerce's

review."  *Id.*  Commerce then concluded:  "A deliberate decision not to cooperate

warrants the application of AFA."  *Id.*

      Commerce explained that its decision to apply AFA was due to the GOC's failure

to provide timely and complete responses to Commerce's discovered subsidies

questions.  *Id.*  Accordingly, Commerce's decision to investigate non-alleged subsidies

PUBLIC VERSION

and apply AFA based on the GOC's failure to cooperate to the best of its ability is

supported by substantial evidence and is in accordance with law.[20]

Finally, Jiangsu Guyu maintains that "Commerce's practice in asking parties,

particularly other governments, to declare and list 'all other subsidies' runs counter to

U.S. law as enumerated in 19 U.S.C. § 1671a."  Pl.-Intervenors MJAR at 41.  However,

§ 1671a concerns the procedures for filing a petition and initiating a CVD investigation.

There is no indication in the statute that procedures under § 1671a are to apply to

subsidies discovered in the course of a proceeding, as occurred in the instant case.  To

the contrary, *§ 1677d* applies specifically to "[c]ountervailable subsidy practices

discovered during a proceeding," and, as stated, does not contain a limitation on

Commerce's ability to inquire into the existence of "other subsidies" that were provided

to the companies under review.  As a consequence, Commerce's decision to inquire into

the existence of "other subsidies" is in accordance with law.

## VI.    Commerce's use of AFA to make its specificity determination concerning electricity for LTAR and benchmark selection

### A.    Background

During the review, Commerce examined whether the GOC provided electricity for

LTAR, a subsidy program that Commerce determined to be countervailable in previous

reviews.  Countervailing Duty Questionnaire at III-10.  Therefore, Commerce requested

that Baroque Timber and Jiangsu Guyu report their electricity suppliers and electricity

---

[20] Plaintiff-intervenors' reliance on the Agreement on Subsidies and Countervailing Measures and any decisions of a WTO Panel or the Appellate Body — should such a decision exist — is unavailing, as "WTO decisions are 'not binding on the United States, much less this court.'"  *Corus Staal BV v. Dep't of Com.*, 395 F.3d 1343, 1348 (Fed. Cir. 2005) (quoting *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004)).

Consol. Court No. 20-03885                                                    Page 70

rates during the POR.  PDM at 21 (citing Countervailing Duty Questionnaire at III-10).

Baroque Timber reported the electricity rates and electricity suppliers during the POR

for itself and Riverside Plywood.  *Id.*  Jiangsu Guyu reported the electricity rates and

electricity suppliers for Shengyu and Shunyang.  *Id.*  Commerce requested information

also from the GOC "regarding the derivation of electricity prices at the provincial level,

the procedure for adjusting retail electricity tariffs, and the role of the National

Development and Reform Commission (NDRC) and the provincial governments in this

process."  IDM at 44.  The GOC provided electricity tariff schedules; however,

Commerce determined that "the GOC failed to explain, in detail, how the prices in the

electricity tariff schedules were derived, including the specific factors or information

relied upon by the NDRC."  *Id.*  Commerce determined also that "the GOC failed to fully

explain the respective roles and nature of the cooperation between the NDRC and the

provincial governments in deriving and implementing electricity price adjustments."  *Id.*

     Commerce found that the requested information was necessary to determine

whether the provision of electricity constituted a financial contribution and whether the

provision was specific.  PDM at 23.  Accordingly, Commerce applied AFA and

determined preliminarily that the provision of electricity constituted a financial

contribution and was specific.  *Id.*  Further, Commerce relied on AFA also in selecting a

benchmark for determining the existence and amount of the benefit.  *Id.*  Commerce

stated that the benchmark rates it selected "[were] derived from the record of this

investigation and are the highest electricity rates on the record for the applicable rate

and user categories."  *Id.*

**PUBLIC VERSION**

In the Final Results, Commerce continued to rely on AFA to determine that the provision constitutes a financial contribution and is specific.  IDM at 45.  Commerce also continued to rely on AFA in its selection of the benchmark for purposes of determining the existence and amount of the benefit.  *Id.* at 45-46.  Specifically, Commerce found that "because the GOC provided the provincial electrical tariff schedules, Commerce relied on this information as facts available and, in making an adverse inference, Commerce identified the highest rates among these schedules for each reported electrical category and used those rates as the benchmarks in the benefit calculations."  *Id.* at 45.

### B.    Legal Framework

A countervailable subsidy exists when there is a financial contribution to a person and a benefit is thereby conferred.  19 U.S.C. § 1677(5)(A)-(B).  The subsidy must also be "specific" within one of the categories listed in § 1677(5A).  A domestic subsidy may be specific as a matter of law or a matter of fact.  *Id.* § 1677(5A)(D).  A domestic subsidy is specific as a matter of fact where "one or more of the following factors exist": (1) the "actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number"; (2) an "enterprise or industry is a predominant user of the subsidy"; (3) an "enterprise or industry receives a disproportionately large amount of the subsidy"; (4) the "manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others"; or (5) the "subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy."  *Id.* § 1677(5A)(D)(iii)-(iv).

PUBLIC VERSION

### C.    Analysis

The court addresses next Commerce's conclusions regarding the provision of electricity for LTAR.  Fine Furniture makes two arguments.  First, Fine Furniture argues that Commerce's specificity determination with respect to the provision of electricity for LTAR is unsupported by substantial evidence because "Commerce failed to connect the information that it found to be missing from the record to its AFA determination and also failed to make factual findings on whether and how the electricity program is specific." Fine Furniture MJAR at 29.  According to Fine Furniture, "Commerce made no precise finding as to how the alleged electricity program was specific," but instead "merely relied on a broad interpretation of its authority to use AFA."  *Id.*  Fine Furniture maintains that "[e]ven when relying on AFA, Commerce must still engage in a statutory analysis of the electricity for LTAR program."  *Id.* at 30 (*citing Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1326 (2018)).  On this point, Fine Furniture contends also that "the facts on the record establish that the GOC is not providing subsidized electricity rates to a specific region or industry" and that "the GOC did not fail to respond to any questions addressing whether electricity rates are generally applicable within the provinces."  *Id.*

Second, Fine Furniture asserts that Commerce's electricity benchmark determination is unsupported by substantial evidence and is not in accordance with law because, according to Fine Furniture, Commerce used electricity rates from [[

                                ]] in measuring the benefit to the mandatory respondents.  *Id.* at 31. The court addresses each of Fine Furniture's arguments in turn.

PUBLIC VERSION

### 1.    Specificity

The court concludes that Commerce's determination, based on AFA, that the provision of electricity for LTAR program was specific is supported by substantial evidence.

In Commerce's initial questionnaire, Commerce requested that "the GOC provide information regarding the roles of provinces, the [NDRC], and cooperation between the provinces and the NDRC on electricity price adjustments," so that Commerce could "determine the process by which electricity prices and price adjustments are derived, identify entities that manage and impact price adjustment processes, and examine cost elements included in the derivation of electricity prices in effect throughout China during the POR."  PDM at 21 (citing Countervailing Duty Questionnaire at Electricity Appendix). Commerce requested specifically:

> Provincial Price Proposals for each province in which mandatory respondents or any company "cross-owned" with those respondents is located for applicable tariff schedules that were in effect during the POR; all original NDRC Electricity Price Adjustment Notice(s) that were in effect during the POR; the procedure for adjusting retail electricity tariffs and the role of the NDRC and the provincial governments in this process; the price adjustment conferences that took place between the NDRC and the provinces, grids and power companies with respect to the creation of all tariff schedules that were applicable to the POR; the cost elements and adjustments that were discussed between the provinces and the NDRC in the price adjustment conferences; and how the NDRC determines that the provincial level price bureaus have accurately reported all relevant cost elements in their price proposals with respect to generation, transmission and distribution.

*Id.* (citing Countervailing Duty Questionnaire at Electricity Appendix).

The GOC asserted in response that it is "the provincial governments" — not the NDRC — "that determine[] the electricity price for different provinces" and that "the

**PUBLIC VERSION**

NDRC no longer reviews the electricity pricing schedules submitted by the provincial

governments."  Initial Questionnaire Response on behalf of Government of China (July

15, 2019) ("GOC Initial Questionnaire Response") at 11, CR 36-98, PR 96-131.  The

GOC raised certain notices[21] that the NDRC issued since 2015 in which, according to

the GOC, the NDRC: (1) "clearly stated that the price department at each province,

autonomous region, and municipality shall develop and establish the grid price and

sales price for electricity within its own jurisdiction"; and (2) instructed that

"interprovincial and interregional electricity adjustments and prices are determined

pursuant to market fundamentals."  *Id*.  The GOC continued that "given that during the

POR the electricity prices within the jurisdiction of each province were established by

the relevant pricing authorities at the provincial level, the NDRC no longer requested

'Provincial Price Proposals' for review."  *Id*. at 15.  The GOC stated:  "[T]he NDRC's role

in regulating provincial electricity pricing is at the macro level; however, the NDRC no

longer determines the electricity prices in provinces within China."  *Id.* at 13.

---

[21] The two notices of the NDRC that Commerce analyzed in the PDM are *Notice of National Development and Reform Commission on Adjusting Schedule of Coal-Fired Power Generation Grid Purchase Price and Sale Price of Industrial and Commercial Electricity of Each Province (District or City)* (Notice 748) and *Lowering Coal-Fired Electricity On-Grid Price and General Industrial and Commercial Electricity Price* (Notice 3105).  PDM at 21-23.  The court observes that these notices were not included in the joint appendix as filed with the court.  This oversight and others below are unacceptable.  Parties are admonished to take greater care in compiling the information from the Administrative Record cited in briefing such that all documents relevant to the court's consideration of the issues raised by the parties are contained in that record.  *See* USCIT R. 56.2(c)(3) (requiring parties to include in the joint appendix a copy of those portions of the administrative record cited in the briefs); *see also* Def. Br. at 44 ("[T]he record indicates that NRDC Electricity Price Adjustment Notice(s) in effect during the period of review direct provinces to reduce prices and report those changes to the NDRC.").

Commerce took the following steps in reaching its specificity determination.

First, Commerce reviewed the relevant notices cited by the GOC and determined that

the notices did not support the assertions of the GOC that "NDRC has no substantive

power to 'review' . . . the established electricity tariffs in the provinces in China."  *Id.* at

15; PDM at 21-23 (citing GOC Initial Questionnaire Response at Exs. 2, 4).  Commerce

observed to the contrary that the notices "explicitly direct provinces to reduce prices and

to report the enactment of those changes to the NDRC."  PDM at 22.  Commerce

concluded based on this review that the notices "indicate that the NDRC continues to

play a seminal role in setting and adjusting electricity prices[] by mandating average

price adjustment targets with which the provinces are obligated to comply in setting their

own specific prices."  *Id.*

Second, Commerce issued to the GOC a supplemental questionnaire in which

Commerce requested that "the GOC explain how the NDRC monitors compliance with

the price changes directed in Notice 748 and what action the NDRC would take were

any province not to comply with the directed price changes."  *Id.* (citing Government of

China's Supplemental Questionnaire Response (Oct. 28, 2019) ("GOC Supplemental

Response") at 5, CR 161-172, PR 207-212).  In its response, the GOC reported that

"Notice 748 does not serve as NDRC's notice of control over provincial electricity price

adjustments," but instead "only provides the most basic principles for electrical

adjustment and provides an average range of adjustments for the sales prices for each

province."  *Id.* at 23 (quoting GOC Supplemental Response at 11).  However, the GOC

stated that "[p]rovincial authorities do submit their price schedules to the NDRC to

PUBLIC VERSION

ensure that the price adjustments follow the principles laid out by the NDRC." *Id.*

(alteration in original) (quoting GOC Supplemental Response at 12).

Third, Commerce determined preliminarily that "the GOC's response does not

constitute a full explanation regarding the roles and nature of cooperation between the

NDRC and provinces in deriving electricity price adjustments" and that "the information

provided by the GOC indicates that . . . the NDRC continues to play a major role in

setting and adjusting prices." *Id.* As a consequence, Commerce determined that

"information necessary to [its] analysis of financial contribution and specificity is not

available on the record, that the GOC withheld information requested by Commerce,

and that the GOC significantly impeded this proceeding." *Id.* Commerce concluded

moreover that AFA "is warranted in the application of facts available" because "the GOC

failed to cooperate to the best of its ability to comply with [Commerce's] repeated

requests for information." *Id.* In applying AFA, Commerce found that "the GOC's

provision of electricity . . . is specific within the meaning of [19 U.S.C. § 1677(5A)]." *Id.*

Commerce cited specifically:

> The GOC failed to provide certain requested information regarding the
> relationship (if any) between provincial tariff schedules and cost, as well as
> requested information regarding cooperation (if any) in price setting
> practices between the NDRC and provincial governments.

*Id.*

The court concludes based on the foregoing analysis that Commerce's

conclusion that information necessary to its specificity analysis was not available on the

record and that the GOC withheld such information that Commerce requested is

explained adequately and is supported by substantial evidence.

Consol. Court No. 20-03885                                                          Page 77

Fine Furniture maintained in its briefing that Commerce erred in its application of
AFA because Commerce "failed to connect the information that it found to be missing
from the record to its AFA determination and also failed to make factual findings on
whether and how the electricity program is specific." Fine Furniture MJAR at 29. Fine
Furniture concludes that, because Commerce did not "explain how it perceives the
electricity program to be specific under these circumstances, even in an AFA context,"
Commerce's determination is unsupported by substantial evidence. *Id.* at 30-31.

This argument is not persuasive. In *Jiangsu Zhongji*, this Court sustained
Commerce's finding of specificity in circumstances nearly identical to the circumstances
in the instant case. As here, in *Jiangsu Zhongji*, Commerce concluded that the GOC's
provision of electricity to respondents for LTAR was specific based on AFA after the
GOC withheld information and failed to comply to the best of its ability. 43 CIT at __,
405 F. Supp. 3d at 1336-39. Also as in the instant case, plaintiff in *Jiangsu Zhongji*
relied on *Trina Solar* and argued that "Commerce failed to make a specificity
determination and establish the relationship between the GOC's withholding of
information and a finding of specificity." *Id.* at __, 405 F. Supp. 3d at 1337.

In *Jiangsu Zhongji*, the Court concluded that *Trina Solar* was inapposite and held
that "the record strongly suggests that the GOC's failure to provide information
regarding the provinces' control over electricity pricing inhibited Commerce from

Consol. Court No. 20-03885                                                    Page 78

determining specificity."[22]  *Id.* at __, 405 F. Supp. 3d at 1338.  The Court looked

specifically to Commerce's analysis of Notice 748 and Notice 3105 of the NDRC and

determined that "[g]iven that record evidence suggests that the GOC controls electricity

pricing, the GOC's failure to provide information regarding how electricity pricing is set

prevented Commerce from determining specificity."  *Id.*; *see also Canadian Solar Inc. v.

United States*, Slip Op. 22-49, 2022 WL 1583428, at *3 (CIT May 19, 2022) ("The court

has repeatedly sustained Commerce's determination that Notice 748 demonstrates that

the NDRC is involved in price-setting in some capacity.").  For that reason, the Court

held that "Commerce's use of AFA to find specificity is supported by substantial

evidence."  *Jiangsu Zhongji*, 43 CIT at __, 405 F. Supp. 3d at 1338.

---

[22] In *Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __ n.14, 405
F. Supp. 3d 1317, 1338 n.14 (2019), the Court noted also that, as in the instant case,
"Commerce did not state how GOC's withholding of information led to the finding that,
for example, the recipients are limited in number, that the aluminum industry is the
predominant user or receives a disproportionately large amount of the subsidy, or that
discretion over the subsidy suggests the GOC favors the aluminum industry."  (citing 19
U.S.C. § 1677(5A)(D)(iii)).  There, plaintiff suggested that Commerce's specificity
determination was based on a finding of regional specificity, *id.*, as plaintiff suggests in
the instant case.  *See* March 2022 Oral Arg. Tr. at 133:24-134:4, ECF No. 78.
However, as the Court explained in *Jiangsu Zhongji*, the GOC's refusal to comply with
Commerce's requests for information inhibited Commerce from determining on what
basis, if any, the electricity subsidy was specific:

> More information regarding the setting of the electricity prices by the
> provinces would reveal how the price reductions have been allocated to
> certain industries.  Pricing data stating which end-user categories received
> certain price reductions or increases, for example, would reveal whether the
> aluminum industry took a disproportionate share of the subsidy.

43 CIT at __, 405 F. Supp. 3d at 1338; *see also* 19 U.S.C. § 1677(5A)(D)(iii)-(iv).

**PUBLIC VERSION**

As in *Jiangsu Zhongji*, the record as outlined above indicates that the GOC

controls electricity pricing, and the GOC failed to provide to Commerce the information

that Commerce required to analyze fully how electricity pricing is set in China.[23]

Accordingly, Commerce's determination based on AFA that the provision of electricity for

LTAR program was specific is supported by substantial evidence.[24]

### 2. Benchmark selection

Commerce relied on AFA also "in selecting the benchmark for determining the

existence and amount of the benefit" for the provision of electricity for LTAR.  PDM at

23.  For the benchmark, Commerce selected "the highest non-seasonal provincial rates

in China during the POR for each applicable user category (*e.g.*, 'large industrial user,'

---

[23] Commerce explained:

> Commerce additionally requested that the GOC explain . . . how increases in labor costs, capital expenses, and transmission and distribution costs are factored into Price Proposals, and how cost element increases and final price increases were allocated across the province and across tariff end-user categories.  The GOC's refusal to answer Commerce's questions completely with respect to the relationship between the NDRC and the provinces in deriving electricity price adjustments, and its failure to explain both the derivation of the price reductions directed to the provinces by the NDRC and the derivation of the prices by the provinces themselves, leaves Commerce unable to carry out a complete specificity and financial contribution analysis.

IDM at 44.

[24] At oral argument, counsel for Fine Furniture raised *Canadian Solar, Inc. v. United States*, 23 F.4th 1372 (Fed. Cir. 2022), as "new [F]ederal [C]ircuit authority since the briefing [that] is averse [sic] to [Fine Furniture's] position."  March 2022 Oral Arg. Tr. at 132:19-22.  Counsel stated with respect to *Canadian Solar*:  "[T]he [F]ederal [C]ircuit directly looked at the Chinese electricity program and determined that Commerce's determination that it was regionally specific was upheld.  So . . . the Federal Circuit did uphold [the] CIT in that case and we do acknowledge that it is relevant and binding here."  *Id.* at 132:24-133:4.

Consol. Court No. 20-03885                                                      Page 80

and 'normal industrial and commercial user'), voltage class (*e.g.*, 1-10kv, 35kv), time

period (general, peak, normal, and valley), and basic fee (*e.g.*, 'base charge/maximum

demand') as provided by the GOC." *Id.* at 37.  Commerce then "calculated benchmark

electricity payments by multiplying consumption volumes by the benchmark electricity

rate corresponding to the user category, voltage class, and time period . . . where

applicable," before "compar[ing] the calculated benchmark payments to the actual

electricity payments made by the company during the POR." *Id.*  Commerce reasoned

that "[w]here the benchmark payments exceeded the payments made by the company,

a benefit was conferred." *Id.*

      Fine Furniture asserts that Commerce's electricity benchmark determination is

unsupported by substantial evidence and is not in accordance with law because the

"AFA benefit measurement method . . . entailed creating a mix-and-match of rates from

[[                                    ]] in China, depending on which one had the highest rate for

the specific electricity user/rate category."  Fine Furniture MJAR at 31 (citing PDM at 35-

36).  According to Fine Furniture, Commerce's decision was "nonsensical" and "imputes

electricity rates from [[      ]] different provinces in China to the same (stationary)

facility of the mandatory respondents." *Id.* at 31-32.  Fine Furniture asserts moreover

that Commerce's methodology is "contrary to law in that it is a complete abrogation of its

own regulatory obligation to identify a benchmark that represents an unsubsidized,

market price for the input."  Reply Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R.

of Consol. Pls. and Pl.-Intervenors ("Fine Furniture Reply Br.") at 19, ECF No. 62-63

(citing 19 C.F.R. § 351.511(a)(2)(ii)).  Fine Furniture concludes that Commerce is

required to "select a benchmark that represents the *unsubsidized* region," and cannot

select a benchmark that "reflect[s] a mix and match of the highest prices in various

categories and fees from different provinces." *Id.* at 20.

Commerce's selection of the electricity benchmark is supported by substantial

evidence and is in accordance with law.

Commerce determined that "[a]s a result of the GOC's refusal to provide the

requested information and unwillingness to cooperate, Commerce was unable to

determine whether the electricity rates included in the electricity schedules submitted by

the GOC were calculated based on market principles." IDM at 45. For that reason,

Commerce applied AFA to the determination of the appropriate benchmark. *Id.*

Commerce noted that "the GOC provided the provincial electrical tariff schedules,"

which Commerce relied on "as facts available." *Id.* In applying AFA, Commerce

"identified the highest rates among these schedules for each reported electrical

category and used those rates as the benchmarks in the benefit calculations." *Id.* (citing

PDM at 36-37); *see also* GOC Initial Questionnaire Response at Ex. 10 (electricity

schedules). Commerce then "calculated benchmark electricity payments by multiplying

consumption volumes by the benchmark electricity rate corresponding to the user

category, voltage class, and time period." PDM at 37.

Commerce explained that it "attempted to obtain information on how Chinese

provincial schedules are calculated and why they differ, which could have contributed to

Commerce's analysis of an appropriate benchmark for the benefit calculation in this

program." IDM at 45 (citing PDM at 23).

This Court has sustained this precise methodology on numerous occasions. For

example, in *Jiangsu Zhongji*, plaintiff claimed that "Commerce's selection led to a[n]

PUBLIC VERSION

[electricity] benchmark derived from multiple regions in which no aluminum foil producer

could logically be present at the same time."  43 CIT at __, 405 F. Supp. 3d at 1338-39.

There, the Court held that "Commerce's decision to select the highest rate was within its

lawful discretion and Zhongji provides no argument for why Commerce's selection of the

highest rate from various provinces is less reflective of the market rate for electricity

absent government interference."  *Id.* at __, 405 F. Supp. 3d at 1339 (citing *Trina Solar*,

42 CIT at __, 352 F. Supp. 3d at 1343).  Likewise, in *Trina Solar*, this Court stated:

> The GOC refused to provide certain details regarding variation of provincial
> electricity rates and whether these rates were calculated based on market
> principles.  Accordingly, Commerce can apply an adverse inference to the
> GOC's electricity rate submissions and select the highest rates for each
> electrical category and use those to set a benchmark.

42 CIT at __, 352 F. Supp. 3d at 1343 (citing 19 U.S.C. § 1677e(b); 19 C.F.R. §

351.511(a)(2)(iii)); *see also Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT

1206, 1210-12, 865 F. Supp. 2d 1254, 1260-62 (2012) (sustaining Commerce's decision

to apply AFA to set a benchmark rate equal to the highest rate reported in the provincial

price schedules for electricity).

        In sum, Commerce's determination that the provision of electricity for LTAR was

specific and Commerce's selection of the electricity benchmark are supported by

substantial evidence and are in accordance with law.

**VII.    Commerce's determination that Jiangsu Guyu's suppliers of poplar core
         sheets were authorities**

      **A.    Background**

        During the review, Commerce issued a new subsidy allegation questionnaire

requesting that mandatory respondents and their cross-owned affiliates report their

purchases of, inter alia, plywood during the POR.  PDM at 18; *see* Jiangsu Guyu NSA

Response.  In response to Commerce's new subsidy allegation questionnaire, Jiangsu

Guyu reported that its cross-owned affiliate Shunyang purchased poplar core sheets

during the POR.  PDM at 18; Jiangsu Guyu NSA Response, attach. 1 at 1.  Jiangsu

Guyu submitted also an exhibit that listed the suppliers of poplar core sheet.  Jiangsu

Guyu Second Supplemental Response, Ex. Supp. 2-4.  According to Jiangsu Guyu, this

exhibit demonstrated that Shunyang purchased its poplar core sheet from individual

farmers.  *Id.*; Pl.-Intervenors Reply Br. at 11, ECF No. 68-69.

Commerce also "sought information from the GOC that would allow [Commerce]

to determine whether the [input suppliers] are 'authorities' within the meaning of [19

U.S.C. § 1677(5)(B)]."  PDM at 19.  The GOC did not respond to Commerce's request

for information.  *Id.* at 20.  As a result, Commerce determined preliminarily that the GOC

had failed to cooperate by not acting to the best of its ability to comply with Commerce's

request regarding whether any of Jiangsu Guyu's input suppliers were "authorities."  *Id.*

Consequently, Commerce determined that an adverse inference was warranted.  *Id.*  As

AFA, Commerce concluded preliminarily that "CCP officials are present in each of

Baroque Timber's (including Riverside Plywood) and Guyu's (including Shengyu and

Shunyang) input suppliers as individual owners, managers and members of the boards

of directors, and that this gives the CCP, as the government, meaningful control over the

companies and their resources."  *Id.*  Therefore, Commerce preliminarily found that the

"the domestic producers that supplied . . . Guyu (including Shengyu and Shunyang) with

fiberboard, plywood, and veneers during the POR are 'authorities' within the meaning of

[19 U.S.C. § 1677(5)(B)]."  *Id.*

PUBLIC VERSION

In their case briefs, the GOC, Jiangsu Guyu and Fine Furniture contested

Commerce's conclusion that the individual poplar farmers were "authorities."  IDM at 26-

27.  According to the GOC, it "was never asked by Commerce to provide any

information regarding Shunyang's poplar core sheet suppliers" because "Commerce did

not make a finding that Shunyang's poplar core sheets were 'veneers[]' until the

*Preliminary Results*."  *Id.* at 26.  The GOC, Jiangsu Guyu and Fine Furniture added that

"facts on the record . . . demonstrate Shunyang's poplar core sheet suppliers are not

corporations or enterprises" but instead are "individual farmers."  *Id.* at 27.  According to

the GOC, those individual farmers are "private parties" that cannot be considered

"authorities."  *Id.*

In the Final Results, Commerce continued to find that Shunyang's suppliers of

poplar core sheets were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *Id.*

at 29.

### B.    Legal framework

19 U.S.C. § 1677e(a) governs the application of facts otherwise available.

Commerce may use facts otherwise available in reaching its determination when:

> (1) necessary information is not available on the record, or
> (2) an interested party or any other person —
>> (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
>> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . . ,
>> (C) significantly impedes a proceeding under this subtitle, or
>> (D) provides such information but the information cannot be verified as provided in [19 U.S.C. § 1677m(i)].

*Id.*  "[U]nder the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

Commerce's application of AFA is governed by § 1677e(b), which states:

If the administering authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . , the administering authority . . . in reaching the applicable determination under this subtitle . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

*Id.* § 1677e(b)(1)(A).  A subsidy is countervailable where "an authority[] provides a financial contribution" that confers a benefit and that is "specific" to "an enterprise or industry" or a group of enterprises or industries.  *Id.* § 1677(5)(B), (5A).  "[T]he term 'authority' means a government of a country or any public entity within the territory of the country."  *Id.* § 1677(5)(B).

## C.    Analysis

The court addresses whether Commerce's determination that Shunyang's suppliers of poplar sheets were "authorities" is supported by substantial evidence and is in accordance with law.

Plaintiff-intervenors raise two arguments.  First, plaintiff-intervenors argue that "no gap [in the record] exists regarding the nature and identity" of the poplar sheet suppliers because "Commerce never asked the GOC about the poplar suppliers and thus never provided the GOC with an opportunity to address whether they are 'authorities.'"  Pl.-Intervenors Reply Br. at 13.  Second, plaintiff-intervenors assert that "[t]he record establishes that Guyu purchased poplar core sheets from *private individual*

PUBLIC VERSION

*farmers*," and that "natural persons" cannot be considered "authorities" under §

1677(5)(B).  Pl.-Intervenors' Rule 56.2 Mem. in Supp. J. on Agency R. ("Dalian MJAR")

at 14-15, ECF No. 45.  The court examines each argument in turn.

> 1.  **Commerce's decision to apply AFA to its determination as to whether Shunyang's suppliers of poplar core sheets were "authorities" under § 1677(5)(B)**

Plaintiff-intervenors argue first that "Commerce's automatic use of complete AFA

in finding that [the poplar core sheet suppliers] are 'authorities' is not warranted"

because Commerce "never asked the GOC to provide information with respect to those

suppliers."  Pl.-Intervenors Reply Br. at 11.  Plaintiff-intervenors argue that neither

Commerce's initial questionnaire — issued to the GOC before Jiangsu Guyu reported

the poplar core sheet purchases — nor the final supplemental questionnaire — issued

to the GOC after Jiangsu Guyu reported the poplar core sheet purchases — requested

that the GOC provide information about the poplar core sheet suppliers.  *Id.* at 11-12.

Because Commerce "never asked the GOC about the poplar suppliers," plaintiff-

intervenors maintain that "no gap exists regarding the nature and identity of these

suppliers as private parties."  *Id.* at 13.

The court notes at the outset that the moving parties argued in their opening

briefs only that the record establishes that Shunyang purchased the poplar core sheet

from individual farmers, and that natural persons cannot be considered authorities

under § 1677(5)(B).  *See* Pl.-Intervenors MJAR; Dalian MJAR.  Plaintiff-intervenors and

Dalian did not argue until their reply briefs that Commerce failed to identify a gap in the

record prior to applying facts otherwise available in concluding that the poplar core

sheet suppliers were authorities.  *See* Pl.-Intervenors Reply Br.  Defendant argues on

this basis that plaintiff-intervenors and Dalian waived their right to raise this issue before the Court.  March 2022 Oral Arg. Tr. at 88:24-89:6.

"Arguments raised for the first time in a reply brief are not properly before this court."  *United States v. Ford Motor Co.*, 463 F.3d 1267, 1276 (Fed. Cir. 2006); *Hangzhou Ailong Metal Prods. Co. v. United States*, 47 CIT __, __, 628 F. Supp. 3d 1348, 1358-59 (2023) (holding that plaintiff waived argument raised for the first time in its reply brief).  Regardless of whether Dalian and plaintiff-intervenors waived their right to raise the issue to the court, Commerce's determination that a gap existed in the record and that the GOC failed to cooperate to the best of its ability with respect to whether the suppliers of poplar core sheet were authorities is supported by substantial evidence.

In Commerce's initial questionnaire, Commerce noted that it was investigating the provision of veneers for LTAR and sought information with respect to "input producers . . . that produced the standing timber, cut timber, [and] veneers . . . purchased by the respondent companies during the POR."  Countervailing Duty Questionnaire at II-26.  Commerce requested information from the GOC "regarding whether any individual owners, board members, or senior managers were government or CCP officials and the role of any CCP primary organization within the [input suppliers]."  IDM at 29.  Commerce requested specifically in the "Input Producer Appendix" that the GOC provide, "[f]or all input producers that are *not* majority Government-owned and that produced the standing timber, cut timber, *veneers*, formaldehyde, urea, and water purchased by the respondent companies during the POR," certain documentation, including: articles of incorporation, capital verification

Consol. Court No. 20-03885                                                            Page 88

reports, articles of groupings, company by-laws, annual reports and articles of

association.  GOC Initial Questionnaire Response at 66-67 (second emphasis supplied).

Commerce requested also that the GOC "identify any individual owners, members of

the board of directors, or senior managers who were Government or CCP *officials*

during the POR."  *Id.* at 86.  The initial questionnaire instructed:

> The GOC should respond to the following questions if any of the mandatory
> company respondents purchased the input from Chinese producers, either
> directly or through a supplier, during the POR, regardless of whether the
> respondents claim they did not use the input to produce the subject
> merchandise.    Please  coordinate  immediately  with  the  company
> respondents to obtain a complete list of each company's *input* producers,
> including the producers of inputs purchased by the respondent through a
> supplier.

Countervailing Duty Questionnaire at II-10; *see also id.* at III-13-14 (requesting that

respondents report "all of [their input] purchases during the POR").

On July 15, 2019, the GOC filed its initial questionnaire response.  The GOC did

not provide the requested information but stated that it is "unable to require the CCP, the

People's Congress, the CPPCC or the rest of [sic] entities as mentioned in the question

to provide the information as required by [Commerce], because they are not

government[] agencies."  GOC Initial Questionnaire Response at 75.  The GOC

reported also that "the suppliers of veneers of the mandatory respondents are all private

companies," and attached as an exhibit "the names and addresses of veneer suppliers

and producers reported by the mandatory respondents" at that time.  *Id.* at 65.

Then, on November 8, 2019, Jiangsu Guyu reported for the first time Shunyang's

purchases of the poplar core sheets but argued that the poplar core sheets should not

be included in the new subsidy allegations raised by AMMWF.  Jiangsu Guyu NSA

PUBLIC VERSION

Response, attach. 1 at 1-2.  Commerce then issued to Jiangsu Guyu supplemental

questionnaires requesting detailed information with respect to the suppliers for "each of

Shunyang's purchases of poplar core sheet."  Jiangsu Guyu Second Supplemental

Response at 3.

The GOC argued before Commerce that, because Commerce did not make a

finding that Shunyang's poplar core sheets were veneers until the preliminary results,

"the GOC could not provide this information [as] it was unaware that Shunyang's poplar

sheets were veneers."  IDM at 30.

As Commerce noted in its IDM, "the responsibility to coordinate and provide input

supplier information for all inputs under review is with the GOC and Jiangsu Guyu, not

Commerce," and "there is no statute or requirement that obligates Commerce to issue

multiple questionnaires to ensure that the GOC is properly coordinating its responses

with the mandatory respondents."  *Id.* at 31.

Commerce explained also that: (1) it "had provided the GOC and Jiangsu Guyu

with the definition of veneer and issued multiple questionnaires regarding Jiangsu Guyu

[sic] wood inputs and Shunyang's poplar veneer sheets"; and (2) Commerce in the initial

questionnaire "clearly stated" that the GOC should respond to the questions "if any of

the mandatory company respondents purchased the input from Chinese producers . . .

regardless of whether the respondents claim they did not use the input to produce the

subject merchandise."  *Id.* at 30.  Commerce concluded reasonably for these reasons

that "the record contains Shunyang's poplar core sheet purchases, which included its

supplier information, and the GOC had the information it needed to provide Commerce

with [the] requested input supplier information." *Id.* at 31 (citing Jiangsu Guyu NSA

Response at Ex. NSA-3).

Commerce noted moreover in the IDM that the GOC did not indicate whether it

had attempted to contact the CCP or otherwise describe the GOC's efforts to provide

the requested information despite GOC responses in previous CVD proceedings that

"demonstrate[d] that [the GOC] is, in fact, able to access information similar to what

[Commerce] requested." *Id.* at 30 (citing *High Pressure Steel Cylinders from the*

*People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77

Fed. Reg. 26,738 (Dep't of Commerce May 7, 2012) and accompanying IDM (Dep't of

Commerce Apr. 30, 2012) at 13).  Commerce continued that, if the GOC could not

provide any of the requested information with respect to the suppliers of veneers, the

GOC "should have promptly explained . . . attempts it made to obtain" the requested

information, and "proposed providing th[e] information in an alternative form." *Id.* (citing

19 U.S.C. § 1677m(c)(1)).[25]  On this basis, Commerce concluded reasonably that the

GOC failed to cooperate by not acting to the best of its ability to comply with

Commerce's request for information.

---

[25] Section 1677m(c)(1) provides:

> If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission . . . that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission . . . shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

**PUBLIC VERSION**

In sum, the GOC had the opportunity to respond to Commerce's requests for information with respect to the suppliers of the poplar core sheets but failed to do so. Accordingly, Commerce's decision to (1) apply facts otherwise available to fill the gap created by the GOC's failure to provide the requested information and (2) apply AFA based on the GOC's failure to respond to the best of its ability to Commerce's request for information is supported by substantial evidence.

> **2.    Whether Shunyang's suppliers of poplar core sheets can be considered "authorities" under § 1677(5)(B)**

Plaintiff-intervenors argue next that the suppliers of poplar core sheets cannot be considered authorities under § 1677(5)(B) because the suppliers are "farmers" and "are individuals and private natural persons."  Pl.-Intervenors MJAR at 26.  According to plaintiff-intervenors, "the questions posed by Commerce in its standard Input Producer Appendix are inapplicable to [the individual] suppliers because [the questions] are intended for 'entities' and 'companies.'"  *Id.*  Plaintiff-intervenors assert also that the Public Bodies Analysis Memoranda on which Commerce relied for its conclusion that the individual poplar farmers are authorities "do not focus on natural persons" but instead are "replete with references to enterprises and government control over them." *Id.*  Plaintiff-intervenors argue further that the statute as supported by the SAA does not permit Commerce to conclude that "natural persons" can be considered "authorities." *Id.* at 28.  Because the poplar core sheet suppliers "are not public bodies or entities," plaintiff-intervenors assert that Commerce's conclusion in this respect is unsupported by substantial evidence and is not in accordance with law.  *Id.* at 26-29.

**PUBLIC VERSION**

Commerce's conclusion that Shunyang's suppliers of poplar core sheet were "authorities" under § 1677(5)(B) is supported by substantial evidence and is in accordance with law.

Section 1677(5)(A)-(B) defines a countervailable subsidy as "the case in which an authority" provides a financial contribution that is specific and confers a benefit to the recipient.  Section 1677(5)(B) states that "the term 'authority' means a government of a country or any public entity within the territory of the country."[26]

Plaintiff-intervenors have not proffered any reason, nor is there any basis in the statute to conclude, that Commerce is precluded from determining through the application of AFA that individually owned input suppliers are "subject to government control," IDM at 31, and therefore are "authorities" under § 1677(5)(B).  "It is well established . . . that Commerce may seek the information it needs from the exporting government in a countervailing duty proceeding and, in appropriate circumstances, may invoke its authority under 19 U.S.C. § 1677e(b), even if the result is a collateral adverse effect upon a cooperating party."  *Yama Ribbons and Bows Co. v. United States*, 46 CIT __, __, 606 F. Supp. 3d 1345, 1352-53 (2022) (citing *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372-73 (Fed. Cir. 2014)).  Commerce should seek to avoid this adverse impact if relevant information exists elsewhere on the record — in this case, information with respect to the role of the CCP in Shunyang's suppliers of

---

[26] 19 U.S.C. § 1671(a)(1), which describes the conditions under which countervailing duties may be imposed, mirrors the language of § 1677(5)(B) and states that a countervailing duty may be imposed if, inter alia, "the administering authority determines that *the government of a country or any public entity within the territory of a country* is providing, directly or indirectly, a countervailable subsidy."  (emphasis supplied).

poplar core sheet. *Archer Daniels Midland Co. v. United States*, 37 CIT 760, 769, 917 F. Supp. 2d 1331, 1342 (2013).

This Court addressed a similar argument in *Yama Ribbons and Bows Co. v. United States*, 48 CIT __, __, 719 F. Supp. 3d 1388, 1396-97 (2024). There, plaintiff objected to Commerce's application of AFA to conclude that a private company input supplier was an "authority" under § 1677(5)(B). *Id.* at __, 719 F. Supp. 3d at 1396. According to plaintiff in that case, facts on the record made clear that the GOC and the CCP were "prohibited by law from interfering in the ordinary business operations and management" of private companies. *Id.* Plaintiff asserted also that there was "nothing 'on the record suggesting that CCP's involvement in a private company is sufficient to transform the company into a government authority.'" *Id.*

The Court responded that plaintiff's argument "miss[ed] the point" because "Commerce did not find as a fact that [plaintiff's] suppliers were controlled by the government." *Id.* Rather, Commerce had "used, permissibly under the circumstances, an adverse inference that the[] suppliers were subject to government control and, therefore, authorities":

> As defendant explained, "the GOC's noncooperation resulted in a gap of record information, which is necessary for Commerce's determination that [plaintiff's] input suppliers are independent from government control, and which could not be overcome by [plaintiff's] partial information.

*Id.*

Similarly, here, plaintiff-intervenors assert that the list of input suppliers that Jiangsu Guyu submitted to the record precluded Commerce from applying AFA to conclude that Jiangsu Guyu's suppliers of poplar core sheets were authorities.

However, plaintiff-intervenors do not claim that Jiangsu Guyu could have provided the information that Commerce requested from the GOC, nor have plaintiff-intervenors undermined Commerce's conclusion that the GOC failed to cooperate to the best of its ability, as described *supra* Section VII.C.1.  *See id.*; *see also Yama Ribbons*, 46 CIT at __, 606 F. Supp. 3d at 1353 (stating that plaintiff's reliance on "generalized record evidence" that could "support a finding that CCP presence did not amount to government control" was unavailing because "[Commerce's] investigative ability was hindered by the GOC's failure to cooperate on the question of a possible CCP presence in the suppliers").  For those reasons, Commerce's conclusion that Shunyang's suppliers of poplar core sheet were "authorities" is supported by substantial evidence and is in accordance with law.

## VIII.    Commerce's finding that the respondents benefited from the Export Buyer's Credit Program

### A.    Background

The Export Buyer's Credit Program ("EBCP") of the People's Republic of China Export-Import Bank ("China Export-Import Bank") is a program that extends credit at preferential rates to foreign importers to promote the export of Chinese goods.  GOC Initial Questionnaire Response, Ex. 37 ("2000 Administrative Measures of EBCP") at Art. 2; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012) and accompanying IDM (Dep't of Commerce Oct. 9, 2012) at cmt. 18; *see also SolarWorld Americas, Inc. v. United States*, 41 CIT __,

PUBLIC VERSION

__, 229 F. Supp. 3d 1362, 1363 (2017) (noting that the China Export-Import Bank

provides "preferential rates" under the EBCP); *Clearon Corp. v. United States*, 43 CIT

__, __, 359 F. Supp. 3d 1344, 1347 (2019).

During the instant review, Commerce investigated the EBCP as a countervailable

subsidy.  PDM at 23.  Commerce requested certain information from the GOC, Baroque

Timber and Jiangsu Guyu.  Commerce requested that Baroque Timber and Jiangsu

Guyu, as well as their cross-owned affiliates, report "all types of financing provided by

the China ExIm Bank," "a list of all of the customers to which [Baroque Timber and

Jiangsu Guyu] exported during the POR," the "role [the respondent] plays in assisting

[its] customers in obtaining buyer credits" and "the steps [the respondent] took to

determine that no customer used the [EBCP]."  *See, e.g.*, Jiangsu Guyu Initial

Questionnaire Response at 11-12.  Baroque Timber, Riverside Plywood and Jiangsu

Guyu provided a list of their U.S. customers, stated that none of their customers used

the EBCP and submitted in support of that statement certifications of non-use from

some, but not all, of their U.S. customers. PDM at 23-24; Jiangsu Guyu Initial

Questionnaire Response, Ex. IV-C-5 (certifications); Baroque Timber Initial

Questionnaire Response, Ex. 15c (certifications).  Baroque Timber provided customer

certifications for 60 percent of Riverside Plywood's reported customers and Jiangsu

Guyu provided customer certifications for "approximately 50 percent of its reported

customers."  PDM at 24 n.124, n.126.

Commerce explained that it had obtained information in a prior CVD proceeding

that indicated that "the GOC revised the Administrative Measures regarding this

program in 2013 [("2013 revisions")] and that the China Ex-Im Bank may disburse

**PUBLIC VERSION**

export buyer's credits directly *or through third-party partner and/or correspondent banks*." PDM at 24 (emphasis supplied); IDM at 59 (citing *Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China: Final Affirmative Determination*, 82 Fed. Reg. 8,405 (Dep't of Commerce Jan. 25, 2017) and accompanying IDM (Dep't of Commerce Jan. 17, 2017) at cmt. 17 ("*Silica Fabric IDM*"); GOC Initial Questionnaire Response at Ex. 36). Also in that prior proceeding, Commerce learned that the 2013 revisions may have eliminated "the $2 million minimum business contract requirement" that had previously governed eligibility for the EBCP. IDM at 57; *see also* 2000 Administrative Measures of the EBCP at Art. 5(i).

For those reasons, Commerce requested from the GOC in both the initial questionnaire and in a supplemental questionnaire specific information with respect to the operation of the EBCP. In particular, Commerce requested "original and translated copies of laws, regulations or other governing documents" for the EBCP, including "the 2013 Administrative Measures revisions," a sample application for the program and other documents making up the "paper trail" of a direct or indirect export credit from the China Export-Import Bank to the U.S. customers. PDM at 24; IDM at 61. Commerce requested from the GOC also "a list of all partner/correspondent banks involved in the disbursement of funds." PDM at 24. Finally, Commerce requested that the GOC "explain in detail the steps the GOC took to determine that no customer used the [EBCP]." GOC Initial Questionnaire Response at 38.

In response, the GOC provided as exhibits to its initial questionnaire response the 2000 Administrative Measures and also Detailed Implementation Rules Governing Export Buyers' Credit of the China Export-Import Bank. GOC Initial Questionnaire

**PUBLIC VERSION**

Response at Exs. 37-38.  However, the GOC declined to provide the 2013 revisions to

the EBCP, the list of partner banks or the sample application and "paper trail" of EBCP

loan documents.  IDM at 61.

In response to Commerce's request that the GOC explain in detail its method for

determining that no customer used the EBCP, the GOC "reported that the China

[Export-Import] Bank searched its database for the U.S. importers provided by the

mandatory respondents, and it did not find any of the companies listed in its database."

PDM at 24.  In a supplemental questionnaire, Commerce requested screenshots of the

database, with "a step-by-step detail of how [the GOC] determined that the Export

Buyer's Credit was not used by the listed U.S. importers."  *Id.*

Commerce determined that the screenshots that the GOC provided were

"insufficient," "incomplete" and "unusable" without the additional information that

Commerce requested.  *Id.* at 25.  Commerce found that the missing information was

"necessary and critical to [its] understanding of the program."  IDM at 57.

Commerce concluded that "the GOC withheld necessary information that was

requested of it and significantly impeded this proceeding."  *Id.* at 65.  In addition,

Commerce found that "the GOC did not act to the best of its ability in providing the

necessary information to Commerce," and, for that reason, determined that an adverse

inference was warranted in selecting from the facts otherwise available.  *Id.*  As AFA,

Commerce concluded that "under [the EBCP] the GOC bestowed a financial

contribution and provided a benefit to Baroque Timber and Jiangsu Guyu."  *Id.*

PUBLIC VERSION

### B.    Legal framework

During a CVD investigation or review, Commerce requires information from both the foreign government alleged to have provided a subsidy and the respondent companies alleged to have received the subsidy.  *See Fine Furniture*, 748 F.3d at 1369-1370.

A government's failure to provide information can constitute a failure to cooperate to the best of its ability.  *See id.* at 1368.  When a foreign government does not cooperate with Commerce's investigation, an inference adverse to the interests of the non-cooperating government respondent may collaterally affect a respondent company, even if the respondent company was otherwise cooperative.  *See id.* at 1373 ("Although it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent.").

This Court has recognized that in such circumstances the application of AFA "may adversely impact a cooperating party, although Commerce should seek to avoid such impact if relevant information exists elsewhere on the record."  *Archer Daniels*, 37 CIT at 769, 917 F. Supp. 2d at 1342.  The Court has also held that: "To apply AFA in circumstances where relevant information exists elsewhere on the record — that is, solely to deter non-cooperation or 'simply to punish' — would make the agency's determination based on an incomplete (and therefore, inaccurate) account of the record; that is a fate this court should sidestep." *Guizhou Tyre Co. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018).  "Where information has been submitted on the

record that may fill the gap such that it makes the use of AFA inappropriate, Commerce

must show that the information submitted is not reasonably verifiable before it applies

AFA." *Risen Energy, Co. v. United States*, 48 CIT __, __, 724 F. Supp. 3d 1356, 1363

(2024).

> In the context of EBCP cases, the Court has stated:

> [T]he Court has determined that to apply an adverse inference to find that
> a cooperating party benefitted from the EBCP based on the GOC's failure
> to cooperate, "Commerce must: (1) define the gap in the record explaining
> exactly what information is missing from the record necessary to verify non-
> use; (2) establish how the withheld information creates this gap by
> explaining why the information the GOC refused to give was necessary to
> verify claims of non-use; and (3) show that only the withheld information can
> fill the gap by explaining why other information, on the record or accessible
> by respondents, is insufficient or impossible to verify."

*Guizhou Tyre Co. v. United States* ("*Guizhou VI*"), 45 CIT __, __, 523 F. Supp. 3d 1312,

1361 (2021) (quoting *Jiangsu Zhongji*, 43 CIT at __, 405 F. Supp. 3d at 1333).

> Commerce practice with respect to determining usage of the EBCP has evolved

over time and in response to instructions from this Court.  Under Commerce's current

practice, Commerce continues to apply AFA for the GOC's failure to cooperate, but

"when the full universe of a respondent's U.S. customers voluntarily supplies

certifications of non-use, Commerce has determined to take the additional steps toward

possible verification despite the GOC's continued refusal to provide certain information."

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the*

*People's Republic of China: Final Results and Partial Rescission of Countervailing Duty*

*Administrative Review; 2020*, 88 Fed. Reg. 44,108 (Dep't of Commerce July 11, 2023)

and accompanying IDM (Dep't of Commerce June 29, 2023) at cmt. 1 ("*Crystalline*

*Silicon Photovoltaic Cells* IDM").  The "additional steps toward possible verification" may

include Commerce sending "supplemental questions seeking complete lending

information from the U.S. customers" and taking "steps to verify the customers'

responses where the voluntary information provided covers the full universe of financing

for all of a respondent's U.S. customers." *Id.*; *see Clearon Corp.*, 43 CIT at __, 359 F.

Supp. 3d at 1359-60 (ordering Commerce to attempt verification where respondent

submitted non-use certifications and the GOC confirmed non-use claims); *Both-Well*

*(Taizhou) Steel Fittings, Co. v. United States*, 46 CIT __, __, 557 F. Supp. 3d 1327,

1330-31, 1337 (2022) (ordering Commerce to "attempt to verify the non-use

certifications" where customers submitted them and the GOC confirmed that none of the

customers used the program); *Risen Energy Co. v. United States*, Slip Op. 23-48, 2023

WL 2890019 (CIT Apr. 11, 2023) (ordering Commerce to "attempt to verify" respondent's

submissions of non-use where half of respondent's customers comprising roughly 95%

of respondent's U.S. sales provided non-use certifications and financial records).

### C.   Analysis

The Court has applied a three-part framework to determine whether Commerce's

decision to apply an adverse inference to find that a cooperating party benefitted from

the EBCP based on the GOC's failure to cooperate is supported by substantial evidence

and is in accordance with law. *Jiangsu Zhongji*, 43 CIT at __, 405 F. Supp. 3d at 1333;

*Guizhou VI*, 45 CIT at __, 523 F. Supp. 3d at 1361; *Cooper (Kunshan) Tire Co. v. United*

*States* ("*Cooper II*"), 46 CIT __, __, 610 F. Supp. 3d 1287, 1316 (2022).  Under that

framework, Commerce is required to: (1) define the gap in the record by explaining

exactly what information is missing from the record necessary to verify non-use; (2)

establish how the withheld information creates this gap by explaining why the

information the GOC refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify. *Guizhou VI*, 45 CIT at __, 523 F. Supp. 3d at 1361.

The Court concludes that Commerce: (1) has identified the information missing from the record with respect to certain aspects of the operation of the EBCP created by the failure of the GOC to provide requested information; (2) has explained adequately the reasons that the information that the GOC refused to give was necessary to verify claims of non-use; and (3) has demonstrated the reasons that the information on the record is insufficient or impossible to verify.  For those reasons, Commerce's decision to apply AFA to determine that Baroque Timber and Jiangsu Guyu benefited from the EBCP is supported by substantial evidence.

### 1.    Whether Commerce identified the information missing from the record necessary to verify non-use

The moving parties argue that the information that Commerce deemed "missing" did not "actually create[] a gap in the record concerning usage."  Baroque Timber MJAR at 30.  These parties explain that this information "was only critical to understanding the operation of the program and not establishing usage of this program."  *Id.*  The parties explain further that the information that the GOC and respondents submitted to the record was sufficient for Commerce to conclude that neither mandatory respondent used the EBCP.  *Id.*

The court concludes that Commerce has identified sufficiently a gap in the record due to the GOC's failure to provide the requested information.

**PUBLIC VERSION**

Commerce is required to "define the gap in the record" and "explain[] exactly what information is missing from the record [that is] necessary to verify non-use." *Guizhou VI*, 45 CIT at __, 523 F. Supp. 3d at 1361 (emphasis supplied); *see also Cooper II*, 46 CIT at __, 610 F. Supp. 3d at 1304.

Commerce identified in the IDM three core categories of information that Commerce requested from the GOC and that Commerce asserted were necessary to verify non-use of the EBCP.  First, Commerce "requested a list of all partner/correspondent banks involved in the disbursement of funds" under the EBCP. IDM at 56.  Second, Commerce sought from the GOC the 2013 revisions to the EBCP. *Id.*  Third, Commerce requested a "sample application[] and other documents making up the 'paper trail' of a direct or indirect export credit from" the China Export-Import Bank. *Id.* at 61.  As to each category, Commerce determined that the GOC failed to provide the requested information.

With respect to a list of partner banks, the GOC stated that "the GOC has confirmed that neither of the mandatory company respondents applied for, received, or accrued assistance under this program during the POR, and has submitted evidence to this effect.  The GOC has no authority or right to force the Ex-Im Bank to reveal details of other transactions because those are confidential commercial information belonging to the Ex-Im Bank.  Therefore, this question is not applicable."  GOC Supplemental Response at 5.

With respect to the 2013 revisions, the GOC stated that the "2013 guidelines are internal to the bank, non-public, and not available for release" and that the GOC "has no authority or right to force the Ex-Im Bank to provide a copy of the 2013 guidelines."  *Id.*

**PUBLIC VERSION**

Consol. Court No. 20-03885                                    Page 103

In response to Commerce's request for a "sample application" along with the "application's approval" and the "agreement between the respondent's customer and the China [Export-Import] Bank," the GOC stated only that "to the best of [its] knowledge, none of the U.S. customers of the mandatory respondents or their cross-owned companies applied for, used, benefited from or accrued assistance from" the EBCP. GOC Initial Questionnaire Response at 36.  The GOC then declined to provide the requested documentation.  *Id.*

Accordingly, the court concludes that Commerce identified the information that Commerce requested and that it considered necessary to verify non-use.

The moving parties maintain that the GOC's failure to provide the 2013 revisions and the list of correspondent banks did not create a gap in the record concerning usage of the EBCP.  Baroque Timber MJAR at 30.  The moving parties assert that respondents and the GOC submitted to the record all the information that Commerce required to conclude that the respondents had not benefited from the EBCP.  *Id.*

This Court has on numerous occasions sustained Commerce's explanation that the failure of the GOC to provide the requested list of partner banks, further information with respect to the apparent elimination of the $2 million eligibility requirement and other "indicia" of China Export-Import Bank involvement created a gap of information in the record necessary to verify non-use.  *Cooper (Kunshan) Tire Co. v. United States* ("*Cooper I*"), 45 CIT __, __, 539 F. Supp. 3d 1316, 1329 (2021); *Guizhou VI*, 45 CIT at __, 523 F. Supp. 3d 1362; *Risen Energy Co.*, 48 CIT at __, 724 F. Supp. 3d 1362 (stating with respect to the missing list of partner banks that Commerce's "explanation is reasonable" and that "Commerce has supported that a gap exists"); *Fujian Yinfeng Imp*

*& Exp Trading Co. v. United States*, Slip Op. 22-107, 2022 WL 4180886, at *5 (CIT Sept.

13, 2022). Therefore, the moving parties' position that Commerce has not identified a

gap of missing information necessary to verify non-use is not persuasive.

### 2.    Necessity of the withheld information

The court turns next to whether Commerce provided an adequate explanation of

the reasons that the withheld information was necessary to verify non-use of the EBCP.

The moving parties assert that "the record of this case contains overwhelming

and consistent evidence demonstrating that Baroque's customers did not use the

EBCP," such as the partial U.S. customer certifications of non-use, Baroque Timber's

own certification that it did not assist its customers in submitting EBCP applications and

the GOC's corroboration that none of the U.S. customers of the mandatory respondents

benefited from the EBCP. Baroque Timber MJAR at 29.

Commerce explained sufficiently the reasons that the withheld information was

necessary to verify non-use.

As to the 2013 revisions, Commerce explained that information supplied by the

GOC in the Silica Fabric investigation indicated that the 2013 revisions "appear to be

significant and have impacted a major condition in the provision of loans under the

program . . . by eliminating the $2 million minimum business contract requirement

identified in the 2000 *Administrative Measures*." IDM at 57 (citing *Silica Fabric* IDM at

12, 61). Commerce continued that further information about the 2013 revisions was

"critical" to Commerce's understanding of the program:

> For instance, if the program continues to be limited to $2 million contracts
> between a mandatory respondent and its customer, this is an important
> limitation to the universe of potential loans under the program and can assist

**PUBLIC VERSION**

> us in targeting our verification of non-use.  However, if the program is no
> longer limited to $2 million contracts, this increases the difficulty of verifying
> loans without any such parameters.

*Id.* at 57-58.

"Commerce is not precluded from using threshold criteria as a method of narrowing the scope of contracts."  *Cooper I*, 45 CIT at __, 539 F. Supp. 3d at 1333.  As this Court has stated: "It is within the discretion of Commerce to determine how to verify . . . , and due deference will be given to the expertise of the agency."  *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 532, 622 F. Supp. 1071, 1082 (1985). Commerce articulated explicitly that without further information concerning the 2013 revisions to the EBCP — and in particular without further information concerning the continued existence of the $2 million threshold requirement — Commerce would be incapable of narrowing the universe of potential loans received by the respondents' U.S. customers.  IDM at 57-58; *see Cooper II*, 46 CIT at __, 610 F. Supp. 3d at 1310 (sustaining Commerce's explanation on remand of "the reasons that knowing whether the threshold information is still in place would allow Commerce to determine whether to tailor its verification and to verify reliably within its 'limited time available'").

With respect to the requested list of partner banks, Commerce explained the reasons that the missing information was required for verification of non-use. Commerce described that "based on the information obtained in the *Silica Fabric Investigation*," which was placed on the record, "the loans associated with [the EBCP] are not limited to direct disbursements through the China Ex-Im Bank."  IDM at 59 (citing GOC Initial Questionnaire Response at Ex. 36 (GOC Seventh Supplemental Response in the Silica Fabric Investigation)).  Commerce continued:

> [I]t appears that: (1) customers can open loan accounts for disbursements through this program with other banks; (2) the funds are first sent from the China Ex-Im Bank to the importer's account, which could be at the China Ex-Im Bank or other banks; and (3) these funds are then sent to the exporter's bank account. Given the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administered is necessary to verify claims of non-use.

*Id.* at 60.

Commerce elaborated that given this loan disbursement structure, "there will not necessarily be an account in the name 'China Ex-Im Bank' in the books and records (e.g., subledger, tax return, bank statements) of the U.S. customer." *Id.* at 61. Therefore, "verifying non-use of the program without knowledge of the correspondent banks would require Commerce to view the underlying documentation for *all* entries from the subledger *to attempt* to confirm the origin of each loan — *i.e.*, whether the loan was provided from the China Ex-Im Bank via an intermediary bank," which "would be an extremely onerous undertaking for any company that received more than a small number of loans." *Id.* Therefore, in this review, "Commerce was . . . explicit — without the names of the partner/correspondent banks, Commerce determined that its verification process would be futile because it would not be able to confirm non-use, even if the books and records made no mention of the China Export-Import Bank." *Cooper I*, 45 CIT at __, 539 F. Supp. 3d at 1333.

Finally, Commerce added that its "typical non-use verification procedures," such as examining specific entries from the subledger and requesting to see underlying documentation, "would be of no value" without the requested sample application and related documents because "Commerce would simply not know what to look for behind

PUBLIC VERSION

each loan in attempting to identify a loan provided by the China Ex-Im Bank via a

correspondent bank."  IDM at 61.  Commerce elaborated:

> [E]ven were Commerce to attempt to verify respondents' non-use of the
> [EBCP] . . . by examining *each* loan received by *each* of the respondents'
> U.S. customers, Commerce still would not be able to verify which loans
> were normal loans versus [EBCP] loans due to its lack of understanding of
> what underlying documentation to expect to review, and whether/how that
> documentation would indicate China Ex-Im Bank involvement.

*Id.* at 61-62; *see Fujian Yinfeng*, Slip Op. 22-107, 2022 WL 4180886, at *5 (sustaining

Commerce's explanation that "it needed to know EBCP loan documentation

requirements to look for 'indicia of China Ex-Im involvement'" because "[a]bsent an

understanding of those requirements, Commerce could not 'verify which loans were

normal loans versus EBC[P] loans'"); *Jiangsu Alcha Aluminum Co. v. United States*, 48

CIT __, __, 712 F. Supp. 3d 1376, 1389 (2024) (holding that Commerce "appropriately

drew an adverse inference" because Commerce explained that it needed, inter alia, "the

typical paper trail that a loan generates," which the GOC refused to provide).

Accordingly, the court concludes that Commerce explained the reasons that the

information that the GOC refused to provide was necessary to verify non-use of the

EBCP.

### 3. Whether Commerce explained the reason that information on the record was insufficient or impossible to verify

The court examines last whether Commerce explained adequately the reason that information on the record was insufficient or impossible to verify.

The moving parties claim that the record contains sufficient information for Commerce to make a determination of non-use, and that Commerce's position that the information is insufficient or impossible to verify is unfounded.  Baroque Timber MJAR at 35-40; Fine Furniture MJAR at 26-29.  The moving parties cite specifically screenshots of the China Export-Import Bank database submitted by the GOC and allegedly showing that respondents did not benefit from the EBCP.  Baroque Timber MJAR at 35-40; Fine Furniture MJAR at 26-29.  The moving parties raise additionally the respondents' assertions that their customers did not use the EBCP and that, if their customers were benefiting from the EBCP, the respondents would necessarily be aware.  Baroque Timber MJAR at 35-40; Fine Furniture MJAR at 26-29.  The moving parties cite also the certifications of non-use of the respondents' U.S. customers, which the moving parties assert Commerce could have accepted or verified.  Baroque Timber MJAR at 35-40; Fine Furniture MJAR at 26-29.

According to the moving parties, Commerce's position that it "could not 'accurately and effectively' verify usage of the company respondents' customers" has been "firmly, and repeatedly, refuted by the Court."  Baroque Timber MJAR at 35.  The moving parties contend that decisions of the Court require that Commerce "at least attempt to verify the certifications of non-use in this case."  *Id.* at 35-36 (quoting

**PUBLIC VERSION**

*Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 19-143, 2019 WL

6124908, at *3 (CIT Nov. 18, 2019)).[27]

        The moving parties raise finally Commerce determinations issued post-briefing in

which Commerce concluded that it could in fact verify non-use of the EBCP based on

certifications of non-use submitted by respondents' U.S. customers.  Baroque Timber

Notice of Supp. Authority, ECF No. 75; March 2022 Oral Arg. Tr. at 102:7-13.  The

moving parties assert that these determinations are contrary to Commerce's position in

the instant review that it could not verify non-use of the EBCP as a result of the GOC's

failure to respond to Commerce's request for information.  March 2022 Oral Arg. Tr. at

102:7-13.

        The court first summarizes the information on the record pertaining to non-use of

the EBCP.  First, Commerce requested in the initial questionnaire that the mandatory

respondents "discuss in detail the role" that they played "in assisting [their] customers in

obtaining buyer credits."  Countervailing Duty Questionnaire at III-13.  If the mandatory

respondents stated that none of their customers received buyer credits during the POR,

Commerce requested that the respondents "explain in detail the steps [they] took to

determine that no customer used the Buyer Credit Facility."  *Id*.

        In response, Jiangsu Guyu stated that it "has never assisted its customers in

obtaining buyer credits."  Jiangsu Guyu Initial Questionnaire Response at 12.  Jiangsu

---

[27] The moving parties argue also that Commerce should have pursued verification at the
China Export-Import Bank.  However, this Court has explained previously that access to
the China Export-Import Bank has been "repeatedly denied" and that Commerce need
not seek access to the bank to verify non-use.  *See Cooper (Kunshan) Tire Co. v.
United States*, 46 CIT __, __ n.15, 610 F Supp. 3d 1287, 1305 n.15 (2022) (collecting
cases).  The court does not address the argument further.

Guyu went on to explain that it contacted its customers, "discussed the issue with them" and "obtained the customer declarations . . . showing [that] Guyu's customers did not use buyer's credits during the POR." *Id.* Baroque Timber responded similarly that none of its or Riverside Plywood's customers used the program and that Baroque Timber and Riverside Plywood "have never been in contact with China [Export-Import Bank] regarding this program." Baroque Timber Initial Questionnaire Response at 21.

Baroque Timber then explained that:

> Riverside Plywood's and Baroque Timber's export customers could not obtain Export Buyer's Credits from China [Export-Import] Bank, or any other partner bank, without Riverside Plywoods and Baroque Timbers [sic] direct cooperation and involvement. Since neither Riverside Plwyood [sic] nor Baroque Timber have ever been approached by their customers or by China Ex-Im bank regarding an Export Buyer's Credit, they have direct knowledge that their export customers have not used this program. Nevertheless, the companies also contacted their U.S. custoemrs [sic] and confirmed that they did not use the program.

*Id.*

The GOC reported that it took the following steps to confirm that none of the customers of the mandatory respondents used the EBCP. First, the GOC received from the mandatory respondents a list of their U.S. customers. GOC Initial Questionnaire Response at 38. Then, the China Export-Import Bank searched its database, which "contains all users of the [EBCP] regardless of whether [the China Export-Import Bank] partnered with any other bank." *Id.* The GOC reported that the database search "showed no results," and in a subsequent questionnaire response provided to Commerce screenshots "of each individual search conducted by the [China Export-Import Bank] in its database for each of the U.S. customers showing, for all searches,

that '[n]o qualified records were found.'"  *Id.*; GOC Supplemental Questionnaire

Response at 6-7.

Next, the GOC explained that "whether a foreign buyer receives any loan

pursuant to export buyer's credits of the [China Export-Import] Bank normally can be

confirmed by the Chinese exporter."  GOC Initial Questionnaire Response at 38.  The

GOC asserted for that reason that "the Chinese exporter is in a position to verify and

confirm the existence, if any, of sales contracts that were supported by the [EBCP]."  *Id.*

In *Guizhou VI*, 45 CIT at __, 523 F. Supp. 3d at 1361, a case in which each of the

mandatory respondents' U.S. customers submitted certifications of non-use, this Court

concluded that Commerce "failed to articulate a reasonable explanation as to why

Commerce could not verify information on the record from respondents' customers."  In

particular, the Court noted that Commerce "failed to explain": (1) the reasons that

information about the $2 million threshold requirement and third-party partner banks

"was critical to Commerce's verification process"; and (2) the reasons that Commerce

"could not rely on information from the respondents and their customers to establish

non-use."  *Id.* at __, 523 F. Supp. 3d at 1375-76.  The Court therefore remanded to

Commerce to describe "how the missing information prevents Commerce from taking

the steps that it considers necessary to verify non-use" and "explain why the claims of

non-use are 'unverifiable' by describing step-by-step Commerce's methodology for

verifying non-use."  *Id.*

By contrast, in the instant case Commerce explained fully the reasons that

information on the record was insufficient or impossible to verify.  To start, the moving

parties' position that Commerce was required to at least attempt verification before

concluding based on AFA that respondents benefited from the EBCP is not correct.

Baroque Timber MJAR at 35-36.  This Court has held that, "in situations in which third

parties are involved, . . . Commerce need not seek third-party information due to the

unnecessary burden posed as to time constraints, accuracy and the inability to 'compel'

responses."  *Cooper II*, 46 CIT at __, 610 F. Supp. 3d at 1320 (citing *CS Wind Vietnam

Co. v. United States*, 41 CIT __, __, 219 F. Supp. 3d 1273, 1279, 1284 (2017); *Guizhou

VI*, 45 CIT at __, 523 F. Supp. 3d at 1372).  Instead, this Court has declined to require

Commerce to attempt verification in such circumstances prior to concluding that

verification is not possible or is overly burdensome.  *Guizhou VI*, 45 CIT at __, 523 F.

Supp. 3d at 1372.

Commerce addressed in the PDM the screenshots that the GOC submitted of

China Export-Import Bank database search queries.  Commerce concluded that "the

data query results for the search [were] unclear" and that there was "no way to confirm

what variables were used in the data query."  PDM at 25.  In addition, Commerce

determined that screenshots were "incomplete" because they were "not fully translated"

and:

> did not contain any information tying the database to the [ECBP], did not
> provide a trace showing the step-by-step process that the GOC took to
> obtain information showing that the respondents' customers did not
> participate in the [EBCP], did not show how the companies listed in the
> screenshots are related to purchases from either of the respondents, nor
> explain how the screenshots would be dispositive to show that the
> companies participated in the [EBCP].

*Id.*

With respect to the assertions of the GOC and the mandatory respondents that

Chinese exporters "would know whether there was an interaction between the China

Ex-Im Bank and the borrowers," Commerce concluded that "neither the GOC, nor the

respondent companies, provided enough information for Commerce to understand this

interaction or how this information would be reflected in the respondent companies' (or

their U.S. customers') books and records."  IDM at 62.

        In addition, Commerce explained in great detail its verification methods as well

as the reasons that the customer certifications of non-use could not be verified.

Commerce explained first that "usage of the program could not be confirmed at the

respondent exporters in a manner consistent with its long-standing verification

methods."  *Id.* at 52.  Commerce elaborated that "despite company certifications of non-

use," it was "not possible to determine whether export buyer's credits were received

with respect to the export of wood flooring because the potential recipients of export

buyer's credits are not limited to the customers of the company respondents, as they

may be received by third-party banks and institutions."  *Id.* at 64.  Commerce repeated

that it "would not know what indicia to look for in searching for usage or even what

records, databases, or supporting documentation [Commerce] would need to examine

to effectively conduct the verifications."  *Id.*; *see also id.* at 65 ("[W]e simply do not know

what to look for when we examine a loan to determine whether the China Ex-Im Bank

was involved, or whether the given loan was provided under the EBC program, for the

reasons explained above.").

        Commerce stated that a "careful verification" of the U.S. customers' certification

of non-use "without understanding the identity of these [partner banks] would be

extremely difficult, if not impossible."  *Id.* at 61.  Commerce continued specifically that

without the list of partner banks, the second step in its verification process — examining

**PUBLIC VERSION**

a company's subledgers for references to the party making the financial contribution —

could not demonstrate that the U.S. customers did not use the program.  *Id.*; *see also*

*supra* Section VIII.C.2.  In this way, Commerce related that examining a U.S. customer's

subledgers also would not "narrow down the company's lending to a subset of loans

likely to be the export buyer's credits."  IDM at 61.  Commerce summarized the difficulty:

> Thus, verifying non-use of the program without knowledge of the
> correspondent banks would require Commerce to view the underlying
> documentation for *all* entries from the subledger to *attempt* to confirm the
> origin of each loan — *i.e.*, whether the loan was provided from the China
> Ex-Im Bank via an intermediary bank.  This would be an extremely onerous
> undertaking for any company that received more than a small number of
> loans.

*Id.*

     Finally, Commerce reasoned that, notwithstanding its lack of knowledge of the

partner banks, even if Commerce examined each loan received by each of the

respondents' U.S. customers, "without a thorough understanding of the program,

Commerce might not recognize indicia of [China Export-Import Bank] involvement."  *Id.*

at 62.  On this point, Commerce explained that the GOC's failure to provide the 2013

revisions prevented Commerce from attaining "[a] complete understanding of the

program," which would "provide[] a 'roadmap' for the verifiers by which they can conduct

an effective verification of usage."  *Id.*  To conduct a verification of the customers without

such an understanding, Commerce found, "would amount to looking for a needle in a

haystack with the added uncertainty that Commerce might not even be able to identify

the needle when it was found."  *Id.*

     Accordingly, as outlined above, Commerce detailed step-by-step its verification

procedures and the reasons that the information that the GOC withheld prevented

**PUBLIC VERSION**

Commerce from verifying non-use of the EBCP. In addition, Commerce explained that, in the absence of the missing information from the GOC, it would not be capable of verifying non-use of the EBCP, notwithstanding the certifications of non-use submitted by certain of the U.S. customers of the mandatory respondents.

The moving parties maintain that recent Commerce determinations demonstrate that Commerce is capable of verifying non-use of the EBCP, contrary to Commerce's determination in the instant review. March 2022 Oral Arg. Tr. at 102:5-9; Baroque Timber Notice of Supp. Authority. According to the moving parties, these cases establish that Commerce could have and should have proceeded to verify the non-use certifications of the U.S. customers in the instant review. Baroque Timber Notice of Supp. Authority.

The cases on which the moving parties rely are inapposite. In recent reviews, Commerce has adopted a practice of issuing supplemental questionnaires to respondents to verify non-use where each of those respondents' U.S. customers submitted certifications of non-use of the EBCP. *Supra* Section VIII.B; *see, e.g.*, *Crystalline Silicon Photovoltaic Cells* IDM at cmt. 1.

This Court has on numerous occasions remanded to Commerce to explain the reasons that it could not verify non-use of the EBCP even where respondents' U.S. customers submitted certifications of non-use. *See, e.g.*, *Both-Well*, 46 CIT at __, 557 F. Supp. 3d at 1335 ("Put simply, Commerce fails to show that the information it seeks [from the GOC] is the only information it can use to verify the non-use certifications."); *Canadian Solar Inc. v. United States*, 45 CIT at __, __, 537 F. Supp. 3d 1380, 1401

**PUBLIC VERSION**

Consol. Court No. 20-03885                                                    Page 116

(2021) ("We conclude, as we have in the past, that Commerce has not reasonably

shown that the customer certifications are unverifiable on the record before us.").

However, as defendant notes, neither mandatory respondent in the instant review

submitted certifications of non-use from *each* of its U.S. customers.  *See* PDM at 24

n.124, n.126; Def. Br. at 38; March 2022 Oral Arg. Tr. at 105:14-19.  As this Court has

stated, "Commerce's approach to attempting verification of statements pertaining to

non-use is predicated upon the respondents voluntarily providing information on the

record that might fill the gap caused by the GOC's noncooperation."  *Cooper II*, 46 CIT

at __, 610 F. Supp. 3d at 1316.  Therefore, even had Commerce's practice existed at

the time of this review, Commerce would not have proceeded to verify the non-use

certifications by issuing to the mandatory respondents supplemental questionnaires.  *Id.*

(noting that even if Commerce had developed a practice to attempt to verify, the

practice would not apply in that case because the respondents had not submitted

certifications of non-use).  For that reason, the cases on which the moving parties rely

are inapposite.

In sum, the court concludes that Commerce's decision to apply AFA to

respondents' use of the EBCP is supported by substantial evidence.

### CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's Final

Results and Second Remand Results.  For the foregoing reasons, it is hereby

**ORDERED** that on remand Commerce is to select for examination as a

mandatory respondent Jiangsu Senmao; it is further

**PUBLIC VERSION**

Consol. Court No. 20-03885                                             Page 117

**ORDERED** that on remand Commerce reconsider its decision to include in the plywood for LTAR benchmark calculation data from HS category 4412.99; it is further

**ORDERED** that on remand Commerce either (1) permit Jiangsu Guyu an opportunity to submit to the record additional benchmark information with respect to the veneers for LTAR program; or (2) provide a more thorough explanation of Commerce's conclusion that the existing benchmark data on the record for veneers are sufficient in terms of Commerce practice, its regulations or the statute to apply to Jiangsu Guyu's poplar core sheets; it is further

**ORDERED** that Commerce shall file with the court its remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties and AMMWF shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties or AMMWF submit comments, defendant shall have 15 days from the date of filing of the last comment to submit a response.


                                        /s/      Timothy M. Reif
                                        Timothy M. Reif, Judge


Dated:    March 24, 2025
          New York, New York